## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- x

In re                                             :        **Chapter 11**
                                                  :
**BROOKS BROTHERS GROUP, INC.,** *et al.*,        :        **Case No. 20-11785 (CSS)**
                                                  :
                        Debtors.[1]               :        **(Jointly Administered)**
                                                  :
                                                  :        [Proposed] Obj. Deadline:
                                                  :        July 29, 2020 at 4:00 p.m. (ET)
                                                  :
                                                  :        [Proposed] Hearing Date:
                                                  :        August 3, 2020 at 1:00 p.m. (ET)
                                                  :
---------------------------------------------------------- x

## MOTION OF DEBTORS FOR ENTRY OF ORDERS (I) APPROVING (A) BIDDING PROCEDURES, (B) FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE HEARING, AND (C) ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) SCHEDULING AUCTION AND SALE HEARING, (III) APPROVING (A) SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

Brooks Brothers Group, Inc. ("**Brooks Brothers**") and its debtor subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):[2]

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Brooks Brothers Group, Inc. (8883); Brooks Brothers Far East Limited (N/A); BBD Holding 1, LLC (N/A), BBD Holding 2, LLC (N/A), BBDI, LLC (N/A), Brooks Brothers International, LLC (N/A); Brooks Brothers Restaurant, LLC (3846); Deconic Group LLC (0969); Golden Fleece Manufacturing Group, LLC (5649); RBA Wholesale, LLC (0986); Retail Brand Alliance Gift Card Services, LLC (1916); Retail Brand Alliance of Puerto Rico, Inc. (2147); and 696 White Plains Road, LLC (7265).  The Debtors' corporate headquarters and service address is 346 Madison Avenue, New York, New York 10017.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Marotta Declaration and the Bidding Procedures, each as defined herein.

**Preliminary Statement**

1.      The Debtors seek to maximize the value of their estates for the benefit of their creditors by conducting an auction for the sale of substantially all of their assets (the "**Assets**"). The Debtors are engaged in advanced negotiations with multiple parties with respect to a potential stalking horse bid, and file this Motion to advance the bidding process and schedule an auction to secure the highest or best bid for the benefit of their estates.

2.      Prior to the Petition Date (as defined below), the Company conducted an extensive and robust prepetition marketing and sales process that continued through the commencement of these chapter 11 cases (the "**Prepetition Sale Process**").  With the Prepetition Sale Process in mind, and in an effort to maximize value for all stakeholders, the Debtors, overseen by the Special Committee of the Board of Directors of Brooks Brothers (the "**Special Committee**"), have developed postpetition marketing, bidding and auction procedures (the "**Postpetition Sale Process**") for the orderly marketing and sale of the Debtors' business (the "**Bidding Procedures**"). The Bidding Procedures are designed to promote a competitive and robust bidding process and are intended to generate the greatest level of interest in the Debtors' businesses.

3.      The Bidding Procedures provide the Debtors with flexibility to solicit proposals, negotiate transactions, select a stalking horse bidder, hold an auction, and proceed to consummate a potential sale transaction (a "**Sale Transaction**"), all while protecting the due process rights of all interested parties and ensuring that there is a full and fair opportunity to review and consider proposed transactions.

4.       The Debtors propose to establish the following key dates and deadlines for the sale process:

| Key Event | Deadline |
|---|---|
| Deadline to Submit Bids | **August 5, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | **August 9, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Auction to be held if the Debtors receive more than one Qualified Bid | **August 10, 2020 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline to File Notice and Identities of Successful Bid(s) and Back-Up Bid(s) | **August 11, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to file objections to (i) Sale Transaction, (ii) cure costs, and/or (iii) adequate assurance of future performance | **August 13, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to reply to objections to (i) Sale Transaction, (ii) cure costs, and/or (iii) adequate assurance of future performance | **August 16, 2020 at 11:59 p.m. (prevailing Eastern Time)** |
| Sale Hearing | **August 17, 2020 (subject to the Court's availability)** |

5.       The Debtors encourage interested parties to contact the Debtors' proposed investment banker prior to the proposed deadline to submit bids.  Given the ongoing COVID-19 pandemic and the state of the Debtors' operations and financial condition, it is vital that the Debtors consummate a sale in an efficient manner.  Accordingly, the Debtors request approval of the Bidding Procedures to facilitate a potential Sale Transaction in a timely and efficient manner.

**Background**

6.       On July 8, 2020 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

3

7.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

8.    Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Stephen Marotta in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 38] (the "**Marotta Declaration**"), filed on the Petition Date.

## Jurisdiction

9.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.    Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

11.    By this Motion, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Local Rules 2002-1, 6004-1, and 9006-1, the Debtors seek the following:

i.    entry of the "**Bidding Procedures Order,**" substantially in the form attached hereto as **Exhibit A**:

4

(a)     authorizing and approving the Bidding Procedures substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**;

(b)     setting the deadline for potential bidders to submit a proposal to purchase all or part of the Debtors' businesses (the "**Bid Deadline**"), authorizing and scheduling an auction (the "**Auction**"), and scheduling a hearing with respect to the approval of the proposed sale transaction (the "**Sale Hearing**");

(c)     authorizing and approving the form and manner of notice of the sale of the Debtors' businesses, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "**Sale Notice**");

(d)     approving the procedures set forth in the Bidding Procedures Order (the "**Assumption and Assignment Procedures**") for the assumption and assignment of the Debtors' executory contracts and unexpired leases (the "**Assigned Contracts**") and the determination of the amount necessary to cure any defaults thereunder (the "**Cure Costs**");

(e)     authorizing and approving the form and manner of notice to each relevant non-Debtor counterparty to an executory contract or unexpired lease (collectively, the "**Contract Counterparties**") regarding the Debtors' potential assumption and assignment of certain executory contracts and unexpired leases of the Debtors and of the Debtors' calculation of the Cure Costs, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "**Cure Notice**");

ii.     entry of one or more orders (each, a "**Sale Order**") authorizing and approving the following:

(a)     the Sale of the Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets, with liens to attach to the proceeds of such sale(s);

(b)     the assumption and assignment of the Assigned Contracts; and

iii.     granting related relief.

5

## Prepetition Marketing Process

12.     PJ Solomon has advised the Company on a number of matters for nearly a decade.  In early 2019, the Company asked PJ Solomon to advise it on multiple strategic investment initiatives and transactions, including a potential sale (the "**Prepetition Sale Process**").  In April 2019, PJ Solomon contacted a significant number of potential domestic and international investors, including both strategic and financial investors, to solicit interest in the Company.  During this process, interested investors executed confidentiality agreements and were provided with diligence access and a Confidential Information Memorandum ("**CIM**").  A number of parties submitted indications of interest ("**IOI**").  The Debtors engaged in extensive discussions and negotiations with bidders and provided significant diligence to assist bidders in their evaluation of the Company.

13.     As the diligence process progressed from late 2019 into 2020, the impact of COVID-19 began to materialize.  As the COVID-19 pandemic rapidly intensified, the Debtors were forced to shut-down all of their North American stores on March 17, 2020.  This severely jeopardized the Debtors' ability to consummate any previously contemplated transaction.

14.     After further discussions with parties, in May 2020, PJ Solomon reached out to a number of parties that had previously executed non-disclosure agreements and had data room access, requesting that each party submit an IOI to act as a stalking horse bidder in connection with a potential chapter 11 case.  In late-May 2020, several parties submitted IOIs.

15.     Following the receipt of such IOIs, PJ Solomon negotiated extensively with the parties in an effort to drive up the value of their bids.  The Debtors continued negotiations with such parties until the Petition Date, but ran out of liquidity prior to being able to secure a value-maximizing agreement.  Accordingly, after the Petition Date, and after securing postpetition

6

financing, the Debtors continued to engage and negotiate with such parties. As of the date hereof, the Debtors are engaged in advanced negotiations with multiple parties with respect to a potential stalking horse bid, but seek the relief requested herein at this time to commence a formal postpetition bidding process to ensure they can complete their sale process in a timely manner, with the ultimate goal of maximizing value for their estates and stakeholders.

### Need for a Timely Sale Process

16.     The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable and will provide all parties with sufficient time and information to submit a bid for all or part of the Debtors' businesses. In formulating the Bidding Procedures and the time periods set forth therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process with the Debtors' available liquidity to maximize value. To that end, the Bidding Procedures are designed to encourage all prospective bidders to submit bids at the outset of these chapter 11 cases to provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

17.     The Debtors' formulation of the Bidding Procedures was also informed by the Prepetition Marketing Process. Potential bidders have had, and will, in accordance with the Bidding Procedures, continue to have access to comprehensive information prepared by the Debtors and their advisors that is compiled in an electronic data room. In light of the foregoing, the Debtors have determined that pursuing the Bidding Procedures is in the best interests of the Debtors' estates and provides interested parties with sufficient opportunity to participate.

18.     Access to postpetition financing is also critical to the Debtors' ability to operate their businesses during the Sale Process and pendency of these chapter 11 cases. After

7

extensive, arms'-length negotiations with the DIP Agent[3]), who agreed to extend the Company postpetition financing, the Debtors and the DIP Agent agreed on a timeline for the Sale Process. Accordingly, the Debtors and the DIP Agent agreed to the following Case Milestones (as defined in the DIP Order), among others:

    a.    on or before August 12, 2020, the Bankruptcy Court shall have entered the Bidding Procedures Order;

    b.    on or before August 30, 2020, the Debtors shall have entered the Sale Order; and

    c.    on or before October 4, 2020, the Debtors shall have consummated the Approved Sale (as defined in the DIP Motion).

19.    Access to the DIP Financing is critical to the Debtors' ability to continue their operations with minimal disruption on account of the commencement of their chapter 11 cases.  Failure to adhere to the Case Milestones could jeopardize the Debtors' availability under the DIP Facility, and, in turn, compromise the Sale Process and the Debtors' ability to maximize recoveries for creditors. Accordingly, the Debtors request that the Court approve the relief requested herein in accordance with the Debtors' proposed timeline to ensure continued compliance with the DIP Facility.

20.    Moreover, although there has been significant interest in acquiring the Debtors' assets to date, the complications associated with the constantly evolving COVID-19 pandemic make it unknowable at what level such interest will continue.  Thus, proceeding with the sale process on the proposed timeline will help the Debtors secure a value-maximizing sale transaction while there is active interest.

---

[3]    As defined in the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [D.I. 118] (the "**DIP Order**").

## The Bidding Procedures

A.    Overview

21.    The Bidding Procedures are designed to promote a competitive and robust sale process for the Debtors' assets and businesses.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential bidders that constitute the highest or otherwise best offers for all or parts of the Debtors' businesses on a timeline that is consistent with Case Milestones.  The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable and appropriate.  Under the proposed timeline, there will be approximately twenty-one (21) days between the filing of this Motion and the Bid Deadline (as defined in the Bidding Procedures).  Although the Debtors and their advisors have canvassed the market for over a year, any potential bidders who have not previously conducted diligence on the Company's business will have immediate access, subject to the execution of an appropriate confidentiality agreement, to a substantial body of information regarding the Debtors' assets, including information gathered based upon countless, specific due diligence requests of various petition bidders who participated in the prepetition sales process.

22.    The Bidding Procedures are attached to the Bidding Procedures Order and therefore are not restated herein in their entirety.  The Debtors will have the ability to alter the Bidding Procedures based upon the exigencies of a given situation if the Debtors determine, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with certain parties as provided in the Bidding Procedures.  Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures are highlighted in the chart below.[4]

---

[4]    To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br>Local Rule 6004-1(c)(i)(A)-(B) | **A.  Bid Deadline –** the deadline to submit a binding and irrevocable offer to acquire the Assets is **August 5, 2020 at 4:00 p.m. prevailing Eastern Time**<br><br>**B.  Potential Bidder Requirements –** To access the dataroom of the Debtors' material documents, a potential bidder (a "**Potential Bidder**") must submit:<br><br>1. Confidentiality Agreement. An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern).<br><br>2. Financial Wherewithal. Sufficient information, as reasonably determined by the Debtors, to allow the Debtors to determine that the interested party (i) has the financial wherewithal to consummate the applicable Sale Transaction and (ii) intends to access the dataroom for a purpose consistent with the Bidding Procedures.<br><br>**C.  Qualified Bid Requirements –** The Debtors, in their reasonable judgment, will determine whether such bids may qualify as Qualified Bids.<br><br>1. Identity of Bidder. A Qualified Bid must fully disclose, by their legal names, the identity of the Potential Bidder and each entity that will be participating in its bid, and the complete terms of any such participation.<br><br>2. Acquired Property. A Qualified Bid must clearly identify in writing the particular Assets the Potential Bidder seeks to acquire from the Debtors, which Qualified Bid may include less than all or substantially all of the Assets.<br><br>3. Purchase Price. A Qualified Bid must specify the price (the "**Purchase Price**") proposed to be paid for the Assets, which Purchase Price must include the sum of the Termination Payment.<br><br>4. Assumed Liabilities.  A Qualified Bid must clearly identify the particular liabilities, if any, the Bidder seeks to assume.<br><br>5. Form of Consideration.  Each Bid must indicate (a) whether it is an all-cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid and/or the assumption of liabilities and  (b) the allocation of the Purchase Price among the Assets to be acquired and the liabilities to be assumed, if applicable.<br><br>6. Credit Bid.  Persons or entities holding a perfected security interest in the Assets may, pursuant to section 363(k) of the Bankruptcy Code, seek to submit a credit bid on such Assets, to the extent permitted by applicable law, any Bankruptcy Court orders, and the documentation governing the Debtors' prepetition or postpetition secured credit facilities.<br><br>    a.  Direction Letter.  To the extent applicable, a credit bid must include a copy of the direction by the applicable lenders to the applicable agent to authorize the submission of such credit bid.<br><br>    b.  Cash Requirements.  If the credit bid is submitted for any portion of the Assets, such Bid shall include an amount sufficient to pay the Termination Payment in cash.  Each credit bid must include a commitment to provide cash consideration sufficient to pay in full all costs associated with winding down the Debtors' chapter 11 cases. |

7.  <u>Joint Bids</u>. The Debtors will be authorized to approve joint Bids, including joint credit bids, in their reasonable discretion on a case-by-case basis.

8.  <u>Deposit</u>. A Qualified Bid must be accompanied by a good faith deposit in the form of cash in an amount equal to ten percent (10%) of the Purchase Price.

    a.  A deposit is not required for the credit bid portion of such Qualified Bid.

    b.  To the extent a Qualified Bidder increases the Purchase Price before, during, or after the Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its Deposit so that it equals ten percent (10%) of the increased Purchase Price.

    c.  Each Successful Bidder's deposit (if any) shall be applied against the portion of the Purchase Price of its Successful Bid upon the consummation of the applicable Sale Transaction.

    d.  A deposit of any Qualified Bidder will be forfeited to the Debtors if (a) the Qualified Bidder attempts to modify, amend, or withdraw its Qualified Bid, except as permitted herein or with the Debtors' written consent, during the time the Qualified Bid remains binding and irrevocable or (b) the Qualified Bidder is selected as a Successful Bidder and fails to enter into the required definitive documentation or to consummate the applicable Sale Transaction in accordance with the Bidding Procedures.

9.  <u>Proposed Asset Purchase Agreement</u>. A Qualified Bid must include, in both PDF and MS-WORD format, an executed purchase agreement (the "**Proposed Purchase Agreement**"), together with a copy of the same that has been marked against the form asset purchase agreement provided to prospective bidders.

10. <u>Employee Obligations</u>. A Qualified Bid must specify (i) whether the Qualified Bidder intends to hire all of the Debtors' employees and (ii) expressly propose the treatment of the Debtors' prepetition compensation, incentive, retention, bonus or other compensatory arrangements, plans, or agreements, including, offer letters, employment agreements, consulting agreements, severance arrangements, retention bonus agreements, change in control arrangements, retiree benefits, and any other employment related agreements.

11. <u>Designation of Contracts and Leases</u>. A Qualified Bid must identify with particularity each executory contract and unexpired lease, the assumption and assignment of which is a condition to closing the applicable Sale Transaction.

12. <u>Financial Information</u>. A Qualified Bid must include the following:

    a.  A Qualified Bid must contain such financial and other information that allows the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the applicable Sale Transaction, including:

        (i)  without limitation, such financial and other information setting forth the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party,

        (ii)  current financial statements or similar financial information certified to be true and correct as of the date thereof,

        (iii)  proof of financing commitments (if needed) to close the applicable Sale Transaction (not subject to, in the Debtors' sole discretion, any unreasonable conditions),

        (iv)  contact information for verification of such information, including any financing sources, and

        (v)  any other information reasonably requested by the Debtors necessary to demonstrate that the Potential Bidder has the ability to close the applicable Sale Transaction in a timely manner.

13. <u>Representations and Warranties</u>. A Qualified Bid must include the following representations and warranties:

   a. Statement that the Potential Bidder had an opportunity to conduct all due diligence regarding the applicable Assets prior to submitting bid,

   b. Statement that the Potential Bidder relied solely upon its own due diligence in making its bid,

   c. Statement that the Potential Bidder agrees to serve as Back-Up Bidder, if its bid is selected as the second or third highest or best bid after the Successful Bid with respect to the applicable Assets,

   d. Statement that the Potential Bidder has not engaged in any collusion with respect to the submission of its bid,

   e. Statement that all proof of financial ability to consummate the applicable Sale Transaction in a timely manner and all information provided to support adequate assurance of future performance is true and correct, and

   f. Statement that the Potential Bidder agrees to be bound by the terms of the Bidding Procedures.

14. <u>Required Approvals</u>.

   a. If applicable, a statement that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and pay any related fees.

   b. If applicable, explanation or evidence of Potential Bidder's plan and ability to obtain all governmental and regulatory approvals to operate or own the Assets, including, an explanation from the bidder's legal counsel to the Debtors' legal counsel such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed Purchase Agreement.

   c. Bid is reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors in consultation with the professionals to the Committee.

15. <u>Authorization</u>. A Qualified Bid must include evidence of corporate authorization with respect to the submission, execution, and delivery of a bid, participation in the Auction, and closing the Sale Transaction(s) contemplated by the applicable Proposed Purchase Agreement.

16. <u>Other Requirements</u>.

   a. A Qualified Bidder must agree to serve as a back-up bidder if such bidder's Qualified Bid is selected as the second or third highest or best bid after the Successful Bid with respect to the applicable Assets.

   b. A Qualified Bid must be binding, unconditional, and irrevocable until the first business day following the close of any Sale Transaction(s) with the Successful Bidder(s) for the applicable Assets.

   c. Statement that the bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense  claims under section 503(b) of the Bankruptcy Code related to the bidding process.

12

|  | d. | Provide contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder. |
|  | e. | Written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the Proposed Purchase Agreement) and such other evidence of ability to consummate the transaction contemplated by the Proposed Purchase Agreement, the Bidding Procedures Order, and the Bidding Procedures, as acceptable in the Debtors' business judgment. |
|  | f. | Provide the identity of each entity that will be participating in connection with such Bid and taking ownership of the Assets and a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the Proposed Purchase Agreement |
|  | g. | Covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements. |
|  | h. | Detailed analysis of the value of any non-cash component of the bid, if any, and back-up documentation to support such value. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | 1. | The Bidding Procedures do not provide for bid protections to a stalking horse or initial bidder at this time.  The Debtors and their advisors are, however, currently in negotiations with one or more potential stalking horse bidders for the Assets (each, a "**Stalking Horse Bidder**"). To that end, in the event that the Debtors enter into an asset purchase agreement with a Stalking Horse Bidder (each, a "**Stalking Horse Agreement**"), the Debtors reserve the right, at any time prior to the bidding procedures hearing to (i) deem such Stalking Horse Agreement a Qualified Bid; (ii) designate such Stalking Horse Agreement as a baseline bid (a "**Stalking Horse Bid**"); and (iii) provide such Stalking Horse Bidder with some or all of the following bid protections: (a) a break-up fee; and/or (b) expense reimbursement (collectively, the "**Stalking Horse Bid Protections**"). |
|  | 2. | To the extent the Debtors enter into one or more Stalking Horse Agreements prior to the hearing on entry of the Bidding Procedures Order, the Debtors will (i) file a copy of the Stalking Horse Agreement, (ii) include a summary thereof in accordance with Local Rule 6004-1(b), and (iii) seek approval of the Stalking Horse Agreement and Stalking Horse Bid Protections at the bidding procedures hearing. |
| **Modification of Bidding and Auction Procedures** Local Rule 6004-1(c)(i)(D) | 1. | The Debtors may extend the Bid Deadline without further order of the Bankruptcy Court after consultation with any statutory committee appointed in the chapter 11 cases (a "**Committee**"). |
|  | 2. | The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid. |
|  | 3. | The Debtors reserve the right to adapt and may increase or decrease the Minimum Overbid Amount at any time during the Auction. |
|  | 4. | The Debtors may, in the exercise of their business judgment, adopt rules for the Auction consistent with the Bidding Procedures and the Bidding Procedures Order that the Debtors, in consultation with the Committee, reasonably determine to be appropriate to promote a competitive auction. |
|  | 5. | The Sale Hearing may be adjourned or continued to a later date by the Debtors, after consultation with the Committee, by sending notice prior to or making an announcement at |

| | |
|---|---|
| | the Sale Hearing. No further notice of any such adjournment or continuance will be required to be provided to any party. |
| | 6.  The Debtors may elect to seek approval of a Sale Transaction in advance of the Sale Hearing. To the extent the Debtors determine to do so, notice will be provided for alternative hearing dates and related timelines. |
| | 7.  The Debtors may extend the Sale Objection deadline, as the Debtors deem appropriate in the exercise of their reasonable business judgment. |
| **Closing with Alternative Backup Bidders**<br>Local Rule 6004-1(c)(i)(E) | 1.  The Debtors may identify which Qualified Bid(s) constitute the second highest or otherwise best bid(s) and, if applicable, the third highest or otherwise best bid(s) and deem such second and third highest or otherwise best bid(s) each a Back-Up Bid. |
| | 2.  Back-Up Bid(s) shall remain open and irrevocable until the earliest to occur of: |
| | a.  applicable "outside date" for consummation of the Sale Transaction set forth in the Back-Up Bid, |
| | b.  consummation of the Sale Transaction with a Successful Bidder, and |
| | c.  release of such Back-Up Bid by the Debtors in writing (such date, the "**Back-Up Bid Expiration Date**"). |
| | 3.  If a Sale Transaction with a Successful Bidder is terminated prior to the Back-Up Bid Expiration Date, the Back-Up Bidder shall be deemed a Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were a Successful Bid. |
| **Provisions Governing the Auction**<br>Local Rule 6004-1(c)(ii) | 1.  If the Debtors select a Stalking Horse Agreement and do not receive any Qualified Bids (other than the Stalking Horse Bid) for any of the Assets on the same or better terms as provided in the Stalking Horse Bid by the Bid Deadline, the Debtors will not conduct the Auction and shall file a notice with the Bankruptcy Court indicating that the Auction has been cancelled. The Debtors shall also publish such notice on the website of their claims and noticing agent, Prime Clerk. If no other Qualified Bid is received, but a Stalking Horse Agreement is entered into, the Stalking Horse Bidder shall be deemed the Successful Bidder and the Stalking Horse Bid shall be deemed a Successful Bid. |
| | 2.  If the Debtors receive any Qualified Bids (other than the Stalking Horse Bid), the Debtors will conduct the Auction on August 11, 2020 beginning at 10:00 a.m. (prevailing Eastern Time), or such other date as may be determined by the Debtors in consultation with counsel to the Committee, either (i) at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, or (ii) virtually pursuant to procedures to be timely filed on the Bankruptcy Court's docket.  The Auction will be conducted openly and shall be transcribed or recorded. |
| | **Participants and Attendees**:<br>A.  Only Qualified Bidders will be eligible to participate in the Auction. |
| | B.  Professionals and/or other representatives of the Debtors and of any official committee of unsecured creditors shall be permitted to attend and observe the Auction. |

C.  Qualified Bidder(s) must confirm on record that they have not engaged in any collusion and that its Qualified Bid represents a binding, good faith, bona fide offer.

**Auction Procedures**:
A.  <u>Open Auction</u>. The Auction will be transcribed or recorded.

B.  <u>Baseline Bids</u>.  Bidding for the Assets will start with the highest or otherwise best Purchase Price and/or terms received as determined by the Debtors in their sole discretion.

C.  <u>Minimum Overbid</u>.  Bidding shall begin in the amount of the Minimum Overbid Amount.  The Debtors have the right to increase or decrease the Minimum Overbid Amount at any time during the Auction.

D.  <u>Disclosure of Bids</u>. All material terms of each Qualified Bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders.

## Assumption and Assignment Procedures

23.     The Assumption and Assignment Procedures set forth in the Bidding Procedures Order will, among other things, govern the Debtors' provision of notice to all Contract Counterparties of Cure Costs in the event the Debtors decide to transfer such contracts in connection with a Sale Transaction.  The Debtors will file the Cure Notice with the Court and serve the Cure Notice on the Contract Counterparties at least seven (7) days before the Sale Objection Deadline.

24.     Objections to the Cure Costs set forth on the Cure Notice (a "**Cure Objection**") and provision of adequate assurance of future performance (an "**Adequate Assurance Objection**") must:  (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; (v) be filed with the Court and be served the Objection Notice Parties (as defined in the Cure Notice) by the deadline provided in the applicable Cure Notice.

15

**Approval of the Relief Requested Is Warranted and in**
**the Best Interests of the Debtors and Their Economic Stakeholders**

**A.      The Bidding Procedures are Fair and Reasonable**

25.      The Bidding Procedures are designed to promote the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate.  *See Burtch v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor had fiduciary duty to maximize and protect value of estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets").

26.      The Bidding Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Debtors' business.  The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offer reasonably available for the Debtors' business.  Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction, if necessary, in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Sale Transaction.  The Bidding Procedures provide the Debtors with an adequate opportunity to

16

consider competing bids and to select the highest or otherwise best offers for the completion of a Sale Transaction.

27.      Moreover, an orderly and expeditious sale process is critical to preserve and realize the Debtors' going concern value and maximize recoveries for the Debtors' stakeholders.  In formulating the Bidding Procedures, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process.  The Bidding Procedures provide for the marketing of the Debtors' business and for the consummation of a Sale Transaction.

**B.      Assumption and Assignment of Assigned Contracts Should be Approved**

28.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and may only be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

29.      The assumption of the Assigned Contracts in connection with a Sale Transaction is an exercise of the Debtors' sound business judgment because the Assigned

17

Contracts are necessary to operate the Debtors' business and, as such, are essential to obtaining the highest or otherwise best offer for the Debtors' business. Moreover, the Assigned Contracts will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bidding Procedures Order, which will be reviewed by the Debtors' key stakeholders. Accordingly, the Debtors' assumption of the Assigned Contracts is an exercise of sound business judgment and should be approved.

30.    The consummation of a Sale Transaction, which will involve the assignment of the Assigned Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court and serve on each Contract Counterparty, the Cure Notice indicating the Debtors' calculation of the Cure Cost for each such contract. The Contract Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder, including the proposed Cure Costs.

31.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

32.     As set forth in the Bidding Procedures, for a bid to qualify as a "Qualified Bid," a Potential Bidder must information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Assigned Contracts (the "**Adequate Assurance Information**"). The Debtors will provide Adequate Assurance Information to all counterparties to the Assigned Contracts and counterparties will have an opportunity to file an Adequate Assurance Objection in advance of the Sale Hearing. Based on the foregoing, the Debtors' assumption and assignment of the Assigned Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

33.     In addition, to facilitate the assumption and assignment of the Assigned Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Assigned Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[5]

---

[5]     Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease,

C.    **The Proposed Sale**

34.    Ample authority exists for approval of a Sale Transaction.  Section 363 of the Bankruptcy Code provides, in relevant part, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).

35.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:  (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) and whether the parties have acted in good faith.  *See In re Decora Indus., Inc.*, Case No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the

---

the trustee may assign such contract or lease[.]"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkcom*, 488 A.2d 858, 872 (Del. 1985)).

### a. Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale

36.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (recognizing that paramount goal of any proposed sale of property of estate is to maximize value).

37.     A strong business justification exits for the proposed Sale Transaction. An orderly but expeditious sale of the Assets is critical to both preserving and realizing the Company's going-concern value and maximizing recovery for the Debtors' economic stakeholders and also is required under the express terms of the DIP Credit Agreement.

### b. The Proposed Sale Transaction Will Produce a Fair and Reasonable Purchase Price for the Assets

38.     As set forth above, the Debtors believe that a Sale Transaction  will produce a fair and reasonable purchase price for the Assets.  The Bidding Procedures were carefully designed to ensure that the Auction, if necessary, will yield the maximum value for the Debtors' estates and creditors.  The Bidding Procedures allow all parties in interest an opportunity to conduct in-depth diligence.  The Bidding Procedures also provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors and their economic stakeholders.  The Bidding Procedures clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids.

In addition, the Bidding Procedures are prudently designed to stimulate bidding on as many of the Assets as possible. Finally, compliance with the Bidding Procedures and the Bidding Procedures Order will provide a basis for the Court to find that no Sale Transaction constitutes a fraudulent transfer because the purchase price represents reasonably equivalent value and is fair and reasonable.

### c.   The Bidding Procedures Ensure that the Proposed Sale Transaction Will Be Consummated in Good Faith

39.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 3d Cir. 1986). *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

40.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process to allow the Debtors to obtain the highest or otherwise best offer for the sale of the Assets. Any sale agreement entered into between

22

the Debtors and any Successful Bidder at the Auction will be negotiated at arms'-length and in good faith.  Accordingly, the Debtors seek a finding that each Successful Bidder at the Auction is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

41.    In light of the foregoing, the Debtors have demonstrated that the Sale Transaction (or higher or better bids) is a sound exercise of the Debtors' business judgment and should be approved.

**D.    Sale Free and Clear of Liens, Claims, Interests, and Encumbrances**

42.    In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the Sale Transaction.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

a.    Applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.    such entity consents;

c.    such interest is a lien at the price at which such property is to be sold is greater than the value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions

are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

43.    The Debtors submit that the sale of the Assets free and clear of liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  Any lien holder will be adequately protected by having its lien attach to the proceeds of the Sale Transaction, subject to any claims and defenses that the Debtors may have with respect thereto.  Accordingly, the Debtors request that the Court authorize the Debtors to sell the Assets free and clear of any liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

### Waiver of Bankruptcy Rules 6004(h) 6006(d)

44.    The Debtors request waivers of the fourteen-day stay requirements under Bankruptcy Rules 6004(h) and 6006(d).  Delays in closing a Sale Transaction could risk the Debtors defaulting under the DIP Facility.  Accordingly, the Debtors request that each Sale Order approving a Sale Transaction be effective immediately upon entry of such order and that the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

### Notice

45.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney's Office for the District of Delaware; (vi) the United States Attorney General/Antitrust Division of the Department of Justice; (vii) all persons and entities known by the Debtors to have expressed an interest to the Debtors in a transaction involving any material portion of the Assets during the past twelve (12) months, including any person or entity that has submitted a bid for any material portion of the Assets;

(viii) counsel to any statutory committee appointed in these chapter 11 cases;  (ix) all persons and entities known or reasonably believed to have asserted a lien, claim, interest, or encumbrance with respect to any of the Assets; (x) all equity holders; (xi) all applicable state and local taxing authorities; (xii) the offices of the attorneys general for the states in which the Debtors operate; (xiii) the Banks; and (xiv) all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (the "**Sale Notice Parties**").  The Debtors respectfully submit that no further notice is required.

46.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

[*Page Intentionally Left Blank*]

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: July 15, 2020
      Wilmington, Delaware

/s/ Christopher M. De Lillo
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
Sarah E. Silveira (No. 6580)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:      collins@rlf.com
              shapiro@rlf.com
              haywood@rlf.com
              delillo@rlf.com
              silveira@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Garrett A. Fail (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:   (212) 310-8007
E-mail:      garrett.fail@weil.com
              davidj.cohen@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

26