**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
------------------------------------------------------------- x
                                                              :
In re                                                         :       Chapter 11
                                                              :
BROOKS BROTHERS GROUP, INC., et al.,                          :       Case No. 20–11785 (CSS)
                                                              :
                              Debtors.¹                       :       (Jointly Administered)
                                                              :
------------------------------------------------------------- x       Re: D.I. 154
```

**SUPPLEMENT TO MOTION OF DEBTORS FOR ENTRY OF
ORDERS (I) APPROVING (A) BIDDING PROCEDURES, (B) FORM
AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE HEARING, AND
(C) ASSUMPTION AND ASSIGNMENT PROCEDURES, (II) SCHEDULING AUCTION
AND SALE HEARING, (III) APPROVING (A) SALE OF SUBSTANTIALLY ALL OF
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES, AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

        1.      Brooks Brothers Group, Inc. ("**Brooks Brothers**") and its debtor affiliates,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

the "**Debtors**"), hereby file this supplement (the "**Supplement**") to the *Motion of Debtors for

Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form and Manner of Notice of Sale,

Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Scheduling

Auction and Sale Hearing, (III) Approving (A) Sale of Substantially All of Debtors' Assets Free

and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of*

---

¹    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Brooks Brothers Group, Inc. (8883); Brooks Brothers Far East Limited (N/A); BBD Holding 1, LLC (N/A), BBD Holding 2, LLC (N/A), BBDI, LLC (N/A), Brooks Brothers International, LLC (N/A); Brooks Brothers Restaurant, LLC (3846); Deconic Group LLC (0969); Golden Fleece Manufacturing Group, LLC (5649); RBA Wholesale, LLC (0986); Retail Brand Alliance Gift Card Services, LLC (1916); Retail Brand Alliance of Puerto Rico, Inc. (2147); and 696 White Plains Road, LLC (7265). The Debtors' corporate headquarters and service address is 346 Madison Avenue, New York, New York 10017.

*Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* (the "**Motion**")

[D.I. No. 154].[2]

2.    As set forth in the Motion, the Debtors indicated that they were seeking a stalking horse purchaser for all or a portion of their Assets.  Subsequent to the filing of the Motion, the Debtors have identified a stalking horse for the Acquired Assets (as defined herein) and hereby file this Supplement to the Motion seeking approval of the selection of the Stalking Horse Bidder (as defined herein) and related relief as fully set forth herein.  In further support of the Motion and the Supplement, the Debtors respectfully state as follows:

### Selection of the Stalking Horse Bidder

3.    As set forth in the Motion, since the Petition Date, the Debtors have been engaged in discussions with multiple bidders with respect to a potential stalking horse agreement. After the Motion was filed, the Debtors continued such negotiations, and ultimately selected the highest and best bidder to serve as a going-concern stalking horse bidder.

4.    On July 23, 2020, the Debtors entered into that certain *Asset Purchase Agreement* (the "**Stalking Horse Agreement**") by and among Brooks Brothers, 696 White Plains Road, LLC, Brooks Brothers International, LLC, Brooks Brothers Restaurant, LLC, RBA Wholesale, LLC, Retail Brand Alliance Gift Card Services, LLC, Retail Brand Alliance Of Puerto Rico, Inc., Brooks Brothers Canada Ltd., BBD Holding 1, LLC, BBD Holding 2, LLC, and BBDI, LLC (each of the foregoing a "**Seller**" and, collectively, "**Sellers**") and SPARC Group LLC (the "**Stalking Horse Bidder**," or "**Buyer**"), a copy of which is attached hereto as **Exhibit A**, and which agreement shall serve as the stalking horse agreement for the Acquired Assets at the Auction

---

[2]    Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion or the Stalking Horse Agreement (as defined herein), as applicable.

(to the extent the Debtors receive another Qualified Bid for such Acquired Assets prior to the Bid

Deadline). The Stalking Horse Agreement provides for consideration for the Acquired Assets of

(i) an aggregate Dollar amount equal to (A) $305,000,000, *minus* (B) the amount of the Credit Bid

(if any), *plus* (C) the Estimated Inventory Adjustment Amount, *minus* (D) the Customer Deposit

Balance, (ii) at the option of the DIP Lenders, an aggregate credit bid of all or any portion of the

DIP Obligations, and (iii) Buyer's assumption of the Assumed Liabilities.

5.    In accordance with Local Rule 6004-1, the chart below summarizes the

material terms of the Stalking Horse Agreement.[3]

| MATERIAL TERMS OF THE STALKING HORSE AGREEMENT[4] | |
|---|---|
| **Purchase Price** | The consideration shall be (i) an aggregate Dollar amount equal to (a) $305,000,000, minus (b) the amount of the Credit Bid (if any), plus (c) the Estimated Inventory Adjustment Amount, minus (d) the Customer Deposit Balance (such amount, the "**Closing Date Purchase Price**"), (ii) at the option of the DIP Lenders, an aggregate credit bid of all or any portion of the DIP Obligations (as defined in the DIP Order) (the "**Credit Bid**" which, together with the Closing Date Purchase Price, as adjusted pursuant to Section 2.7, shall be the "**Purchase Price**") and (iii) Buyer's assumption of the Assumed Liabilities.<br><br>*See* Stalking Horse Agreement § 2.3 |
| **Acquired Assets** | The Acquired Assets are all of Sellers' right, title and interest, in and to all of the properties, rights, interests and other tangible and intangible assets of Sellers used in, held for use in, or relating to the Business, including, without limitation:<br><br>a.   the Inventory (other than Excluded Inventory);<br><br>b.   the Furnishings and Equipment (other than Excluded Furnishings and Equipment);<br><br>c.   the Owned Real Property and the Assumed Leases, together with (to the extent of Sellers' interest therein) the buildings, fixtures and |

---

[3]    To the extent that there is any inconsistency between the terms of the Stalking Horse Agreement and the summary of such terms in this Supplement, the terms of the Stalking Horse Agreement shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

[4]    All references to sections or schedules in this summary refer to the Stalking Horse Agreement, unless otherwise specified.

improvements located on or attached to the underlying real property, and all rights arising thereunder, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, and with respect to the Leases, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases;

d.   all rights and benefits under the Transferred Contracts;

e.   all Permits of Sellers, to the extent transferable;

f.   all prepaid expenses of any Seller, including deposits, security deposits, merchant deposits, prepaid rent and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases and, to the extent transferable, other deposits relating to the Stores under any of the Transferred Contracts;

g.   the Store Cash as of the Closing;

h.   all books and records, including files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records of any Seller used in, held for use in, or relating to the Business, the Acquired Assets or the Assumed Liabilities, excluding (for the avoidance of doubt) Customer Data;

i.   all marketing, advertising and promotional materials and product samples and designs, in each case that do not exclusively relate to the Excluded Trademarks;

j.   all goodwill, customer and referral relationship, other intangible property and all privileges relating to, arising from or associated with the Business or the Acquired Assets, in each case that do not exclusively relate to the Excluded Trademarks;

k.   all personal property and interests therein, including machinery, equipment, furniture, office equipment, communications equipment, information technology systems, computer systems, hardware, vehicles, spare and replacement parts, fuel and other tangible personal property;

l.   all of the equity interests of Sellers' Subsidiaries listed on Schedule 1.1(a);

m.   all assets, rights and properties of or relating to any Assumed Employee Benefit Plan;

n.   all Intellectual Property owned or purported to be owned by Sellers;

o.   all internet domain names, social media accounts, profiles, pages, feeds, registrations and other online presences owned or purported to

WEIL:\97562329\8\30950.0070

be owned by Sellers, in each case other than those exclusively relating to the Excluded Trademarks;

p.  all software, computer programs, computer code, and related programmers' annotations, documentation and notes, in each case owned or controlled by Sellers;

q.  all of Sellers' rights of publicity and all similar rights, including all commercial merchandising rights, in each case other than those exclusively relating to the Excluded Trademarks;

r.  product designs, design rights, tech packs, artwork, archival materials and advertising materials, copy, commercials, images and artwork owned by any Seller, or in which any Seller has any interest or right, in each case that do not exclusively relate to the Excluded Trademarks;

s.  royalty payments and licensing receivables generated in connection with the Intellectual Property Licenses attributable to the period from and after the Closing, in each case other than royalty payments generated exclusively by the Excluded Trademarks, and in each case where the allocation of the royalty payments and licensing receivables between Buyer and Sellers shall be determined in accordance with Schedule 1.1(b);

t.  all Sellers' telephone, fax numbers and email addresses;

u.  all Intellectual Property Licenses granted by the Sellers or their respective Subsidiaries to third parties (including the JVs), other than Intellectual Property Licenses exclusively related to Excluded Trademarks;

v.  all customer data and information derived from any purchases at the Stores, through the E-Commerce Platform or through any other platform or branded loyalty promotion programs (collectively, "**Customer Data**"), provided such information is owned by Sellers or their respective Subsidiaries and solely to the extent permitted by the Bankruptcy Code, applicable Law, and Sellers' contractual obligations and respective privacy policies or notices in effect at the time of collection of such information;

w.  financial, marketing and business data, pricing and cost information, business and marketing plans, servers, offsite and backup storage, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of any Seller in whatever media retained or stored, including computer programs and disks, in each case used in, held for use in, or relating to the Business, the Acquired Assets or the Assumed Liabilities, including files in the possession of or under the control of Sellers;

WEIL:\97562329\8\30950.0070

| | |
|---|---|
| | x. (i) insurance proceeds received by Sellers following the Closing Date (or that are received prior to the Closing) that were specifically paid in respect of losses incurred in respect of any individual Acquired Assets acquired by Buyer hereunder and (ii) insurance awards received by Sellers following the Closing Date (or that are received prior to the Closing) that were specifically paid in respect of losses incurred in respect of any individual Acquired Assets acquired by Buyer hereunder, in each case of clauses (i) and (ii) in respect of which such Acquired Assets have not been remediated to their form immediately prior to the loss incurring event by Sellers or their Affiliates prior to Closing; <br><br> y. any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset or Tax receivable of or with respect to any Assumed Taxes; <br><br> z. to the extent transferable, all third-party warranties, guarantees, refunds, rights of recovery, rights of set-off or counter-claim and rights of recoupment of every kind and nature for the benefit of, or enforceable by, any Seller in each case to the extent arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities; <br><br> aa. all tangible and intangible assets included in the E-Commerce Platform or any similar e-commerce platform owned, operated, or controlled by any Seller or Subsidiary thereof; provided that to the extent any such assets include rights to which Sellers or any of their respective Subsidiaries are entitled pursuant to any Contract, such rights shall only be included in the Acquired Assets if such Contract is a Transferred Contract, and excluding (for the avoidance of doubt) Customer Data; <br><br> bb. the Purchased Actions; and <br><br> cc. any accounts receivable of Sellers which consist of accounts payable of any Designated Foreign Subsidiary (other than any JV) the equity interests of which are sold, assigned or transferred in accordance with Section 6.11 or any Transferred Entity, other than accounts payable of any such Designated Foreign Subsidiary or Transferred Entity permitted to be paid in accordance with Section 5.2(a)(II) or (III). <br><br> provided, however, notwithstanding anything to the contrary set forth above, the Acquired Assets shall not include any Excluded Assets. <br><br> *See* Stalking Horse Agreement §§ 1.1 (definition of "**Acquired Assets**"); 2.1 |
| **Assumed Liabilities** | The Assumed Liabilities means only the following Liabilities: <br><br> a. all Liabilities under the Assumed Leases and Transferred Contracts solely to the extent such Liabilities arise from and after the Closing Date; |

WEIL:\97562329\8\30950.0070

| | |
|---|---|
| | b.  all Buyer Cure Costs;<br><br>c.  all Assumed Taxes and all Transfer Taxes to be borne by Buyer pursuant to Section 6.4(a);<br><br>d.  all accounts payable relating to any Inventory ordered upon the written request of Buyer following the Petition Date and delivered following the Closing Date (the "**New Inventory**");<br><br>e.  all Liabilities to the extent relating to or arising out of the ownership, possession, operation or use of any Acquired Assets, in each case from and after the Closing;<br><br>f.  all Liabilities related to an Assumed Employee Benefit Plan (including all assets, trusts, insurance policies and administration service contracts related thereto) arising on or after the Closing and all Liabilities which are expressly assumed pursuant to Section 6.3;<br><br>g.  all Liabilities related to the Owned Real Properties solely to the extent such Liabilities arise from and after the Closing, including any Permitted Post-Closing Liens to which they are subject;<br><br>h.  all Liabilities relating to or arising out of honoring any of the items described in clause (a) of the definition of Gift Cards (as defined in the Stalking Horse Agreement) issued before Closing and presented to Buyer or its Affiliates for redemption after Closing; and<br><br>i.  any Liabilities arising from Buyer's employment of the Transferred Employees after the Closing, including those Liabilities which are expressly assumed pursuant to Section 6.3.<br><br>*See* Stalking Horse Agreement §§ 1.1 (definition of "**Assumed Liabilities**"); 2.1 |
| **Sale to Insider**<br>Local Rule 6004-1(b)(iv)(A) | Buyer is not an insider of the Debtors. |
| **Agreements with Management or Key Employees**<br>Local Rule 6004-1(b)(iv)(B) | None. |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | None. |
| **Private Sale/No Competitive Bidding**<br>Local Rule 6004-1(b)(iv)(D) | The Stalking Horse Agreement contemplates an auction.<br><br>*See* Stalking Horse Agreement § 5.4(e) |

WEIL:\97562329\8\30950.0070

| | |
|---|---|
| **Closing and Other Deadlines**<br>Local Rule 6004-1(b)(iv)(E) | Either Party may terminate the Stalking Horse Agreement if the Closing shall not have occurred prior to October 4, 2020 (the "**Outside Date**"); provided, however, that if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order or the condition to Closing set forth in <u>Section 7.1(e)</u> of the Stalking Horse Agreement (all applicable waiting periods under any Antitrust Laws shall have expired or otherwise been terminated) remains unsatisfied or not waived and if all other conditions to the respective obligations of the Parties to close that are capable of being fulfilled by the Outside Date shall have been so fulfilled or waived, then no Party may terminate the Stalking Horse Agreement pursuant to <u>Section 8.1(b)(ii)</u> thereof prior to October 20, 2020; provided, further, that if the Closing shall not have occurred on or before the Outside Date primarily due to a material breach of any representations, warranties, covenants or agreements contained in the Stalking Horse Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to Section 8.1(b)(ii) of the Stalking Horse Agreement.<br><br>Further, Sellers shall comply with the following timeline:<br><br>a.  No later than August 12, 2020, Sellers shall obtain entry of the DIP Final Order;<br><br>b.  No later than August 12, 2020, Sellers shall obtain entry of the Bidding Procedures Order;<br><br>c.  No later than August 20, 2020, the Auction (if necessary) shall have been held pursuant to the Bidding Procedures Order;<br><br>d.  No later than August 27, 2020, the Bankruptcy Court shall have held the Sale Hearing to consider entry of the Sale Order; and<br><br>e.  No later than August 30, 2020, Sellers shall obtain entry by the Bankruptcy Court of the Sale Order.<br><br>*See* Stalking Horse Agreement §§ , 5.4(d), 8.1(b)(ii) |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | Upon execution, the Buyer shall immediately deposit with the Escrow Agent the amount of $30.5 million by wire transfer of immediately available funds (the "**Escrow Amount**").  If the Closing occurs, the Escrow Amount, together with all accrued investment income thereon, if any, shall be applied towards the Purchase Price payable by Buyer to Sellers under Section 2.3(a) of the Stalking Horse Agreement and delivered to Sellers at Closing.  If the Stalking Horse Agreement is terminated by Sellers pursuant to Section 8.1(d), the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers.  If the Stalking Horse Agreement is terminated for any reason other than by Sellers pursuant to Section 8.1(d) of the Stalking Horse Agreement, the Escrow Amount, together with all accrued |

| | |
|---|---|
| | investment income thereon, if any, shall be returned to Buyer within three (3) Business Days of such termination.<br><br>*See* Stalking Horse Agreement § 2.3(b) |
| **Interim Arrangements with Stalking Horse Bidder**<br>Local Rule 6004-1(b)(iv)(G) | None. |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | None. |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | None. |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | Post-Closing, upon request by any Party (the "**Requesting Party**"), the other Parties will permit the Requesting Party and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of such other Party, to all premises, properties, personnel, books and records, and Contracts or Leases of such Party for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations under the Stalking Horse Agreement or any of the Related Agreements, (c) complying with the requirements of any Governmental Authority or (d) otherwise providing such reasonable assistance and cooperation as may be reasonably requested by Buyer from time to time to facilitate the transition of the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law (it being agreed that each such Person shall use commercially reasonable efforts to cause such access or information to be provided in a manner that does not cause such waiver or violation as set forth in the foregoing clauses (i) and (ii), or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations. Buyer agrees to maintain the files or records which are contemplated by the first sentence of Section 6.2 of the Stalking Horse Agreement in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing.<br><br>*See* Stalking Horse Agreement § 6.2 |
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | Certain avoidance actions related to the Business shall be sold as Acquired Assets.<br><br>*See* Stalking Horse Agreement § 1.1 (definition of "**Purchased Actions**") |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | Upon the Closing, Buyer and its Affiliates shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to any Seller, including, a "successor employer" for the purposes of the IRC, ERISA or other applicable Laws; |

WEIL:\97562329\8\30950.0070

| | |
|---|---|
| | (b) have any responsibility or Liability for any obligations of any Seller, or any Affiliate of any Seller based on any theory of successor or similar theories of Liability; (c) have, de facto or otherwise, merged with or into any Seller; (d) be an alter ego or a mere continuation or substantial continuation of any Seller (and there is no continuity of enterprise between Buyer and any Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, Tax, COBRA, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to any Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any Seller or its estate. *See* Stalking Horse Agreement § 6.9 |
| **Sale Free and Clear of Unexpired Leases** Local Rule 6004-1(b)(iv)(M) | None. |
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | The consideration shall be (i) an aggregate Dollar amount equal to (a) $305,000,000, minus (b) the amount of the Credit Bid (if any), plus (c) the Estimated Inventory Adjustment Amount, minus (d) the Customer Deposit Balance, (ii) at the option of the DIP Lenders, an aggregate credit bid of all or any portion of the DIP Obligations, and (iii) Buyer's assumption of the Assumed Liabilities. *See* Stalking Horse Agreement § 2.3(a) |
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | The Debtors request waivers of the fourteen-day stay requirements under Bankruptcy Rules 6004(h) and 6006(d) and that the Sale Order be effective immediately upon entry. *See* Motion ¶ 44 |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder** Local Rule 6004-1(c)(i)(C) | Subject to entry of the Bidding Procedures Order and those conditions specified in the Stalking Horse Agreement, including those conditions contained in Section 5.4 thereof, the Stalking Horse Bidder shall be entitled to payment of (i) a Break-Up Fee in the amount of 3% of $305,000,000 and (ii) Expense Reimbursement up to $1,000,000. *See* Stalking Horse Agreement §1.1 and §5.4. |

## Bidding Procedures

6.      The Bidding Procedures remain substantially the same as set forth in the Motion, but have been revised to (i) reflect the selection of the Stalking Horse Bidder, and (ii) revise the proposed schedule to address the Court's availability, as reflected in the proposed Bidding Procedures attached hereto as **Exhibit B** and the blackline against the Bidding Procedures filed with the Motion attached hereto as **Exhibit C** and the revised Bidding Procedures Order,

which is attached hereto as **Exhibit D**, along with a blackline against the Bidding Procedures Order

filed with the Motion attached hereto as **Exhibit E**. The bases for approval of the Bidding

Procedures are fully set forth in the Motion.  The revised proposed schedule is set forth below.

| Key Event | Deadline |
|---|---|
| Deadline to Submit Bids | **August 5, 2020 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | **August 6, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Auction to be Held if the Debtors Receive More Than One Qualified Bid | **August 7, 2020 at 10:00 a.m. (prevailing Eastern Time)** |
| Deadline to File Objections to Sale Transaction | **August 7, 2020 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to (i) File Notice and Identities of Successful Bid(s) and Back-Up Bid(s) and (ii) Provide Affected Counterparties With the Successful Bidder's Proposed Form of Adequate Assurance of Future Performance With Respect to Proposed Assigned Contracts, if Applicable | **August 9, 2020 at 4:00 p.m. (prevailing Eastern Time) or as soon as is practicable after the Auction** |
| Deadline to File Objections to (i) Identity of Successful Bidder, (ii) Conduct of Auction, (iii) Cure, and (iv) Adequate Assurance | **August 10, 2020 at 11:59 p.m. (prevailing Eastern Time)** |
| Deadline to Reply to Objections to (i) Sale Transaction, (ii) Identity of Successful Bidder, (iii) Conduct of Auction, (iv) Cure, and (v) Adequate Assurance | **August 11, 2020 at 11:59 a.m. (prevailing Eastern Time)** |
| Sale Hearing | **August 11, 2020 at 2:00 p.m. (prevailing Eastern Time)** |

**The Bid Protections Have Sound Business Purposes and Should be Approved**

7.      Pursuant to the Stalking Horse Agreement, the Debtors have agreed, subject

to Court approval, to pay the Stalking Horse Bidder a break-up fee not to exceed $9,150,000, under

certain conditions (the "**Break-Up Fee**"), and an expense reimbursement up to $1,000,000 (the

"**Expense Reimbursement**," and, collectively with the Break-Up Fee, the "**Bid Protections**").

Such amounts are only payable if the conditions set forth in the Stalking Horse Agreement are

WEIL:\97562329\8\30950.0070

satisfied. The Debtors believe that the Bid Protections are necessary for the Stalking Horse Bidder to enter into the Stalking Horse Agreement.  In addition, the Debtors believe that the presence of the Stalking Horse Bidder will set a floor for the value of the Acquired Assets and attract other potential buyers to bid for such assets, thereby maximizing the realizable value of the Acquired Assets for the benefit of the Debtors' estates, their creditors and all other parties in interest. Moreover, in the event the Stalking Horse Bidder is not the winning bidder at the Auction (a "**Successful Bidder**") but the Stalking Horse Bid is the second highest or otherwise best bid or the third highest or otherwise best bid, the Stalking Horse Bidder will be obligated to serve as a "back-up" bidder (a "**Back-Up Bidder**").

8.    The Debtors request approval (i) of the designation of the Stalking Horse Bidder and Stalking Horse Bid on the terms provided in the Stalking Horse Agreement and (ii) of standard stalking horse protections, in particular, the payment of the Break-Up Fee and the Expense Reimbursement as an administrative expense in the event that the Stalking Horse Bid is not selected as the winning bidder or the Debtors consummate one or more sale transactions for the Assets with one or more other bidders and any initial or subsequent overbid amounts.

9.    Given the Debtors' need to maximize value for creditors through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bidder and offer such bidder Bid Protections is justified, appropriate, and essential.

10.    The Bidding Procedures allow the Debtors to provide the Bid Protections to the Stalking Horse Bidder.  Bidding incentives such as these Bid Protections have become a recognized practice in chapter 11 cases because they enable a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.

11.    Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  *First*, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  *Second*, if the availability of break-up fees were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

12.    In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.    the presence of self-dealing or manipulation in negotiating the break-up fee;

b.    whether the fee harms, rather than encourages, bidding;

c.    the reasonableness of the break-up fee relative to the purchase price;

d.    whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.    the correlation of the fee to a maximum value of the debtor's estate;

WEIL:\97562329\8\30950.0070

g.      the support of the principal secured creditors and creditors' committees of the break-up fee;

h.      the benefits of the safeguards to the debtor's estate; and

i.      the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 536.

13.      While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections. First, the Stalking Horse Bidder would not enter into the Stalking Horse Agreement without the Bid Protections. In addition, the Stalking Horse Bid attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including, among other things, the Stalking Horse Agreement and the schedules thereto, in making their bid. In sum, if the Assets are sold to a Successful Bidder other than the Stalking Horse Bidder, the Sale Transaction likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing an acceptable price and offer against which other parties can bid. Moreover, courts in this district have previously approved the grant of superpriority administrative expense status to claims for break-up fees and expense reimbursements. *See, e.g.*, *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. June 19, 2020) (authorizing priority expense status for break-up fee and expense reimbursement); *In re Bumble Bee Parent, Inc.*, No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (same); *In re Things Remembered , Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (same); *In re Scottish Holdings, Inc.*, No. 18-10160 (LSS) (Bankr. D. Del. Feb. 28, 2018 (same); *In re Terravia Holdings, Inc.*, No. 17-11655 (CSS) (Bankr. D. Del. Aug. 22, 2017) (same); *In re Ensequence Inc.*, No. 18-10182 (KG) (Bankr. D. Del. Mar. 26, 2018) (same); *In re CIBER, Inc.*, No. 17-10772 (BLS) (Bankr. D. Del. May 2, 2017) (same).

WEIL:\97562329\8\30950.0070

14.    Accordingly, the Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit D**, and, after the Sale Hearing, the Sale Order, respectively, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: July 23, 2020
      Wilmington, Delaware

/s/ Zachary I. Shapiro

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Zachary I. Shapiro (No. 5103)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:        collins@rlf.com
                    shapiro@rlf.com

-and-

WEIL, GOTSHAL & MANGES LLP
Garrett A. Fail (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
E-mail:        garrett.fail@weil.com
                    davidj.cohen@weil.com

*Proposed Attorneys for Debtors
and Debtors in Possession*

WEIL:\97562329\8\30950.0070