## Exhibit A

**Stalking Horse Agreement**

**Execution Version**

ASSET PURCHASE AGREEMENT

BY AND AMONG

BROOKS BROTHERS GROUP, INC.,
696 WHITE PLAINS ROAD, LLC
BROOKS BROTHERS INTERNATIONAL, LLC
BROOKS BROTHERS RESTAURANT, LLC
RBA WHOLESALE, LLC
RETAIL BRAND ALLIANCE GIFT CARD SERVICES, LLC
RETAIL BRAND ALLIANCE OF PUERTO RICO, INC.
BROOKS BROTHERS CANADA LTD.
BBD HOLDING 1, LLC
BBD HOLDING 2, LLC
BBDI, LLC
BROOKS BROTHERS FAR EAST LIMITED

AND

SPARC GROUP LLC

JULY 23, 2020

THIS DOCUMENT SHALL BE KEPT CONFIDENTIAL PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BY THE RECIPIENT HEREOF AND, IF APPLICABLE, ITS AFFILIATES AND REPRESENTATIVES.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS .................................................................................1

    Section 1.1    Definitions.................................................................................1
    Section 1.2    Interpretations .........................................................................24

ARTICLE II PURCHASE AND SALE ...............................................................25

    Section 2.1    Purchase and Sale of Assets....................................................25
    Section 2.2    Assumed Liabilities .................................................................26
    Section 2.3    Consideration; Deposit; Escrow Amount ................................26
    Section 2.4    Closing ....................................................................................27
    Section 2.5    Closing Payments and Deliveries ...........................................27
    Section 2.6    Inventory.................................................................................28
    Section 2.7    Post-Closing Purchase Price Adjustment................................28
    Section 2.8    Assumption/Rejection of Certain Contracts and Leases and
                    Designation Rights; Non-Assignment ......................................31
    Section 2.9    Allocation................................................................................35
    Section 2.10   Proration..................................................................................36
    Section 2.11   Removal of Excluded Assets ...................................................37
    Section 2.12   Withholding .............................................................................37

ARTICLE III SELLERS' REPRESENTATIONS AND WARRANTIES .................37

    Section 3.1    Organization of Sellers; Good Standing ..................................37
    Section 3.2    Authorization of Transaction ...................................................38
    Section 3.3    Noncontravention; Government Filings....................................38
    Section 3.4    Title to Assets; Sufficiency of Assets ......................................39
    Section 3.5    Transferred Contracts and Assumed Leases.............................39
    Section 3.6    Real Property ...........................................................................40
    Section 3.7    Litigation; Decrees..................................................................41
    Section 3.8    Labor Relations.......................................................................41
    Section 3.9    Brokers' Fees ..........................................................................42
    Section 3.10   Data Privacy and Security........................................................42
    Section 3.11   Taxes.......................................................................................43
    Section 3.12   Employee Benefits...................................................................44
    Section 3.13   Intellectual Property.................................................................45
    Section 3.14   Compliance with Laws; Permits ..............................................47
    Section 3.15   Environmental Matters.............................................................48
    Section 3.16   Related Party Transactions .......................................................49
    Section 3.17   Financial Statements ................................................................50
    Section 3.18   Absence of Certain Changes....................................................50
    Section 3.19   Inventory.................................................................................50
    Section 3.20   Pricing Files............................................................................51
    Section 3.21   Royalties. ................................................................................51
    Section 3.22   Disclaimer of Other Representations and Warranties................51

i

ARTICLE IV BUYER'S REPRESENTATIONS AND WARRANTIES ....................................52

    Section 4.1    Organization of Buyer; Good Standing ...................................52
    Section 4.2    Authorization of Transaction ...................................................52
    Section 4.3    Noncontravention; Government Filings ....................................52
    Section 4.4    Litigation; Decrees .................................................................52
    Section 4.5    Brokers' Fees .........................................................................53
    Section 4.6    Sufficient Funds; Adequate Assurances ..................................53

ARTICLE V PRE-CLOSING COVENANTS.............................................................................53

    Section 5.1    Efforts; Cooperation................................................................53
    Section 5.2    Conduct of the Business Pending the Closing ..........................53
    Section 5.3    Regulatory Approvals .............................................................57
    Section 5.4    Bankruptcy Court Matters.......................................................58
    Section 5.5    Notices and Consents ..............................................................61
    Section 5.6    Notice of Developments ..........................................................62
    Section 5.7    Access .....................................................................................62
    Section 5.8    Bulk Transfer Laws.................................................................63
    Section 5.9    Replacement Bonding Requirements........................................63
    Section 5.10    Directors and Officers Insurance ............................................63
    Section 5.11    Intercompany Indebtedness .....................................................63
    Section 5.12    Canadian Inventory ................................................................64
    Section 5.13    Transition Services Agreement................................................64

ARTICLE VI OTHER COVENANTS.......................................................................................64

    Section 6.1    Further Assurances..................................................................64
    Section 6.2    Access; Enforcement; Record Retention ..................................65
    Section 6.3    Covered Employees ................................................................65
    Section 6.4    Certain Tax Matters ................................................................69
    Section 6.5    Insurance Matters....................................................................70
    Section 6.6    Acknowledgements .................................................................71
    Section 6.7    Press Releases and Public Announcements ..............................71
    Section 6.8    Wind Down and Marketing License ........................................71
    Section 6.9    No Successor Liability.............................................................72
    Section 6.10    Confidentiality .......................................................................73
    Section 6.11    Designated Foreign Subsidiaries.............................................73

ARTICLE VII CONDITIONS TO OBLIGATION TO CLOSE................................................75

    Section 7.1    Conditions to Buyer's Obligations...........................................75
    Section 7.2    Conditions to Sellers' Obligations ..........................................76
    Section 7.3    No Frustration of Closing Conditions......................................76

ARTICLE VIII TERMINATION ..............................................................................................77

    Section 8.1    Termination of Agreement.......................................................77
    Section 8.2    Effect of Termination..............................................................78

ARTICLE IX MISCELLANEOUS ...................................................................................79

    Section 9.1      Survival ..........................................................................79
    Section 9.2      Expenses ........................................................................79
    Section 9.3      Entire Agreement ..........................................................79
    Section 9.4      Incorporation of Exhibits and Disclosure Schedule....................79
    Section 9.5      Amendments and Waivers .............................................79
    Section 9.6      Succession and Assignment ..........................................80
    Section 9.7      Notices ...........................................................................80
    Section 9.8      Governing Law ..............................................................81
    Section 9.9      Submission to Jurisdiction; Service of Process .........................81
    Section 9.10    Waiver of Jury Trial.......................................................82
    Section 9.11    Specific Performance .....................................................82
    Section 9.12    Severability ....................................................................82
    Section 9.13    No Third Party Beneficiaries ........................................82
    Section 9.14    Non-Recourse ................................................................82
    Section 9.15    Mutual Drafting ..............................................................83
    Section 9.16    Disclosure Schedule.......................................................83
    Section 9.17    Headings; Table of Contents..........................................83
    Section 9.18    Counterparts; Facsimile and Electronic Signatures ..................84

Exhibit A – Bidding Procedures Order
Exhibit B – Escrow Agreement
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Assignment and Assumption Agreement
Exhibit E-1 – Form of Copyright Assignment Agreement
Exhibit E-2 – Power of Attorney (Copyrights)
Exhibit F-1 – Form of Trademark Assignment Agreement
Exhibit F-2 – Power of Attorney (Trademarks)
Exhibit G-1 – Form of Patent Assignment Agreement
Exhibit G-2 – Power of Attorney (Patents)
Exhibit H – Form of Domain Name Assignment Agreement
Exhibit I – Form of Assignment and Assumption of Lease
Exhibit J – Form of Equity Commitment Letter
Exhibit K – Form of Occupancy Agreement

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of July 23, 2020 by and among Brooks Brothers Group, Inc., a Delaware corporation ("BBGI") and the direct or indirect wholly-owned Subsidiaries of BBGI signatory hereto (together with BBGI, each a "Seller" and, collectively, "Sellers"), and SPARC GROUP LLC, a Delaware limited liability company ("Buyer"). Each of Sellers and Buyer are referred to herein as a "Party" and, collectively, as the "Parties".

## WITNESSETH

WHEREAS, Sellers and certain of their affiliates have filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 8, 2020 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers are engaged in, among other things, (i) the business of designing, sourcing, marketing, licensing, distributing and selling apparel and accessories on both wholesale and retail bases, (ii) the business and operations of the retail clothing stores at the locations set forth in Section 3.6 of the Disclosure Schedule (as defined below) under the brand "Brooks Brothers" (each a "Store" and, collectively, the "Stores") by Sellers relating to the retail sale of clothing and accessories at such Stores, (iii) the business and operations of acting as a franchisor of retail clothing stores under the brand "Brooks Brothers" relating to the retail sale of clothing and accessories at such stores, and (iv) the business and operations of the e-commerce platforms (including the E-Commerce Platform) by Sellers relating to the retail sale of clothing and accessories on such e-commerce platforms (collectively, the "Business" but in any event excluding the Excluded Business (as defined below));

WHEREAS, concurrently with the execution and delivery of this Agreement, each of Simon Property Group, L.P. and ABG Intermediate Holdings 2 LLC has entered into an equity commitment letter with Buyer, substantially in the form attached hereto as Exhibit J, pursuant to which each of Simon Property Group, L.P. and ABG Intermediate Holdings 2 LLC has committed to make, or cause one or more of its Affiliates to make, in connection with this Agreement, an equity contribution to Buyer in accordance with the terms thereof; and

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Sellers, all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement:

"Acquired Assets" means all of Sellers' right, title and interest, in and to all of the properties, rights, interests and other tangible and intangible assets of Sellers used in, held for use in, or relating to the Business (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP) including any such properties, rights, interests and other tangible and intangible assets acquired by Sellers after the date hereof but prior to the Closing; provided, however, that the Acquired Assets shall not include any Excluded Assets and; provided, further, that such definition shall be narrowed by the qualifications set forth in clauses (a) through (o) below.  Without limiting the generality of the foregoing, the Acquired Assets shall include the following assets (except to the extent listed or otherwise included as an Excluded Asset) used in, held for use in, or relating to the Business:

(a)     the Inventory (other than Excluded Inventory);

(b)     the Furnishings and Equipment (other than Excluded Furnishings and Equipment);

(c)     the Owned Real Property and the Assumed Leases, together with (to the extent of Sellers' interest therein) the buildings, fixtures and improvements located on or attached to the underlying real property, and all rights arising thereunder, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, and with respect to the Leases, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Assumed Leases;

(d)     all rights and benefits under the Transferred Contracts;

(e)     all Permits of Sellers, to the extent transferable;

(f)     all prepaid expenses of any Seller, including deposits, security deposits, merchant deposits, prepaid rent and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases and, to the extent transferable, other deposits relating to the Stores under any of the Transferred Contracts;

(g)     the Store Cash as of the Closing;

(h)     all books and records, including files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records of any Seller used in, held for use in, or relating to the Business, the Acquired Assets or the Assumed Liabilities, excluding (for the avoidance of doubt) Customer Data;

(i)     all marketing, advertising and promotional materials and product samples and designs, in each case that do not exclusively relate to the Excluded Trademarks;

(j)     all goodwill, customer and referral relationship, other intangible property and all privileges relating to, arising from or associated with the Business or the Acquired Assets, in each case that do not exclusively relate to the Excluded Trademarks;

2

(k)    all personal property and interests therein, including machinery, equipment, furniture, office equipment, communications equipment, information technology systems, computer systems, hardware, vehicles, spare and replacement parts, fuel and other tangible personal property;

(l)    all of the equity interests of Sellers' Subsidiaries listed on Schedule 1.1(a);

(m)    all assets, rights and properties of or relating to any Assumed Employee Benefit Plan;

(n)    all Intellectual Property owned or purported to be owned by Sellers;

(o)    all internet domain names, social media accounts, profiles, pages, feeds, registrations and other online presences owned or purported to be owned by Sellers, in each case other than those exclusively relating to the Excluded Trademarks;

(p)    all software, computer programs, computer code, and related programmers' annotations, documentation and notes, in each case owned or controlled by Sellers;

(q)    all of Sellers' rights of publicity and all similar rights, including all commercial merchandising rights, in each case other than those exclusively relating to the Excluded Trademarks;

(r)    product designs, design rights, tech packs, artwork, archival materials and advertising materials, copy, commercials, images and artwork owned by any Seller, or in which any Seller has any interest or right, in each case that do not exclusively relate to the Excluded Trademarks;

(s)    royalty payments and licensing receivables generated in connection with the Intellectual Property Licenses attributable to the period from and after the Closing, in each case other than royalty payments generated exclusively by the Excluded Trademarks, and in each case where the allocation of the royalty payments and licensing receivables between Buyer and Sellers shall be determined in accordance with Schedule 1.1(b);

(t)    all Sellers' telephone, fax numbers and email addresses;

(u)    all Intellectual Property Licenses granted by the Sellers or their respective Subsidiaries to third parties (including the JVs), other than Intellectual Property Licenses exclusively related to Excluded Trademarks;

(v)    all customer data and information derived from any purchases at the Stores, through the E-Commerce Platform or through any other platform or branded loyalty promotion programs (collectively, "Customer Data"), provided such information is owned by Sellers or their respective Subsidiaries and solely to the extent permitted by the Bankruptcy Code, applicable Law, and Sellers' contractual obligations and respective privacy policies or notices in effect at the time of collection of such information;

3

(w)    financial, marketing and business data, pricing and cost information, business and marketing plans, servers, offsite and backup storage, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of any Seller in whatever media retained or stored, including computer programs and disks, in each case used in, held for use in, or relating to the Business, the Acquired Assets or the Assumed Liabilities, including files in the possession of or under the control of Sellers;

(x)    (i) insurance proceeds received by Sellers following the Closing Date (or that are received prior to the Closing) that were specifically paid in respect of losses incurred in respect of any individual Acquired Assets acquired by Buyer hereunder and (ii) insurance awards received by Sellers following the Closing Date (or that are received prior to the Closing) that were specifically paid in respect of losses incurred in respect of any individual Acquired Assets acquired by Buyer hereunder, in each case of clauses (i) and (ii) in respect of which such Acquired Assets have not been remediated to their form immediately prior to the loss incurring event by Sellers or their Affiliates prior to Closing;

(y)    any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset or Tax receivable of or with respect to any Assumed Taxes;

(z)    to the extent transferable, all third-party warranties, guarantees, refunds, rights of recovery, rights of set-off or counter-claim and rights of recoupment of every kind and nature for the benefit of, or enforceable by, any Seller in each case to the extent arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities;

(aa)    all tangible and intangible assets included in the E-Commerce Platform or any similar e-commerce platform owned, operated, or controlled by any Seller or Subsidiary thereof; provided that to the extent any such assets include rights to which Sellers or any of their respective Subsidiaries are entitled pursuant to any Contract, such rights shall only be included in the Acquired Assets if such Contract is a Transferred Contract, and excluding (for the avoidance of doubt) Customer Data;

(bb)    the Purchased Actions; and

(cc)    accounts receivable of Sellers which consist of accounts payable of any Designated Foreign Subsidiary (other than any JV) the equity interests of which are sold, assigned or transferred in accordance with Section 6.11 or any Transferred Entity, other than accounts payable of any such a Designated Foreign Subsidiary or Transferred Entity permitted to be paid in accordance with Section 5.2(a)(II) or (III).

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Adjustment Amount" has the meaning set forth in Section 2.7(c)(i).

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to

direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Affiliate Agreement</u>" has the meaning set forth in <u>Section 3.16</u>.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Allocation Principles</u>" has the meaning set forth in <u>Section 2.9</u>.

"<u>Anti-Corruption Laws</u>" has the meaning set forth in <u>Section 3.14(d)</u>.

"<u>Antitrust Law</u>" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other Laws and orders that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, whether in the United States or any other jurisdiction.

"<u>Assignment and Assumption Agreement</u>" has the meaning set forth in <u>Section 2.5(b)</u>.

"<u>Assignment and Assumption of Lease</u>" has the meaning set forth in <u>Section 2.5(b)</u>.

"<u>Assumed Employee Benefit Plan</u>" means each Employee Benefit Plan listed on <u>Section 3.12(a)</u> of the Disclosure Schedule, subject to update by Buyer in accordance with <u>Section 2.8</u>.

"<u>Assumed Leases</u>" has the meaning set forth in <u>Section 2.8(b)</u>, and shall include, for the avoidance of doubt, the Designated Leases assumed and assigned to Buyer pursuant to <u>Section 2.8(c)</u>.

"<u>Assumed Liabilities</u>" means only the following Liabilities:

(a)    all Liabilities under the Assumed Leases and Transferred Contracts solely to the extent such Liabilities arise from and after the Closing Date;

(b)    all Buyer Cure Costs;

(c)    all Assumed Taxes and all Transfer Taxes to be borne by Buyer pursuant to <u>Section 6.4(a)</u>;

(d)    all accounts payable relating to any inventory ordered upon the written request of Buyer following the Petition Date and delivered following the Closing Date (the "<u>New Inventory</u>");

(e)    all Liabilities to the extent relating to or arising out of the ownership, possession, operation or use of any Acquired Assets, in each case from and after the Closing;

(f)    all Liabilities related to an Assumed Employee Benefit Plan (including all assets, trusts, insurance policies and administration service contracts related thereto)

5

arising on or after the Closing and all Liabilities which are expressly assumed pursuant to Section 6.3;

(g)    all Liabilities related to the Owned Real Properties solely to the extent such Liabilities arise from and after the Closing, including any Permitted Post-Closing Liens to which they are subject;

(h)    all Liabilities relating to or arising out of honoring any of the items described in clause (a) of the definition of Gift Cards issued before Closing and presented to Buyer or its Affiliates for redemption after Closing; and

(i)    any Liabilities arising from Buyer's employment of the Transferred Employees after the Closing, including those Liabilities which are expressly assumed pursuant to Section 6.3;

provided, however, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"Assumed Taxes" means any Liability for Taxes arising from the ownership or operation of the Business or the Acquired Assets in a Post-Closing Tax Period. For the avoidance of doubt, Taxes allocated to Buyer under Section 2.10(c) shall be treated as Assumed Taxes.

"Auction" has the meaning set forth in Section 5.4(e).

"Audited Financial Statements" has the meaning set forth in Section 3.17.

"Back-Up Bidder Notice" has the meaning set forth in Section 5.4(e).

"Back-Up Termination Date" has the meaning set forth in Section 5.4(e).

"Bankruptcy Cases" means the contemplated Chapter 11 cases of Sellers and certain of their Affiliates.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Court Milestones" has the meaning set forth in Section 5.4(d).

"Bidding Procedures Order" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Sellers that, among other things, (a) approves and authorizes the payment of the Termination Payment on the terms and conditions set forth in Section 5.4, (b) establishes procedures for the Auction process, the forms of which are attached hereto as Exhibit A, and (c) establishes a date for the Auction, if necessary, and the Sale Hearing.

"Bill of Sale" has the meaning set forth in Section 2.5(b).

"Bonding Requirements" means standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"Break-Up Fee" means an amount equal to three percent (3%) of $305,000,000, to compensate Buyer for serving as the "stalking horse" and subject this Agreement and the Related Agreements to higher and better offers.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

"Buyer" has the meaning set forth in the preamble.

"Buyer 401(k) Plan" has the meaning set forth in Section 6.3(e).

"Buyer Cure Costs" means all Cure Costs as determined by Final Order of the Bankruptcy Court or as agreed by Buyer and the applicable counterparty to an Assumed Lease or Transferred Contract arising out of the assumption by the applicable Sellers and assignment to Buyer of (i) the Assumed Leases and (ii) the Transferred Contracts, including any Designated Contracts and Designated Leases designated by Buyer for assumption and assignment pursuant to Section 2.8(b), Section 2.8(c) or Section 2.8(d).  For the avoidance of doubt, Buyer Cure Costs shall not include any Liabilities allocated to Sellers pursuant to Section 2.10 or any Liabilities with respect to any Assumed Lease or Transferred Contract accruing or payable on or after the Petition Date and before the Closing, all of which shall be paid by Sellers.

"Buyer Proration Amount" has the meaning set forth in Section 2.10(a).

"Canada Distribution Center" means the third party distribution center located at 5101 Orbitor Drive, Mississauga, ON L4W 5R8, Canada.

"Canadian Seller" means Brooks Brothers Canada Ltd.

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Claim" means any claim within the meaning of Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.4.

"Closing Date" has the meaning set forth in Section 2.4.

"Closing Date Purchase Price" has the meaning set forth in Section 2.3(a).

"COBRA" has the meaning set forth in Section 6.3(g).

"Competing Bid" has the meaning set forth in Section 5.4(b).

"Computer Systems" has the meaning set forth in Section 3.13(f).

"Confidential Information" has the meaning set forth in Section 6.10.

"Confidentiality Agreement" means the confidentiality agreement, dated as of March 28, 2019, by and between BBGI and Authentic Brands Group LLC.

"Contract" means any agreement, contract, license, note, arrangement, commitment, promise, obligation, right, instrument, document, purchase order, sales order, or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby.

"Contracting Parties" has the meaning set forth in Section 9.14.

"Cost" means any Seller's or its applicable Subsidiaries' actual FOB cost, inclusive of all inbound costs of freight and all customs duties and charges, associated with the Inventory as reflected on the Seller's or its applicable Subsidiaries' books and records.

"Covered Collective Bargaining Agreements" means the collective bargaining agreements covering any of the Covered Employees, each of which is listed in Section 3.8 of the Disclosure Schedule.

"Covered Employee" means any employee of BBGI or any of its Subsidiaries at the Closing whose duties relate to the operation of the Business, including such employees who are on short-term disability, long-term disability or any other approved leave of absence.

"Covered Employee Census" has the meaning set forth in Section 3.8(c).

"COVID-19" means COVID-19 and SARS-COV-2 and their progeny.

"COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, safety or similar Law, directive, guidelines or recommendations promulgated by any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to COVID-19.

"Credit Bid" has the meaning set forth in Section 2.3(a).

"Credit Card Receivables" means the accounts receivable and other amounts owed to any Seller or Affiliate thereof in connection with any customer purchases, returns or exchanges or otherwise that are made with credit cards, including, for the avoidance of doubt, any payment processor receivables.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Buyer of the Transferred Contracts and the Assumed Leases.

8

"Cure Notice" means those certain statements filed with the Bankruptcy Court regarding Sellers' potential assumption and assignment of Contracts and Leases and the related Proposed Cure Costs.

"Customer Deposit Balance" means, as of the Closing Date, the aggregate amount of customer deposits held by any Seller or any of its Subsidiaries in respect of made-to-measure or other custom orders not yet delivered, including commercial uniforms.

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Designated Contract" means all executory Contracts not set forth on Schedule 2.8(b) immediately prior to the Closing; provided, however, that "Designated Contract" shall not be deemed to include any Intellectual Property Licenses.

"Designated Foreign Subsidiaries" means each of Sellers' Subsidiaries listed on Schedule 1.1(c) attached hereto.

"Designated Lease" all unexpired Leases not set forth on Schedule 2.8(b) immediately prior to the Closing.

"Designation Counterparty" has the meaning set forth in Section 2.8(c).

"Designation Notice" has the meaning set forth in Section 2.8(c).

"Designation Rights Period" means, with respect to any Contract or Lease to be assumed and assigned or rejected pursuant to Section 2.8(c), the period from the Closing Date and ending on the date which is (i) five (5) Business Days after delivery of a notice of rejection by Buyer with respect to such Contract or Lease, or (ii) the date on which such Contract or Lease is assumed and assigned in accordance with this Agreement; provided, that the Designation Rights Period shall end no later than the later of (A) the date on which the Bankruptcy Court enters an order confirming a reorganization or liquidation plan concerning Sellers in the Bankruptcy Cases, and (B) December 31, 2020.

"DIP Financing Agreement" means that certain Debtor-In-Possession Term Loan Agreement, dated as of July 10, 2020, by and among Brooks Brothers Group, Inc., as Lead Borrower, the other borrowers party thereto, the guarantors party thereto, the lenders party thereto, and ABG-BB, LLC, as Agent.

"DIP Interim Order" means that certain Interim Order (i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) Authorizing the Debtors to Use Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection to the Prepetition Secured Parties, (v) Modifying Automatic Stay, (vi) Scheduling a Final Hearing, and (vii) Granting Related Relief, entered by the Bankruptcy Court in the Bankruptcy Cases on July 10, 2020.

"DIP Lenders" means the "Lenders" as defined in the DIP Financing Agreement.

"Disclosure Schedule" has the meaning set forth in Article III.

"Dispute Notice" has the meaning set forth in Section 2.7(b)(ii).

"E-Commerce Platform" means the series of software and hardware applications (and related services) integrated into and used in the operation of, and through which Sellers or any of their respective Subsidiaries sell inventory to consumers who place orders for such inventory through, the brooksbrothers.com (and similar permutations thereof) websites and any other websites used by Sellers or any of their respective Subsidiaries and related internet or "app" based sales, marketing, advertising, and social media channels, including the Transferred Contracts and Intellectual Property Licenses included in the Acquired Assets pursuant to which such software and hardware applications (and related services) are owned or licensed by Sellers or any of their respective Subsidiaries.

"Employee Benefit Plan" has the meaning set forth in Section 3.12(a).

"Environmental Law" means any federal, state, local or foreign Law relating to the protection of the environment or natural resources or the generation, processing, distribution, use, handling, treatment, storage, disposal, transport, or release of, or exposure to, Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any Person, any corporation, trade or business which, together with such person, is a member of a controlled group of corporations or a group of trades or businesses under common control within the meaning of Section 414 of the IRC.

"ERISA Affiliate Liability" means any obligation, Liability, or expense of Sellers or any of its ERISA Affiliates which arises under or relates to any Employee Benefit Plan that is subject to (i) Title IV of ERISA, Section 302 of ERISA, Section 412 of the IRC or (ii) COBRA or any other statute or regulation that imposes Liability on a "controlled group" basis pursuant to Section 414(b), (c), (m) or (o) of the IRC or Section 4001(b) of ERISA.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date of this Agreement, by and among BBGI, Buyer, and the Escrow Agent, a copy of which is attached hereto as Exhibit B.

"Escrow Amount" has the meaning set forth in Section 2.3(b).

"Estimated Inventory Adjustment Amount" means (a) the Estimated Inventory Purchase Price minus (b) the Target Inventory Purchase Price (which calculation may be a negative number); provided, that in the event the Estimated Inventory Adjustment Amount is a positive number, then the Estimated Inventory Adjustment Amount shall be deemed to equal zero (0).

"Estimated Inventory Purchase Price" means the product of (a) the Estimated Inventory Value multiplied by (b) 0.75.

"Estimated Inventory Value" means Sellers' good faith estimate of the aggregate Inventory Value.

"Excluded Assets" means the following assets of Sellers, and only the following assets:

(a)    (i) all organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (ii) all books and records, correspondence or communications to the extent related to (A) Taxes paid or payable by Sellers and (B) any claims, obligations or liabilities not included in Assumed Liabilities (and including any attorney-client privilege associated with any of the items described in the preceding clauses (A) or (B)); and (iii) any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset or Tax receivable of or with respect to any Seller (including any duty drawbacks paid by or refunded to Sellers), other than as specifically described in clause (y) of the definition of Acquired Assets;

(b)    equity interests in any of Sellers' Subsidiaries (other than, for the avoidance of doubt, the equity interests identified in clause (l) of the Acquired Assets);

(c)    all Cash Equivalents (other than the Store Cash), all Credit Card Receivables, and all accounts receivable;

(d)    all insurance policies and binders (including any directors and officers insurance policies and binders) and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders, in each case other than to the extent included as Acquired Assets (including pursuant to clause (x) of the definition thereof);

(e)    all of Sellers' rights under this Agreement or any Related Agreement;

(f)    all of Sellers' assets, rights, Contracts and properties that are exclusively related to any Excluded Asset;

(g)    any Personal Information or other books and records, data or other information to the extent the transfer of which hereunder would result in a violation of applicable Law or Sellers' contractual obligations or respective privacy policies or notices in effect at the time of collection of such Personal Information;

(h)    the Furnishings and Equipment described on Schedule 1.1(d) (the "Excluded Furnishings and Equipment");

(i)    other than the Purchased Actions, any claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, rights of set-off, rights of subrogation and all other rights of any kind, in each case to the extent arising from the Excluded Assets or the Excluded Liabilities;

11

(j)    all Contracts and Leases other than the Transferred Contracts and Assumed Leases;

(k)    all Excluded Inventory;

(l)    all assets, rights and properties of or relating to any Employee Benefit Plan that is not an Assumed Employee Benefit Plan;

(m)    any credit card numbers or related customer payment source, or social security numbers;

(n)    all Excluded Trademarks;

(o)    the Retained Actions;

(p)    all assets exclusively used or exclusively held for use in the Excluded Business; and

(q)    those items set forth on Schedule 1.1(e).

"Excluded Business" means (i) any business conducted by Deconic Group LLC and (ii) any manufacturing business operated by Sellers.

"Excluded Furnishings and Equipment" has the meaning set forth in the definition of Excluded Assets.

"Excluded Inventory" means inventory of the Business that is (i) not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose; (ii) located in Canada that Sellers cannot transfer to Buyer free and clear of all Liens (other than Permitted Post-Closing Liens), if any, after compliance with their obligations pursuant to Section 5.12; or (iii) not transferable to Buyer under applicable Law.

"Excluded Liabilities" means any and all Liabilities of Sellers, whether existing at the Closing or arising thereafter, other than the Assumed Liabilities.  Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any Seller, any Affiliate thereof or any predecessor of any Seller or Affiliate thereof, whether incurred or accrued before or after the Closing (in each case, other than an Affiliate that is acquired by Buyer pursuant to or in accordance with this Agreement):

(a)    All Cure Costs other than Buyer Cure Costs;

(b)    Any collective bargaining agreements, including the Covered Collective Bargaining Agreements;

(c)    any Liability (i) not relating to or arising out of the Stores or the Acquired Assets or the Business, including any Liability to the extent relating to or arising out of the

12

Excluded Assets or (ii) to the extent relating to or arising out of the closed Stores or Closing Stores, in the case of this clause (ii) unless assumed by Buyer pursuant to <u>Section 2.8</u>;

(d)    (i) all Taxes of the Seller arising from the ownership or operation of the Business or Acquired Assets, other than Assumed Taxes and (ii) Retained Taxes;

(e)    any Liabilities arising from or related to payroll and payroll Taxes for the current and former employees or independent contractors or other service providers of Sellers or any Subsidiary of a Seller accrued or deferred as permitted under Section 2302 of the Coronavirus Aid, Relief, and Economic Security Act of 2020 that otherwise would have been required to be deposited and paid in connection with amounts paid to such person at any time on or prior to the Closing;

(f)    all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(g)    any Liabilities in respect of any Contracts or Leases that are not Transferred Contracts or Assumed Leases, including any Liabilities arising out of the rejection of any such Contracts or Leases pursuant to 365 of the Bankruptcy Code, except for obligations of Buyer during the Designation Rights Period expressly set forth in <u>Section 2.8</u> or in the Occupancy Agreement;

(h)    except for Liabilities expressly identified as Assumed Liabilities or expressly allocated to Buyer in this Agreement, all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers or of any of their predecessors in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Sellers) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code (which such amounts shall be paid by Sellers from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, (ii) the negotiation, execution and consummation of the DIP Financing Agreement, and (iii) the consummation of the transactions contemplated by this Agreement, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers or of any of their predecessors payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

(i)    except as expressly assumed under <u>Section 6.3</u>, all (i) payments or entitlements to any current or former employees, officers, directors or consultants of the Business, including wages, other remuneration, holiday or vacation pay, bonus, change of control, retention, key employee incentive plan payments, key employee retention plan, severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions, insurance premiums and taxes to the extent incurred or accrued on or prior to the Closing, but excluding, for the avoidance of doubt, any Liabilities

13

which are expressly assumed under Section 6.3, (ii) ERISA Affiliate Liability, (iii) any Liability of any Covered Employee or other current or former employee or independent contractor of Sellers and their Subsidiaries that does not become a Transferred Employee, (iv) any obligation, Liability or expense relating to any collective bargaining agreement or union agreement including, without limitation the Covered Collective Bargaining Agreements, and including without limitation any withdrawal liability with respect to any multiemployer plan (as defined under Section 3(37) of ERISA) (whether or not yet asserted), (v) any Liabilities arising from or related to payroll and payroll Taxes for the current and former employees or independent contractors or other service providers of Sellers accrued or deferred as permitted under Section 2303 of the Coronavirus Aid, Relief and Economic Security Act of 2020 that otherwise would have been required to be deposited and paid in connection with amounts paid to such person at any time on or prior to the Closing, (vi) any Liability with respect to Seller's defined benefit pension plans (including the Retail Brand Alliance, Inc. Pension Plan and the Brooks Brothers Pension Plan) or retiree medical or retiree life insurance plans or arrangements (including the Retail Brand Alliance, Inc. Post-Retirement Medical and Life Plan) and (vii) any obligation, Liability or expense relating to or arising out of the employment practices of Sellers or any of their Affiliates in connection with or related to the Business occurring prior to the Closing, including any violations of Sellers or their Affiliates of any labor or employment agreement in connection with or related to the Business;

(j)      any claims, causes of action, lawsuits, judgments, privileges, counterclaims, defenses, demands, right of recovery, rights of set-off, rights of subrogation and all other rights of any kind, in each case to the extent arising from the Excluded Assets or the Excluded Liabilities;

(k)      all Liabilities arising under Environmental Laws, other than to the extent arising solely out of events, facts or circumstances that first occur on or after the Closing with respect to the ownership or operation of the Stores (other than the Closing Stores, unless assumed by Buyer pursuant to Section 2.8) or the Acquired Assets from and after the Closing;

(l)      all Liabilities related to the WARN Act, to the extent applicable, with respect to Sellers' termination of employment of Sellers' or any of their respective Affiliates' employees on or prior to Closing;

(m)      all Liabilities arising under any Employee Benefit Plan that is not an Assumed Employee Benefit Plan (including all assets, trusts, insurance policies and administration service contracts related thereto), but excluding, for the avoidance of doubt, any Liabilities which are expressly assumed under Section 6.3;

(n)      all Liabilities of Sellers or of any of their predecessors to their respective equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise, and any Liability of Sellers or of any of their predecessors pursuant to any Affiliate Agreement that is not a Transferred Contract;

14

(o)    all Liabilities arising out of or relating to any business or property formerly owned or operated by any Seller, any Affiliate or predecessor thereof, but not presently owned and operated by any Seller;

(p)    all accounts payable of Sellers or of any of their predecessors other than Liabilities for New Inventory that are Assumed Liabilities pursuant to clause (d) of the definition thereof;

(q)    all Liabilities of Sellers or of any of their predecessors arising out of any Contract, Permit, or claim that is not transferred to Buyer hereunder;

(r)    all Liabilities for all Professional Fees Amounts;

(s)    any Liabilities in respect of the Excluded Business;

(t)    any Liabilities arising out of or relating to winding down by Sellers of the business of Sellers, including the sale, offer for sale, distribution, provision or promotion by or on behalf of Sellers or their respective Affiliates of products or services using the Intellectual Property as set forth in Section 6.8, but without limiting Buyer's obligations as expressly set forth in Section 6.11;

(u)    all Liabilities of Sellers relating to escheat or unclaimed property obligations arising from the ownership or operation of the Business or the Acquired Assets prior to the Closing, including any such Liabilities (other than Liabilities related to the Customer Deposit Balance) resulting from amounts deposited with Sellers prior to the Closing; and

(v)    any Liability of Sellers or any of their predecessors associated with any and all indebtedness, including any guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' or any of their respective Subsidiaries' obligations, and including any guarantee obligations or imputed Liability through veil piercing incurred in connection with Sellers' Subsidiaries.

"Excluded Trademarks" means those Southwick trademarks set forth in Schedule 1.1(f).

"Financial Statements" has the meaning set forth in Section 3.17(a).

"FOB" means Free On Board under the Incoterms standard published by the International Chamber of Commerce.

"Furnishings and Equipment" means all fixtures, trade fixtures, store models and shelving owned by Sellers.

"GAAP" means United States generally accepted accounting principles consistently applied.

"GDPR" has the meaning set forth in Section 3.10.

15

"Gift Cards" means (a) prepaid balance cards (including single use set amount cards, if any) issued by Sellers that can be used or redeemed to purchase products of the Business and (b) to the extent set forth on Schedule 1.1(g), cards to customers of the Business entitling such customers to discounts on purchases of products of the Business.

"Governmental Authority" means any federal, state, local, or foreign government or governmental, taxing or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Hazardous Material" means any substance, material or waste that is listed, defined or otherwise characterized or regulated as "hazardous," or "toxic," or as a "pollutant," or a "contaminant" or words of similar meaning under any Environmental Laws, including without limitation petroleum, petroleum by-products, asbestos and asbestos-containing materials, polychlorinated biphenyls and pesticides.

"Holdback Account" has the meaning set forth in Section 2.5(a)(ii).

"Holdback Amount" has the meaning set forth in Section 2.5(a)(i).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Independent Accountant" has the meaning set forth in Section 2.7(b)(iii).

"Intellectual Property" means all intellectual property rights worldwide (whether arising under statutory or common law, contract or otherwise), which include the following items (a) technology, proprietary information and materials, including inventions, discoveries, processes, designs, tools, molds, techniques, developments and related improvements whether or not patentable; (b) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or international equivalent of any of the foregoing; (c) trademarks (whether registered, unregistered or applied-for), trade dress, service marks, service names, trade names, brand names, product names, logos, corporate names, fictitious names, other names, symbols (including business symbols), slogans, social media identifiers (such as a Twitter® handle) and any foreign or international equivalent of any of the foregoing and any applications or registrations in connection with the foregoing; (d) domain name registrations; (e) technical, scientific and other know-how and information (including promotional material), confidential information, methods, processes, practices, formulas, designs, design rights, patterns, assembly procedures, software, specifications, drawings, prototypes, molds, models, tech packs, artwork, archival materials and advertising materials, copy, commercials, images, artwork, and samples; (f) copyrights, including copyrights in databases, copyright applications, and copyright registrations, works of authorship and moral rights and renewals in connection therewith; (g) databases and data collections, customer lists, customer contact information, customer licensing and purchasing histories, manufacturing information, business plans, product roadmaps, and archival collections (if any) of articles of clothing, accessories, or any products or services, and all other trade secrets and know-how; (h) all other proprietary or intellectual property rights of every kind and nature

now known or hereafter recognized in any jurisdiction; (i) the right to sue for infringement and other remedies against infringement of any of the foregoing; and (j) rights to protection of interests in the foregoing under the Laws of all jurisdictions, including all registrations, renewals, extensions, combinations, divisions, or reissues of, and applications for, any of the rights referred to above.

"Intellectual Property Licenses" means (i) any grant in writing to a third Person of any right to use any Intellectual Property owned by Sellers and (ii) any grant in writing to Sellers of a right to use a third Person's Intellectual Property rights, and in the case of each of the foregoing clauses (i) and (ii), the right to use any Intellectual Property shall include any co-existence agreements, covenants not to sue and any agreements of a similar nature relating to Intellectual Property.

"Intercompany Obligations" has the meaning set forth in Section 5.11.

"Interim Balance Sheet Date" has the meaning set forth in Section 3.17(a).

"Interim Financial Statements" has the meaning set forth in Section 3.17(a).

"Interim International Period" has the meaning set forth in Section 6.11.

"Inventory" means all finished goods inventory related to the Business to the extent (a) located in any (i) Store set forth on Section 3.6(a) of the Disclosure Schedule that is marked as a "current store" and not marked as a "closed location", "closed March" or on the "closing list" or (ii) Transferred Distribution Center or the Canada Distribution Center or (b) in transit to a Transferred Distribution Center or the Canada Distribution Center and in respect of which title thereto has passed to Sellers, in each case of the foregoing clauses (a) and (b) other than Excluded Inventory.  For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, "Inventory" does not include:  (i) goods which belong to sublessees, licensees, department lessees, or concessionaires of any Seller; (ii) goods held by any Seller on memo, on consignment, or as bailee; (iii) inventory located in any Closing Store or Store set forth on Section 3.6(a) of the Disclosure Schedule that is marked as a "closed location", "closed March" or on the "closing list" on the Closing Date; or (iv) Furnishings and Equipment or improvements to real property.

"Inventory Adjustment Amount" means (a) the Inventory Purchase Price minus (b) the Target Inventory Purchase Price (which calculation may be a negative number).

"Inventory Purchase Price" means the product of (a) the aggregate Inventory Value multiplied by (b) 0.75.

"Inventory Value" means the Cost of all Inventory (calculated in accordance with Schedule 2.6), excluding any Excluded Inventory (but including any portion or all of the Excluded Inventory that Buyer deems in writing to be Inventory (without GAAP adjustment) on the Closing Date), which amount shall be calculated taking into account the Cost of the Inventory, subject to a "roll-forward" of actual sales, returns or receipts of Inventory between the Store Inventory Date, DC Inventory Date and the Closing Date (as each such term is defined in Schedule 2.6); provided, that, in lieu of any other adjustments to the Inventory Value of Inventory under this Agreement (e.g., adjustments for damaged, defective, or other inventory attributes), the aggregate Inventory Value

17

of the Inventory shall be adjusted (i.e., reduced) by means of a single global downward adjustment equal to one-half of one percent (0.5%) of the sum of the aggregate Inventory Value of the Inventory.

"IP Assignment and Assumption Agreements" has the meaning set forth in Section 2.5(b).

"IRC" means the Internal Revenue Code of 1986, as amended.

"IRS" means the Internal Revenue Service.

"JV Agreements" means the organizational documents of the JVs.

"JVs" means, collectively, the entities listed on Schedule 1.1(h).

"Knowledge" of Sellers (and other words of similar import) means the knowledge, after reasonable due inquiry, of each of Rachel Barnett and Steven Goldaper. "Knowledge" of Buyer (and other words of similar import) means the actual knowledge of David Dick.

"Law" means any applicable U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, code, Decree (judicial or administrative) or other requirement or rule of law (including common law) promulgated by any Governmental Authority.

"Leased Real Property" has the meaning set forth in Section 3.6(a).

"Leases" means all leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights in respect of any Store or distribution center or premises exclusively used in connection with the Business.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"License Period" has the meaning set forth in Section 6.8.

"Licensed Marks" has the meaning set forth in Section 6.8.

"Lien" means any lien (statutory or otherwise), Claim, interest, Liability, mortgage, deed of trust, pledge, lien, charge, hypothecation, security interest, option, license (other than non-exclusive licenses of Intellectual Property granted in the Ordinary Course of Business), right of first offer or refusal, easement, covenant, security agreement or other encumbrance or restriction on the use or transfer of any property (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as the foregoing, and (ii) any assignment or deposit arrangement in the nature of a security device).

"Litigation" means any action, cause of action, suit, claim, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity, before any Governmental Authority.

"Material Adverse Effect" means any event, change, occurrence or effect that, individually or in the aggregate, (i) has, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, the Assumed Liabilities or the Business, taken as a whole, or (ii) prevents, materially impedes or materially delays, or would reasonably be expected to prevent, materially impede or materially delay, the consummation by Sellers of the transactions contemplated by this Agreement; provided, however, that solely with respect to clause (i), no effect, change, event or occurrence to the extent arising out of or resulting from the following, shall constitute or be taken into account, individually or in the aggregate, in determining whether there has been or will be a Material Adverse Effect: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail clothing generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) any event, change, occurrence or effect affecting financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other calamity or force majeure events (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, cyber-attack or malware attack, pandemic (including the COVID-19 pandemic, and any future resurgence, or evolutions or mutations, of COVID-19 or related disease outbreaks, epidemics or pandemics), natural disaster, fire, flood, hurricane, tornado, or other catastrophic weather event; (f) changes in Law or accounting rules occurring after the date of this Agreement; (g) the taking of any action expressly required by this Agreement (other than Section 5.2(a)) or any Related Agreement; (h) any effects or changes as a result of the announcement or pendency of this Agreement to the extent relating to the identity of Buyer; (i) any filing or motion made under sections 1113 or 1114 of the Bankruptcy Code; (j) any effects or changes to the extent arising from or related to the breach of the Agreement by Buyer; (k) any effect resulting from the filing of the Bankruptcy Cases; (l) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; or (m) any failure by Sellers to meet internal or published projections, estimates or forecasts of revenues, earnings or other measures of financial or operating performance by any period (provided that the effects or changes underlying such failures (subject to the other provisions of this definition) shall not be excluded); except, in the case of each of causes (a), (b), (c), (d), (e) or (f), if the Acquired Assets, the Assumed Liabilities or the Business, taken as a whole, are disproportionately affected thereby as compared with other participants in the industries or geographic locations in which Sellers operate.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Objection Deadline" has the meaning set forth in Section 2.8(c).

"Occupancy Agreement" means the Occupancy Agreement substantially in the form of Exhibit K.

"OFAC" has the meaning set forth in Section 3.14(c).

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business as conducted by Sellers through the date hereof consistent with past practice, with such deviations therefrom as are or have been reasonably necessary, (a) during any period of full or partial suspension of operations related to COVID-19, to (i) protect the health and safety of Sellers' or their Subsidiaries' employees and other individuals having business dealings with Sellers or their Subsidiaries, (ii) comply with any COVID-19 Measures or (iii) respond to third-party supply or service disruptions caused by COVID-19 or (b) after commencement of the Bankruptcy Cases and subject to substantial compliance with the Approved Budget (as defined in the DIP Interim Order), to preserve the value of the debtor's estate.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Owned Real Property(ies)" means the real property described in Section 3.6(b) of the Disclosure Schedules.

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent, or which are being contested in good faith by appropriate proceedings, in each case for which adequate reserves have been established on the financial statements of Sellers in accordance with GAAP; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business; (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto (excluding any license of Intellectual Property); (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) Liens to be released pursuant to the Sale Order; and (f) easements, covenants, conditions, restrictions and other similar non-monetary matters affecting title to real property and other encroachments and title and survey defects; none of which, individually or in the aggregate, would, or would reasonably be expected to, materially detract from the use or value of the applicable property as currently used.

"Permitted Post-Closing Lien" means (a) with respect to real property leased by Sellers, zoning restrictions, building codes and other land use Laws regulating the use or occupancy of real property, (b) non-monetary encumbrances not violated by Sellers' current use of the assets or property subject to such Lien, to the extent that the Sale Order does not in fact release any such Lien upon Closing, and (c) any encumbrances on the interest of any landlord or sublandlord or underlying fee interest of any Assumed Lease.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any Governmental Authority or any group of any of the foregoing.

"Personal Information" has the meaning set forth in Section 3.10.

"Petition Date" has the meaning set forth in the Recitals.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date.

"Professional Fees Amount" means an amount equal to all fees and expenses incurred and estimated to be incurred on or prior to the Closing Date (regardless of whether such fees and expenses have been approved by the Bankruptcy Court as of the Closing Date) by any professional retained pursuant to sections 327 and 1103 of the Bankruptcy Code in the Bankruptcy Cases.

"Proposed Cure Costs" has the meaning set forth in Section 2.8(a).

"Prorated Charges" has the meaning set forth in Section 2.10(a).

"Proration Period" has the meaning set forth in Section 6.4(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.9.

"Purchased Actions" means all causes of action, lawsuits, judgments, Claims, refunds, rights of recovery, rights of setoff, counterclaims, defenses, demands, remedies, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights (whether choate or inchoate, known or unknown, contingent or noncontingent) available to Sellers or their estates as of the time of the Closing against (A) Buyer or any of its Affiliates (other than Claims pursuant to this Agreement or arising out of the transactions contemplated hereby), (B) any person who as of the Closing serves as a director, officer, manager, employee, or advisor of any Seller or any Subsidiary thereof or any shareholder or Related Party of any Seller who becomes a director or advisor of Buyer or its Affiliates or becomes a Transferred Employee on or after the date of this Agreement ("Employee Purchased Actions"), and (C) any customer, supplier, manufacturer, distributor, broker, or vendor of any Seller, any Subsidiary thereof or any other Person with whom any Seller or any Subsidiary thereof has a commercial relationship in connection with the Business.

"Registered Intellectual Property" has the meaning set forth in Section 3.13(a).

"Related Agreements" means the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the IP Assignment and Assumption Agreements and the Assignment and Assumption of Lease.

"Related Party" means, with respect to any Person, such Person's Affiliates, successors and assigns and the partners, shareholders, members, investors and potential investors, parents, predecessors, subsidiaries, controlling persons, current and former directors, current and former officers, employees, agents, trustees, administrators, managers, advisors, attorneys and representatives of such Person and of such Person's Affiliates, successors and assigns.

"Representative" means, when used with respect to a Person, the Person's controlled and controlling Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Retained Actions" means all causes of action, lawsuits, judgments, Claims, refunds, rights of recovery, rights of setoff, counterclaims, defenses, demands, remedies, warranty claims, rights to indemnification, contribution, advancement of expenses or reimbursement, or similar rights (whether choate or inchoate, known or unknown, contingent or noncontingent) available to Sellers or their estates as of the time of the Closing against any person who as of the Closing serves as a director, officer, manager, employee, or advisor of any Seller or any shareholder or Related Party of any Seller, other than Employee Purchased Actions.

"Retained Taxes" means any Liability for Taxes (i) of any and all Sellers and their respective Subsidiaries (or for which any Seller or any of their Affiliates (other than those Subsidiaries which are listed on Schedule 1.1(a)) are otherwise liable, including as a transferee, successor, by contract or otherwise pursuant to applicable Law, or arising as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having included or required to be included in any Tax Return related thereto), or (ii) in respect of any Excluded Assets.  For the avoidance of doubt, Retained Taxes shall not include the Assumed Taxes.

"Sale Hearing" means a hearing before the Bankruptcy Court to approve this Agreement.

"Sale Order" means an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Buyer and Sellers approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby.

"Sanctions" has the meaning set forth in Section 3.14(c).

"Seller Existing Stock" has the meaning set forth in Section 6.8.

"Seller Proration Amount" has the meaning set forth in Section 2.10(a).

"Seller Related Parties" has the meaning set forth in Section 6.10.

"Seller Retained Proceeds" has the meaning set forth in Section 6.11(c).

"Sellers" has the meaning set forth in the preamble.

"Store Cash" means all Cash Equivalents located at the Stores, all cash located in Store depository accounts or en route to Store depository accounts, all petty cash located at the Stores, and corporate offices.

"Stores" has the meaning set forth in the recitals.

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent (50%) of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent (50%) of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person; provided, however that in all cases, each of the JVs shall be deemed a Subsidiary of Sellers hereunder.

"Successful Bidder" means, if an Auction is conducted, the prevailing party at the conclusion of such Auction.

"Supplemental Motion" has the meaning set forth in Section 5.4(c).

"Target Inventory Purchase Price" means the product of (a) Target Inventory Value multiplied by (b) 0.75.

"Target Inventory Value" means an aggregate Inventory Value of $225,000,000.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever (including withholding on amounts paid to or by any Person), whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto; whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, required to be filed with a Governmental Authority.

"Termination Payment" means the sum of Break-Up Fee and the Expense Reimbursement.

"Title IV Plan" has the meaning set forth in Section 3.12(d).

"Trade Controls" has the meaning set forth in Section 3.14(c).

"Transfer Tax" has the meaning set forth in Section 6.4(a).

"Transferred Contracts" has the meaning set forth in Section 2.8(b) and shall include, for the avoidance of doubt, the Contracts assumed and assigned to Buyer pursuant to Section 2.8(b), Section 2.8(c), or Section 2.8(d).

"<u>Transferred Distribution Centers</u>" means, collectively, the distribution centers located at (i) 107 Phoenix Avenue, Enfield, CT and (ii) 606 Warsaw Road, Clinton, NC.

"<u>Transferred Employee</u>" has the meaning set forth in <u>Section 6.3(a)</u>.

"<u>Transferred Entity</u>" means any Subsidiary of any Seller the equity interests of which constitute an Acquired Asset and any Subsidiaries of such Subsidiaries.

"<u>WARN Act</u>" means, collectively, the Worker Adjustment and Retraining Notification Act of 1989 and any similar state or local Law.

Section 1.2    <u>Interpretations</u>.  Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if."

(e)    The use of "or" herein is not intended to be exclusive.

(f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

(g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

(h)    References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

(i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

(j)     The specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Buyer shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

(k)     References in this Agreement to materials or information "furnished to Buyer" and other phrases of similar import include all materials or information made available to Buyer or its Representatives in the data room prepared by Sellers prior to the date of this Agreement.

(l)     References from or through any date means, unless otherwise specified, from and including or through and including such date, respectively.  References to "days" shall refer to calendar days unless Business Days are specified.  If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day.

(m)     Unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not simply mean "if."

(n)     Sellers' covenants in this Agreement with respect to the JVs (including any obligation to cause the JVs to comply with the provisions of this Agreement) shall only apply to the extent that Sellers or any of their respective Subsidiaries have the right, power and authority to cause such compliance under the JV Agreements and such compliance will not cause Sellers or any of their Affiliates to breach or violate (or otherwise give rise to any material liability of Sellers or any of their Affiliates pursuant to), in the reasonable good faith opinion of Sellers, any fiduciary or other similar duties owed by Sellers or any of their Affiliates to such JV or its equityholders under applicable Law.  In addition, Sellers shall not be responsible or have any liability for any noncompliance by a JV with any such covenant or agreement in this Agreement to the extent that such noncompliance was caused by the actions or inactions of any equityholder of such JV not affiliated with Sellers or any of their respective Affiliates or any of such equityholder's Affiliates.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Buyer will purchase from Sellers, and Sellers will sell, assign, convey, and deliver to Buyer, at the Closing all of Sellers' right, title and interest in, to and under the Acquired Assets, free and clear of Liens, other than Permitted Post-Closing Liens and Assumed Liabilities, subject to applicable Law for Brooks Brothers Far East Limited and Brooks Brothers Canada Ltd.

Section 2.2    <u>Assumed Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, effective as of the Closing, Buyer will assume and become responsible for the Assumed Liabilities.  Buyer agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof, including paying or causing to be paid, upon the later of Closing or the assumption and assignment to Buyer in accordance with this Agreement of the applicable Transferred Contract or Assumed Lease, all Buyer Cure Costs.  For the avoidance of doubt, Sellers shall not be liable for, and shall have no obligation to pay or cause to be paid, any Buyer Cure Costs.

Section 2.3    <u>Consideration; Deposit; Escrow Amount</u>.

(a)    Subject to adjustment pursuant to <u>Section 2.7</u>, the consideration for the Acquired Assets shall be (i) an aggregate Dollar amount equal to (A) $305,000,000, *minus* (B) the amount of the Credit Bid (if any), *plus* (C) the Estimated Inventory Adjustment Amount; *minus* (D) the Customer Deposit Balance (such amount, the "<u>Closing Date Purchase Price</u>"), (ii) at the option of the DIP Lenders, an aggregate credit bid of all or any portion of the DIP Obligations (as defined in the DIP Order) (the "<u>Credit Bid</u>" which, together with the Closing Date Purchase Price, as adjusted pursuant to <u>Section 2.7</u>, shall be the "<u>Purchase Price</u>") and (iii) Buyer's assumption of the Assumed Liabilities.

(b)    Upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Buyer shall immediately deposit with the Escrow Agent the amount of $30,500,000 by wire transfer of immediately available funds (the "<u>Escrow Amount</u>"), to be released by the Escrow Agent and delivered to either Buyer or Sellers, in accordance with the provisions of the Escrow Agreement.  The Escrow Amount shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Buyer and pursuant to the Escrow Agreement, the Escrow Amount (together with all accrued investment income thereon, if any) shall be distributed (and Buyer and Sellers shall deliver any written instructions to the Escrow Agent to effect the distributions of the Escrow Amount) solely as follows:

(i)    if the Closing occurs, the Escrow Amount, together with all accrued investment income thereon, if any, shall be applied towards the Purchase Price payable by Buyer to Sellers under <u>Section 2.3(a)</u> and delivered to Sellers at Closing;

(ii)    if this Agreement is terminated by Sellers pursuant to <u>Section 8.1(d)</u>, the Escrow Amount, together with all accrued investment income thereon, if any, shall be delivered to Sellers; or

(iii)    if this Agreement is terminated for any reason other than by Sellers pursuant to <u>Section 8.1(d)</u>, the Escrow Amount, together with all accrued investment income thereon, if any, shall be returned to Buyer within three (3) Business Days of such termination.

(c)    At least five (5) Business Days prior to the Closing Date, Sellers shall prepare and deliver to Buyer a statement (the "<u>Pre-Closing Statement</u>") setting forth,

together with reasonable supporting detail, the Customer Deposit Balance, the Estimated Inventory Value and the resulting Estimated Inventory Adjustment Amount, if any. Sellers shall make their relevant financial records and personnel available to Buyer and its accountants and other Representatives prior to the Closing at reasonable times for purposes of review of the Pre-Closing Statement. Sellers shall consider in good faith Buyer's comments, if any, to the Pre-Closing Statement or any of the components thereof or calculations therein and Buyer and Sellers shall negotiate in good faith to resolve any such disagreements. If Buyer and Sellers are unable to resolve any such disagreements prior to the Closing, Sellers' proposed Pre-Closing Statement and the components thereof and calculations contained therein, with such changes as have been agreed upon by Buyer and Sellers, shall control for the purposes of the payments to be made at Closing and shall not limit or otherwise affect Buyer's remedies under this Agreement or otherwise constitute an acknowledgement by Buyer of the accuracy of the Purchase Price.

Section 2.4    Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place remotely via the electronic exchange of documents and signature pages (or such other location as shall be mutually agreed upon by Sellers and Buyer) commencing at 10:00 a.m., New York City time, on a date (the "Closing Date") that is the third (3rd) Business Day following the date upon which all of the conditions to the obligations of Sellers and Buyer to consummate the transactions contemplated hereby set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto. For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to be effective as of 12:01 a.m., New York City time, on the Closing Date (including for accounting purposes), but after giving effect to any actions taken by Sellers on the Closing Date prior to the Closing.

Section 2.5    Closing Payments and Deliveries.

(a)    On the Closing Date, Buyer shall pay:

(i)    the amount equal to (A) the Closing Date Purchase Price, minus (B) the Escrow Amount and all accrued investment income thereon, which shall be released to Sellers by the Escrow Agent, minus (C) an amount equal to the product of (1) 0.10 multiplied by (2) the lesser of (x) the Estimated Inventory Value and (y) the Target Inventory Value (such product, the "Holdback Amount") by wire transfer of immediately available funds into an account (or accounts) designated in advance by Sellers; and

(ii)    the Holdback Amount to the Escrow Agent by wire transfer of immediately available funds into an account (or accounts) designated in advance by the Escrow Agent (such account, the "Holdback Account").

(b)    At the Closing, Sellers will deliver to Buyer: (i) a duly executed Bill of Sale substantially in the form of Exhibit C (the "Bill of Sale"); (ii) a duly executed Assignment and Assumption Agreement substantially in the form of Exhibit D (the "Assignment and

Assumption Agreement"); (iii) a duly executed Copyright Assignment Agreement, substantially in the form of Exhibit E-1, a duly executed Power of Attorney (Copyrights), substantially in the form of Exhibit E-2, a duly executed Trademark Assignment Agreement, substantially in the form of Exhibit F-1, a duly executed Power of Attorney (Trademarks), substantially in the form of Exhibit F-2, a duly executed Patent Assignment Agreement, substantially in the form of Exhibit G-1, a duly executed Power of Attorney (Patents), substantially in the form of Exhibit G-2, and a duly executed Domain Name Assignment Agreement, substantially in the form of Exhibit H (collectively, the "IP Assignment Agreement and Assumption Agreements"); (iv) a duly executed assignment and assumption of Lease substantially in the form of Exhibit I with respect to each of the Assumed Leases for the Stores  (the "Assignment and Assumption of Lease"); (v) a duly executed special warranty deed with respect to each Owned Real Property; (vi) a title affidavit in customary form reasonably required by Buyer's title insurer sufficient to delete the standard exceptions in form and substance reasonably acceptable to Sellers and such evidence as the title insurer may reasonably require as to the existence of Sellers and the authority of the person or persons executing documents on behalf of Sellers that may be reasonably requested by the title insurer to issue title insurance policies insuring Buyer's interest in some or all of the Owned Real Properties; provided, however, that (A) the Closing is not conditioned on Buyer obtaining any title insurance and (B) any title insurance policy (including any title endorsements) will be paid by Buyer; (vii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b) and Section 7.1(c) is satisfied; (viii) an IRS Form W-9 of each Seller that is a "United States person" within the meaning of section 7701(a)(30) of the IRC; (ix) a non-foreign affidavit from each Seller that is organized in or under the Laws of the United States or any state thereof, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under Treasury Regulations issued pursuant to section 1445 of the IRC and (x) the Occupancy Agreement, duly executed by Sellers.

(c)     At the Closing, Buyer will deliver to Sellers (i) the Bill of Sale duly executed by Buyer; (ii) the Assignment and Assumption Agreement duly executed by Buyer; (iii) each of the IP Assignment and Assumption Agreements duly executed by Buyer; (iv) a duly executed Assignment and Assumption of Lease with respect to each of the Leases for the Stores; (v) a duly executed certificate from an officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) are satisfied; (v) the Occupancy Agreement duly executed by Buyer.

Section 2.6     Inventory.   The Parties shall conduct the inventory taking in accordance with Schedule 2.6.

Section 2.7     Post-Closing Purchase Price Adjustment.

(a)     Determination of Purchase Price After Closing.  No later than forty-five (45) calendar days after the Closing Date (or, if the Inventory Report (as defined in Schedule 2.6) is delivered to Buyer after the Closing Date, forty-five (45) calendar days following the date of delivery of the Inventory Report; provided, that in any event no later than November 1, 2020), Buyer shall deliver a statement to Sellers (the "Closing

Statement") setting forth Buyer's calculations, together with reasonable supporting detail, of (i) the Seller Proration Amount, if any, (ii) the Buyer Proration Amount, if any, and (iii) the Inventory Value and the resulting Inventory Adjustment Amount, in each case, calculated in accordance with the terms and definitions set forth in this Agreement and after giving effect to any actions taken by Sellers on the Closing Date prior to the Closing.

(b)    Examination and Review.

(i)    Examination.  After receipt of the Closing Statement, Sellers shall have thirty (30) calendar days (the "Review Period") to review the Closing Statement.  During the Review Period, Sellers and their accountants shall have reasonable access (subject to execution of customary access agreements) to the books and records of Buyer, the personnel of, and work papers prepared by, Buyer or Buyer's accountants to the extent that they relate to the Closing Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Statement as Sellers may reasonably request for the purpose of reviewing the Closing Statement and to prepare a Dispute Notice (as defined below).

(ii)    Objection.  If, on or prior to the last day of the Review Period, Sellers dispute any item in the Closing Statement as delivered by Buyer, Sellers may object to the Closing Statement by delivering to Buyer a written statement setting forth Sellers' objections in reasonable detail, indicating each disputed item or amount and what Sellers believe to be the correct value of the disputed item or amount and the reasons for Sellers' disagreement therewith (the "Dispute Notice").  If Sellers fail to deliver the Dispute Notice before the expiration of the Review Period, the Closing Statement as delivered by Buyer shall become final and binding on the Parties.

(iii)    Resolution of Disputes.  If the Parties cannot agree on an item(s) set out in a Dispute Notice within fourteen (14) calendar days after Buyer's receipt of the Dispute Notice, the Parties shall refer the disputed item(s) to a nationally recognized independent accounting firm mutually agreed between Sellers and Buyer other than Sellers' accountants or Buyer's accountants ("Independent Accountant") who, acting as an expert and not an arbitrator, shall resolve the specific items under dispute by the Parties in accordance with the terms and conditions of this Agreement.  The Independent Accountant shall only decide the specific items under dispute by the Parties (as set forth in the Dispute Notice) and its decision for each disputed amount must be within the range of values assigned to each such item in the Closing Statement and the Dispute Notice, respectively.  The Independent Accountant shall decide the procedural rules in connection with its hearing of the Parties' positions on the disputed item and shall ensure that a decision can be reached as quickly as possible.  Each Party shall give the Independent Accountant access to all information which in the reasonable opinion of the Independent Accountant is necessary to decide on the disputed item and shall cause that such information is provided promptly; provided, that the Independent Accountant shall not be permitted to hold a hearing or otherwise hear testimony in

29

respect of any of the dispute items without the express written consent of each Party. There shall be no *ex parte* communication between the Independent Accountant and any of Buyer, Sellers or any of their respective Affiliates or Representatives, except for ministerial matters or other non-substantive communications or in the event a Party declines, after notice, to participate in a communication involving the Independent Accountant and such Person. None of Buyer, Sellers or any of their respective Affiliates or Representatives shall disclose to the Independent Accountant, and the Independent Accountant shall not consider for any purpose, any settlement discussions or settlement offer made by any Party. Notwithstanding the fact that the Independent Accountant is acting as an expert and not an arbitrator, the decisions of the Independent Accountant shall be final and binding on the Parties (absent manifest error) and no Party shall seek further recourse through courts or other tribunals other than to enforce the decision of the Independent Accountant. The fees, costs and expenses of the Independent Accountant incurred pursuant to this Agreement shall be borne pro rata as between Sellers on the one hand and Buyer on the other hand in proportion to the final allocation made by the Independent Accountant of the disputed items weighted in relation to the claims made by Sellers on the one hand and Buyers on the other hand, such that the prevailing Party pays the lesser proportion of such fees, costs and expenses. For example, if Buyer claims that the appropriate adjustments are, in the aggregate, $1,000 greater than the amount claimed by Sellers and if the Independent Accountant ultimately resolves the dispute by awarding to Buyer an aggregate of $300 of the $1,000 contested, then the fees, costs and expenses of the Independent Accountant will be allocated thirty percent (30%) (i.e., 300 ÷ 1,000) to Sellers and seventy percent (70%) (i.e., 700 ÷ 1,000) to Buyer.

(c)    <u>Purchase Price Adjustment After Closing</u>.

(i)    If the computation of (A) the Inventory Adjustment Amount (as finally determined in accordance with this <u>Section 2.7</u>) *minus* the Estimated Inventory Adjustment Amount (which calculation may be a negative number), *plus* (B) the Seller Proration Amount, if any (as finally determined pursuant to this <u>Section 2.7</u>), *minus* (C) the Buyer Proration Amount, if any (as finally determined in accordance with this <u>Section 2.7</u>) (the computation of the preceding clauses (A)-(C) constituting the "<u>Adjustment Amount</u>") is a positive number, then (1) Buyer shall promptly (but in any event within three (3) Business Days) pay to Sellers an amount equal to the Adjustment Amount by wire transfer of immediately available funds and (2) Buyer and BBGI shall promptly (but in any event within three (3) Business Days) deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to promptly release to Sellers the entire Holdback Amount from the Holdback Account; <u>provided</u>, that in no event shall Buyer's Liability in respect of the Adjustment Amount exceed an amount equal to the Holdback Amount.

(ii)    If the Adjustment Amount is a negative number, then promptly (but in any event within three (3) Business Days) Sellers shall pay, or cause to be paid, to Buyer the absolute value of the Adjustment Amount as follows: (A) Buyer and BBGI shall deliver joint written instructions to the Escrow Agent instructing the

Escrow Agent to promptly release funds from the Holdback Account to Buyer to satisfy the payment obligation of Sellers to Buyer under this Section 2.7(c)(ii) and (B) if the amount of funds released to Buyer pursuant to the preceding clause (A) is sufficient to satisfy fully the payment obligation of Sellers to Buyer under this Section 2.7(c)(ii), Buyer and BBGI shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to promptly release to Sellers the remaining amount of the Holdback from the Holdback Account (after giving effect to the preceding clause (A)) to Sellers; provided, that in no event shall Sellers' Liability in respect of the Adjustment Amount exceed the amount held in the Holdback Account.

(d)    Adjustments for Tax Purposes.    Any payments made pursuant to this Section 2.7 shall be treated as an adjustment to the purchase price by the Parties for Tax purposes, unless otherwise required by Law.

Section 2.8    Assumption/Rejection of Certain Contracts and Leases and Designation Rights; Non-Assignment.

(a)    No later than the fifth (5th) calendar day following the date of this Agreement, Sellers shall deliver to Buyer Schedule 2.8(a) which shall set forth, to the Knowledge of Sellers, a true and complete list, as of such date of delivery, of all executory Contracts (including, for the avoidance of doubt, those included in clause (b) of the definition of Gift Cards) and unexpired Leases to which any Seller is a party and which are related to or used in the Business, including Sellers' proposed Cure Costs associated with each such Contract and unexpired Lease set forth therein as of such date of delivery (the "Proposed Cure Costs").    Upon written request by Buyer, Sellers shall provide to Buyer as promptly as practicable an updated Schedule 2.8(a) setting forth, to the Knowledge of Sellers, the Proposed Cure Costs as of the date of such request with respect to any Contracts or Leases identified by Buyer in such written request.

(b)    Following the delivery of Schedule 2.8(a) pursuant to Section 2.8(a) above, until the date that is five (5) days prior to either the Auction, if any, or the Sale Hearing, if no Auction is held, Buyer may, in its sole discretion, (i) designate a Contract, excluding any Intellectual Property License granted by the Sellers or their respective Subsidiaries to third parties, listed on Schedule 2.8(a) for assumption and assignment to Buyer or its designee to the extent permitted under the Bankruptcy Code, effective on and as of the Closing (such Contracts, together with any other Contracts, including all Intellectual Property Licenses included in the Acquired Assets, assumed by any Seller and assigned to Buyer or its designee pursuant to this Agreement, the "Transferred Contracts"), or (ii) designate a Lease listed on Schedule 2.8(a) for assumption and assignment to Buyer or its designee, effective on and as of the Closing (such Leases, together with any other Leases assumed by any Seller and assigned to Buyer or its designee pursuant to this Agreement, the "Assumed Leases"); provided, that under no circumstances shall fewer than one hundred twenty five (125) Leases (which, for the avoidance of doubt, may include Leases in respect of closed Stores or Closing Stores; provided, further, that if Leases in respect of closed Stores or Closing Stores are included, then such Leases shall become Assumed Leases in accordance herewith) be designated for assumption and assignment to Buyer or

31

to its designees, or (iii) designate any Contract or Lease listed on Schedule 2.8(a) for rejection by Buyer effective upon notice of such designation to Sellers in accordance with Section 2.8(c).  The Transferred Contracts and Assumed Leases as of the date hereof that are to be assumed and assigned effective on and as of the Closing are set forth on Schedule 2.8(b) hereto, which Schedule shall be (and shall be deemed) modified or supplemented to reflect additions or removals, as applicable, of Leases and Contracts that are (i) designated for assumption and assignment as set forth in this Section 2.8(b) and (ii) designated for rejection.

(c)    During the Designation Rights Period, Buyer may, in its sole discretion, designate any Designated Contract or Designated Lease that has not previously been designated for assumption and assignment or rejection pursuant to Section 2.8(b) for either (i) assumption and assignment to Buyer or its designee, or (ii) rejection, in each case by providing written notice to Sellers (the "Designation Notice"); provided, however, that Buyer shall determine whether any Designated Contract or Designated Lease will be assumed and assigned or rejected and shall provide Sellers with a Designation Notice in respect thereof at least five (5) days prior to expiration of the applicable Designation Rights Period.  Within three (3) Business Days of Sellers' receipt of a Designation Notice, Sellers shall provide written notice to the counterparty to such Designated Contract or Designated Lease (such counterparty, the "Designation Counterparty") of Sellers' intent to assume and assign or reject such Designated Contract or Designated Lease, which notice shall, with respect to any Designated Contract or Designated Lease to be assumed and assigned, include (A) the Proposed Cure Costs associated with such Designated Contract or Designated Lease as designated by Buyer, (B) information supplied by Buyer or its designee intended to provide such Designation Counterparty with adequate assurance of future performance, and (C) the deadline to object to the assumption and assignment of such Designated Contract or Designated Lease (the "Objection Deadline"), which deadline shall be no less than seven (7) calendar days from service of such notice.  The Sale Order shall provide that the assumption and assignment of a Designated Contract or Designated Lease shall be effective without further order of the Bankruptcy Court upon expiration of the applicable Objection Deadline unless (1) the Designation Counterparty timely serves an objection upon Buyer and Sellers that relates to adequate assurance of future performance or a cure issue that could not have been raised in an objection to any Cure Notice prior to the Sale Hearing and pertains to matters arising after the Closing, or (2) the Designation Counterparty otherwise consents to the assumption and assignment on terms mutually agreed by Buyer and the Designation Counterparty.  If Buyer, Sellers and Designation Counterparty are unable to resolve such objection timely served pursuant to clause (1) above, Sellers shall schedule the matter for hearing on no less than five (5) Business Days' notice.  The Sale Order shall provide that the rejection of any Designated Contract or Designated Lease shall be effective without further order of the Bankruptcy Court.  Any Contract or Lease that is not designated for assumption and assignment or rejection before the expiration of the Designation Rights Period shall be deemed designated for rejection effective as of the date on which the Designation Rights Period expires.  For the avoidance of doubt, all Designated Contracts assumed and assigned to Buyer or its designee pursuant to this Section 2.8(c) shall be Transferred Contracts, and all Designated Leases assumed and assigned to Buyer pursuant to this Section 2.8(c) shall be Assumed Leases.  The Parties hereby acknowledge and agree that Buyer is deemed to have provided

a Designation Notice to Sellers for the rejection, as of the Closing, of each of the Contracts set forth as items 6 through 16 on <u>Section 3.16</u> of the Disclosure Schedule.

(d)    The Sale Order shall provide that, notwithstanding <u>Section 2.8(c)</u>, during the Designation Rights Period, Buyer may deliver a written notice to Sellers of Buyer's entry into an agreement with a Designation Counterparty to any Designated Contract or Designated Lease pursuant to which such Designation Counterparty consents to the assumption and assignment to Buyer or its designee of such Designated Contract or Designated Lease on the terms set forth in such agreement.    The assumption and assignment of any Designated Contract or Designated Lease pursuant to this <u>Section 2.8(d)</u> shall be effective on the date set forth in the written notice provided to Sellers without further order of the Bankruptcy Court.    For the avoidance of doubt, all Designated Contracts assumed and assigned to Buyer pursuant to this <u>Section 2.8(d)</u> shall be Transferred Contracts, and all Designated Leases assumed and assigned to Buyer pursuant to this <u>Section 2.8(d)</u> shall be Assumed Leases.

(e)    Buyer shall be responsible for any and all payment Liabilities (including Taxes) of Buyer, Sellers or any of their respective Affiliates (i) under the Designated Contracts and Designated Leases or (ii) as a result of, arising out of or in connection with the operation of any Store or distribution center governed by any such Designated Contracts or Designated Leases, in each case that are incurred and come due and payable during the period from and after Closing through the effective date of such Designated Contract's or Designated Lease's assumption and assignment to Buyer or rejection by any Seller in accordance with this Agreement.    All such Liabilities incurred during and attributable to such period but that become due and payable after such effective date shall be prorated using the proration method set forth in <u>Section 2.10</u> as appropriately modified to reflect the fact that the proration shall occur as of the effective date of the assignment and assumption or rejection and that Buyer is responsible for the prorated charges through such effective date.    For the avoidance of doubt, Buyer shall pay all such Liabilities on a current basis as and when they come due and payable.

(f)    Sellers shall take all commercially reasonable actions required to assume and assign the Transferred Contracts and Assumed Leases to Buyer or its designee (and for Buyer or its designee to assume all Assumed Liabilities in connection therewith), including taking all actions reasonably necessary, at Buyer's expense following the Closing Date, to facilitate any negotiations with the counterparties to such Contracts or Leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts or Leases to Buyer or its designee satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(g)    Buyer shall take all actions reasonably required for Sellers to assume and assign the Transferred Contracts and Assumed Leases to Buyer or its designee (and for Buyer or its designee to assume all Assumed Liabilities in connection therewith) (including the payment of Buyer Cure Costs, if so required), including taking all actions reasonably necessary to facilitate any negotiations with the counterparties to such Contracts or Leases and, if necessary, to obtain an order of the Bankruptcy Court containing a finding

that the proposed assumption and assignment of the Contracts or Leases to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(h)    Buyer shall as promptly as reasonably practicable, but in any event upon assumption and assignment of any Transferred Contract or Assumed Lease hereunder, pay all Buyer Cure Costs (if any) in connection with any such assumption.

(i)    Prior to and during the Designation Rights Period, Sellers shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Designated Contract or Designated Lease, or take any affirmative action not required thereby, without the prior written consent of Buyer except if (i) Buyer has provided written notice to Sellers designating such Contract or Lease for rejection pursuant to this Section 2.8 or (ii) in the case of any Contract or Lease as to which Buyer has materially breached its obligations with respect to the payment of Liabilities associated with such Contract or Lease as required by the terms of this Agreement.

(j)    Notwithstanding the foregoing and anything herein to the contrary, and subject to Section 5.6, a Contract or Lease shall not be assigned to, or assumed by, Buyer or its designee hereunder to the extent that such Contract or Lease (i) is terminated by a Seller (subject to Section 5.2(b)(vi) and Section 5.2(b)(xvi)) or the counterparty thereto, or terminates or expires by and in accordance with its terms, on or prior to the end of the Designation Rights Period and is not continued or otherwise extended upon assumption, or (ii) requires a consent or authorization from a Governmental Authority (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer or its designee of the applicable Seller's rights under such Contract or Lease, and such consent or authorization has not been obtained prior to the Closing or end of the Designation Rights Period.  In the event that any Transferred Contract or Assumed Lease is deemed not to be assigned pursuant to clause (ii) of this Section 2.8(j), the Closing shall nonetheless occur and the Designation Rights Period shall nonetheless end subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such consent or authorization is obtained and twelve (12) months following the Closing (or the remaining term of such Contract or Lease, the confirmation of any chapter 11 plan under the Bankruptcy Code, or the closing of the Bankruptcy Cases, if shorter), Sellers and Buyer shall (A) use commercially reasonable efforts to secure such consent or authorization as promptly as practicable after the Closing (at Buyer's expense), and (B) cooperate in good faith to allow Buyer or its designee to perform the services thereunder on Sellers' behalf, in all cases, without infringing upon the legal rights of any third party, including by good faith cooperation with any lawful and commercially reasonable arrangement reasonably proposed by Buyer, including subcontracting, licensing or sublicensing to Buyer any or all of any Sellers' rights and obligations with respect to any such Contract or Lease, under which (1) Buyer shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective Affiliates) under such Contract or Lease with respect to which the consent or authorization has not been obtained, and (2) Buyer shall assume any related burden (net of the amount of any related Tax benefit obtained by Sellers or their respective Affiliates) and obligation (including performance) with respect to such Contract or Lease.  Upon satisfying all such

requisite consent or authorization requirements applicable to such Contract or Lease after the Closing, such Contract or Lease shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement.

(k)     During the Designation Rights Period, subject to the terms of the Occupancy Agreement, Sellers shall provide Buyer access to all properties governed by any Designated Leases, allow Buyer and its Representatives to operate the Business during the period from and after Closing through the effective date of the applicable Designated Lease's assumption and assignment to Buyer or rejection by any Seller in accordance with this Agreement.

(l)     In the case of any executory Contract or Lease of the Canadian Seller listed on Schedule 2.8(a), to the extent insolvency proceedings are commenced with respect to the Canadian Seller pursuant to Section 5.12 or otherwise, Sellers and Buyer shall cooperate in good faith to provide for treatment of each such Contract or Lease pursuant to such insolvency proceedings substantially similar to that set forth in Section 2.8(b)-(k), to the extent permitted by or otherwise in accordance with applicable Canadian Law.  To the extent insolvency proceedings are not commenced with respect to the Canadian Seller, the provisions of Section 2.8(b)-(k) shall not apply to the executory Contracts and Leases of the Canadian Seller.

Section 2.9     Allocation.

(a)     Buyer and Sellers agree to allocate the Purchase Price, the Assumed Liabilities, and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles").  No later than one hundred twenty (120) days after the Closing Date, Buyer shall in good faith prepare and deliver to Sellers an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Sellers' review and approval (such approval not to be unreasonably withheld, conditioned or delayed).   Any reasonable comments timely provided by Sellers to Buyer under this Section 2.9 shall be considered by Buyer in good faith.  The Purchase Price Allocation (inclusive of any reasonable comments accepted by Buyer) shall be conclusive and binding on the Parties, and Buyer and Sellers agree (and agree to cause their respective subsidiaries and Affiliates) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the Purchase Price Allocation. None of the Parties will take any position inconsistent with the Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority.  Notwithstanding the foregoing, in the case of any Acquired Asset for which an allocation of the Purchase Price is required earlier than contemplated by the foregoing, the timeframe for determination of the allocation of the Purchase Price to those assets shall be fixed by the Parties to accommodate such requirement, provided that any such allocation may thereafter be revised for other purposes as appropriate and necessary to reflect the overall final Purchase Price Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.9 shall survive the Closing without limitation.

(b)     If Sellers disagree with the Purchase Price Allocation, Sellers shall notify Buyer in writing of such disagreement within thirty (30) calendar days after the Buyer's delivery of the Purchase Price Allocation. The Sellers and Buyer shall negotiate in good faith to resolve any such disagreement and shall amend the Purchase Price Allocation to reflect any resolution agreed to in writing.

(c)     Any disagreement described in <u>Section 2.9(a)</u> or regarding any amendment described in <u>Section 2.9(b)</u> that Buyer and the Sellers are unable to resolve through good faith negotiations within thirty (30) calendar days shall be submitted to an Independent Accountant (acting as an expert and not as an arbitrator) for resolution. For this purpose, (i) the Independent Accountant may not assign a value to any disputed item greater than the greatest value for such disputed item claimed by any Party or less than the lowest value for such disputed item claimed by any Party and (ii) all fees and expenses relating to the work, if any, to be performed by the independent accountant will be allocated between Buyer and Sellers in the same manner provided for in <u>Section 2.7(b)(iii)</u>. The Purchase Price Allocation shall be amended to reflect the Independent Accountant's resolution of any such disagreement.

Section 2.10     <u>Proration</u>.

(a)     On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, and utility charges) under the Assumed Leases (the "<u>Prorated Charges</u>") shall be apportioned and prorated between Sellers on the one hand and Buyer on the other hand as of the Closing Date with (i) Buyer bearing the expense of Buyer's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges under the applicable Lease and the denominator being the total number of days in the lease month in which the Closing Date occurs, times (B) the number of days in such lease month following the day that immediately precedes the Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing Date and not already taken into account in the Adjustment Amount, and (ii) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Buyer to the extent payment for such Prorated Charges has not been previously made by Sellers and not already taken into account in the Adjustment Amount. The net amount of all Prorated Charges owed to Buyer and Sellers under this shall be referred to as the "<u>Buyer Proration Amount</u>" if owed to Buyer or the "<u>Seller Proration Amount</u>" if owed to Sellers. Except as set forth in this <u>Section 2.10</u> and in <u>Section 6.4</u>, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Buyer.

(b)     As to all non-monthly real estate related payments under the Assumed Leases, the same shall be apportioned between Sellers and Buyer as of 12:01 a.m. on the Closing Date. If any amounts are payable in installments, all installments due through the Closing Date together with the accrued but unpaid portion of any other installments not yet due as of the Closing Date shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date.

(c)     As to real estate Taxes and assessments, if the Closing shall occur before a new real estate or personal property tax rate is fixed for the applicable property, the apportionment of such Taxes for such property at the Closing shall be upon the basis of the old tax rate for the preceding fiscal year applied to the latest assessed valuation.  Promptly after the new tax rate is fixed, the apportionment of Taxes shall be recomputed and any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the Closing shall be promptly corrected and the proper Party reimbursed.

(d)     If any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the Closing are discovered subsequent to the Closing, then such items shall be reapportioned and such errors and omissions corrected in connection with the delivery of the Closing Statement and determination of the Purchase Price.

Section 2.11   <u>Removal of Excluded Assets</u>.  As promptly as practicable following the Closing Date (and in any event within ten (10) Business Days), Sellers shall remove at their expense all of the Excluded Assets that are located at the Stores and, if requested by Sellers, Buyer shall reasonably cooperate with Sellers so that Sellers can arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' expense.

Section 2.12   <u>Withholding</u>.  Buyer and any other applicable withholding agent shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement any amount that Buyer or such other applicable withholding agent, as the case may be, is required to deduct and withhold under any provision of Law; <u>provided</u>, <u>however</u>, that Buyer shall use reasonable efforts to provide the applicable payee with (a) written notice upon Buyer becoming aware that any deduction or withholding is required and (b) the opportunity to reduce or eliminate any such withholding obligation.  To the extent such deducted or withheld amounts are remitted to the appropriate Governmental Authority, such amounts shall be treated as delivered to Sellers hereunder.  For the avoidance of doubt, the Parties acknowledge that no deduction or withholding will be made with respect to any bulk transfer laws or similar Laws or any jurisdiction which <u>Section 5.8</u> is applicable.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers make the following representations and warranties to Buyer, except as set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>").

Section 3.1   <u>Organization of Sellers; Good Standing</u>.  Each Seller and each of its Subsidiaries is a corporation or other organization duly organized, validly existing and in good standing under the Laws of the state of its incorporation, formation or organization and has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now being conducted.  Each Seller and each of its Subsidiaries is legally qualified to transact business as a foreign entity in all jurisdictions where the nature of its properties and the conduct of its business as now conducted

require such qualification, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

Section 3.2    Authorization of Transaction.   Subject to the Bankruptcy Court's entry of the Sale Order, each Seller has full power and authority (including full corporate power and authority) to execute, deliver and perform this Agreement, the Related Agreements, and all other agreements contemplated hereby to which it is or will be a party and to perform its obligations hereunder and thereunder.   The execution, delivery, and performance of this Agreement, the Related Agreements, and all other agreements contemplated hereby to which each Seller is or will be a party have been duly authorized by such Seller.   Upon due execution hereof by each Seller, this Agreement, the Related Agreements, and all other agreements contemplated hereby (assuming due authorization and delivery by Buyer) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 3.3    Noncontravention; Government Filings.   Neither the execution, delivery or performance of this Agreement, the Related Agreements, and all other agreements contemplated hereby, nor the consummation of the transactions contemplated hereby or thereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of any Seller or any of its Subsidiaries, (b) subject to the entry of the Sale Order, violate any Law or Decree to which any Seller is subject in respect of the Acquired Assets, (c) subject to the entry of the Sale Order, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any (i) Lease or (ii) material Contract to which any Seller or any of its Subsidiaries is a party or to which any of the Acquired Assets is subject, or (d) result in the creation of, or require the creation of, any Lien (other than Permitted Post-Closing Liens) upon any Acquired Assets or any property of Sellers or any of their respective Subsidiaries, except, in the cases of clauses (b) and (c), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.   Other than (x) in connection with applicable filing, notification, waiting period or approval requirements, to the extent required, under the HSR Act and all applicable Antitrust Laws, and (y) the Bankruptcy Code, the Bidding Procedures Order, or the Sale Order, no Seller or any Subsidiary thereof is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, or any other agreements contemplated hereby or thereby, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as whole, or prevent or materially impair or delay Sellers' ability to consummate the transactions contemplated hereby or perform their obligations hereunder or thereunder on a timely basis.

Section 3.4    Title to Assets; Sufficiency of Assets.

(a)    Sellers and their respective Subsidiaries have good and valid title to, or the right to use, the tangible Acquired Assets.  Pursuant to the Sale Order (or any other similar Decree under applicable Law for Brooks Brothers Far East Limited and Brooks Brothers Canada Ltd), Sellers will convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Post-Closing Liens).

(b)    All tangible assets of the Business (i) are in good working order and condition, ordinary wear and tear excepted, (ii) have been reasonably maintained, (iii) do not require more than regularly scheduled maintenance in the Ordinary Course of Business and the established maintenance policies of Business, as applicable, in order to keep them in good operating condition and (iv) comply in all material respects with all requirements under any Laws and any licenses which govern the use and operation thereof.   The Acquired Assets, together with the Excluded Assets, constitute all the material properties, material assets and material rights (other than Intellectual Property and Intellectual Property Licenses, which is the subject of Section 3.13(b)), owned or used by Sellers and their Subsidiaries (other than the JVs) in the conduct of the Business as currently conducted by Sellers and their Subsidiaries (other than the JVs).

Section 3.5    Transferred Contracts and Assumed Leases.

(a)    Schedule 2.8(a) sets forth a complete list, as of the date of its delivery to Buyer in accordance with Section 2.8(a), of all (i) executory Contracts, and (ii) unexpired Leases to which any Seller or Subsidiary thereof (other than the JVs) is a party.

(b)    True and complete copies of all Contracts and Leases required to be set forth on Schedule 2.8(a) (including all modifications, amendments, supplements and waivers thereto) have been made available to Buyer (other than off-the-shelf, commercially available software costing or having an annual fee of less than $100,000).

(c)    Other than as a result of (i) rejection by Sellers in the Bankruptcy Cases, (ii) the automatic stay under the Bankruptcy Code, (iii) the suspension of obligations pursuant to Section 365(d)(3) of the Bankruptcy Code or (iv) any consequence of any of the foregoing, (A) there does not exist under any Contract (including, for the avoidance of doubt, any Intellectual Property License) required to be set forth on Schedule 2.8(a) any breach, violation or default on the part of a Seller or any of its Affiliates, or, to the Knowledge of Sellers, any other party to such Contract, that would, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, (B) there does not exist any event, including the consummation of the transactions contemplated in this Agreement or any Related Agreement, that would (with or without notice, passage of time, or both) constitute a breach, violation or default thereunder on the part of a Seller or result in the acceleration of any obligation under such Contract, which breach, violation, acceleration or default is, or would, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole, and (C) Sellers and their respective Subsidiaries have not received any written notice of any default, notice of termination or intent to terminate, or notice regarding payment delinquency in respect

of any such Contract that would, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

Section 3.6    Real Property.

(a)    Section 3.6(a) of the Disclosure Schedule sets forth the location of each Store, distribution center, and office, each of which is leased to Sellers or their respective Subsidiaries (other than the JVs) by a third party (collectively, the "Leased Real Property"), and a true and complete list of all Leases. Sellers have made available to Buyer a true and complete copy of each Lease to the extent in their possession. With respect to each Lease, (i) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of each Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity, and (ii) except as set forth in Section 3.6(c) of the Disclosure Schedule, neither such Sellers nor, to Sellers' Knowledge, the counterparty thereto is in breach or default under such Lease, and to Sellers' Knowledge no event has occurred or condition exists that, with notice or lapse of time, or both, would constitute a default by any Seller or, to Sellers' Knowledge, by any other party thereto, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to be material to the Business, taken as a whole. To Sellers' Knowledge, no Person that is not a Seller has any right to possess, use or occupy any of the Leased Real Property. The leasehold interests of Sellers in the Leases are subject to no Liens other than Permitted Liens. To Sellers' Knowledge, no Person that is not a Seller has any right to possess, use or occupy the Lease premises.

(b)    Section 3.6(b) of the Disclosure Schedule sets forth a true and complete list of all Owned Real Property. Sellers have good and indefeasible fee simple title to the Owned Real Property free and clear of all Liens, other than Permitted Liens. Except as set forth on Section 3.6(b) of the Disclosure Schedules, with respect to each Owned Real Property, (i) no Seller nor any of its Subsidiaries has leased, licensed or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof, (ii) other than the right of Buyer pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein, and (iii) except for this Agreement, no Seller nor any of its Subsidiaries is a party to any Contract to sell, transfer, or encumber any Owned Real Property. Sellers and their Subsidiaries have not received written notice that any of the Owned Real Property is subject to any governmental decree or order to be sold or is being condemned, expropriated or otherwise taken by any public authority with or without payment of compensation therefor and, to the Knowledge of Sellers, no such condemnation, expropriation or taking has been proposed or is contemplated.

Section 3.7    <u>Litigation; Decrees</u>.    Except as set forth in <u>Section 3.7</u> of the Disclosure Schedule, and other than the Bankruptcy Cases, as of the date of this Agreement, there is no Litigation pending that (a) would reasonably be expected to be material to the Business, taken as a whole or (b) challenges the validity or enforceability of this Agreement or the Related Agreements or that seeks to enjoin or prohibit consummation of the transactions contemplated hereby or thereby.  Other than the Bankruptcy Case, as of the date of this Agreement, no Seller or any Subsidiary thereof is subject to any outstanding Decree that would (a) reasonably be expected to be material to the Business, taken as a whole or (b) prevent, materially impede or materially delay any Seller's ability to consummate the transactions contemplated hereby or by the Related Agreements or perform in any material respect its obligations hereunder or thereunder.

Section 3.8    <u>Labor Relations</u>.

(a)    Except for the Covered Collective Bargaining Agreements, no Seller or any Subsidiary thereof is a party to or bound by any collective bargaining agreement covering the Covered Employees.  To the Knowledge of Sellers, no union or other labor organization (i) is currently attempting to organize any Covered Employee for the purpose of representation or (ii) has demanded recognition or filed any petition seeking certification in the three-year period prior to the date of this Agreement.  Since August 1, 2017, there have been no strikes, work stoppages, slowdowns, picketing, concerted refusal to work overtime, handbilling, demonstrations, leafletting, lockouts, material arbitrations or grievances (in each case involving labor matters) or other material labor disputes pending or, to Sellers' Knowledge, threatened against any Seller or any of its Subsidiaries.  No Seller or any of its Subsidiaries have entered into any agreement, arrangement or understanding, whether written or oral, with any labor union, trade union, works council or other employee representative body or with any material number or category of its employees that Sellers or any of their respective Subsidiaries believe would reasonably be interpreted or construed to prevent (i) the consummation of the transactions contemplated by this Agreement or (ii) the implementation of any layoff, redundancy, severance or similar program within its or their respective workforces (or any part of them), subject to compliance with Sellers' or any of their Subsidiaries' severance plan and any applicable severance provisions in the Covered Collective Bargaining Agreements.

(b)    Except as would not reasonably be expected to result in material Liability, with respect to the Covered Employees, each Seller and each Subsidiary thereof (i) is and has been in, since August 1, 2017, compliance with all applicable Laws relating to labor, employment and employment practices, including all Laws relating to terms and conditions of employment, wages and hours, discrimination, immigration, workplace safety and health, "mass layoffs" and "plant closings" (as those terms are defined in the WARN Act and similar state and local Laws), classification of independent contractors, and workers' compensation; (ii) has no grievance, arbitration proceeding, unfair labor practice charge or complaint, pending or, to the Knowledge of Sellers, threatened against it that arises out of or under any of Seller's or any of its Subsidiaries' collective bargaining agreements or relates to any employee of Sellers or any of their respective Subsidiaries; and (iii) is not currently experiencing, and has received no current threat of, any strike, slowdown, work stoppage, picketing or lockout related to any employee of any Seller or any Subsidiary thereof.

41

(c)      Section 3.8(c) of the Disclosure Schedule sets forth a true, correct and complete list, as of the date of this Agreement, of all Covered Employees and identifies the job title, work location, visa and expiration date (if applicable), date of hire, exempt or non-exempt status, employment status (whether active or on leave of absence), part-time or full-time, union, annual base salary or regular hourly wage rate, and bonus or commission entitlement for each such Covered Employee, as well as whether such Covered Employee is on leave and the date of such leave and the expected return to work date, provided that such list of Covered Employees identifies no Covered Employee by name or other personal information (the "Covered Employee Census").

(d)      Except as would not reasonably be expected to result in material Liability, there is no governmental investigation or audit or other similar proceeding pending or, to the Knowledge of Sellers, threatened against any Seller or any Subsidiary thereof by, on behalf of or relating to any Covered Employee(s) or former employees.

(e)      Section 3.8(e) of the Disclosure Schedule provide Buyer with a true, correct and complete list of all employees of Sellers and their respective Subsidiaries who have experienced an employment loss within the meaning of the WARN Act or any similar state, local or foreign Law within the one year prior to the date hereof, along with such employee's work location and date of hire (the "WARN List") and Sellers shall provide an updated WARN List to Buyer on the Closing Date as well as upon reasonable request of Buyer prior to the Closing Date. Sellers and their respective Affiliates have complied in all material respects with the WARN Act during the one-year period prior to the date hereof. Sellers and their respective Affiliates have complied with all obligations with respect to the WARN Act.

Section 3.9      Brokers' Fees.   Other than the fees and expenses payable to PJ Solomon in connection with the transactions contemplated hereby (including any transaction involving a Designated Foreign Subsidiary pursuant to Section 6.1), which shall be borne by Sellers, no Seller or any Subsidiary thereof has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Buyer could become liable or obligated to pay. No fees are payable by any Seller or any of their respective Subsidiaries in connection with any transaction involving a Designated Foreign Subsidiary pursuant to Section 6.11.

Section 3.10      Data Privacy and Security.   In each case, except as would not reasonably be expected, individually on in the aggregate, to be material to the Business, in connection with its collection, storage, transfer (including any transfer across national borders) and use of any personally identifiable information from any individuals, including any customers, prospective customers, employees, prospective employees and/or other third parties (collectively, "Personal Information"), Sellers and their respective Subsidiaries are and have in the past three (3) years been in compliance with all applicable Laws, regulations, and industry standards in all relevant jurisdictions related to Personal Information, including the EU General Data Protection Regulation ("GDPR") and all applicable national legislation implementing the GDPR, the California Consumer Privacy Act of 2018 (California Civil Code §§ 1798.100 to 1798.199), as well as the Business's privacy policies and the requirements of any contract or codes of conduct to which any Seller or any of its Subsidiaries is a party. Sellers and their respective Subsidiaries

42

have adopted and follow commercially reasonable physical, technical, organizational and administrative security measures and policies designed to protect all Personal Information and confidential business information collected by any of them or on any of their behalf from and against unauthorized access, use and/or disclosure. Except as would not reasonably be expected, individually or in the aggregate, to be material to the Business, Sellers and their respective Subsidiaries are and have since August 1, 2017 been in compliance with all Laws relating to notification or other obligations in the event of data loss, theft and or breach. Sellers and their respective Subsidiaries have in place a commercially reasonable data incident response plan, including procedures to be followed in the event of a data incident. Since August 1, 2017, in each case, except as would not reasonably be expected, individually or in the aggregate, to be material to the Business: (i) to Sellers' Knowledge, none of Sellers, their respective Subsidiaries or any of their respective vendors or service providers have been the subject of any data breaches or other data security incidents, and (ii) neither Sellers nor their respective Subsidiaries have been the subject of any complaints, claims or investigations related to its data practices from consumers, regulators or law enforcement agencies.

Section 3.11   Taxes.

(a)     Sellers and their respective Subsidiaries have timely filed all material Tax Returns required to be filed by Sellers and their respective Subsidiaries with respect to the Acquired Assets or the Business with the appropriate Governmental Authorities (taking into account any extension of time to file granted or to be obtained on behalf of Sellers), and all such Tax Returns are true, complete, and correct in all material respects.

(b)     All material Taxes imposed on Sellers and their respective Subsidiaries or with respect to the Acquired Assets or the Business that are due and owing have been paid (other than any Taxes not due as of the date of the filing of the Bankruptcy Cases as to which subsequent payment was prohibited by reason of the Bankruptcy Cases or any such Taxes that are being contested in good faith and for which appropriate reserves have been made in accordance with GAAP).

(c)     There are no material pending (or threatened in writing) audits, examinations, investigations or other proceedings relating to a material amount of Taxes imposed on Sellers or any of their respective Subsidiaries or with respect to the Acquired Assets or the Business.

(d)     There are no Liens relating to Taxes (other than Permitted Liens) on any Acquired Assets.

(e)     Sellers and their respective Subsidiaries have withheld all material amounts of Taxes with respect to the Acquired Assets or the Business required to be withheld and timely paid or remitted such material amounts of Taxes to the appropriate Governmental Authority.

(f)     In the last three (3) years, no claim has been made in writing by an Governmental Authority in a jurisdiction where a Seller or any of its Subsidiaries does not

currently file Tax Returns that such Seller or any of its Subsidiaries may be subject to Tax by that jurisdiction with respect to the Acquired Assets or the Business.

Section 3.12    Employee Benefits.

(a)    Section 3.12(a) of the Disclosure Schedule lists all material "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans, agreements, plans, practices or arrangements providing for compensation, employee benefits, change in control payments, equity awards, fringe benefits, bonus plans or arrangements, incentive plans, deferred compensation arrangements, severance pay or benefits, sick leave, vacation pay, disability, medical insurance and life insurance or other remuneration or benefit of any kind, whether written or unwritten, funded or unfunded, that is sponsored, maintained, contributed to, or required to be contributed to by Sellers and their Subsidiaries, in each case, for the benefit of any Covered Employees (other than governmental plans and statutorily required benefit arrangements) (the "Employee Benefit Plans"). Section 3.12(a) of the Disclosure Schedule also separately identifies each Assumed Employee Benefit Plan.

(b)    True, correct and complete copies of the following documents, with respect to each of the Assumed Employee Benefit Plans identified as such as of the date of this Agreement, have been made available to Buyer: (i) each plan document (and all amendments thereto), or in the case of an unwritten Assumed Employee Benefit Plan, a written description thereof; (ii) any trust agreement, investment management contract, custodial agreement or insurance contract relating to such plan; (iii) the most recent summary plan description and all summaries of material modifications thereto; and (iv) the most recent annual reports on Form 5500 and all Schedules thereto. If Buyer identifies other Employee Benefit Plans as Assumed Employee Benefit Plans after the date of this Agreement, the Sellers will provide the foregoing documents with respect to each such newly identified Assumed Employee Benefit Plan within a reasonable amount of time.

(c)    Each of the Employee Benefit Plans that is intended to qualify under Section 401(a) of the IRC (i) has received a favorable determination letter from the IRS, or with respect to a prototype plan or can rely on an opinion letter from the IRS issued to the prototype plan sponsor, and to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination and (ii) does not hold "employer real property" or "employer securities" as a plan asset within the meaning of ERISA.

(d)    Except as set forth on Section 3.12(d) of the Disclosure Schedule, no Seller, Subsidiary thereof or any of their respective ERISA Affiliates has, within the past six (6) years, maintained, sponsored, had a commitment to create or has any Liability or contingent Liability with respect to any arrangement (i) that is subject to Title IV of ERISA (a "Title IV Plan"); (ii) that is a "multiemployer plan" (as defined under Section 3(37) of ERISA); or (iii) provides health or welfare benefits to any former employee of any Seller, except as required under COBRA or any similar state Law.

(e)    Each of the Employee Benefit Plans has been established, maintained and operated in compliance with applicable Law (including ERISA and IRC and the Patient Protection Affordable Care Act), except as would not reasonably be expected to result in material Liability to Buyer.  Sellers and their respective Affiliates have complied in all material respects with all obligations with respect to any COBRA Liabilities incurred prior to the date hereof.

(f)    Except as set forth on Section 3.12(f) of the Disclosure Schedule, with respect to any Employee Benefit Plan that is a Title IV Plan, (i) all premiums due to the PBGC as of the date hereof have been paid, (ii) as of the date of this Agreement, no Seller or any of its Subsidiaries has filed a notice of intent to terminate the plan or adopted any amendment to treat such plan as terminated, and (iii) as of the date of this Agreement, the PBGC has not instituted proceedings to treat such plan as terminated.  As of the date of this Agreement, no Seller or any of its Subsidiaries has terminated any Title IV Plan within the last six (6) years or incurred any outstanding Liability under Section 4062 of ERISA to the PBGC or to a trustee appointed under Section 4042 of ERISA.

Section 3.13    Intellectual Property.

(a)    Section 3.13(a) of the Disclosure Schedule sets forth a full and accurate list of all registered Intellectual Property and applications for registration of Intellectual Property, in each case, owned by Sellers or any of their respective Subsidiaries as of the date of this Agreement (the "Registered Intellectual Property").  The Registered Intellectual Property is subsisting and, to the Knowledge of Sellers, valid and enforceable. Sellers or their respective Subsidiaries are the exclusive owners of all Registered Intellectual Property and the public records of each item of material Registered Intellectual Property reflect the correct corporate name of each Seller or Subsidiary that owns such material Registered Intellectual Property.  All Registered Intellectual Property shall be transferred free and clear of all Liens (other than Permitted Post-Closing Liens).

(b)    Sellers and their respective Subsidiaries own or have rights to use all Intellectual Property included in the Acquired Assets free and clear of all Liens (other than Permitted Liens).  Other than the Excluded Trademarks, the Intellectual Property and Intellectual Property covered by Intellectual Property Licenses included in the Acquired Assets and Intellectual Property Licenses included in Schedule 2.8(a) constitute all Intellectual Property owned or used or held for use by Sellers or their respective Subsidiaries (other than the JVs) in connection with the Business.

(c)    No action is pending, or has been threatened in writing, against Sellers or any of their respective Subsidiaries (i) alleging infringement or misappropriation of the Intellectual Property of any third party or (ii) challenging the validity of any material Intellectual Property owned by Sellers or any of their respective Subsidiaries.  No Seller or any Subsidiary thereof is infringing or misappropriating the Intellectual Property of any third party in any material respect.  No Intellectual Property included in the Acquired Assets or owned by any Subsidiary of any Seller is subject to any outstanding order, judgment, Decree, stipulation or written agreement related to or restricting in any manner

45

the licensing, assignment, transfer or conveyance thereof by Sellers or any of their respective Subsidiaries.

(d)     To the Knowledge of Sellers, the Business as currently conducted by Sellers and their respective Subsidiaries has not, in the last eighteen (18) months, and does not as of the Closing Date infringe, misappropriate or violate any Intellectual Property right of any third party, in each case in any material respect.  There is no pending claim or, to the Knowledge of Sellers, claim threatened in writing alleging that the manufacture, marketing, license, sale or use of any product or service of the Business as currently conducted by Sellers and their respective Subsidiaries infringes, misappropriates or otherwise violates any Intellectual Property right of any third party or violates any Contract with any third party to which Sellers or any of their respective Subsidiaries are a party or by which any of them are bound.

(e)     Sellers and their respective Subsidiaries have taken commercially reasonable steps to secure from each present or former employee, officer, director, agent, outside contractor or consultant of Sellers and their respective Subsidiaries who contributed to the development of any material Intellectual Property on behalf of Sellers or such Subsidiaries a written and enforceable agreement providing for the non-disclosure by such Person of confidential information and assigning to one or more of Sellers or any of their respective Subsidiaries all rights to such Person's contribution to such Intellectual Property.  Sellers and their respective Subsidiaries have taken commercially reasonable and appropriate steps to protect, maintain and preserve the confidentiality of any material trade secrets included in the Acquired Assets.  Any disclosure by Sellers or any of their respective Subsidiaries of such trade secrets to any third party has been pursuant to the terms of a written agreement with such Person.

(f)     All material software owned, licensed, used, or otherwise held for use in the Business is in good working order and condition and is sufficient in all material respects for the purposes for which it is currently used in the Business.  To the Knowledge of Sellers, Sellers and their respective Subsidiaries have not experienced any material defects in design, workmanship or material in connection with the use of such software that have not been corrected.  To the Knowledge of Sellers, no such software contains any computer code or any other procedures, routines or mechanisms which may:  (i) disrupt, disable, harm or impair in any material way such software's operation, (ii) cause such software to damage or corrupt any data, storage media, programs, equipment or communications of Sellers, any of their respective Subsidiaries or any of the foregoing's clients, or otherwise interfere with Sellers' and their respective Subsidiaries' operations as currently conducted in any material way, or (iii) permit any third party to access any such software to cause disruption, disablement, harm, impairment, damage erasure or corruption (sometimes referred to as "traps", "viruses", "access codes", "back doors" "Trojan horses," "time bombs," "worms," or "drop dead devices") in any material way.  The computer software, computer hardware, firmware, networks, interfaces and related systems (collectively, "Computer Systems") used in the Business are sufficient in all material respects for Sellers' and their respective Subsidiaries' current needs in the operation of the Business as presently conducted, and, in the twelve (12) months prior to the date hereof, to the Knowledge of Sellers, there have been no material failures, crashes, or security breaches of the Computer

46

Systems which have caused material disruption to the Business. Sellers and their respective Subsidiaries have taken reasonable actions to protect the integrity and security of the Computer Systems and the information stored therein from unauthorized use, access, or modification by third parties.

Section 3.14    Compliance with Laws; Permits.

(a)    Sellers and their respective Subsidiaries are in compliance, in all material respects, with all Laws applicable to the Business. Except as related to or as a result of the filing or pendency of the Bankruptcy Cases, since August 1, 2017 (i) no Seller or any Subsidiary thereof has received any written notice of, or been charged with, the material violation of any Laws and (ii) to the Knowledge of Sellers, no event has occurred or circumstance exists that (with or without notice, passage of time, or both), individually or in the aggregate, would constitute or result in a failure by any Seller or any of its Subsidiaries to comply, in any material respect, with any applicable Law. Except as related to or as a result of the filing or pendency of the Bankruptcy Cases, no investigation, review or Litigation by any Governmental Authority in relation to any actual or alleged material violation of Law by any Seller or any of its Subsidiaries is pending or, to the Knowledge of Sellers, threatened, nor has any Seller or any of its Subsidiaries received any written notice from any Governmental Authority indicating an intention to conduct the same.

(b)    Sellers have all Permits which are required for the operation of the Business as presently conducted, and all such Permits are valid and in full force and effect, except where the absence of which, individually or in the aggregate, would not be reasonably expected to be material to the Business, taken as a whole. Sellers and their respective Subsidiaries are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit required for the operation of the Business as presently conducted and to which they are parties, except where such default or violation would not be reasonably expected to be material to the Business.

(c)    Each Seller, its Subsidiaries, their respective directors, officers and employees, and to the Knowledge of Sellers, each Seller's and its Subsidiaries' agents and representatives are and have, since August 1, 2017 been in compliance with (i) any economic sanctions laws or regulations administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the U.S. State Department, the United Nations, Canada, the European Union, or the United Kingdom ("Sanctions") (ii) any laws or regulations concerning (a) the importation of merchandise or items (including technology, services, and software), including but not limited to those administered by U.S. Customs and Border Protection or the U.S. Department of Commerce, and (iii) any Laws concerning the exportation or re-exportation of items (including technology, services, and software), including but not limited to those administered by the U.S. Department of Commerce (collectively, "Trade Controls"). None of the Sellers, their respective Subsidiaries or any of the foregoing's respective officers, directors, agents, employees, or any third party acting on their behalf (A) is or has been designated on any sanctions-related list of restricted or sanctioned persons maintained by the United States, Canada, the European Union, or the United Kingdom, including OFAC' s list of "Specially Designated

47

Nationals and Blocked Persons", (B) is located in, organized under the Laws of, or resident in any country or territory that is or whose government is, or has been in the past five (5) years, the target of comprehensive sanctions imposed by the United States, Canada, European Union or United Kingdom (including Cuba, Iran, North Korea, Sudan, Syria, Venezuela, and the Crimean region of the Ukraine), or (C) owned or controlled by any Person or Persons described in clause (A) or (B).  There have been no claims, complaints, charges, investigations, voluntary disclosures, or Litigations under Trade Controls involving any Seller or any of its Subsidiaries, and to the Knowledge of Sellers, there are no pending or threatened claims or investigations involving suspect or confirmed violations thereof.

(d)    Since August 1, 2017, no Seller, any of its Subsidiaries, nor any of their respective directors, officers, employees, agents, representatives, or any Person acting on their behalf has violated any applicable anti-corruption law, including the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act, or any national and international law enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions ("Anti-Corruption Laws") or any applicable anti-money laundering laws.  No Seller or any of its Subsidiaries or any of their respective directors, officers, employees, agents, representatives, or any Person acting on any of the foregoing's behalf has paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to any government official, government employee, political party, political party official, candidate for public office, or officer or employee of a public international organization for the purpose of influencing any official act or decision or to secure any improper advantage.  Since August 1, 2017, each Seller and each of its Subsidiaries has implemented and maintains effective internal controls, including accounting controls, reasonably designed to prevent and detect violations of all applicable Anti-Corruption Laws and anti-money laundering laws, and each Seller and each of its Subsidiaries has recorded and maintained accurate books and records, including appropriate and lawful supporting documentation, in compliance with applicable Anti-Corruption Laws and anti-money laundering laws.  Since August 1, 2017, each Seller and each of its Subsidiaries has not been the subject of or involved in any Litigation or, to the Knowledge of Sellers, threatened Litigations, relating to non-compliance with Anti-Corruption Laws or anti-money laundering Laws, and there have been no allegations (internal or external) against any Seller or any of its Subsidiaries, or any of their respective directors, officers, employees, agents, material representatives, or any Person acting on behalf of any of the foregoing regarding non-compliance with any applicable Anti-Corruption Laws or anti-money-laundering law.

Section 3.15    Environmental Matters.  Except as disclosed in Section 3.15 of the Disclosure Schedule:

(a)    the Owned Real Property, the property subject to the Leases and the operations of Sellers and their respective Subsidiaries with respect to the Business are, and since August 1, 2017 have been, in compliance with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying with all Permits issued pursuant to Environmental Laws necessary to operate the Business except in each case as would not reasonably be expected to be material to the Business, taken as a whole;

(b)      no Seller or any of its Subsidiaries, with respect to the Business, the Owned Real Property, or the property subject to the Leases, is the subject of any pending, or to the Knowledge of Sellers, threatened, Litigation or has received any unresolved notice, alleging that Sellers or any of their respective Subsidiaries may (i) be in violation of any Environmental Law, or any Permit issued pursuant to Environmental Law, or (ii) have any Liability under any Environmental Law, except in each case as would not reasonably be expected to be material to the Business, taken as a whole;

(c)      there are no pending or threatened investigations of any Seller or any of its Subsidiaries with respect to the Business, the Owned Real Property, or the property subject to the Leases except in each case as would not reasonably be expected to result in Sellers or any of their respective Subsidiaries incurring any material Liability pursuant to any Environmental Law and to the Knowledge of Sellers, no Hazardous Materials are present at or have been released at any Owned Real Property or property subject to the Leases in a quantity or concentration that would require any Seller or Subsidiary thereof to undertake investigation or remediation pursuant to Environmental Law except in each case as would not reasonably be expected to be material to the Business, taken as a whole;

(d)      No Seller or any of its Affiliates has manufactured, distributed, treated, stored, arranged for or permitted the disposal of, transported, released, or exposed any Person to, any Hazardous Material, except as would not reasonably be expected to result in material Liability to Sellers or any of their respective Subsidiaries; and

(e)      Sellers have made available to Buyer true and complete copies of any environmental site assessment, reports or evaluations or any other documents correspondence concerning environmental conditions or Liabilities under Environmental Law with respect to the Owned Real Property, the property subject to the Leases or the operations of the Business, to the extent such reports, documents or correspondence are in any of Sellers' or their respective Subsidiaries' possession, custody or control and identify conditions that would reasonably be expected to result in Buyer incurring material Liabilities under Environmental Laws.

Section 3.16    Related Party Transactions.  Except as set forth on Section 3.16 of the Disclosure Schedule and other than the Employee Benefit Plans, no officer, director or manager (or similar position) of any Seller, any Affiliate of any Seller or any member of any of the foregoing's immediate family (other than another Seller) (a) is a party to any Contract or Lease required to be set forth on Schedule 2.8(a), or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, any Seller or any of its Affiliates, to the Knowledge of Sellers, any actual competitor, vendor or licensor of any Seller (each such Contract, Lease or business arrangement, an "Affiliate Agreement"), (b) to the Knowledge of Sellers, none of the foregoing Persons have any cause of action or other claim whatsoever against or related to the Business or the Acquired Assets, and (c) to the Knowledge of Sellers, no Seller or any Affiliate of any Seller has any direct or indirect business arrangement with or financial obligation to the foregoing Persons.

Section 3.17    <u>Financial Statements</u>.

(a)    <u>General</u>.  True, correct and complete copies of (i) the audited consolidated balance sheets and statements of operations and comprehensive income, stockholders' equity and cash flow of Sellers and their respective Subsidiaries as of and for the years ended August 4, 2018 and August 3, 2019, together with the auditor's reports thereon (the "<u>Audited Financial Statements</u>"), and (ii) an unaudited consolidated balance sheets and statements of operations and comprehensive loss, cash flow and stockholders' equity of Sellers and their respective Subsidiaries as of and for the nine-month period ended May 2, 2020 (such date being the "<u>Interim Balance Sheet Date</u>") (the "<u>Interim Financial Statements</u>" and, together with Audited Financial Statements, the "<u>Financial Statements</u>") have been provided to Buyer.  The Financial Statements present fairly, in all material respects, the financial position, results of operations and cash flows of Sellers and their respective Subsidiaries as of the dates and for the periods indicated in such Financial Statements, have been prepared in accordance with the books of account and other financial records of Sellers and their respective Subsidiaries and have been prepared in conformity with GAAP (except, in the case of the Interim Financial Statements, for the absence of footnotes and other presentation items and for normal year-end adjustments that are not material individually or in the aggregate).  Sellers and their respective Subsidiaries maintain a system of internal accounting controls designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements. To the Knowledge of Sellers, there have been no instances of fraud that occurred during any period covered by the Financial Statements.

(b)    <u>No Undisclosed Liabilities</u>.  Except (i) as reflected in the Financial Statements, (ii) as set forth in <u>Section 3.17(b)</u> of the Disclosure Schedule, (iii) for Liabilities that may have arisen since the Interim Balance Sheet Date in the Ordinary Course of Business and are not material to the Business, (iv) Liabilities arising under the executory portion of a Contract (excluding in each case Liabilities for breach, non-performance or default) that would not result in a Material Adverse Effect and (v) the Excluded Liabilities, Sellers and their respective Subsidiaries do not have any Liabilities required to be set forth on an audited balance sheet prepared in accordance with GAAP of Sellers and their respective Subsidiaries.

Section 3.18    <u>Absence of Certain Changes</u>.  Other than as a result of the Bankruptcy Cases, since the Interim Balance Sheet Date until the date of this Agreement, each Seller and its Subsidiaries have conducted their business in the Ordinary Course of Business, and there has not been any event, circumstance, or development that, individually or together with all other events, circumstances, or developments, has had, or would reasonably be expected to have, a Material Adverse Effect.

Section 3.19    <u>Inventory</u>.  The Inventory, taken as a whole, is of a quantity and quality historically useable or saleable in the Ordinary Course of Business.  All Inventory is free from defects in materials and workmanship (normal wear and tear excepted), except as would not be material to the Business.

Section 3.20    Pricing Files.  Sellers and their respective Subsidiaries (other than the JVs) have maintained their pricing files in the Ordinary Course of Business.  All pricing files and records are accurate in all material respects as to the actual Cost to Sellers and their respective Subsidiaries (other than the JVs) for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts.

Section 3.21    Royalties.  Section 3.21 of the Disclosure Schedule sets forth a summary, true and correct in all material respects, without duplication, of all royalty payments generated by the licensee under the Business's license and distribution agreements in the fiscal years ended on or about August 1, 2017, 2018, and 2019 and in the ten-month period ended May 31, 2020.

Section 3.22    Disclaimer of Other Representations and Warranties.  Except for the representations and warranties contained in this Article III (as modified by the Disclosure Schedule) (which representations and warranties shall terminate and be of no further force or effect as of the Closing), or expressly contained in any Related Agreement, no Seller nor any other Person makes, or shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding any Sellers, any Acquired Assets, any Assumed Liabilities, the Business or any other matter and no Seller nor any other Person will be subject to any Liability to Buyer or any other Person resulting from such matters or the distribution to Buyer, or the use of, any such information.  Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, NO SELLER MAKES ANY OTHER (AND HEREBY DISCLAIMS EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  Without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, BUYER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, BUYER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS).  Without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, Sellers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or Representative of Sellers or any of their Affiliates).  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall limit Sellers' liability for fraud.

## ARTICLE IV
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer makes the following representations and warranties to each Seller that:

Section 4.1    Organization of Buyer; Good Standing.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware.

Section 4.2    Authorization of Transaction.  Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement, the Related Agreements, and all other agreements contemplated hereby to which it is or will be a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and performance of this Agreement, the Related Agreements, and all other agreements contemplated hereby to which Buyer is or will be a party have been duly authorized by Buyer.  Upon due execution hereof by Buyer, this Agreement, the Related Agreements, and all other agreements contemplated hereby (assuming due authorization and delivery by Sellers) constitute, subject to the Bankruptcy Court's entry of the Sale Order, the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar Laws relating to creditors' rights and general principles of equity.

Section 4.3    Noncontravention; Government Filings.  Neither the execution, delivery, or performance of this Agreement, the Related Agreements, and all other agreements contemplated hereby nor the consummation of the transactions contemplated hereby and thereby (including the assignments and assumptions referred to in Article II), will (a) conflict with or result in a breach of the organizational documents of Buyer, (b) violate any Law or Decree to which Buyer is subject or (c) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which Buyer is a party, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Buyer.  Other than in connection with applicable filing, notification, waiting period or approval requirements, to the extent required, under the HSR Act and all applicable Antitrust Laws, Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or materially delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    Litigation; Decrees.  There is no Litigation pending or, to Buyer's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby.  As of the date of this Agreement, Buyer is not subject to any outstanding Decree that would prevent or materially impair or delay Buyer's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5      Brokers' Fees.  Buyer has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6      Sufficient Funds; Adequate Assurances.  Upon the Closing, Buyer will have immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  At the Closing, Buyer shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and Assumed Leases and the related Assumed Liabilities.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1      Efforts; Cooperation.  Upon the terms and subject to the conditions set forth in this Agreement (including Section 5.5(a)), each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, except as otherwise specifically provided in Section 5.5.  Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, and (ii) Buyer shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled.

Section 5.2      Conduct of the Business Pending the Closing.

(a)      Prior to the Closing, except (i) as set forth on Section 5.2(a) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly required by this Agreement or (iv) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), each Seller shall, and shall cause its Subsidiaries to, (A) conduct, operate and maintain the Business and the Acquired Assets in the Ordinary Course of Business and (B) use its commercially reasonable efforts to (1) preserve intact the present business operations, organization and goodwill of the Business, (2) preserve the present relationships with licensors, licensees, contractors, distributors, consultants, vendors, suppliers and others having business relationships with Sellers in connection with the operation of the Business, (3) keep available the services of its officers and Covered Employees in the Ordinary Course of Business, (4) pay all of its undisputed post-petition obligations in the Ordinary Course of Business, and (5) continue to operate the Business and Acquired Assets in all material respects in compliance with all Laws applicable to the Business.  Notwithstanding anything to the contrary herein, Sellers shall (A) have no

53

obligation to re-open stores and shall not be obligated to produce or source New Inventory unless Buyer pays all amounts payable for New Inventory and (B) until the Closing, (I) continue to operate the E-Commerce Platform and conduct related business in the Ordinary Course of Business, (II) cease accepting or otherwise receiving, and cause each of its Subsidiaries not to accept or otherwise receive, any payments (whether in Cash Equivalents, by netting of receivables and payables or otherwise) from any Transferred Entity or Designated Foreign Subsidiary (other than any JV or Subsidiary thereof), other than any payments due from Brooks Brothers Singapore Ptd. Ltd, Brooks Brothers Malaysia SDN, BHD. and Brooks Brothers Korea Ltd., up to an aggregate amount of $700,000, (III) initiate (or cause to be initiated) any shipment, dispatch or delivery of any inventory to any Subsidiary, Transferred Entity or Designated Foreign Subsidiary (other than any JV or Subsidiary thereof), except to the extent such shipment, dispatch or delivery was (x) initiated prior to the date of this Agreement or (y) approved in advance by Buyer in writing with payment terms having been negotiated and (IV) pay, or cause to be paid, in cash the aggregate amount of the "fully loaded" compensation and benefits cost for each employee of the Business's design and sourcing team located in Italy to its applicable Subsidiaries employing such Persons.

(b)     Except (i) as set forth on Section 5.2(b) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly required by this Agreement or (iv) with the prior written consent of Buyer, no Seller shall, and each Seller shall cause its Subsidiaries not to:

(i)     other than in the Ordinary Course of Business or as required by any applicable collective bargaining agreement or Employee Benefit Plan, (A) increase compensation or benefits (excluding severance) of any Covered Employee; (B) increase the coverage or benefits available under any Assumed Employee Benefit Plan; or (C) amend any Assumed Employee Benefit Plan;

(ii)     grant any new equity-based awards, or amend or modify the terms of any such outstanding awards under any Assumed Employee Benefit Plan;

(iii)     other than as required by any applicable collective bargaining agreement, amend any severance plan or agreement as in effect on the date of this Agreement, except to modify the benefits due thereunder to the extent such modifications do not result in the levels of such benefits exceeding the levels of such benefits as of the Petition Date;

(iv)     hire any employee who would be a Covered Employee (other than any such employee to be employed at the Stores or any Transferred Distribution Center in the Ordinary Course of Business) or terminate any Covered Employee who is an executive officer unless such termination is (A) for "cause" or (B) as a result of Buyer's written confirmation that such Covered Employee will not be hired; provided, that Sellers shall consult with Buyer prior to any such termination;

(v)     sell, transfer or otherwise dispose of any Owned Real Property used in, held for use in, or relating to the Business;

(vi)    amend, modify, terminate or fail to exercise any renewal option under any Contract or Lease required to be set forth on <u>Schedule 2.8(a)</u> (other than any Contract or Lease designated for rejection by Buyer pursuant to <u>Section 2.8(b)</u>);

(vii)    amend, modify or terminate any Covered Collective Bargaining Agreement or make any changes or negotiate to make any changes which would result in increased Liability to Buyer;

(viii)    subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral;

(ix)    enter into any Contract or Lease that limits or restricts in any material respect the conduct or operations of the business of Sellers or any of their respective Subsidiaries, or that limits or restricts the use of the Intellectual Property included in the Acquired Assets;

(x)    with respect to the Subsidiaries of each Seller, incur, create, assume, guarantee or become liable for any indebtedness for borrowed money;

(xi)    use "liquidation" sales or use "brand sale", "going out of business", "out of business", "going out of business sale", "we quit", "quitting business", "everything must go", "liquidation/liquidating" or similar language with respect to the Business or the Acquired Assets;

(xii)    close any Store, other than Stores set forth in <u>Section 5.2(b)(xii)</u> of the Disclosure Schedule (the "<u>Closing Stores</u>");

(xiii)    modify, amend, supplement, transfer, or terminate any Contract or Lease, other than Contracts (but not Leases) which are immaterial to the Business with a value that do not exceed $25,000 individually or $100,000 in the aggregate;

(xiv)    fail to make, or maintain in full force and effect, any filings necessary to maintain the material Registered Intellectual Property included in the Acquired Assets in full force and effect;

(xv)    write up, write down or write off the book value of any assets other than in the Ordinary Course of Business;

(xvi)    reject any Contracts or Leases other than as set forth on <u>Section 5.2(b)(xvi)</u> of the Disclosure Schedule or those designated for rejection by Buyer pursuant to <u>Section 2.8</u>;

(xvii)    make any new commitment with respect to capital expenditures;

(xviii)    waive any of the rights of Sellers or any of their respective Subsidiaries under any confidentiality or non-compete provisions of any material Transferred Contract;

(xix)   seek to accelerate the receipt of any royalty payments or licensing or other receivables generated by Sellers or any of their respective Subsidiaries, by way of discount or otherwise;

(xx)   acquire, dispose of or transfer any material asset or property that is an Acquired Asset (including any Intellectual Property right), other than (x) acquisitions and dispositions of inventory in the Ordinary Course of Business from or to Persons that are not Affiliates of any Seller and (y) Intellectual Property Licenses entered into the Ordinary Course of Business;

(xxi)   pay, settle or compromise any Litigation or threatened Litigation involving or with respect to the Business or the Acquired Assets, or commence any Litigation;

(xxii)   amend the organizational documents of any Transferred Entity or any Designated Foreign Subsidiary;

(xxiii)  change financial accounting policies or procedures with respect to or otherwise affecting any of the Acquired Assets or the Business, except as required by changes in GAAP or applicable Law;

(xxiv)  invalidate or cause the cancellation of any current insurance coverage (without replacement thereof) or fail to maintain current insurance coverage or suitable renewals thereof providing coverage substantially the same as any expiring policy;

(xxv)   fail to file any material Tax Return or pay any material Taxes when due with respect to the Acquired Assets or the Business;

(xxvi)  transfer any Inventory from any closed Store or Closing Store to any other Store (for the avoidance of doubt, it is understood that transfers of Inventory from any closed Store or Closing Store to any Transferred Distribution Center is not restricted by this Section 5.2(b)(xxvi));

(xxvii) transfer any Cash Equivalents located at the Stores, any Cash Equivalents in Store depository accounts or en route to Store depository accounts, or any petty cash located at the Stores and corporate offices out of such locations outside of the Ordinary Course of Business in each case except to the extent located at a closed Store or a Closing Stores;

(xxviii)issue any Gift Cards, other than to replace lost or stolen Gift Cards consistent with the applicable policies in place as of the date of this Agreement;

(xxix)  enter into any Affiliate Agreement, other than Affiliate Agreements on arm's-length terms;

(xxx)   with respect to any Designated Foreign Subsidiary or any other Transferred Entity, declare, set aside or pay any dividend or other distribution

(whether in cash, stock or property or any combination thereof) in respect of any equity interests thereof; or

(xxxi)  agree, whether in writing or otherwise, to do anything prohibited by this Section 5.2.

Section 5.3    Regulatory Approvals.

(a)    Each of the Parties hereto shall promptly (and in no event later than seven (7) Business Days following the date that this Agreement is executed) make to the extent required its respective filing under the HSR Act with respect to the transactions contemplated hereby.  In addition, the Parties shall mutually agree to make any and all other filings required pursuant to the Antitrust Laws of any other jurisdiction as promptly as reasonably practicable following the date that this Agreement is executed.  Further, Buyer shall use its commercially reasonable efforts to (i) supply as promptly as practicable any additional information and documentary material that may be requested or required pursuant to any Antitrust Law, including the HSR Act; and (ii) cause the expiration or termination of any applicable waiting periods under the HSR Act or any other Antitrust Law as soon as practicable.  Buyer shall not withdraw its HSR Act filing, or other filing required by Antitrust Law, enter into any agreements to extend any HSR Act waiting period or other waiting period under any Antitrust Law, or enter into any agreements to delay or not to consummate the transactions contemplated hereby without the prior written consent of Sellers.  All filing fees related to the HSR Act or any other filings under any other Antitrust Laws shall be borne by Buyer.

(b)    In connection with the efforts referenced in Section 5.1 and this Section 5.3 to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under any Antitrust Law or any state Law, Buyer shall use its commercially reasonable efforts to (i) cooperate with Sellers in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party; (ii) keep Sellers informed in all material respects of any material communication received by Buyer from, or given by Buyer to, any Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case, regarding any of the transactions contemplated hereby; and (iii) permit Sellers to review any material communication given to it by, and consult with Buyer in advance of any meeting or conference with, any Governmental Authority, including in connection with any proceeding by a private party, and, unless prohibited by an applicable Governmental Authority, provide the opportunity to attend or participate in such meeting, conference, or proceeding.  The foregoing obligations in this Section 5.3(b) shall be subject to the Confidentiality Agreement and any attorney-client, work product, or other privilege, and materials provided to the other Party may be reasonably designated as "Outside Counsel Only".  The Parties expect their outside counsel to enter into a joint defense agreement or common interest agreement in connection with such efforts to obtain all requisite approvals and authorizations for the transactions contemplated by this Agreement under any Antitrust Law to allow for the exchange of such privileged materials without waiving any such privilege.

Section 5.4    Bankruptcy Court Matters.

(a)    Approval of Break-Up Fee and Expense Reimbursement.

(i)    In the event that this Agreement is terminated by Buyer or Sellers for any reason pursuant to Section 8.1, other than termination pursuant to Section 8.1(a) or Section 8.1(d), in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Buyer, in accordance with the terms hereof (including Article VIII), the amount of the reasonable and documented expenses of Buyer incurred in connection with the transactions contemplated hereby up to an aggregate amount of $1,000,000 (the "Expense Reimbursement").  The Expense Reimbursement shall be paid on the third Business Day following the date of such termination by wire transfer(s) in immediately available funds to one or more bank accounts of Buyer (or any of its Affiliates) designated in writing by Buyer to Sellers.

(ii)    In addition to any payments that may be due pursuant to Section 5.4(a)(i), if this Agreement is terminated by (A) Buyer or Sellers pursuant to Section 8.1(b)(ii) at a time when Buyer would have been permitted to terminate pursuant to Section 8.1(e) or Section 8.1(f) or (B) by Buyer pursuant to Section 8.1(c), Section 8.1(e), Section 8.1(f) or Section 8.1(i) then in each case of the foregoing clauses (A) and (B), upon consummation by Sellers of (x) in the case of termination pursuant to Section 8.1(c) only, a transaction or series of related transactions involving the sale, licensing or other disposition of all or any material portion of the Intellectual Property included in the Acquired Assets (other than any such sale of Intellectual Property to the DIP Lenders) or (y) a Competing Bid, Sellers shall also promptly (and in any event within three (3) Business Days of such consummation), pay to Buyer the Break-Up Fee, such payment of the Break-Up Fee to be made by wire transfer(s) in immediately available funds to one or more bank accounts of Buyer (or any of its Affiliates) designated in writing by Buyer to Sellers.

(iii)    The Parties acknowledge and agree that (A) the Parties have expressly negotiated the provisions of this Section 5.4(a) and the payment of the Break-Up Fee and the Expense Reimbursement are integral parts of this Agreement, (B) in the absence of Sellers' obligations to make these payments, Buyer would not have entered into this Agreement, and (C) the Break-Up Fee and the Expense Reimbursement shall constitute allowed superpriority administrative expense Claims pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code, other than, and subject and subordinate in all respects to, the Carve Out and the DIP Obligations (each as defined in the DIP Interim Order).

(iv)     Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the entire Break-Up Fee and the Expense Reimbursement payable by Sellers pursuant to this Agreement.

(v)     The obligations of Sellers to pay the Break-Up Fee or the Expense Reimbursement shall survive the termination of this Agreement in accordance with Section 8.2.  The Break-Up Fee or the Expense Reimbursement shall be deemed earned upon entry of the Bidding Procedures Order.

(vi)     Subject to Section 8.2, nothing in this Section 5.4 shall relieve Buyer or Sellers of any Liability for a breach of this Agreement prior to the date of termination.  Upon payment of the Termination Payment to Buyer in accordance with this Section 5.4(a) and subject to Section 2.3(b)(iii), Sellers and their respective Representatives and Affiliates, on the one hand, and Buyer and its Representatives and Affiliates, on the other, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and none of Sellers, their Representatives or Affiliates, on the one hand, nor Buyer, its Representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses.

(b)     Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets (whether in combination with other assets of Sellers or their Affiliates or otherwise) (each a "Competing Bid").  From the date hereof (and any prior time) and until the transactions contemplated hereby are consummated, Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any sale or other disposition of the Acquired Assets.  In addition, Sellers shall have the authority to respond to any inquiries or offers to purchase all or any part of the Acquired Assets (whether in combination with other assets of Sellers or their Affiliates or otherwise) and perform any and all other acts related thereto, including as required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, and including supplying information relating to the Business and the assets of Sellers to prospective purchasers.

(c)     Bankruptcy Court Filings.

(i)     On or before July 23, 2020, Sellers shall file with the Bankruptcy Court a supplement to their motion seeking entry of the Bidding Procedures Order (which shall, among other things, approve and authorize payment of the Termination Payment in accordance with this Section 5.4) (the "Supplemental Motion").  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order, including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing

necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder. In the event the entry of the Bidding Procedures Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(ii)    Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and Assumed Leases and, subject to the consent of Buyer, to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Sellers from filing such motions to reject any Contracts or Leases that have been designated for rejection by Buyer pursuant to Section 2.8.

(iii)    Sellers shall cooperate with Buyer concerning the Bidding Procedures Order, the Sale Order, any other orders (whether of the Bankruptcy Court or otherwise, and whether relating to the Bankruptcy Cases or any other insolvency proceeding initiated pursuant to Section 5.12 or otherwise) relating to the transactions contemplated by this Agreement, and the bankruptcy or other insolvency proceedings in connection therewith, and Sellers shall, to the extent reasonably practicable, provide Buyer with draft copies of all applications, pleadings, notices, proposed orders, and other documents relating to such proceedings at least two (2) Business Days in advance of the proposed filing date so as to permit Buyer sufficient time to review and comment on such drafts, and, with respect to all provisions that impact Buyer or relate to the transactions contemplated by this Agreement, such pleadings and proposed orders shall be in form and substance reasonably acceptable to Buyer. Sellers shall use commercially reasonable efforts to give Buyer reasonable advance notice of any hearings regarding the Bidding Procedures Order, the Sale Order, or any other orders (whether of the Bankruptcy Court or otherwise, and whether relating to the Bankruptcy Cases or any other insolvency proceeding initiated pursuant to Section 5.12 or otherwise) relating to the transactions contemplated by this Agreement.

(d)    Bankruptcy Court Milestones. Sellers shall comply with the following timeline (the "Bankruptcy Court Milestones"):

(i)    As promptly as practicable but in no event later than July 23, 2020, Sellers shall file with the Bankruptcy Court the Supplemental Motion, together with a fully executed or substantially final form of this Agreement;

(ii)    No later than August 12, 2020, Sellers shall obtain entry of the DIP Final Order;

(iii)    No later than August 12, 2020, Sellers shall obtain entry of the Bidding Procedures Order;

(iv)    No later than August 20, 2020, the Auction (if necessary) shall have been held pursuant to the Bidding Procedures Order;

(v)    No later than August 27, 2020, the Bankruptcy Court shall have held the Sale Hearing to consider entry of the Sale Order; and

(vi)    No later than August 30, 2020, Sellers shall obtain entry by the Bankruptcy Court of the Sale Order.

(e)    <u>Back-up Bidder</u>.  Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the auction undertaken pursuant to the Bidding Procedures Order (the "<u>Auction</u>"), if and only if (i) Buyer submits the second highest or second best bid at the Auction or the terms of this Agreement constitute the second highest or best bid and Sellers give Buyer written notice of such determination (a "<u>Back-Up Bidder Notice</u>"), and (ii) Sellers give written notice to Buyer on or before October 20, 2020 (the "<u>Back-up Termination Date</u>"), stating that Sellers (A) failed to consummate the sale of the Acquired Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder, Buyer shall consummate the transactions contemplated hereby upon the terms and conditions as set forth herein (notwithstanding any subsequent bid by Buyer at the Auction).  For the avoidance of doubt, references herein to "the date hereof", "the date of this Agreement," and similar references shall refer to the date set forth in the Preamble to this Agreement notwithstanding any subsequent bid by Buyer at the Auction or delivery by Sellers of the written notice described in this <u>Section 5.4(e)</u>.

(f)    <u>Sale Order</u>.  Provided Buyer is selected as the winning bidder in respect of the Acquired Assets at the Auction, Sellers shall seek entry of the Sale Order and any other necessary orders to close the sale by the Bankruptcy Court as soon as reasonably practicable following the closing of the Auction in accordance with the terms and conditions hereof.  Buyer and Sellers understand and agree that the transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order.  In the event the entry of the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(g)    Sellers shall not voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 of the Bankruptcy Code or chapter 7 of the Bankruptcy Code, or the appointment of an examiner with expanded powers.

(h)    Sellers shall promptly serve true and correct copies of all applicable pleadings and notices in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, and any other applicable order of the Bankruptcy Court.

Section 5.5    <u>Notices and Consents</u>.  Prior to the Closing following the Closing:

(a)    Sellers will give, or will cause to be given, any notices to third parties, and each of the Parties will use its commercially reasonable efforts to obtain any third party

61

consents or sublicenses, in connection with the matters referred to in <u>Section 5.5(a)</u> of the Disclosure Schedule or as are otherwise necessary and appropriate to consummate the transactions contemplated hereby, including the assignment to, and assumption by, Buyer or its designee of the Transferred Contracts and the Assumed Leases; <u>provided</u>, <u>however</u>, that (i) Sellers shall control all correspondence and negotiations with third parties regarding any such matters, (ii) none of Sellers or any of their Subsidiaries shall be required to pay any consideration therefor or incur any expenses in connection therewith, (iii) Sellers shall not be obligated to initiate any Litigation or legal proceedings to obtain such consent or approval, and (iv) Buyer shall pay any reasonable and documented out-of-pocket costs as a result of amendments or modifications to any Transferred Contract or Assumed Lease, in either case as is necessary to obtain such consent or sublicense, and if Buyer refuses to pay such costs, such Contract or Lease shall be excluded from the transactions hereunder and there shall be no adjustment to the Purchase Price on account of such exclusion.

(b)    Without limiting <u>Section 5.3</u>, each of the Parties will give any notices to, make any filings with, and use its commercially reasonable efforts to obtain any authorizations, consents, and approvals of Governmental Authorities as are necessary and appropriate to consummate the transactions contemplated hereby.

Section 5.6    <u>Notice of Developments</u>.  Each Seller and Buyer will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in <u>Article VII</u> not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that (i) the delivery of any such notice pursuant to this <u>Section 5.6</u> shall not be deemed to amend or supplement this Agreement and (ii) the failure to deliver or delay in delivering any such notice shall not (A) constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party or (B) be considered for purposes of the conditions to Closing set forth in <u>Section 7.1(b)</u> or <u>Section 7.2(b)</u>.

Section 5.7    <u>Access</u>.  Upon the reasonable request of Buyer, Sellers will permit Buyer and its Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, information books and records and Transferred Contracts and Assumed Leases included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller; <u>provided</u>, <u>however</u>, that, for avoidance of doubt, the foregoing shall not (a) require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto (it being agreed that each such Person shall use commercially reasonable efforts to cause such access or information to be provided in a manner that does not cause such waiver) or (b) permit Buyer or its Representatives to conduct any sampling or testing of soil, groundwater, air, or other environmental media with respect to the Acquired Assets.  Buyer and its Representatives shall, upon reasonable notice to, and good faith consultation with, Sellers, be permitted to contact any employees, vendors, suppliers, landlords, or licensors of any Seller in connection with or pertaining to any subject matter of this Agreement, and Sellers shall, at their election, be entitled to have a representative present at any such meetings.

Section 5.8    Bulk Transfer Laws.    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar Laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.9    Replacement Bonding Requirements.    On or prior to the Closing Date, Buyer shall settle or provide replacement guarantees, standby letters of credit or other assurances of payment, in forms reasonably satisfactory to Sellers, with respect to only those Bonding Requirements set forth on Schedule 5.9 that are outstanding as of the date of this Agreement, and, both prior to and following the Closing Date, Sellers will cooperate with Buyer in connection with the performance of Buyer's obligations under this Section 5.9.    For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, in no event will Buyer have any obligation under this Section 5.9 to replace, settle or collateralize any Bonding Requirement if such Bonding Requirement relates to a Lease unless and until such Lease is deemed an Assumed Lease hereunder and has been actually assumed by Buyer.

Section 5.10    Directors and Officers Insurance.    Upon Buyer's request, prior to the Closing, Sellers shall (at Buyer's sole cost and expense) obtain, maintain and, upon receiving sufficient funds from Buyer, fully pay for irrevocable "tail" insurance policies (the "Tail Policies") naming each present (as of immediately prior to the Closing) and former director and officer of Sellers and their respective Subsidiaries as direct beneficiaries, with a claims period of at least six (6) years from the Closing Date, from an insurance carrier with the same or better credit rating as Sellers' current insurance carrier with respect to directors' and officers' liability insurance in an amount and scope at least as favorable as Sellers' existing policies with respect to matters existing or occurring at or prior to the Closing Date.

Section 5.11    Intercompany Indebtedness.    Prior to the time that Buyer causes the sale, assignment or other transfer of the equity interests of any JV pursuant to Section 6.11, Sellers and Buyer shall discuss in good faith the treatment of all intercompany indebtedness, accounts and balances and Liabilities (the "Intercompany Obligations") between and among any Seller or any Subsidiary thereof, on the one hand, and such JV or any of its Subsidiaries, on the other hand, to the extent permissible pursuant to any applicable JV Agreement; provided, however, that if Sellers and Buyer cannot agree to the treatment of the Intercompany Obligations, at the request of Buyer, Sellers shall cause any payables owed by any Seller or any Subsidiary thereof (other than such JV and its Subsidiaries) to such JV or any of its Subsidiaries to be fully and finally settled and eliminated (which may include the netting of receivables and payables, contributions to equity and dividends), in each case with no further Intercompany Obligations between Sellers and their respective Subsidiaries (other than such JV and its Subsidiaries), on the one hand, and such JV or any of its Subsidiaries, on the other hand, other than any such Intercompany Obligations set forth in this Agreement and any Related Agreement, to the extent permissible pursuant to any applicable JV Agreement.    Nothing in this Section 5.11 shall require Sellers to terminate any Intercompany Obligations solely between or among any Seller and any of their respective Subsidiaries that are not Transferred Entities.    Notwithstanding anything in this Agreement to the contrary, Sellers hereby agree to use commercially reasonable efforts to cause, prior to the time that Buyer causes the sale, assignment or other transfer, directly or indirectly, of the equity interests of Brooks Brothers Greater China Limited (Hong Kong), the elimination of the Intercompany Obligation

entitled "Loan to BBUS" line item in the amount of US$2,220,000 from the balance sheet of Brooks Brothers Greater China Limited (Hong Kong) to the extent permissible pursuant to any applicable JV Agreement.

Section 5.12   <u>Canadian Inventory</u>.   Prior to the Closing, Sellers shall use their reasonable best efforts to obtain releases of any Liens (other than Permitted Post-Closing Liens) of all finished goods inventory of the Business located in Canada in connection with the Closing, including through obtaining a court order to such effect through an insolvency proceeding in the United States or Canada, if deemed necessary by the Buyer in its sole discretion, following consultation among counsel to Sellers and counsel to Buyer.

Section 5.13   <u>Transition Services Agreement</u>.   Prior to the Closing, Sellers and Buyer shall discuss in good faith a transition services agreement to be entered into effective as of the Closing.   Sellers and Buyer shall cooperate and use commercially reasonable efforts to negotiate such transition services agreement prior to the Closing Date, which shall be in form and substance reasonably acceptable to Sellers and Buyer.

## ARTICLE VI
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1   <u>Further Assurances</u>.   In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Buyer all of the Acquired Assets or to confirm Buyer's assumption of the Assumed Liabilities. Without limiting the generality of the foregoing:

(a)   If, following the Closing, Buyer or any Seller becomes aware that Buyer or any of its Affiliates is in possession of any asset or right that is an Excluded Asset, such Party shall promptly inform the other Party of that fact.   Thereafter, at the request of any Seller, Buyer shall execute, or cause the relevant Affiliate(s) of Buyer to execute, such documents as may be reasonably necessary to cause the transfer of, and Buyer shall thereafter transfer, any such asset or right to Sellers or such other entities nominated by such Sellers for no consideration and such Sellers shall do all such things as are reasonably necessary to facilitate such transfer.   If, following the Closing, Buyer receives any payments in respect of an Excluded Asset, Buyer shall promptly remit such payments to the applicable Sellers or other entity designated by such Sellers.

(b)   If, following Closing, Buyer or any Seller becomes aware that a Seller or any of its Affiliates is in possession of any asset or right that is an Acquired Asset, such Party shall promptly inform the other Party of that fact.   Thereafter, at the request of Buyer, the applicable Sellers shall execute or cause the relevant Affiliate(s) of such Sellers to execute such documents as may be reasonably necessary to cause the transfer of and such

Sellers shall thereafter transfer any such asset or right to Buyer or any other entities nominated by Buyer for no consideration and Buyer shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, a Sellers or its Affiliates receive any payments in respect of the Acquired Assets, such Sellers shall promptly remit such payments to Buyer or other entity nominated by Buyer.

(c)    From and after the Closing, Sellers hereby authorize and empower Buyer and its Affiliates to receive and open all mail and other communications (including electronic communications) received by Buyer or its Affiliates relating to the Business, the Acquired Assets or the Assumed Liabilities and to deal with the contents of such communications.  From and after the Closing, Sellers shall promptly deliver or cause to be delivered to Buyer any mail or other communication (including electronic communications) received by Sellers or any of their respective Affiliates after the Closing Date pertaining to the Business, the Acquired Assets or the Assumed Liabilities and if Sellers or any of their respective Affiliates receive from any Person after the Closing Date any telephone calls with respect to the Business at any telephone number not transferred to Buyer, Sellers shall inform such Person that the telephone number for the Business has changed and provide such Person with, and forward such call to, such telephone number for the Business as is supplied by Buyer.

Section 6.2    Access; Enforcement; Record Retention.  From and after the Closing, upon request by any Party (the "Requesting Party"), the other Parties will permit the Requesting Party and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of such other Party, to all premises, properties, personnel, books and records, and Contracts or Leases of such Party for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations under this Agreement or any of the Related Agreements, (c) complying with the requirements of any Governmental Authority or (d) otherwise providing such reasonable assistance and cooperation as may be reasonably requested by Buyer from time to time to facilitate the transition of the Business; provided, however, that, for avoidance of doubt, the foregoing shall not require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law (it being agreed that each such Person shall use commercially reasonable efforts to cause such access or information to be provided in a manner that does not cause such waiver or violation as set forth in the foregoing clauses (i) and (ii)), or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations. Buyer agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing.

Section 6.3    Covered Employees.

(a)    Offer of Employment.  At least fifteen (15) days prior to the Closing Date, Buyer shall, or shall cause its Affiliates to, provide an offer letter of employment to the Covered Employees selected by Buyer in its sole discretion and set forth on Section 6.3(a) of the Disclosure Schedule (the Covered Employees as in effect on the date of this Agreement are set forth on the Covered Employee Census, which may be updated by

Sellers from time to time), which terms and conditions are expected to be reasonably comparable to the Covered Employees' employment terms and conditions as in effect immediately prior to the Closing (excluding any defined benefit pension plan, retiree medical and equity arrangements) effective as of the Closing Date and contingent upon the Closing. Each Covered Employee who accepts such offer of employment shall be deemed a "Transferred Employee" from and after the date his or her offer becomes effective and Sellers will reasonably cooperate with any reasonable requests by Buyer in order to facilitate the offers of employment and the delivery of such offers.

(b)    <u>Compensation and Benefits</u>.    Commencing on the Closing Date and continuing through the first anniversary of the Closing Date, Buyer or its Affiliates shall provide or cause to be provided to each Transferred Employee: (i) the same location of employment or a location within twenty-five (25) miles of such Transferred Employee's location of employment as in effect immediately prior to the Closing; (ii) annual base salary or base wages and cash incentive compensation opportunities and employee benefits (excluding severance), that are substantially comparable in the aggregate to the annual base salary or base wages and cash incentive compensation opportunities and employee benefits (excluding severance) provided to such Transferred Employee immediately prior to the Closing and (iii) severance that is substantially comparable to the severance provided to similarly situated employees of Buyer.

(c)    <u>Service Credit</u>.    Buyer and its Affiliates shall provide each Transferred Employee with credit for all years of service with Sellers, their Subsidiaries and their respective predecessors prior to the Closing, under any employee benefit plans or arrangements of Buyer and its Affiliates maintained by Buyer or its Affiliates in which such Transferred Employee participates following the Closing Date, for purposes of eligibility, vesting, and entitlement to benefits, excluding for severance benefits, vacation entitlement or accrual of pension benefits. Notwithstanding the foregoing, nothing in this <u>Section 6.3(c)</u> shall be construed to require crediting of service that would result in a duplication of benefits.

(d)    <u>Waiver of Pre-Existing Conditions; Crediting of Deductibles</u>.    No later than the Closing Date, Buyer or its Affiliates shall establish or cause to be established, at its own expense, benefit plans that provide life insurance, health care, dental care, accidental death and dismemberment insurance, disability and other group welfare benefits for Transferred Employees. Buyer or its Affiliates shall use reasonable best efforts to cause (i) the waiver of all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Transferred Employees under any welfare benefit plans to the extent that such conditions, exclusions or waiting periods would not apply under the analogous Employee Benefit Plans, and (ii) for the plan year in which the Closing Date occurs (or, if later, in the calendar year in which Transferred Employees and their dependents commence participation in a welfare plan of Buyer or its Affiliates), the crediting of each Transferred Employee with any co-payments and deductibles paid prior to participation in such welfare plans in satisfying any applicable deductible or out-of-pocket requirements thereunder.

(e)     Buyer 401(k) Plan.  No later than the Closing Date, Buyer shall adopt or identify a qualified defined contribution retirement plan in which Transferred Employees shall participate commencing on the Closing Date (such plan, the "Buyer 401(k) Plan"). Buyer shall cause the Buyer 401(k) Plan to accept a "direct rollover" to the Buyer 401(k) Plan of each Transferred Employee's account balances (including promissory notes evidencing all outstanding loans) under Sellers' 401(k) plans if such rollover is elected in accordance with applicable Law by such Transferred Employee.

(f)     Accrued Vacation.  Buyer or its Affiliates shall provide each Transferred Employee with credit for the same amount of vacation and paid time off such Transferred Employee has accrued but not used through the Closing Date, provided that, to the extent any such accrued amounts are required to be paid by Sellers at or following the Closing under applicable Law, such amounts shall be timely paid by Buyer or its Affiliates to the applicable Transferred Employee in cash (rather than by Buyer or its Affiliates providing vacation or paid time off credit to such Transferred Employee) in full satisfaction of any such payment obligation otherwise owed by Sellers to the applicable Transferred Employee.  Neither Sellers nor their Subsidiaries shall have any obligation or liability to pay or provide any vacation or paid time off payments accrued by any Transferred Employee on or following the Closing Date, and Buyer and its Affiliates expressly assume any such obligation or liability that Sellers or their Subsidiaries may have otherwise owed to any Transferred Employee under applicable Law.

(g)     Welfare Benefit Claims; COBRA.  On the Closing Date, Sellers and their Subsidiaries shall cease to provide welfare coverage to each Transferred Employee and his or her covered dependents, and Buyer or its Affiliates shall commence providing such coverage to such individuals.  Sellers shall be responsible in accordance with its applicable welfare plans (and the applicable welfare plans of their Subsidiaries) in effect prior to the Closing Date for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, under Sellers' or their Subsidiaries' Employee Benefit Plans that are welfare benefit plans prior to the Closing Date by the Transferred Employees and their dependents.  Buyer or its Affiliates shall be responsible in accordance with the applicable welfare plans of Buyer or its Affiliates for all reimbursement claims (such as medical and dental claims) for expenses incurred, and for all non-reimbursement claims (such as life insurance claims) incurred, after the Closing Date by Transferred Employees and their dependents.  For purposes of this Section 6.3(g), a claim shall be deemed to have been incurred as follows: (i) for health, dental and prescription drug benefits, upon provision of such services, (ii) for life, accidental death and dismemberment and business travel accident insurance benefits, upon the death, disability or accident giving rise to such benefits, and (iii) for hospital-provided health, dental, prescription drug or the benefits that become payable with respect to any hospital confinement, based upon the initial date of such event.  Sellers or their Subsidiaries shall provide coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") under Sellers' or their Subsidiaries' Employee Benefit Plans that are group health plans with respect to qualifying events occurring prior to the Closing Date; provided, however, that to the extent that a dependent of a Transferred Employee is receiving continuation coverage under COBRA as of the Closing Date, Buyer or its Affiliates shall be obligated to continue to provide COBRA continuation coverage to such

dependent on and following the Closing Date for the period required under applicable Law. Buyer and its Affiliates shall provide coverage required by COBRA to Transferred Employees and their eligible dependents or beneficiaries under Buyer's group health plans with respect to qualifying events occurring on and after the Closing Date.

(h)    WARN Act.    Sellers shall provide Buyer with a list, by date and location, of employee layoffs implemented by Sellers with respect to employees of the Business in the ninety (90) day period preceding the Closing Date. Seller agrees to take any action reasonably requested by Buyer with respect to the WARN Act including sending out conditional notices to Covered Employees.

(i)    Tax Reporting.    Buyer shall adopt the "alternate procedure" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53.    Under this procedure, Buyer as the successor employer shall provide Forms W-2 to Transferred Employees reflecting all wages paid and Taxes withheld with respect to such Transferred Employees for the calendar year in which the Closing Date occurs.    Sellers as the predecessor employers shall have no employment Tax reporting responsibilities for the Transferred Employees following the Closing Date. Buyer shall also adopt the "alternate procedure" of Revenue Procedure 2004-53 for purposes of Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).

(j)    Cooperation.    After the Closing Date, Buyer shall, and shall cause its Affiliates to, reasonably cooperate with Sellers to provide such current information regarding the Transferred Employees on an ongoing basis as may be reasonably necessary to facilitate determinations of eligibility for, and payments of benefits to, the Transferred Employees under any applicable Employee Benefit Plan that continues to be maintained by Sellers or their Affiliates.    Buyer shall, and shall cause its Affiliates to, permit Transferred Employees to provide such assistance to Sellers as may be reasonably required in respect of claims against Sellers or their Affiliates, whether asserted or threatened, to the extent that, in Sellers' good faith and reasonable opinion, (i) a Transferred Employee has knowledge of relevant facts or issues, or (ii) a Transferred Employee's assistance is reasonably necessary in respect of any such claim.

(k)    Covered Collective Bargaining Agreements.    For the avoidance of doubt, neither Buyer nor any of its Affiliates shall assume, be bound by or become a party to any of the Covered Collective Bargaining Agreements or any other collective bargaining agreement with respect to any Covered Employees or current or former employees of Sellers or their respective Affiliates, and any obligation, Liability or expenses with respect to or relating to any collective bargaining agreements (including withdrawal liability) shall be an Excluded Liability and the Acquired Assets shall be purchased free and clear of all such obligations, Liabilities or expenses.    For the avoidance of doubt, Buyer or its Affiliates may in Buyer's sole discretion offer employment to any employees that were covered by collective bargaining agreements on such terms and conditions that Buyer determines in its sole discretion.

68

(l)     No Third Party Beneficiary Rights; Covered Collective Bargaining Agreements.  The Parties agree that nothing in this Section 6.3, whether express or implied, creates any third party beneficiary rights in any Transferred Employee.  No provision of this Agreement shall create any third party beneficiary rights in any current or former employee or service provider of an Sellers, any Covered Employee or Transferred Employee (including any beneficiary or dependent thereof) in respect of continued employment by Sellers or any of their respective Affiliates or Buyer or its Affiliates or otherwise.  Nothing herein shall (i) guarantee employment for any period of time or preclude the ability of Buyer or any of its Affiliates to terminate any Transferred Employee for any reason, (ii) require Buyer or any of its Affiliates to continue any Employee Benefit Plans, or arrangements or prevent the amendment, modification or termination thereof after the Closing, or (iii) constitute an amendment to any Employee Benefit Plan, employee benefit plans or arrangements.

Section 6.4     Certain Tax Matters.

(a)     Transfer Taxes.  Buyer shall pay any stamp, documentary, filing, recording, registration, sales, use, transfer, added-value or other non-income Tax, fee, duty, assessment or governmental charge (a "Transfer Tax") imposed under applicable Law in connection with the transactions contemplated hereby.  Accordingly, if any Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for the amount of such Transfer Taxes actually paid by such Seller (including the cost associated with preparing and filing any such Tax Returns).  The Party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall prepare and timely file such Tax Returns.  The non-filing Party shall be entitled to receive copies of such Tax Returns and other documentation reasonably in advance of filing by the filing Party, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to the non-filing Party's approval, which shall not be unreasonably withheld, delayed, or conditioned.  The Parties shall cooperate to permit the filing Party to prepare and timely file any such Tax Returns.

(b)     Tax Adjustments.  Subject to Section 2.10, Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes, personal property Taxes and similar Taxes) for the tax period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the tax period immediately preceding the Proration Period, using the apportionment method described in Section 2.10(c), and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period.  When the actual amounts become known, such proration shall be recalculated by Buyer and Sellers, and Buyer or

Sellers, as the case may be, promptly (but not later than ten (10) days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and Sellers.  Any refunds of such Taxes for a Proration Period shall be allocated between Sellers and Buyer in a manner consistent with this <u>Section 6.4(b)</u>.

(c)    <u>Tax Refunds</u>.  In furtherance of Sellers' right to retain those assets described in clause (a)(iii) of the definition of Excluded Assets, Sellers shall be entitled to receive from Buyer all refunds (or credits for overpayments) of Retained Taxes, including any interest paid thereon, by a Governmental Authority, net of any costs, fees, expenses or Taxes incurred in obtaining such refunds (or credits).  In furtherance of Buyer's right to retain those assets described in clause (cc) of the definition of Acquired Assets, Buyer shall be entitled to receive from Sellers all refunds (or credits for overpayments) of Assumed Taxes, including any interest paid thereon, by a Governmental Authority, net of any costs, fees, expenses or Taxes incurred in obtaining such refunds (or credits).  Buyer and Sellers shall execute all documents, take reasonable additional actions and otherwise reasonably cooperate as may be necessary to obtain the Tax refunds (or credits) contemplated by this <u>Section 6.4(d)</u>.  Buyer or Sellers, as applicable, shall pay any such Tax refund (or the amount of any such credit) to the other party within five (5) calendar days after Buyer or Sellers, as applicable, receives such Tax refund from a Governmental Authority or files a Tax Return claiming such credit.

(d)    <u>Cooperation</u>.  Buyer and Sellers shall reasonably cooperate (i) in the preparation and timely filing of any Tax Return relating to the Business, the Acquired Assets, or the Assumed Liabilities; (ii) in any audit or other proceeding with respect to Taxes or Tax Returns relating to the Business, the Acquired Assets, or the Assumed Liabilities; (iii) in making available any information, records, or other documents relating to any Taxes or Tax Returns relating to the Business, the Acquired Assets, or the Assumed Liabilities; and (iv) in providing certificates or forms, and in timely executing any Tax Return, that are necessary or appropriate to establish an exemption for (or reduction in) any Transfer Tax.

(e)    <u>Tax Proceedings</u>.  Sellers, at their sole cost and expense, shall control any audits or other proceedings relating to Retained Taxes.  Buyer, at its sole cost and expense, shall control any audits or other proceedings relating to Assumed Taxes.  Notwithstanding the foregoing, to the extent the audit or Tax proceeding relates to Taxes relating solely to Acquired Assets for a Straddle Period, Buyer, at its sole cost and expense, shall control such audit or Tax proceeding to the extent it could result in or could affect an Assumed Tax; provided that Buyer shall keep Sellers reasonably informed regarding the status of such audit or Tax proceeding and provided further, that the costs and expenses of conducting such an audit or Tax proceeding will be apportioned and prorated between Sellers and Buyer as of the Closing using the apportionment method described in <u>Section 6.4(b)</u>.

Section 6.5    <u>Insurance Matters</u>.  Buyer acknowledges that, except as otherwise set forth in this Agreement and the Related Documents, upon Closing, all insurance coverage

70

provided in relation to Sellers, the Stores, the Business or the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Buyer, the Stores, or the Acquired Assets and no further coverage shall be available to Buyer, the Stores, the Business or the Acquired Assets under any such policies.

Section 6.6    <u>Acknowledgements</u>.  Buyer acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics.  Buyer acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Buyer is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Buyer nor any other Person shall have any claim against any Seller or any of their Affiliates or any of their respective directors, officers, employees, stockholders, members, managers, partners, Affiliates, agents, or other Representatives with respect thereto.  Accordingly, without limiting the generality of <u>Section 9.1</u>, Buyer acknowledges that none of Sellers nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

Section 6.7    <u>Press Releases and Public Announcements</u>.  Promptly following the Closing, the Parties shall issue an initial press release concerning this Agreement and the transactions contemplated hereby in form and substance reasonably acceptable to Sellers and Buyer.  Thereafter, no Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless (a) a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court or (b) such press release or public announcement is consistent with press releases or public statements previously made in accordance with this <u>Section 6.7</u>.  If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure.  The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Bidding Procedures Order or the Sale Order.

Section 6.8    <u>Wind Down and Marketing License</u>.  Sellers shall, from the period commencing on the Closing Date and ending on June 30, 2021, be entitled to use, and Buyer hereby grants to Sellers a license to use, on a non-exclusive and royalty-free basis, all trademarks included in the Acquired Assets in connection with winding down the Business or the promotion, marketing or offering for sale any of the Excluded Assets (provided that such marketing or offering for sale shall not include any "liquidation" sales or use "brand sale", "going out of business", "out of business", "going out of business sale", "we quit", "quitting business", "everything must go", "liquidation/liquidating" or similar language with respect to the Business or the Acquired Assets), including any existing trademarks that are in active use solely on existing stocks of signs, billboards, trucks, cars, labels, packaging, letterheads, advertisements and promotional materials, inventory and other documents and materials relating to the Business as of the Closing Date (the "<u>Seller Existing Stock</u>") (such trademarks, the "<u>Licensed Marks</u>") (such period, the "<u>License Period</u>"), by the end of which period, Sellers shall, and shall have caused their applicable Subsidiaries to (a) cease using the Licensed Marks, and (b) destroy or remove any and all Licensed

Marks from any and all assets in their possession or control that contain, incorporate or display the Licensed Marks so that there is no continued use of the Licensed Marks.  Solely to the extent necessary to promote, market or sell any Excluded Assets, Sellers and their Subsidiaries may create, produce or issue any additional stocks of signs, billboards, trucks, cars, labels, packaging, letterheads, advertisements and promotional materials, inventory and other documents and materials that include the Licensed Marks; provided, however, that by the end of the License Period, Sellers shall, and shall have caused their applicable Subsidiaries to destroy or remove all Licensed Marks from any of the foregoing.  All goodwill resulting from the use of the Licensed Marks under this Section 6.8 in connection with winding down the Business shall inure to the benefit of Buyer.  Any and all use of the Licensed Marks by Sellers shall be consistent with the manner in which such Licensed Marks are used as of the date of this Agreement and any and all goods and services sold under the Licensed Marks shall comply with the quality control and quality standards in effect as of the date of this Agreement.  As soon as reasonably practicable, but in no event more than (i) thirty (30) days after the Closing in the U.S. or (ii) sixty (60) days after the Closing in the case of any Seller or Affiliate thereof domiciled outside the U.S., each Seller shall, and shall cause its Affiliates to, take all actions necessary to change its legal, registered, assumed, trade and "doing business as" name, as applicable, to a name or names not containing "Brooks Brothers" or any name confusingly similar to the foregoing and will cause to be filed as soon as practicable after the Closing, in all jurisdictions in which each Seller and each of its Affiliates is qualified to do business, any documents necessary to reflect such change in its legal, registered, assumed, trade and "doing business as" name, as applicable, or to terminate its qualification therein.  Each Seller may sublicense its rights hereunder to any of its respective Affiliates or an entity that was an Affiliate prior to the Petition Date so long as it conditions the license grant on the sublicensee's compliance with the restrictions above that apply to Sellers, secures an acknowledgment that all goodwill resulting from use of the Licensed Marks in connection with winding down the Business shall inure to the benefit of Buyer, provides in the relevant sublicense agreement that Buyer is an intended third-party beneficiary thereof, and provides that the license shall be terminable if the sublicensee commits a material uncured breach of the restrictions above that apply to Sellers.  So long as each Seller notifies Buyer promptly upon learning of a material breach of such restrictions and exercises such termination right promptly upon becoming aware of such an uncured material uncured breach, no act or omission of a sublicensee will be deemed to be a breach of such Seller's obligations under this provision.

Section 6.9    No Successor Liability.  The Parties intend that upon the Closing, Buyer and its Affiliates shall not and shall not be deemed to:  (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to any Seller, including, a "successor employer" for the purposes of the IRC, ERISA or other applicable Laws; (b) have any responsibility or Liability for any obligations of any Seller, or any Affiliate of any Seller based on any theory of successor or similar theories of Liability; (c) have, de facto or otherwise, merged with or into any Seller; (d) be an alter ego or a mere continuation or substantial continuation of any Seller (and there is no continuity of enterprise between Buyer and any Seller), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, Tax, COBRA, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to any Seller's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any Seller or its estate.

Section 6.10    <u>Confidentiality</u>.  The Confidentiality Agreement shall automatically terminate in connection with the Closing without further action by any Party thereto.  For a period of five (5) years following the Closing, each Seller shall, and shall cause such Seller's respective Representatives and Affiliates (each of the foregoing, collectively, "<u>Seller Related Parties</u>") to, (i) maintain the confidentiality of, (ii) not use, and (iii) not divulge to any Person, any confidential, non-public or proprietary information included in the Acquired Assets or otherwise relating to the Business ("<u>Confidential Information</u>"), except with the prior written consent of Buyer, or as may be required by applicable Law; <u>provided</u>, that such Seller and its Seller Related Parties shall not be subject to such obligation of confidentiality for Confidential Information that is or becomes generally available to the public without breach of this Agreement by such Seller or any of its Seller Related Parties.  If any Seller or any Seller Related Party shall be required by applicable Law to divulge any Confidential Information, such Seller or its Seller Related Party shall provide Buyer with prompt written notice of each such request so that Buyer may, at Buyer's sole expense, seek an appropriate protective order or other appropriate remedy, and such Seller or Seller Related Party shall reasonably cooperate with Buyer to obtain a protective order or other remedy; <u>provided</u>, that, in the event that a protective order or other remedy is not obtained, such Seller or Seller Related Party shall furnish only that portion of such Confidential Information which, in the opinion of its counsel, such Seller or Seller Related Party is legally compelled to disclose and shall exercise its commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any such Confidential Information so disclosed.

Section 6.11    <u>Designated Foreign Subsidiaries</u>.

(a)    Subject to compliance with any applicable Laws or any JV Agreement as in effect on the date of this Agreement, from and after the Closing through the expiration of the Designation Rights Period (the "<u>Interim International Period</u>"), Buyer and its Affiliates shall have the exclusive right to act as Sellers' exclusive agent for the purposes of marketing and selling, assigning or otherwise transferring any or all of Sellers' and their Subsidiaries' rights, title and interest in and to the capital stock (or similar equity interests) in the Designated Foreign Subsidiaries.  Any such transaction may be to any purchaser, acquirer, assignee or transferee, whether or not a third party, on such terms as Buyer shall determine in its sole discretion, subject to compliance with any applicable Laws or any JV Agreement as in effect on the date of this Agreement.  Each Seller shall take, and shall cause its applicable Affiliates to take, all actions as may reasonably be requested by Buyer or reasonably be required to effectuate the foregoing on behalf of Buyer and its Affiliates, subject to compliance with any applicable Laws or any JV Agreement as in effect on the date of this Agreement.  Without limiting the generality of the foregoing, during the Interim International Period, Sellers shall, and shall cause their respective Affiliates to, subject to compliance with any applicable Laws or any JV Agreement as in effect on the date of this Agreement:

(i)    cooperate with Buyer and its Representatives and any potential purchasers, acquirers, assignees or other transferees of any of Sellers' and their respective Subsidiaries' rights, title and interest in and to the capital stock (or similar equity interests) in any of the Designated Foreign Subsidiaries, and thereafter Sellers shall, and shall cause their respective Affiliates to, direct all bids or expressions of interest regarding Sellers' and their respective Affiliates' rights, title and interest in and

73

to the capital stock (or similar equity interests) in the Designated Foreign Subsidiaries to Buyer;

(ii)     consult and cooperate with Buyer in good faith with respect to all material aspects of the day-to-day operation of the Designated Foreign Subsidiaries;

(iii)     use reasonable best efforts to prevent such Designated Foreign Subsidiaries from changing accounting policies or procedures or Tax reporting principles, methods or policies, except as required by a change in GAAP; and

(iv)     upon the request of Buyer and at Buyer's sole cost and expense, initiate and administer an insolvency proceeding with respect to any Designated Foreign Subsidiaries; provided, that initiating and administering such insolvency proceeding does not breach or violate (or otherwise give rise to any unreimbursed liability of Sellers or any of their Affiliates pursuant to), in the reasonable good faith opinion of Sellers, any fiduciary or other similar duties owed by Sellers or any of their Affiliates to such Designated Foreign Subsidiary under applicable Law.

(b)     Except as otherwise expressly required by this Agreement or any JV Agreement as in effect on the date of this Agreement or with the prior written consent of Buyer, and subject to compliance with applicable Laws, during the Interim International Period solely with respect to the Designated Foreign Subsidiaries, Sellers shall not (with respect to the Designated Foreign Subsidiaries), and shall cause the Designated Foreign Subsidiaries not to, take any action that, if taken after the date of this Agreement without Buyer's consent, would constitute a breach of the covenants set forth in Section 5.2 (applied *mutatis mutandis* to the Designated Foreign Subsidiaries).

(c)     All proceeds from the sale, assignment or transfer of Sellers' and their Subsidiaries' rights, title and interest in and to the capital stock (or similar equity interests) in the Designated Foreign Subsidiaries (other than any proceeds from or attributable to sales of Inventory by such Designated Foreign Subsidiaries in the Ordinary Course of Business until the date the applicable Designated Foreign Subsidiary is sold, assigned or transferred hereunder (the "Seller Retained Proceeds")) shall be paid to and retained by Buyer for Buyer's sole and exclusive benefit, and Sellers shall thereafter have no right, title, or interest therein or thereto.  Notwithstanding anything to the contrary herein, Sellers shall have no obligation to pay, perform or discharge any Liabilities (including Taxes) relating to, under, arising out of or in connection with, or as a result of, the Designated Foreign Subsidiaries (other than the JVs and their respective Subsidiaries), in each case that are incurred and come due and payable during the International Interim Period. Nothing herein will restrict or prohibit Sellers and its Subsidiaries (other than the JVs and their respective Subsidiaries) from following good faith consultation with Buyer, (i) taking any action required by applicable Laws and (ii) with the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed, it being understood that it would be unreasonable for Buyer to withhold its consent in the event that, in the reasonable good faith opinion of Sellers, any fiduciary or other similar duties owed by Sellers or any of their Affiliates to such Designated Foreign Subsidiary under applicable Law would be breached by Sellers' failure to take the following steps), taking any steps to reorganize or restructure

Sellers and its Subsidiaries (other than the JVs and their respective Subsidiaries), including filing for insolvency proceedings.  Any and all Seller Retained Proceeds shall be paid to and retained by Sellers for Sellers' sole and exclusive benefit, and Buyer shall promptly pay over or cause to be promptly paid over any and all Seller Retained Proceeds actually received in cash by Buyer or its Affiliates.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    <u>Conditions to Buyer's Obligations</u>.    Buyer's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver by Buyer of the following conditions:

(a)    (i) the representations set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.3(a)</u>, and <u>Section 3.9</u> (the "<u>Fundamental Representations</u>") shall be true and correct in all respects, other than de minimis exceptions, as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), (ii) the representations and warranties set forth in <u>Section 3.4(a)</u> shall be true and correct in all material respects, as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), and (iii) all representations and warranties of Sellers in this Agreement (other than the Fundamental Representations and as set forth in clause (ii)) shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), except in the case of this clause (iii) where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation or qualification as to "material", "materiality" or "Material Adverse Effect" (or any correlative terms) set forth therein), individually or in the aggregate, has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect;

(b)    Sellers shall have performed and complied with each of their respective covenants and agreements hereunder through the Closing in all material respects;

(c)    since the date of this Agreement, there shall not have occurred any event, change, occurrence or effect that, individually or together with all other events, changes, occurrences or effect, has had, or would reasonably be expected to have, a Material Adverse Effect;

(d)    the Bankruptcy Court shall have entered (i) the Bidding Procedures Order, and (ii) the Sale Order, and no order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date;

(e)    all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(f)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(g)    each delivery contemplated by <u>Section 2.5(b)</u> to be delivered to Buyer shall have been delivered.

Section 7.2    <u>Conditions to Sellers' Obligations</u>.    Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver by Sellers of the following conditions:

(a)    (i) the representations set forth in <u>Section 4.1</u>, <u>Section 4.2</u>, <u>Section 4.3(a)</u> and <u>Section 4.5</u> shall be true and correct in all respects, other than de minimis exceptions, as of the Closing Date as though made on the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date) and (ii) all representations and warranties set forth in <u>Article IV</u> (other than as set forth in clause (i)) shall be true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) as of the Closing Date as though made on the Closing Date (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date), in each case except for such failure to be so true and correct that, individually or in the aggregate, have not had, and would not reasonably be expected to have, a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement;

(b)    Buyer shall have performed and complied with each of its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered (i) the Bidding Procedures Order, and (ii) the Sale Order, and no order staying, reversing, modifying, or amending the Sale Order shall be in effect on the Closing Date;

(d)    all applicable waiting periods under any Antitrust Law shall have expired or otherwise been terminated;

(e)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(f)    each delivery contemplated by <u>Section 2.5(c)</u> to be delivered to Sellers shall have been delivered.

Section 7.3    <u>No Frustration of Closing Conditions</u>.    Neither Buyer nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, as the case may be, to be satisfied if such failure was primarily caused by such Party's or its Affiliates' failure to comply with the terms of this Agreement in all material respects.

## ARTICLE VIII
## TERMINATION

Section 8.1    <u>Termination of Agreement</u>.    The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if:

(i)    any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 8.1(b)(i)</u> shall not be available to a Party if the failure to consummate the Closing because of such action by a Governmental Authority shall be due to the failure of such Party to have fulfilled, in any material respect, any of its obligations under this Agreement; or

(ii)    the Closing shall not have occurred prior to October 4, 2020 (the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order or the condition to Closing set forth in <u>Section 7.1(e)</u> remains unsatisfied or not waived and if all other conditions to the respective obligations of the Parties to close hereunder that are capable of being fulfilled by the Outside Date shall have been so fulfilled or waived, then no Party may terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u> prior to October 20, 2020; <u>provided</u>, <u>further</u>, that if the Closing shall not have occurred on or before the Outside Date primarily due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Sellers, then the breaching Party may not terminate this Agreement pursuant to this <u>Section 8.1(b)(ii)</u>.

(c)    by Buyer by giving written notice to Sellers if there has been a breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Buyer at Closing set forth in <u>Section 7.1(a)</u> or <u>Section 7.1(b)</u> and such breach has not been waived by Buyer, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (i) ten (10) days after receipt of Buyer's notice of intent to terminate or (ii) the Outside Date; <u>provided</u>, that Buyer shall not have a right of termination pursuant to this <u>Section 8.1(c)</u> if Sellers could, at such time, terminate this Agreement pursuant to <u>Section 8.1(d)</u>;

(d)    by any Seller by giving written notice to Buyer if there has been a breach by Buyer of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u>, and such breach has not been waived by such Seller, or, if such breach is curable, cured by Buyer prior to the earlier to

77

occur of (i) ten (10) days after receipt of such Seller's notice of intent to terminate or (ii) the Outside Date; provided, that no Seller shall have a right of termination pursuant to this Section 8.1(d) if Buyer could, at such time, terminate this Agreement pursuant to Section 8.1(c);

(e)    by Sellers or Buyer, if (i) (x) Sellers enter into a definitive agreement with respect to a Competing Bid or (y) the Bankruptcy Court enters an order approving a Competing Bid; provided, that if Sellers have delivered to Buyer a Back-Up Bidder Notice in accordance with Section 5.4(e), and the Back-Up Termination Date has not yet occurred, Buyer shall not be permitted to terminate this Agreement pursuant to this Section 8.1(e) until the Back-Up Termination Date or (ii) the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement, subject to Buyer's right to payment of the Termination Payment, if applicable, in accordance with the provisions of Section 5.4;

(f)    by Buyer, if Buyer is not the Successful Bidder at the Auction; provided, that if Sellers have delivered to Buyer a Back-Up Bidder Notice in accordance with Section 5.4(e), and the Back-Up Termination Date has not yet occurred, Buyer shall not be permitted to terminate this Agreement pursuant to this Section 8.1(f) until the Back-Up Termination Date;

(g)    by Buyer, if any of the Bankruptcy Court Milestones are not met;

(h)    by Sellers or Buyer, if the Bankruptcy Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Business is appointed in the Bankruptcy Cases;

(i)    by Buyer, if Sellers withdraw or seek authority to withdraw the Supplemental Motion; or

(j)    by Buyer, if (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, such order is (A) amended, modified or supplemented in a manner materially adverse to Buyer without Buyer's prior written consent or (B) voided, reversed or vacated or is subject to a stay, or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (A) amended, modified or supplemented in a materially adverse way without Buyer's prior written consent or (B) voided, reversed or vacated or is subject to a stay.

Section 8.2    Effect of Termination.    If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 2.3(b), Section 5.4(a), Section 6.6, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 5.4) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any material breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, that the

maximum Liability of (a) Sellers under this Agreement, if this Agreement is terminated in accordance with Section 8.1, shall not exceed the aggregate amount of the Termination Payment and (b) Buyer under this Agreement, if this Agreement is terminated in accordance with Section 8.1, shall not exceed the Escrow Amount.  Sellers' receipt of the Escrow Amount, together with all accrued investment income thereon, if any, shall constitute liquidated damages (and not a penalty) in a reasonable amount that will compensate Sellers in the circumstances in which this Agreement is terminated pursuant to Section 8.1(d), which amount would otherwise be impossible to calculate with precision, and be the sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) of Sellers against Buyer, and any of its former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents for any loss suffered as a result of any breach of any covenant, representation, warranty or agreement in this Agreement by Buyer or the failure of the transactions contemplated hereby to be consummated, and upon payment of such amounts, none of Buyer nor any of its former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates or agents shall have any further Liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1    Survival.    Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.5(b) or Section 2.5(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.  Any covenants or obligations to be performed from and after the Closing shall survive in accordance with their terms.

Section 9.2    Expenses.  Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants.  For the avoidance of doubt, Buyer shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.    This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement.  No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall

be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.  No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this <u>Section 9.5</u> except as expressly provided herein.  Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6 <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties.  Notwithstanding the foregoing or anything in this Agreement to the contrary, Buyer may assign (in whole or in part) any of its rights, interests or obligations hereunder to any other Person without the prior written consent of the other Parties; <u>provided</u>, that no such assignment shall relieve Buyer of its obligations hereunder.  In furtherance of the foregoing, Buyer may, without the consent of any of the other Parties, designate, in accordance with the terms of this paragraph and effective as of the Closing, one or more Persons to acquire all, or any portion of, the Acquired Assets and assume all or any portion of the Assumed Liabilities or pay all or any portion of the Purchase Price.  Such designation may be made by Buyer by written notice to Sellers at any time prior to the Closing; <u>provided</u>, that such designation shall not relieve Buyer of its obligations hereunder.  The Parties agree to modify, or cause to be modified, any Closing deliverables in accordance with any such designation.

Section 9.7 <u>Notices</u>.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Sellers:          Steven Goldaper
                        100 Phoenix Drive
                        Enfield, CT 06082
                        E-mail: <u>SGoldaper@brooksbrothers.com</u>

                        With a copy (which shall not constitute notice to Sellers) to:

                        Weil, Gotshal & Manges LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Attention: Jackie Cohen and Garrett Fail
                        Facsimile: (212) 310-8007

E-mail: jackie.cohen@weil.com, garrett.fail@weil.com

If to Buyer:             SPARC Group LLC
                         c/o Simon Property Group
                         225 West Washington Street
                         Indianapolis, Indiana 46204
                         Attention: Stanley Shashoua; Steven Fivel, David Dick
                         E-mail: SShashoua@simon.com; SFivel@simon.com;
                         DDick@aeropostale.com

                         With a copy (which shall not constitute notice to Buyer) to:
                         Authentic Brands Group
                         1411 Broadway
                         New York, New York 10001
                         Attention: Jay Dubiner
                         E-mail: jdubiner@abg-nyc.com

                         Paul, Weiss, Rifkind, Wharton & Garrison LLP
                         1285 Avenue of the Americas
                         New York, New York 10019-6064
                         Attention: Edward T. Ackerman; Robert B. Schumer
                         E-mail: eackerman@paulweiss.com; rschumer@paulweiss.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.7.

Section 9.8    Governing Law.    This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware (without regard to its conflicts of law principles), except to the extent that the Laws of such state are superseded by the Bankruptcy Code.

Section 9.9    Submission to Jurisdiction; Service of Process.    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court; provided, however, that if the Bankruptcy Cases have not been commenced, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware, for the resolution of any such claim or dispute.  Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other

81

security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7; provided, however, that nothing in this Section 9.9 shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10   Waiver of Jury Trial.   EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11   Specific Performance. Each Party acknowledges and agrees that the other Parties (and, in the case of Sellers, their respective estates) would be damaged irreparably in the event each of the other Parties does not perform its obligations under this Agreement in accordance with the specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that the Parties hereto may have under Law or equity, each Party shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.12   Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13   No Third Party Beneficiaries.   Except as otherwise expressly provided in Section 9.14, this Agreement shall not confer any rights or remedies upon any Person other than Buyer, each Seller, and their respective successors and permitted assigns.

Section 9.14   Non-Recourse. All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "Contracting Parties"). In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("Non-Party Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any

claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.14.

Section 9.15    Mutual Drafting.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16    Disclosure Schedule.    All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure against only those other sections of the Disclosure Schedule to which it is reasonably apparent on the face of such disclosure that such matter relates. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication to any third party that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced. The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17    Headings; Table of Contents.    The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18    <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

## BROOKS BROTHERS GROUP, INC.

By: _____

Name: Steven Goldaper

Title:   Chief Financial Officer

## 696 WHITE PLAINS ROAD, LLC

By: _____

Name: Steven Goldaper

Title:   Authorized Signatory

## BBD HOLDING 1, LLC

By: _____

Name: Steven Goldaper

Title:   Authorized Signatory

## BBD HOLDING 2, LLC

By: _____

Name: Steven Goldaper

Title:   Authorized Signatory

*[Signature Page to Asset Purchase Agreement]*

**BROOKS BROTHERS INTERNATIONAL, LLC**

By: _____ *Steve Goldaper* _____
        F06BA2C05AE7411...
Name: Steven Goldaper
Title:   Authorized Signatory


**BROOKS BROTHERS RESTAURANT, LLC**

By: _____ *Steve Goldaper* _____
          F06BA2C05AE7411...
Name: Steven Goldaper
Title:   Authorized Signatory


**RBA WHOLESALE, LLC**

By: _____ *Steve Goldaper* _____
          F06BA2C05AE7411...
Name: Steven Goldaper
Title:   Authorized Signatory


**RETAIL BRAND ALLIANCE GIFT CARD SERVICES, LLC**

By: _____ *Steve Goldaper* _____
          F06BA2C05AE7411...
Name: Steven Goldaper
Title:   Authorized Signatory


[*Signature Page to Asset Purchase Agreement*]

**RETAIL BRAND ALLIANCE OF PUERTO RICO, INC.**

By: _Steve Goldaper_
F06BA2C05AE7411...

Name: Steven Goldaper
Title:   Authorized Signatory

**BROOKS BROTHERS CANADA LTD.**

By: _Steve Goldaper_
F06BA2C05AE7411...

Name: Steven Goldaper
Title:   Treasurer

**BROOKS BROTHERS CANADA LTD.**

By: Brooks Brothers International, LLC,
       the sole shareholder of Brooks Brothers Canada Ltd.

By: _Steve Goldaper_
F06BA2C05AE7411...

Name: Steven Goldaper
Title:   Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

**BBDI, LLC**

By: _____
Name: Steven Goldaper
Title:   Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

DocuSign Envelope ID: D502ED11-69B0-407D-A77F-B246DB1738E7

**BROOKS BROTHERS FAR EAST LIMITED**

By: _____

Name: Stephen Marotta

Title:   Chief Restructuring Officer

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

SPARC GROUP LLC

By: _____
Name: David Dick
Title: CFO