**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
                                              :

**In re**                                :         **Chapter 11**
                                               :

**BROOKS BROTHERS GROUP, INC.,** *et al.*,    :         **Case No. 20–11785 (CSS)**
                                               :

                     **Debtors.**[1]          :         **(Jointly Administered)**
                                               :

                                               :         **<u>Objection Deadline</u>: Extended to**
                                               :         **July 30, 2020 for the Committee**
                                               :

                                               :         **<u>Hearing Date</u>: August 3, 2020 at**
                                               :         **1:00 p.m.**
---------------------------------------------------------------- x

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN**
**RESPONSE TO DEBTORS' MOTION FOR APPROVAL OF BIDDING PROCEDURES**

        The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Brooks Brothers

Group, Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>" and

together with their non-Debtor affiliates, "<u>Brooks Brothers</u>"), by and through its undersigned

proposed counsel, hereby submits this statement (the "<u>Statement</u>") in response to the *Motion of*

*Debtors for Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form and Manner of Notice*

*of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures,*

*(II) Scheduling Auction and Sale Hearing, (III) Approving (A) Sale of Substantially All of Debtors'*

*Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and*

*Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Brooks Brothers Group, Inc. (8883); Brooks Brothers Far East Limited (N/A); BBD Holding 1, LLC (N/A); BBD Holding 2, LLC (N/A); BBDI, LLC (N/A); Brooks Brothers International, LLC (N/A); Brooks Brothers Restaurant, LLC (3846); Deconic Group LLC (0969); Golden Fleece Manufacturing Group, LLC (5649); RBA Wholesale, LLC (0986); Retail Brand Alliance Gift Card Services, LLC (1916); Retail Brand Alliance of Puerto Rico, Inc. (2147); and 696 White Plains Road, LLC (7265). The Debtors' corporate headquarters and service address is 346 Madison Avenue, New York, New York 10017.

[Docket No. 154] (the "Motion") and the *Supplement to Motion of Debtors for Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Scheduling Auction and Sale Hearing, (III) Approving (A) Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 204] (the "Supplement").[2] In support of this Statement, the Committee respectfully states as follows:

## BACKGROUND

1.      On July 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in these cases. These chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the Court's *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 105], entered on July 10, 2020.

2.      The United States Trustee for the District of Delaware appointed the Committee on July 21, 2020 [Docket No. 175]. The Committee is currently comprised of the following members: (i) 39-15 Skillman Realty Co., LLC; (ii) FedEx Corporate Services, Inc.; (iii) Workers United, affiliated with SEIU; (iv) Trajes Mexicanos S.A. de C.V.; (v) Swiss Garments Company; (vi) PT. Ungaran Sari Garments; and (vii) the Pension Benefit Guaranty Corporation. The Committee selected Akin Gump Strauss Hauer & Feld LLP as counsel and Troutman Pepper Hamilton Sanders

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to those terms in the Motion or the Supplement, as applicable.

LLP as co-counsel on July 24, 2020 and selected FTI Consulting, Inc. as financial advisor on July 27, 2020.

3.       On July 15, 2020, the Debtors filed the Motion seeking approval of proposed bidding procedures (the "Bidding Procedures").   On July 23, 2020, the Debtors filed the Supplement amending the Bidding Procedures and seeking approval of proposed bid protections in favor of SPARC Group LLC (the "Stalking Horse Bidder" and the stalking horse bid submitted by SPARC Group LLC, the "Stalking Horse Bid") as contemplated by SPARC Group LLC's asset purchase agreement (the "Stalking Horse Agreement") in the form of a break-up fee in the amount of up to $9,150,000 (the "Break-Up Fee") and an expense reimbursement in the amount of up to $1,000,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections").

4.       The proposed Bidding Procedures establish the procedures for bidding in connection with the sale of the Debtors' assets, including, among other things, the form and content of bids and the Debtors' review of bids.  The Bidding Procedures further contemplate that, if no Qualified Bids are submitted by the Bid Deadline, the Debtors shall deem the Stalking Horse Bidder the Successful Bidder.

5.       The parties have agreed to adjourn the Sale Hearing from August 11, 2020 to August 14, 2020.  Accordingly, the Committee proposes that the sale process follow the below schedule, which revises certain dates to take into account the adjourned Sale Hearing:

| Event | Original Date | Revised Date |
|---|---|---|
| Deadline to Submit Bids | August 5, 2020 at 10:00 a.m. | August 6, 2020 at 4:00 p.m. |
| Deadline to File Objections to Stalking Horse Sale Transaction | August 7, 2020 at 4:00 p.m. | August 8, 2020 at 4:00 p.m. |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | August 6, 2020 at 4:00 p.m. | August 9, 2020 at 4:00 p.m. |

#109189231 v1

| Event | Original Date | Revised Date |
|---|---|---|
| Auction (if any) | August 7, 2020 at 10:00 a.m. | August 10, 2020 at 10:00 a. m. |
| Deadline to (i) File Notice and Identities of Successful Bid(s) and Back-Up Bid(s) and (ii) Provide Affected Counterparties with Proposed Form of Adequate Assurance | August 9, 2020 at 4:00 p.m. or as soon as practicable after the Auction | August 11, 2020 at 4:00 p.m. or as soon as practicable after the Auction |
| Deadline to Object to (i) Identify of Successful Bidder, (ii) Conduct of Auction, (iii) Proposed Cure Costs, and (iv) Adequate Assurance | August 10, 2020 at 11:59 p.m. | August 12, 2020 at 4:00 p.m. |
| Deadline for Debtors to Reply to Objections | August 11, 2020 at 11:59 a.m. | August 13, 2020 at 11:59 p.m. |
| Sale Hearing | August 11, 2020 at 2:00 p.m. | August 14, 2020 at 10:00 a.m. |

**STATEMENT**

6.      The Committee is a new entrant in these cases and in the Debtors' effort to market

and sell their assets against the backdrop of an admittedly dire retail (and global) landscape.

Although the Committee's advisors have had just days to collect, review, and digest information

relevant to the Debtors' current circumstances, the Committee has already developed an

understanding of, and an appreciation for, the need to move quickly.  Indeed, the Committee does

not object to the relief sought in the Motion or the Supplement.  The Committee files this

Statement, however, to raise a number of discrete concerns regarding the sale process and the

Stalking Horse Agreement.  More specifically, this Statement will address (i) concerns regarding

the provision of Bid Protections to the Stalking Horse Bidder, (ii) preliminary concerns regarding

the terms of the Stalking Horse Agreement, and (iii) certain modifications that the Committee

requests be made to the Bidding Procedures and Bidding Procedures Order.

7.      *First*, the provision of Bid Protections to the Stalking Horse Bidder may not be

warranted given the facts and circumstances of these cases.  As noted by numerous courts, "the

4

allowability of break-up fees, like that of other administrative expenses, depends on the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999);[3] *In re Energy Future Holdings Corp.*, 575 B.R. 616, 634 (Bankr. D. Del. 2017) ("The Court is required to determine whether the movant has carried the 'heavy burden' of demonstrating that a post-petition transaction 'provided an actual benefit' to the debtor's estate, justifying the future payment of a termination fee as one of the necessary costs or expenses of the estate."); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 662 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (finding that the aggregate amount of break-up fees must be "reasonably related to the risk, effort, and expenses of the prospective purchaser."); *see also* Bruce A. Markell, *The Case Against Break-Up Fees in Bankruptcy*, 66 Am. Bankr. L.J. 349, 366 (1992) ("the debtor should grant, and the bankruptcy court should approve, a break-up fee only if there is a showing that the fee induces an increased bid by the amount of the fee, and if the amount of the fee correlates with the fee that other bidders would have received."). Although the Break-Up Fee and Expense Reimbursement proposed here nominally fall within the range of "market" for comparable transactions as considered by courts in this district, the Committee does not believe that the Debtors have met their burden of showing that the approval of such fees is necessary in these cases. Indeed, in the present circumstances, the potential benefits of the fees may well outweigh their potential harm to the competitive bidding process. *See In re Energy Future Holdings Corp.*, 904 F.3d a 314 (3d Cir.

---

[3] In *O'Brien*, the Third Circuit recognized that break-up fees and expense reimbursements may not necessarily be appropriate in all circumstances. "[E]ven if the purpose for the break-up fee is not impermissible, the break-up fee may not be needed to effectuate that purpose. For example, in some cases a potential purchaser will bid whether or not break-up fees are offered . . . . In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate." *Id.* at 535.

2018) ("Exercising [its] discretion and taking into account all of the relevant circumstances, the bankruptcy court must make what is ultimately a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is 'actually necessary to preserve the value of the estate.'").  The Stalking Horse Bidder here is an affiliate of the Debtors' DIP Lenders, who presumably elected to extend a DIP facility on economically favorable terms in order to facilitate the submission and ultimate acceptance of the Stalking Horse Bid.  Moreover, this is not a case in which the Stalking Horse Bidder is being asked to keep its bid open while the Debtors conduct a 60-90 day marketing process, under which circumstances the Stalking Horse Bidder could arguably be entitled to compensation for the creation and maintenance of a bidding "floor."  Indeed, even under the revised schedule set forth above, bids are proposed to be due just ***three days*** after the Motion is scheduled to be heard.

8.      Additionally, the Committee is not convinced that payment of the Bid Protections is necessary or appropriate in each circumstance in which payment of the Bid Protections would currently be triggered under the proposed Stalking Horse Agreement.  The Stalking Horse Agreement currently provides that the Break-Up Fee would be paid if the Debtors choose to consummate an alternative transaction, a trigger that the Committee believes is appropriate assuming that the Bid Protections are themselves appropriate.  However, there are two additional scenarios in which the Stalking Horse Bidder would be entitled to receive the Break-Up Fee, both of which are problematic.  First, if the Debtors breach a representation, warranty or covenant in the Stalking Horse Agreement such that the transaction is not consummated, then the Seller must pay the Break-Up Fee to the Buyer upon the Closing of a sale of all or a material amount of the Intellectual Property of the Company.  Under these circumstances, any subsequent sale of the Intellectual Property alone is likely to provide less value to the Debtors than the Stalking Horse

6

Bid.  In that instance, the Debtors should not also be obligated to reduce those proceeds further by payment of the Break-Up Fee.  Second, the Debtors must pay the Break-Up Fee to the Buyer upon the Closing of an alternate transaction if the Debtors withdraw the Motion.  If the Motion is withdrawn, the Debtors will not be authorized by the Bankruptcy Court to pay the Break-Up Fee and the Stalking Horse Bidder should not be permitted to circumvent Bankruptcy Court approval.

9.    Finally, in determining whether a break-up fee is appropriate, courts have examined whether the amount of the fee will potentially "impede" or "chill" the bidding on the assets. *See In re Twenver, Inc.*, 149 B.R. 954 (Bankr. D. Colo. 1992).  In this case, payment of the Expense Reimbursement and Break-Up Fee could ultimately chill bidding on the Debtors' assets by creating an unnecessary hurdle for other bidders to overcome.

10.    *Second*, in the event the Stalking Horse Bidder is ultimately the Successful Bidder and the Debtors elect to proceed with the sale, the Committee anticipates objecting to approval of the Stalking Horse Agreement unless certain provisions, as summarized below, are removed or revised prior to the sale hearing.[4]  Most critically, the Stalking Horse Agreement contemplates that any and all potential claims or causes of action against directors and officers of the Debtors (the "Purchased Actions") who are ultimately retained by the Stalking Horse Bidder shall be transferred to the Stalking Horse Bidder at Closing and subsequently released.  These Purchased Actions are, of course, valuable assets of the estates.  Problematically, however, neither the Debtors nor the Committee know just how valuable the Purchased Actions are at this point in the cases (although the Committee strongly suspects, based on information provided to date, that there may well be meaningful value attributable to such Claims).  The Debtors themselves have not conducted an

---

[4] The Committee continues to review and diligence, among other things, the Stalking Horse Agreement and, accordingly, the list of issues identified in this Statement is preliminary in nature.  The Committee reserves all rights as to the Stalking Horse Agreement, and will submit a comprehensive objection to the proposed sale transaction if its concerns are not addressed by the relevant parties.

#109189231 v1

investigation into these Purchased Actions.  Moreover, the Committee has not had an adequate

opportunity (nor does it have adequate information) to form a concrete view as to how viable or

valuable the Purchased Actions are, and thus cannot determine whether any value that may

ultimately be attributed to the Purchased Actions is reasonable and appropriate under the

circumstances.[5]   Given these facts, a release of the Purchase Actions at this stage is entirely

inappropriate, and also lacking in any apparent business justification.  The Purchased Actions

should thus be removed from the list of assets being acquired by the Stalking Horse Bidder.

11.    Additionally, the Committee has concerns about, among others, the following

provisions of the Stalking Horse Agreement:

- Cure Costs:  The Stalking Horse Agreement provides that postpetition cure costs are required to be paid by the Debtors.  The responsibility for paying postpetition cure costs related to contracts being assumed by the Stalking Horse Bidder should be an obligation of the Stalking Horse Bidder and not an obligation of the Debtors, without any related deductions to the purchase price;

- Back-Up Bidder: The Stalking Horse Agreement provides that the Stalking Horse Bidder will serve as the Back-Up Bidder if, at the end of an Auction, it has the second highest or otherwise best bid.  However, in such event, it will only be required to consummate the transactions pursuant to the terms and conditions of the Stalking Horse Agreement, even if it has made subsequent higher and better bids at the Auction.  If the Stalking Horse Bidder makes subsequent bids at the Auction and it is named the Back-Up Bidder with respect to any such bid, the Stalking Horse Bidder should be required to consummate the transaction pursuant to the terms and conditions of such subsequent bid;

- Time to Assume or Reject Contracts and Leases: The Stalking Horse Agreement provides that the Stalking Horse Bidder has until the later of: (a) December 31, 2020 or (b) the confirmation date of a plan (the "Designation Rights Period") to determine which contracts and leases it wishes to assume or reject.  This situation creates significant uncertainty for the estate and other stakeholders post-closing as they try to determine the pool of proceeds and claims available after the Closing.  To alleviate this concern, the Stalking Horse Bidder should be required to determine which contracts and leases it wishes to assume or reject within 45 days after the Closing.  Additionally, the Buyer is not obligated to provide its initial list

---

[5] The Committee has served the Debtors with discovery requests in an effort to begin diligencing the Purchased Actions and anticipates filing a motion under Bankruptcy Rule 2004 related to the substance of the Purchase Actions in the near future.

of assumed contracts and leases until five (5) days before the Auction, leaving contract counterparties with little understanding of where they stand and making it more challenging for competing bidders to evaluate the list of proposed assumed contracts and leases and prepare a competitive counter-offer;

- <u>Foreign Subsidiaries and JV Interests</u>: The Stalking Horse Agreement contemplates that the Stalking Horse Bidder has the right to sell the equity of the Debtors' foreign subsidiaries and interests in certain foreign joint ventures (the "<u>Designated Foreign Subsidiaries</u>") during the Designation Rights Period. Any proceeds received from the sale of the Designated Foreign Subsidiaries will be retained by the Stalking Horse Bidder. However, neither the equity related to these interests, nor the option to conduct a sale of such interests is an Acquired Asset. Further, the Stalking Horse Agreement limits the revenue that the Debtors would receive from the joint ventures while the Stalking Horse Bidder determines whether or not to sell the interests, subject to certain exceptions. The Debtors are fully responsible for all liabilities that may be incurred during the Designation Rights Period. The Stalking Horse Bidder should be required to pay for the option right and should indemnify the Debtors for any liabilities or obligations that may be incurred during the Designation Rights Period in the same manner as they are indemnifying the Debtors in connection with contracts and leases being assumed pursuant to the Stalking Horse Agreement; and

- <u>Purchase Price Deductions</u>: The Stalking Horse Agreement contains a number of purchase price deductions, making it difficult for the Committee to gauge the true value of the Stalking Horse Bid.

12.    ***Third***, the Committee has been working constructively with the Debtors to resolve

its concerns regarding the Motion and the Bidding Procedures. To that end, the Committee has

requested that the Debtors make the following changes to the Bidding Procedures and the Bidding

Procedures Order:[6]

- Revise the Bidding Procedures to allow for bids to take the form of a chapter 11 plan of reorganization;

- Provide greater consultation rights for the Committee, including providing that individual Committee members shall be entitled to receive copies of all Qualified Bids received;

---

[6] As of the filing of this Statement, the Committee is in discussions with the Debtors regarding these changes. Copies of the Committee's proposed revisions to the Bidding Procedures and Bidding Procedures Order are attached hereto as **Exhibits A and B**.

- Provide that the Bidding Procedures may not be amended absent a Court order or the consent of the Committee;

- Ensure that the Stalking Horse Bidder will serve as a Back-Up Bidder if the Stalking Horse Bidder submits the second highest or otherwise best bid at an Auction; and

- Revise certain dates and deadlines to ensure that parties in interest have as much notice and opportunity as possible to participate in the sale process, including, if necessary, to file objections.

13.     Given the extremely expedited nature of these proceedings and in light of the Committee's recent formation and selection of advisors, the Committee reserves all rights to supplement or amend this Statement with additional information, objections, and legal arguments based on its ongoing review and diligence, and expressly reserves the right to raise additional or further objections at or prior to the hearing on the Motion or at any subsequent hearing to approve any sale, including a sale to the Stalking Horse Bidder or to any other potential purchaser on any and all grounds.

Dated: July 30, 2020
      Wilmington, Delaware

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

/s/ Evelyn J. Meltzer
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
Evelyn J. Meltzer (DE No. 4581)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
Email: david.stratton@troutman.com
      david.fournier@troutman.com
      evelyn.meltzer@troutman.com
      marcy.smith@troutman.com

-and-

Meredith A. Lahaie (admitted *pro hac vice*)

10

Abid Qureshi (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036-6745
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: mlahaie@akingump.com
      aqureshi@akingump.com


-and-

Kate Doorley (admitted *pro hac vice*)
Julie Ann Thompson (admitted *pro hac vice*)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Robert S. Strauss Tower, 2001 K Street, N.W.
Washington, DC 20006-1037
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: kdoorley@akingump.com
      Julie.thompson@akingump.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

11