**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------ x
: 
: 
: Chapter 11
In re :
: Case No. 20–11785 (CSS)
BROOKS BROTHERS GROUP, INC., *et al.*, :
: (Jointly Administered)
:
Debtors.[1] : Re: D.I. 154, 204
------------------------------------------------------------ x

**DEBTORS' REPLY IN FURTHER SUPPORT OF DEBTORS'**
**REQUEST FOR APPROVAL OF BIDDING PROCEDURES AND RELATED RELIEF**

Brooks Brothers Group, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases, submit this omnibus reply in further support of the *Motion of Debtors for Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Scheduling Auction and Sale Hearing, (III) Approving (A) Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 154] (the "**Original Motion**") and the *Supplement to Motion of Debtors for Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Scheduling Auction and Sale Hearing, (III) Approving (A) Sale of Substantially All of Debtors' Assets Free*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are Brooks Brothers Group, Inc. (8883); Brooks Brothers Far East Limited (N/A); BBD Holding 1, LLC (N/A), BBD Holding 2, LLC (N/A), BBDI, LLC (N/A), Brooks Brothers International, LLC (N/A); Brooks Brothers Restaurant, LLC (3846); Deconic Group LLC (0969); Golden Fleece Manufacturing Group, LLC (5649); RBA Wholesale, LLC (0986); Retail Brand Alliance Gift Card Services, LLC (1916); Retail Brand Alliance of Puerto Rico, Inc. (2147); and 696 White Plains Road, LLC (7265). The Debtors' corporate headquarters and service address is 346 Madison Avenue, New York, New York 10017.

RLF1 23808482v.1

*and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 204] (the "**Supplement**", and together with the Original Motion, the "**Motion**")[2] and respectfully submit as follows:

## Reply

1. Brooks Brothers is faced with the challenge of preserving its global business – a retail operation that is best known for selling suits and ties – in the midst of the unprecedented COVID-19 pandemic. As this Court has recognized in these cases and others, the COVID-19 pandemic has caused significant business interruption as the economic and social impact of the pandemic threatens the survival of retail operators – even one as iconic as Brooks Brothers®. For the sake of the Debtors' stakeholders, including approximately 4,000 employees and hundreds of landlords and vendors whose personal livelihoods and businesses depend on the survival of the Debtors' iconic business as a going concern, the Debtors have set these cases on a path to achieve a value-maximizing result.

2. The Debtors' Special Committee directed PJ Solomon's continuation of a lengthy and thorough prepetition sale process into these chapter 11 cases. The Debtors sought and secured a stalking horse to provide certainty in the form of a floor value for the Debtors' core business and to encourage bidding through an auction. It is without dispute that the Debtors' agreement with SPARC Group LLC provides the Debtors and these estates with significant benefits, including, among other things, providing for a going concern sale of the Debtors' core business, guaranteeing that a minimum of 125 Brooks Brothers® stores will continue in operation,

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

2

providing the Debtors with payment of $305 million (subject to certain adjustments), and assuming or otherwise satisfying certain of the Debtors' material prepetition liabilities.

3. Following negotiation of the Stalking Horse Bid, the Debtors worked with the official committee of unsecured creditors (the "**Committee**"), the Prepetition ABL Agent, and other stakeholders including various landlords, to modify the Bidding Procedures to encourage all parties to submit value-maximizing bids and to ensure parties' concerns were addressed. As a result of those efforts, the Debtors achieved their goal of fully-agreed-upon procedures and timelines. **There are no outstanding objections to the Bidding Procedures or Bid Protections.**[3] The Bidding Procedures and Bid Protections are in the best interests of the Debtors' estates and **the Motion should be approved as it is uncontested**.

4. A revised proposed order granting the Motion is annexed hereto as **Exhibit A** (the "**Proposed Order**"). A redline of the Proposed Order (including the Bidding Procedures) against the versions filed with the Supplement is attached hereto as **Exhibit B**.

5. The proposed and agreed timeline, as modified after consultation with the various parties in interest, is shown in the following chart:

| Key Date | Prior Deadline | New Deadline |
| --- | --- | --- |
| Deadline to Submit Bids | August 5, 2020 at 10:00 a.m. (prevailing Eastern Time) | August 6, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders | August 6, 2020 at 4:00 p.m. (prevailing Eastern Time) | August 9, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Auction to be Held if the Debtors Receive More Than One Qualified Bid | August 7, 2020 at 10:00 a.m. (prevailing Eastern Time) | August 10, 2020 at 10:00 a.m. (prevailing Eastern Time) |

---

[3] The Committee filed a statement [D.I. 266] (the "**Statement**") that confirmed that the Committee "**does not object to the relief sought in the Motion**." Statement ¶ 6. The limited objection to the Debtors' sale filed by Maricopa County [D.I. 234] is not before the Court at this time. The Debtors resolved the objections filed by (i) Asheville Retail Associates LLC and Palm Beach Outlets I, LLC [D.I. 229]; (ii) Brookfield Property REIT, Inc. [D.I. 247]; and (iii) Wells Fargo Bank, National Association [D.I. 248] and each party has confirmed to the Debtors that their objection is withdrawn.

| | | |
|---|---|---|
| Deadline to File Objections to Stalking Horse Sale Transaction | August 7, 2020 at 4:00 p.m. (prevailing Eastern Time) | August 8, 2020 at 11:59 p.m. (prevailing Eastern Time) |
| Deadline to (i) File Notice and Identities of Successful Bid(s) and Back-Up Bid(s) and (ii) Provide Affected Counterparties With the Successful Bidder's Proposed Form of Adequate Assurance of Future Performance With Respect to Proposed Assigned Contracts, if Applicable | August 9, 2020 at 4:00 p.m. (prevailing Eastern Time) or as soon as is practicable after the Auction | August 11, 2020 at 4:00 p.m. (prevailing Eastern Time) or as soon as is practicable after the Auction |
| Deadline to File Objections to (i) Identity of Successful Bidder, (ii) Conduct of Auction, (iii) Cure, and (iv) Adequate Assurance | August 10, 2020 at 11:59 p.m. (prevailing Eastern Time) | August 12, 2020 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to Reply to Objections to (i) Sale Transaction, (ii) Identity of Successful Bidder, (iii) Conduct of Auction, (iv) Cure, and (v) Adequate Assurance | August 11, 2020 at 11:59 a.m. (prevailing Eastern Time) | August 13, 2020 at 11:59 a.m. (prevailing Eastern Time) |
| Sale Hearing | August 11, 2020 at 2:00 p.m. (prevailing Eastern Time) | August 14, 2020 at 10:00 a.m. (prevailing Eastern Time) |

6.      The Debtors recognize and appreciate that the Committee is a new entrant, joining a few weeks into these cases. However, the Committee, while not objecting to the Motion, has questioned the need for the market-based bid protections provided to the Stalking Horse Bidder in the form of 3% Break-Up Fee and a limited Expense Reimbursement capped at $1 million (collectively, the "**Bid Protections**"). The Debtors file this reply to highlight the uncontroverted evidence that will be introduced at the uncontested hearing: entry into the Stalking Horse Agreement and proceeding to an auction with the Stalking Horse Bid in hand is profoundly important and beneficial to the Debtors' estates. A binding, baseline bid – in this period of unprecedented economic and social uncertainty – is a mooring upon which all of the Debtors' constituents can depend, and against which all other bidders must now compete. And, it is uncontroverted that the Debtors' agreement to provide the Stalking Horse Bidder with standard, market-based Bid Protections was necessary to induce the Stalking Horse Bidder to be bound by the terms of its offer; and the Debtors' decision (acting through the Special Committee) to provide

the Bid Protections represents a reasonable exercise of the Debtors' business judgment. Again, the Committee "does not object to the relief sought in the Motion." Statement ¶ 6.

**A.    The Revised Bidding Procedures are Fair and Reasonable**

7.    The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may bid, allowing for a value-maximizing sale of the Debtors' assets. *See* Pitts Decl. ¶ 15. The Debtors have revised the Bidding Procedures to address certain issues raised by the Committee and Prepetition ABL Agent, including allowing for a broader scope of bids and providing enhanced consultation rights to the Committee and Prepetition ABL Agent.

**B.    Sale Issues Are Not Ripe for Consideration**

8.    The Court is not being asked to approve any sale transaction at this time. Any potential objection to an ultimate proposed sale transaction or particular asset purchase agreement (including any objections to the sale of potential estate claims or causes of action, allocation of cure costs, the length of the designation rights period, the value received for certain designation rights, or the amount of purchase price deductions) can be addressed at the Sale Hearing to the extent unresolved and relevant at that time.

**C.    The Bid Protections Are Reasonable and Appropriate**

9.    Granting bid protections in the form of break-up fees, expense reimbursements, and minimum overbid amounts for a sale of assets pursuant to section 363 of the Bankruptcy Code is a widely-known and widely-accepted practice. In this context, where the complications associated with the constantly evolving COVID-19 pandemic adds uncertainty to the success of any sales process (*see* Pitts Decl. ¶ 23), including with respect to any potential bidder's continued interest (and at what level), providing bid protections to induce bidders to

5

commit to a binding purchase agreement is more important than ever. *See In re Lucky Brand Dungarees, LLC,* Case No. 20-11768 (CSS) (Bankr. D. Del.) (Hr'g. Tr. July 30, 2020 at 78:17-21) ("I think, in this situation, it is absolutely appropriate to award a breakup fee. As a matter of fact, I can't imagine doing this transaction without a breakup fee. It's complicated, a lot of effort has gone into it. We're in a high-risk environment.")

### *i. The Bid Protections Were Necessary to Induce the Stalking Horse Bidder to Commit to the Stalking Horse Agreement*

10. The Committee wonders whether the fact that an affiliate of the Stalking Horse Bidder provided the DIP Facility would make it inevitable that the Stalking Horse Bidder would bid on the Debtors' assets and therefore somehow render Bid Protections unnecessary. Statement ¶ 7. No one doubts that the Stalking Horse Bidder was interested in bidding for the Debtors' assets, but the DIP Facility by design and for the benefit of these estates was and is a stand-alone agreement. The DIP Facility had exactly zero terms requiring a bid for Brooks Brothers. In this environment, it would hardly be responsible to give credence to speculation about whether a binding offer might be made in the absence of bid protections. What matters in times like these is evidence, which, here, is uncontroverted, and shows that the Bid Protections were a material inducement for, and condition of, the Stalking Horse Bidder's entry into the Stalking Horse Agreement. *See* Pitts Decl. ¶ 22 ("The Stalking Horse Bidder was unwilling to hold open its offer without assurance of payment of the Termination Payment under the conditions set forth in the Stalking Horse Agreement and the Bidding Procedures").

11. This Court has previously recognized what has occurred here: that a party may both provide a loan to a debtor and then separately require inducement to conduct diligence, negotiate, and commit to entering into an asset purchase agreement:

6

> Breakup fees are all about inducement to come to the table. And theoretically, I guess at least, parties who are already at the table don't need inducement to come to it. Now maybe they need inducement to stay, and maybe that's the point because, while you're a pre-petition secured lender, that's not say[ing] you're a pre-petition secured lender that's willing to draft a stalking horse -- draft an APA and do the due diligence needed to be an owner -- as opposed to a lender, which is different, and I would say probably more stringent -- and an inducement to be part of a process, an inducement to be a target as the stalking horse. So I think there are reasons why a -- even a pre-petition secured lender would need to be induced to be a stalking horse bidder, even on a credit bid situation, on a post-petition basis.

*In re Sancilio Pharmaceuticals Co., Inc.*, Case No. 18-11333 (CSS) (Bankr. D. Del.) (Hr'g. Tr. Jun 28, 2020, at 46:7-21) [D.I. 114]. Bid protections for stalking horse bidders that were also postpetition lenders have been approved by this Court in numerous cases. *See In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS) (Bankr. D. Del. June 19, 2020) [D.I. 344] (granting expense reimbursement over objection to stalking horse bidder group that also was a DIP lender, pre-petition lender and equity holder); *In re Katy Industries, Inc.*, Case No. 17-11101 (KJC) (Bankr. D. Del. June 19, 2017) [D.I. 163] (granting break-up fee and expense reimbursement to stalking horse bidder who was also the DIP lender); *In re BPS US Holdings Inc.*, Case No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) [D.I. 233] (same); *In re Vertellus Specialties, Inc.*, Case No. 16-11290 (CSS) (Bankr. D. Del. June 28, 2016) [D.I. 169] (same); *In re Appvion, Inc.*, Case No. 17-12082 (KJC) (Bankr. D. Del. Mar. 12, 2018) [D.I. 565] (granting expense reimbursement to stalking horse bidder who was also the DIP lender).

12. Here, it took significant effort and time by the Debtors and the Stalking Horse Bidder to reach agreement on the lengthy and complex Stalking Horse Agreement. The diligence required to consider, negotiate and finalize the Stalking Horse Agreement subsequent to the Debtors' entry into the DIP Facility was substantial, and – not surprisingly – far exceeded the level of diligence required to provide secured financing under the terms of the DIP Facility.

7

### ii.  *The Bid Protections are Beneficial Prior to the Auction*

13.  Notwithstanding the implication that the creation and maintenance of a bidding "floor" may not entitle the Stalking Horse Bidder to compensation given the Debtors' bidding schedule (Statement ¶ 7), the Bid Protections correspond to the real and considerable benefits conferred upon the Debtors' estates by the Stalking Horse Agreement.  Although the Stalking Horse Bidder is not "being asked to keep its bid open while the Debtors conduct a 60-90 day marketing process" (Statement ¶ 8), it is creating genuine value for the estates as the Debtors continue negotiations with other potential bidders, who have been on notice of the baseline – and thanks to the Bid Protections, *binding* – bid since July 23, 2020 (two weeks prior to the proposed bid deadline and 18 days prior to the proposed auction date).

14.  Indeed, as this Court knows, time is of the essence in these cases.  In light of the only available time remaining in the Debtors' sale process, the presence of the Stalking Horse Bid is critical, given that it will streamline the process and provide competing bidders an adequate basis by which to compare and evaluate subsequent bids in a relatively short timeframe.  Without the Stalking Horse Agreement, the Debtors would not realize significant benefits, including (i) the creation and continued maintenance of a binding baseline bid of $305 million (subject to certain adjustments), and the assumption of certain material liabilities, (ii) a mechanism to prompt other bidders to submit overbids, and (iii) a foundation in the form of the asset purchase agreement to evaluate and compare subsequent bids.

15.  Even outside of the COVID-19 pandemic, this Court has regularly approved bid protections where there is limited time between the hearing to consider the bid procedures and the bid deadline.  *See In re Things Remembered, Inc.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) [D.I. 150] (seven (7) days between entry of the bidding procedures order and the bid deadline); *In re Charlotte Russe Holding, Inc.*, Case No. 19-10210 (LSS) (Bankr. D. Del. Feb.

21, 2019) [D.I. 199] (ten (10) days between entry of the bidding procedures order and the bid deadline); *In re Hobbico, Inc.,* Case No. 18-10055 (KG) (Bankr. D. Del. Mar. 14, 2018) [D.I. 243] (nine (9) days between entry of the bidding procedures order and the bid deadline); *In re Marsh Supermarkets Holding, LLC*, Case No. 17-110066 (BLS) (Bankr. D. Del. May 30, 2017) [D.I. 157] (five (5) days between entry of the bidding procedures order and the bid deadline); *In re JMO Wind Down, Inc.*, Case No.16-10682 (BLS) (Bankr. D. Del. Apr. 21, 2016) [D.I. 155] (five (5) days between entry of the bidding procedures order and the bid deadline).

   *iii.* ***The Bid Protection Triggers in the Stalking Horse Agreement are Reasonable and Appropriate and Were Necessary to Induce the Stalking Horse Bidder***

   16. The Committee questioned ***but did not object to*** payment of the Bid Protections (1) where the Debtors withdraw the Motion and (2) where the Debtors breach a representation, warranty or covenant in the Stalking Horse Agreement and subsequently consummate a different transaction.  UCC Statement ¶ 8.

   17. The first scenario should be of no concern to the Committee.  The Debtors expect that the Motion will be approved, as it is uncontested, and the trigger will not be relevant. And, if the Debtors did withdraw the Motion, the Bid Protections would never be approved and the inclusion of the provision in the Stalking Horse Agreement would not prejudice the Debtors' estate.

   18. With respect to the second scenario, it is common for Court-approved bid protections to be payable upon a debtor's breach of representations, warranties, and covenants. *See In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS) (Bankr. D. Del. July 16, 2020) [D.I. 548] (authorizing the payment of the termination fee for the breach of representations, warranties, and covenants); *In re Lucky Brand Dungarees, LLC,* Case No. 20-11768 (CSS) (Bankr. D. Del. July 30, 2020) [D.I. 251] (same); *In re Bumblebee Parent Inc.*, Case No. 19-12502 (LSS) (Bankr. D.

Del. Dec. 19, 2019) [D.I. 171] (same); *In re Things Remembered, Inc.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) [D.I. 150] (same). The Debtors engaged in extensive negotiations with the Stalking Horse Bidder with respect to this provision (and the provision related to withdrawal of the Motion) and were able to successfully negotiate that the Bid Protections only become payable once another transaction is consummated, which ensures that liquidity is preserved unless and until another sale is completed. And, again, as the evidence shows "[t]he Stalking Horse Bidder was unwilling to hold open its offer without assurance of payment of the Termination Payment under the conditions set forth in the Stalking Horse Agreement and the Bidding Procedures." Pitts Decl. ¶ 22.

### *iv. The Size of the Break-Up Fee and Expense Reimbursement are Reasonable and Appropriate Under the Circumstances and Will not Chill Bidding*

19. Break-up fees of 3% of a purchase price plus expense reimbursements are typical and regularly approved in this district. *See, e.g.*, *In re Celadon Grp., Inc.*, Case No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [D.I. 219] (authorizing a break-up fee of up to 3% of the purchase price plus an expense reimbursement of 1.5% of the purchase price); *In re Bumblebee Parent Inc.*, Case No. 19-12502 (LSS) (Bankr D. Del. Dec. 19, 2019) [D.I. 171] (approving a break-up fee of up to $23,125,000 (approximately 2.5%), plus a separate expense reimbursement in the maximum amount of $2.5 million).

20. Here, the Break-Up Fee and the Expense Reimbursement are reasonable and appropriate and are not expected to chill billing. The uncontroverted evidence is that "executing the Stalking Horse Agreement has put the Company in a position to solicit competing bids that may be materially higher or otherwise better than the Stalking Horse Bid." Pitts Decl. ¶ 22. Securing the Stalking Horse Bid was "important, if not essential, to help support the foundation for the final phase of the Company's sale process, including to give other bidders

necessary information to proceed quickly and efficiently, and the Debtors' estates a minimum bid on which to rely, all to promote more competitive bidding." *Id.*  As a result, the Break-Up Fee and Expense Reimbursement are "(a) commensurate to the benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; and (b) fair, reasonable, and appropriate in light of the circumstances and the size and nature of the proposed sale and the efforts that have been and will be expended by the Stalking Horse Bidder." *Id.*

**Conclusion**

21. The revised Proposed Order should be entered and the revised Bidding Procedures approved so that the Debtors can proceed successfully through the next phases of these cases.

Dated: August 2, 2020
      Wilmington, Delaware

    */s/ Christopher M. De Lillo*
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Zachary I. Shapiro (No. 5103)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
Sarah E. Silveira (No. 6580)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
E-mail: collins@rlf.com
      shapiro@rlf.com
      haywood@rlf.com
      delillo@rlf.com
      silveira@rlf.com

- and -

WEIL, GOTSHAL & MANGES LLP
Garrett A. Fail (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
E-mail: garrett.fail@weil.com
      davidj.cohen@weil.com

*Proposed Attorneys for Debtors
and Debtors in Possession*