**<u>Schedule 3</u>**

**DIP Agreement**

**DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT**

Dated as of July 10, 2020

among

**BROOKS BROTHERS GROUP, INC.,**
as the Lead Borrower

For

The Borrowers Named Herein

The Guarantors Named Herein

**ABG-BB, LLC,**
as Agent,

and

The Other Lenders Party Hereto

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION FACILITY

# TABLE OF CONTENTS

**Section**                                                  **Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................... 1

    1.01    Defined Terms ...................................................................... 1

    1.02    Other Interpretive Provisions .......................................... 26

    1.03    Accounting Terms .............................................................. 27

    1.04    Rounding ............................................................................ 27

    1.05    Times of Day ..................................................................... 28

    1.06    [Reserved] .......................................................................... 28

    1.07    [Reserved] .......................................................................... 28

    1.08    [Reserved] .......................................................................... 28

    1.09    Divisions ............................................................................ 28

ARTICLE II THE TERM LOAN ....................................................................... 28

    2.01    Commitments and Loans ................................................... 28

    2.02    [Reserved] .......................................................................... 28

    2.03    Credit Extensions .............................................................. 28

    2.04    [Reserved] .......................................................................... 29

    2.05    Optional and Mandatory Prepayments ............................. 29

    2.06    [Reserved] .......................................................................... 30

    2.07    Repayment of all Obligations at Maturity. ...................... 30

    2.08    Interest. ............................................................................... 30

    2.09    Fees .................................................................................... 30

    2.10    Computation of Interest and Fees ..................................... 30

    2.11    Evidence of Debt. .............................................................. 30

    2.12    Payments Generally; Agent's Clawback. ......................... 31

    2.13    Sharing of Payments by Lenders ..................................... 32

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF
LEAD BORROWER ................................................................................ 33

    3.01    Taxes. ................................................................................. 33

    3.02    [Reserved] .......................................................................... 35

    3.03    [Reserved] .......................................................................... 35

    3.04    Increased Costs. ................................................................. 35

    3.05    Compensation for Losses .................................................. 36

    3.06    Mitigation Obligations; Replacement of Lenders. ........... 37

    3.07    Survival .............................................................................. 37

    3.08    Designation of Lead Borrower as Borrowers' Agent. ...... 37

(i)

**TABLE OF CONTENTS**
(continued)

| Section | Page |
|---|---|

ARTICLE IV CONDITIONS PRECEDENT TO TERM LOAN.................................................. 38

4.01     Conditions to Effectiveness and Availability of the Initial Credit Extension .................. 38

4.02     Conditions to Each Credit Extension ........................................................................... 40

ARTICLE V REPRESENTATIONS AND WARRANTIES ................................................. 41

5.01     Organization; Powers.................................................................................................... 41

5.02     Authorization; Enforceability ...................................................................................... 42

5.03     Governmental Approvals; No Conflicts ...................................................................... 42

5.04     Financial Condition; No Material Adverse Effect. ...................................................... 42

5.05     Properties; Intellectual Property Rights. ...................................................................... 42

5.06     Litigation and Environmental Matters. ........................................................................ 43

5.07     Compliance with Laws; No Default ............................................................................. 43

5.08     Investment Company Status ......................................................................................... 43

5.09     Taxes.............................................................................................................................. 43

5.10     ERISA; Labor Matters. ................................................................................................ 44

5.11     Disclosure ..................................................................................................................... 44

5.12     [Reserved]. .................................................................................................................... 44

5.13     Insurance ....................................................................................................................... 44

5.14     Subsidiaries and Joint Ventures .................................................................................. 45

5.15     Collateral Matters ........................................................................................................ 45

5.16     Federal Reserve Regulations; EEA Financial Institution. .......................................... 45

5.17     Use of Proceeds ........................................................................................................... 45

5.18     [Reserved]. .................................................................................................................... 45

5.19     No Burdensome Restrictions ....................................................................................... 46

5.20     OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.................. 46

5.21     Patriot Act .................................................................................................................... 46

5.22     Affiliate Transactions .................................................................................................. 46

5.23     Common Enterprise ..................................................................................................... 46

5.24     Budget and Financial Plan ........................................................................................... 47

ARTICLE VI AFFIRMATIVE COVENANTS ................................................................... 47

6.01     Financial Statements, Certificates and Other Information............................................ 47

6.02     Notices of Material Events............................................................................................ 50

6.03     Existence; Conduct of Business.................................................................................... 50

6.04     Payment of Obligations ................................................................................................ 50

6.05     Maintenance of Properties ............................................................................................ 51

(ii)

**TABLE OF CONTENTS**

(continued)

| Section | | Page |
|---|---|---|

| 6.06 | Books and Records; Inspection Rights | 51 |
| 6.07 | Compliance with Laws and Material Contractual Obligations | 51 |
| 6.08 | [Reserved]. | 51 |
| 6.09 | Accuracy of Information | 51 |
| 6.10 | Maintenance of Insurance. | 52 |
| 6.11 | [Reserved]. | 52 |
| 6.12 | [Reserved]. | 52 |
| 6.13 | Bankruptcy Court Orders; Cash Management. | 52 |
| 6.14 | Additional Loan Parties | 53 |
| 6.15 | [Reserved]. | 53 |
| 6.16 | Information Regarding the Collateral | 53 |
| 6.17 | Environmental Laws | 53 |
| 6.18 | Further Assurances; Additional Collateral | 54 |
| 6.19 | Additional Reporting | 54 |
| 6.20 | [Reserved]. | 55 |
| 6.21 | OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws | 55 |
| 6.22 | Milestones | 55 |
| 6.23 | Approved Budget | 56 |
| 6.24 | Disposition of Collateral | 57 |
| 6.25 | Winddown Budget | 57 |
| 6.26 | Post-Closing Matters | 57 |
| ARTICLE VII NEGATIVE COVENANTS | | 57 |
| 7.01 | Indebtedness; Certain Equity Securities. | 57 |
| 7.02 | Liens | 59 |
| 7.03 | Fundamental Changes; Business Activities. | 59 |
| 7.04 | Investments, Loans, Advances, Guarantees and Acquisitions | 60 |
| 7.05 | Asset Sales | 61 |
| 7.06 | Sale/Leaseback Transactions | 62 |
| 7.07 | Swap Contracts | 62 |
| 7.08 | Restricted Payments; Certain Payments of Indebtedness. | 63 |
| 7.09 | Transactions with Affiliates | 63 |
| 7.10 | Restrictive Agreements | 63 |
| 7.11 | Amendment of Organization Documents and Material Documents | 64 |
| 7.12 | Use of Proceeds | 64 |

WEIL:\97549758\6\30950.0070

**TABLE OF CONTENTS**
(continued)

| Section | | | Page |
|---|---|---|---|
| 7.13 | Changes in Fiscal Periods or Accounting Policies | | 65 |
| 7.14 | [Reserved]. | | 65 |
| 7.15 | Chapter 11 Modifications | | 65 |
| 7.16 | Additional Restrictions on Loan Parties | | 65 |
| ARTICLE VIII | EVENTS OF DEFAULT AND REMEDIES | | 65 |
| 8.01 | Events of Default | | 65 |
| 8.02 | Remedies Upon Event of Default; Financial Covenant Cure. | | 71 |
| 8.03 | Application of Funds | | 72 |
| ARTICLE IX | THE AGENT | | 72 |
| 9.01 | Appointment and Authority | | 72 |
| 9.02 | Rights as a Lender | | 72 |
| 9.03 | Exculpatory Provisions | | 72 |
| 9.04 | Reliance by Agent | | 73 |
| 9.05 | Delegation of Duties | | 73 |
| 9.06 | Resignation of Agent | | 73 |
| 9.07 | Non-Reliance on Agent and Other Lenders | | 74 |
| 9.08 | [Reserved]. | | 74 |
| 9.09 | Agent May File Proofs of Claim | | 74 |
| 9.10 | Collateral and Guaranty Matters | | 75 |
| 9.11 | Notice of Transfer | | 75 |
| 9.12 | Reports and Financial Statements | | 75 |
| 9.13 | Agency for Perfection | | 76 |
| 9.14 | Indemnification of Agent | | 76 |
| 9.15 | Relation among Lenders | | 76 |
| ARTICLE X | MISCELLANEOUS | | 77 |
| 10.01 | Amendments, Etc | | 77 |
| 10.02 | Notices; Effectiveness; Electronic Communications. | | 78 |
| 10.03 | No Waiver; Cumulative Remedies | | 79 |
| 10.04 | Expenses; Indemnity; Damage Waiver. | | 79 |
| 10.05 | Payments Set Aside | | 81 |
| 10.06 | Successors and Assigns. | | 81 |
| 10.07 | Treatment of Certain Information; Confidentiality | | 85 |
| 10.08 | Right of Setoff | | 85 |
| 10.09 | Interest Rate Limitation. | | 86 |

(iv)

**TABLE OF CONTENTS**
(continued)

Section                                                                                                   Page

| | | |
|---|---|---|
| 10.10 | Counterparts; Integration; Effectiveness | 86 |
| 10.11 | Survival | 86 |
| 10.12 | Severability | 87 |
| 10.13 | Replacement of Lenders | 87 |
| 10.14 | Governing Law; Jurisdiction; Etc. | 87 |
| 10.15 | Waiver of Jury Trial | 89 |
| 10.16 | No Advisory or Fiduciary Responsibility | 89 |
| 10.17 | Patriot Act Notice | 90 |
| 10.18 | Foreign Asset Control Regulations | 90 |
| 10.19 | Time of the Essence | 90 |
| 10.20 | [Reserved]. | 90 |
| 10.21 | Press Releases. | 90 |
| 10.22 | Additional Waivers. | 91 |
| 10.23 | No Strict Construction | 92 |
| 10.24 | Attachments | 92 |
| 10.25 | Conflicts | 92 |
| 10.26 | Acknowledgment and Consent to Bail-In of EEA Financial Institutions | 92 |
| 10.27 | Credit Bidding | 93 |
| ARTICLE XI SECURITY AND PRIORITY | | 94 |
| 11.01 | Collateral; Grant of Lien and Security Interest | 94 |
| 11.02 | Priority and Liens Applicable to Loan Parties. | 95 |
| 11.03 | Grants, Rights and Remedies | 95 |
| 11.04 | No Filings Required | 96 |
| 11.05 | Survival | 96 |

**SCHEDULES**

| | |
|---|---|
| 1.01 | Borrowers |
| 1.02 | Guarantors |
| 2.01 | Commitments and Applicable Percentages |
| 4.01 | Initial Approved Budget |
| 5.05 | Properties |
| 5.06 | Disclosed Matters |
| 5.10(a) | ERISA Events |
| 5.13 | Insurance |
| 5.14 | Subsidiaries and Joint Ventures |
| 5.22 | Affiliate Transactions |
| 6.02(h) | ERISA Material Events |

(v)

**TABLE OF CONTENTS**
(continued)

Section                                                                                                    Page

| | |
|---|---|
| 6.23 | Approved Budget |
| 6.26 | Post-Closing Matters |
| 8.01(h) | ERISA Events of Default |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

*Form of*

| | |
|---|---|
| A | Term Note |
| B | Compliance Certificate |
| C | Assignment and Assumption |
| D | Joinder Agreement |
| E | Request for Credit Extension |
| F | [Reserved] |
| G | Interim DIP Order |

WEIL:\97549758\6\30950.0070

## DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT

This DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT (this "<u>Agreement</u>") is entered into as of July 10, 2020, among BROOKS BROTHERS GROUP, INC., a Delaware corporation, as debtor and debtor-in-possession (the "<u>Lead Borrower</u>"), the Persons named on <u>Schedule 1.01</u> hereto (collectively, the "<u>Borrowers</u>"), the Persons named on <u>Schedule 1.02</u> hereto, each as debtor and debtor-in-possession (collectively, the "<u>Guarantors</u>"), each Lender (as hereinafter defined) and ABG-BB, LLC, a Delaware limited liability company, as Agent.

### PRELIMINARY STATEMENTS

WHEREAS, on the Petition Date, the Loan Parties have commenced voluntary cases (the "<u>Chapter 11 Cases</u>") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), and the Loan Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lenders provide a senior secured term loan facility in the aggregate principal amount of $80,000,000, and the Lenders have indicated their willingness to extend such credit, on the terms and conditions set forth herein; and

WHEREAS, to provide security for the repayment of the Loans, and the payment of the other Obligations of the Loan Parties hereunder and under the other Loan Documents, the Loan Parties will grant to the Agent, for its benefit and the benefit of the Lenders, certain security interests, liens, and other rights and protections pursuant to the terms hereof and pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, all as more fully described herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

### ARTICLE I
### DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Accommodation Payment</u>" as defined in <u>Section 10.22(d)</u>.

"<u>Acceptable Wind-Down</u>" means a resolution of the Chapter 11 Cases approved by the Agent in writing in its sole discretion that provides for the application of the proceeds of a sale of all or substantially all assets of the Debtors in the Chapter 11 Cases, having been indefeasibly paid for in cash prior to the effective date of such plan or order, which shall comprise (a) in the case of a Plan Wind-Down, a plan of reorganization or liquidation and related disclosure statement for each of the Chapter 11 Cases filed by the Debtors, each of which shall be approved by the Agent in writing in its sole discretion or (b) in the case of an Alternative Wind-Down, a dismissal order approved by the Agent in writing in its reasonable discretion.

"<u>Account</u>" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred, (e) for

WEIL:\97549758\6\30950.0070

energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract, (g) arising out of the use of a credit or charge card or information contained on or for use with the card, or (h) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.  The term "Account" includes healthcare-insurance receivables.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Agent.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified (and if that Person is an individual, including any member of the Family Group), (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (iv) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means ABG-BB, LLC, in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor thereto.

"Agent's Office" means the Agent's address and account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Agreement" has the meaning specified in the introductory paragraph hereto.

"Airport License Agreements" means any license agreements of the Loan Parties entered into with Paradies Lagardère Travel Retail relating to airport locations of the Loan Parties.

"Allocable Amount" has the meaning specified in Section 10.22(d).

"Alternative Wind-Down" means the resolution of the Chapter 11 Cases through a dismissal order agreed to by the debtors in the Chapter 11 Cases and the Agent and approved by the Bankruptcy Court.

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the outstanding portion of the Term Loan held by such Lender at such time.

"Applicable Rate" means 0.00% per annum.

2

"Approved Budget" means the thirteen (13) week budget prepared by the Lead Borrower in the form of Schedule 6.23 and initially furnished to the Agent on or before the Closing Date, as the same may or shall be updated, modified and/or supplemented thereafter from time to time as provided in Section 6.01(f)(i), which budget shall include (A) a weekly cash budget, including information on a line item basis as to (x) projected cash receipts and (y) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees and expenses budgeted for the Case Professionals on a weekly basis), capital expenditures, asset sales and fees and expenses of the Agent and the Lenders (including counsel therefor) and any other fees and expenses relating to the Loan Documents), (B) projected net cash flows and (C) projected cash balances in the cash accounts of the Loan Parties, including the balances in the Operating Account and the Professional Fees Account (as defined in the DIP Order).

"Approved Budget Variance Report" means a report provided by the Lead Borrower to the Agent in accordance with Section 6.01(g), describing in reasonable detail the Loan Parties' (A) (x) cumulative receipts for such Budget Testing Period, plus the amount of any Carryover receipts from the immediately preceding Budget Testing Period which are not included in the current Budget Test Period, in each case as compared to the projected receipts provided by the then-current Approved Budget for the same period, (y) aggregate cash operating, inventory, and restructuring disbursements during the relevant Budget Testing Period as compared to the projected, aggregate operating, inventory, and restructuring disbursements provided by the then-current Approved Budget for the same period and (z) an analysis, certified by a Responsible Officer of the Lead Borrower, demonstrating that the Loan Parties are in compliance with Section 6.23 hereof for such Budget Testing Period, (B) net cash flow calculations for the relevant Budget Testing Period and comparison thereof with the projected net cash flows and (C) cash balances in the cash accounts of the Loan Parties, including the balances in the Operating Account and the Professional Fees Account, at the end of the Budget Testing Period and the comparison thereof with the projected account balances.

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Approved Sale" has the meaning set forth in Section 6.22(g).

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit C or any other form approved by the Agent.

"Auction" has the meaning set forth in the Bid Procedures Order.

"Audited Financial Statements" means the audited consolidated balance sheet of the Lead Borrower and its Subsidiaries for the Fiscal Year ended August 3, 2019, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Lead Borrower and its Subsidiaries, including the notes thereto.

"Avoidance Actions" has the meaning set forth in the DIP Order.

3

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Court</u>" has the meaning specified in the recitals hereto.

"<u>Bankruptcy Court DIP Order</u>" means the Interim DIP Order or the Final DIP Order, as applicable.

"<u>BB Far East</u>" means Brooks Brothers Far East Limited, an entity organized under the laws of Hong Kong, and a wholly-owned Subsidiary of the Lead Borrower.

"<u>BB Far East Inventory Agreement</u>" means the Master Sale of Goods Agreement between the Lead Borrower and BB Far East effective as of August 2, 2014 and any substantially similar agreement between any Loan Party and BB Far East that may be entered into from time to time.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>Bid Procedures</u>" means the bid procedure attached to the Bid Procedure Order and the Sale Order.

"<u>Bid Procedures Motion</u>" means the motion seeking approval of the Bid Procedures Order and the Sale Order.

"<u>Bid Procedures Order</u>" means the order entered by the Bankruptcy Court establishing the procedures relating to the solicitation, submission, acceptance and approval of bids in form and substance satisfactory to the Agent.

"<u>Borrowers</u>" has the meaning specified in the introductory paragraph hereto. As of the Closing Date, the Borrowers are the Lead Borrower and Golden Fleece.

"<u>Budget Testing Date</u>" means, initially, the Thursday closest to the date that is three (3) full weeks following the Petition Date, and thereafter, the fourth (4th) business day of each week.

"<u>Budget Testing Period</u>" means, initially, the Initial Budget Testing Period and, thereafter, a rolling four (4) week period ending on Friday of each week.

"<u>Burdensome Restrictions</u>" means any consensual encumbrance or restriction of the type described in <u>Sections 7.10(a)</u> or <u>(b)</u>.

4

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carryover" means, for any period, (i) with respect to receipts, the amount of any actual receipts during such period that exceed the projected receipts set forth in the Approved Budget for such period (without giving effect to any Carryover receipts from a prior period), (ii) with respect to disbursements, the amount of any budgeted disbursements not expended during such period (without giving effect to any Carryover of budgeted disbursements from a prior period), and (ii) with respect to the amount of "Total Operating Disbursements (exclusive of Inventory Disbursements)", "Inventory Disbursements", and "Other Restructuring Costs" (each as referenced on the Approved Budget) of the Debtors, the amount of any such budgeted disbursements for each such line item not expended during such period (without giving effect to any Carryover of budgeted disbursements for each such line item from a prior period).  For the avoidance of doubt, (a) the amount of Carryover receipts from any period prior to the first Budget Test Period shall be zero, and (b) the amount of Carryover budgeted disbursements from any period prior to the Petition Date shall be zero.

"Carve-Out" has the meaning specified in the then applicable Bankruptcy Court DIP Order.

"Cash Equivalents" means:

(a)       marketable, direct obligations issued or unconditionally guaranteed by the United States Government, or issued by an agency thereof and backed by the full faith and credit of the United States Government, maturing within one year after the date of acquisition thereof;

(b)       commercial paper maturing no more than nine months after the date of creation thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then the highest rating from such other nationally recognized rating services acceptable to the Agent);

(c)       certificates of deposit, guaranteed investment certificates or bankers acceptances denominated in Dollars and maturing within one hundred eighty (180) days after the date of acquisition thereof issued by any Lender or any other commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, having combined capital and surplus of not less than $500,000,000;

(d)       fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above of the Agent, any Lender or any other commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, having combined capital and surplus of not less than $500,000,000; and

(e)       money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

5

"<u>Cash Management Order</u>" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Agent in its sole discretion, which, among other matters, authorizes the Loan Parties to maintain their existing cash management and treasury arrangements or such other arrangements.

"<u>Change in Control</u>" means (a) the Ownership Group shall cease to own, free and clear of all Liens or other encumbrances, at least a majority of the outstanding voting Equity Interests of the Lead Borrower on a fully diluted basis; (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Lead Borrower by Persons who were neither (i) nominated by the board of directors of the Lead Borrower nor (ii) appointed by directors so nominated; (c) the acquisition of direct or indirect Control of the Lead Borrower by any Person or group other than the Ownership Group; (d) the Lead Borrower shall cease to own, directly or indirectly, 100% of the outstanding voting Equity Interests of the other Loan Parties on a fully diluted basis or (e) a "change of control" as defined in the Pre-Petition ABL Credit Agreement.

"<u>Change in Law</u>" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"<u>Chapter 11 Cases</u>" has the meaning specified in the recitals hereto.

"<u>Closing Date</u>" means the first date on which all the conditions in <u>Section 4.01</u> have been satisfied or waived, which shall not be later than three Business Days after the Interim DIP Order Entry Date.

"<u>Code</u>" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"<u>Collateral</u>" has the meaning set forth in <u>Section 11.01(a)</u> together with any "DIP Collateral" as defined in the Bankruptcy Court DIP Order.

"<u>Commitment</u>" means, as to each Lender, its obligation to make its portion of the Term Loan to the Borrowers pursuant to <u>Section 2.01</u>, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on <u>Schedule 2.01</u>. The aggregate Commitments on the Closing Date are $80,000,000.

"<u>Committee</u>" means the official statutory unsecured creditors' committee, if any, appointed in the Chapter 11 Cases.

"<u>Compliance Certificate</u>" means a certificate substantially in the form of <u>Exhibit B</u>.

"<u>Consolidated</u>" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the

6

consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Credit Card Issuer" means any person (other than a Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche, PayPal, Synchrony Bank, and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Extension" means a borrowing of Loans made under this Agreement.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means, without limitation, (a) all reasonable and documented out-of-pocket costs and expenses incurred by the Agent and its Affiliates in connection with this Agreement and the other Loan Documents (including without limitation, (i) the reasonable and documented fees, charges and disbursements of (A) counsel for the Agent, limited to one single firm of primary counsel, one firm of specialized intellectual property counsel, and one local counsel in each relevant jurisdiction, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examinations and (E) all such out-of-pocket expenses incurred  during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments,, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), or (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collet, or enforce the Collateral, and (iii) all reasonable, documented and customary fees and charges  (as adjusted from time to time) of the Agent with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrowers (whether by wire transfer or otherwise), together with any reasonable and documented out-of-pocket costs and expenses incurred in connection therewith, and (b) all reasonable and documented out-of-pocket expenses incurred by the Credit Parties who are not the Agent or any Affiliate of the Agent, after the occurrence and during the continuance of an Event of Default, provided that such Credit Parties shall be entitled to reimbursement for no more than one single firm of primary counsel (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.

"Debtor Relief Laws" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

7

arrangement, receivership, insolvency, reorganization, or similar debtor relief Laws (including corporate Laws) of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Deconic</u>" means Deconic Group, LLC, a Delaware limited liability company.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means when used with respect to any Obligations, an interest rate equal to the interest rate otherwise applicable to such Obligations plus 2% per annum.

"<u>DIP Superpriority Claim</u>" means allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted by the Bankruptcy Court DIP Order, subject only to the Carve-Out.

"<u>Disclosed Matters</u>" means, collectively (i) the Chapter 11 Cases and (ii) the actions, suits and proceedings and the environmental matters disclosed in <u>Schedule 5.06</u>.

"<u>Disposition</u>" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) or other disposition (whether in one transaction or in a series of transactions) of any property (including, without limitation, any Equity Interests other than Equity Interests of the Lead Borrower) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts or any rights and claims associated therewith.

"<u>Disqualified Stock</u>" means any Equity Interests which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the first anniversary of the Maturity Date, or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) cash, debt securities or (iii) any Equity Interests referred to in (a) above, in each case at any time prior to the first anniversary of the Maturity Date. Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Stock solely because holders of the Equity Interests have the right to require the issuer of such Equity Interests to repurchase such Equity Interests upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of such Equity Interests provide that the issuer may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption is permitted under the terms of this Agreement. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Lead Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"<u>Document</u>" means "document" as defined in the UCC.

"<u>Dollars</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

8

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (a) a Credit Party or any of its Affiliates; (b) a bank, insurance company, or company engaged in the business of making commercial loans; (c) an Approved Fund; (d) any Person to whom a Credit Party assigns its rights and obligations under this Agreement as part of an assignment and transfer of such Credit Party's rights in and to a material portion of such Credit Party's portfolio of asset based credit facilities, and (e) any other Person (other than a natural person) approved by (i) the Agent, and (ii) unless a Default or an Event of Default has occurred and is continuing, the Lead Borrower (each such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of the Loan Parties' Affiliates or Subsidiaries.

"Environmental Laws" means any and all federal, state, municipal, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

9

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with a Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure with respect to a Plan to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of any Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by any Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Borrower or any ERISA Affiliate of any notice, of the imposition upon any Borrower or any ERISA Affiliate of withdrawal liability (within the meaning of Title IV of ERISA) or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in "endangered" or "critical" status within the meaning of Section 432 of the Code or Section 305 of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Subsidiary" means (a) any Subsidiary other than a Domestic Subsidiary, (b) any Domestic Subsidiary that is a direct or indirect Subsidiary of a CFC, (c) any Domestic Subsidiary with no material assets other than Equity Interests of one or more CFCs, (d) any Subsidiary that is prohibited or restricted by applicable Law from providing a Facility Guaranty of the applicable Obligations or if such Facility Guaranty would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received, (e) any Subsidiary that is a not-for-profit organization, (f) any Subsidiary that is an Immaterial Subsidiary (unless the Lead Borrower otherwise elects), (g) Deconic, and (h) any other Subsidiary with respect to which, in the reasonable judgment of the Agent (confirmed in writing by notice to the Lead Borrower), the cost or other consequences of becoming a Guarantor shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"Excluded Taxes" means, with respect to the Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) Taxes imposed on or measured by its net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located, in which it is resident for tax purposes or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which any Loan Party is located, (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Lead Borrower under Section 10.13), any withholding Tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a

new Lending Office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding Tax pursuant to <u>Section 3.01(a)</u>, (d) Taxes attributable to its failure or inability (other than as a result of a Change in Law) to comply with <u>Section 3.01(e)</u>, and (e) any U.S. federal withholding Tax imposed under FATCA.

"<u>Executive Order</u>" has the meaning set forth in <u>Section 10.18</u>.

"<u>Extraordinary Receipt</u>" means any cash received by or paid to or for the account of any Person not in the ordinary course of business (as determined by the Lead Borrower in good faith), including tax refunds, pension plan reversions, proceeds of insurance and condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments.

"<u>Facility</u>" means the Loans and Commitments made available to the Borrowers under this Agreement.

"<u>Facility Guaranty</u>" means, collectively, each Guarantee made by the Guarantors in favor of the Agent and the other Credit Parties, in form reasonably satisfactory to the Agent, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"<u>Family Group</u>" means (i) any Person comprising the Ownership Group and his/her spouse, parents, siblings, children, grandchildren, nephews, nieces, heirs, legatees, lineal descendants, executors, administrators, and other representatives, and (ii) any trust, family partnership or similar investment entity of which any of the foregoing Persons are trustee(s), managing member(s), managing partner(s) or similar officer(s) and/or that is for the benefit of any of the foregoing Persons as long as one or more of such Persons has the exclusive or joint right to control the voting and disposition of securities held by such trust, family partnership or similar investment entity.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and (a) any current or future regulations or official interpretations thereof, (b) any agreements entered into pursuant to Section 1471(b)(1) of the Code, and (c) any intergovernmental agreement entered into by the United States (or any fiscal or regulatory legislation, rules, or practices adopted pursuant to any such intergovernmental agreement entered into in connection therewith).

"<u>FCPA</u>" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"<u>Final DIP Order</u>" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Agent in all respects and in the Agent's sole discretion, together with all extensions, modification, and amendments thereto, in form and substance satisfactory to the Agent in its sole discretion, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Agent's and the Lenders' claims.

"<u>Final DIP Order Entry Date</u>" means the date on which the Final DIP Order is entered on the docket of the Bankruptcy Court.

"<u>Final Borrowing</u>" has the meaning specified in <u>Section 2.01</u>.

11

"<u>Financial Officer</u>" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer or controller of such Person.

"<u>Fiscal Month</u>" means any fiscal month of any Fiscal Year, which month shall generally consist of either four (4) or five (5) weeks and shall generally end on the Saturday closest to the end of each calendar month in accordance with the fiscal accounting calendar of the Lead Borrower and its Subsidiaries.

"<u>Fiscal Quarter</u>" means any fiscal quarter of any Fiscal Year, which quarters shall generally consist of thirteen (13) weeks or fourteen (14) weeks and shall generally end on the Saturday closest to the end of each July, October, January and April of such Fiscal Year in accordance with the fiscal accounting calendar of the Lead Borrower and its Subsidiaries.

"<u>Fiscal Year</u>" means any period of twelve (12) consecutive months ending on the Saturday closest to July 31 of each calendar year.

"<u>Foreign Assets Control Regulations</u>" has the meaning set forth in <u>Section 10.18</u>.

"<u>Foreign Lender</u>" means any Lender that is organized under the laws of a jurisdiction other than that in which the Lead Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

"<u>GAAP</u>" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"<u>Golden Fleece</u>" means Golden Fleece Manufacturing Group, LLC.

"<u>Golden Fleece Haverhill Property</u>" means real property owned by Golden Fleece in Haverhill, Massachusetts.

"<u>Governmental Authority</u>" means the government of the United States or any other nation, or of any political subdivision thereof, whether state, municipal or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Guarantee</u>" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee

12

against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" has the meaning specified in the introductory paragraph hereto and includes each other Subsidiary of the Lead Borrower that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.14. As of the Closing Date, the Guarantors are all Subsidiaries of the Lead Borrower that are not an Excluded Subsidiaries on the Petition Date, including, without limitation, RBA Wholesale, LLC, Brooks Brothers International, LLC, Retail Brand Alliance Gift Card Services, LLC, Retail Brand Alliance of Puerto Rico, Inc., and 696 White Plains Road, LLC.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" of any Person means, without duplication, whether or not included as indebtedness or liabilities in accordance with GAAP, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable incurred in the ordinary course of business), (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding compensation and current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) the capitalized amount of all Indebtedness in respect of Capital Lease Obligations that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) obligations under any liquidated earn-out, (l) in respect of Synthetic Lease Obligations, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were treated as a capital lease for accounting purposes, and (m) obligations, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (x) any and all Swap Contracts and (y) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Contract transaction, and (n) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock), or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result

of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means, (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by, or on account of any obligation of, any Loan Party under any Loan Document, and (b) to the extent not otherwise described in the foregoing clause (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Initial Approved Budget" has the meaning specified in Section 4.01(a).

"Initial Borrowing" has the meaning specified in Section 2.01.

"Initial Budget Testing Period" has the meaning specified in Section 6.23.

"Intellectual Property Collateral" has the meaning specified in the Security Agreement.

"Intellectual Property Rights" means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other similar source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications (including copyrights for computer programs); unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; customer lists, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source code, object code, data and databases; all other intellectual property or proprietary rights (including the types of Intellectual Property Rights described in the Security Agreement); all moral rights, goodwill associated with and symbolized by any of the foregoing; and all common law and other rights throughout the world in and to all of the foregoing; all claims for, and rights to sue for, past, present or future infringement of any of the foregoing; and all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including damages and payments for past, present or future infringements of any of the foregoing, and payments and damages under all licenses granted in, to or under any of the foregoing.

"Intellectual Property Security Agreement" means that certain Intellectual Property Security Agreement (including any and all supplements thereto), dated as of the Closing Date, among the Loan Parties and the Agent, for the benefit of the Agent and the Credit Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Interest Payment Date" means the first day of each calendar month and the Maturity Date.

"Interim DIP Order" means. collectively, the order of the Bankruptcy Court, entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance reasonably satisfactory to the Agent, which, among other matters, but not by way of limitation, authorizes on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents.

14

"Interim DIP Order Entry Date" means the date on which the Interim DIP Order is entered on the docket of the Bankruptcy Court.

"Inventory" has the meaning set forth in the UCC and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Disbursements" has the meaning specified in Section 6.23.

"Investment" means, with respect to a specified Person, any Equity Interests, evidences of Indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or any capital contribution or loans or advances to, Guarantees of any Indebtedness or other obligations of, or any other investment (including any investment in the form of transfer of property for consideration that is less than the fair value thereof (as determined reasonably and in good faith by the chief financial officer of the Lead Borrower)) in, any other Person that are held or made by the specified Person. The amount, as of any date of determination, of (a) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, without any adjustment for write-downs or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (b) any Investment in the form of a Guarantee shall be determined in accordance with the definition of the term "Guarantee," (c) any Investment in the form of a purchase or other acquisition for value of any Equity Interests, evidences of Indebtedness or other securities of any Person shall be the fair value (as determined reasonably and in good faith by the chief financial officer of the Lead Borrower) of the consideration therefor (including any Indebtedness assumed in connection therewith), plus the fair value (as so determined) of all additions, as of such date of determination, thereto, and minus the amount, as of such date of determination, of any portion of such Investment repaid to the investor in cash as a repayment of principal or a return of capital, as the case may be, but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the time of such Investment, (d) any Investment (other than any Investment referred to in clause (a), (b) or (c) above) in the form of a transfer of Equity Interests or other property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the fair value (as determined reasonably and in good faith by the chief financial officer of the Lead Borrower) of such Equity Interests or other property as of the time of such transfer (less, in the case of any investment in the form of transfer of property for consideration that is less than the fair value thereof, the fair value (as so determined) of such consideration as of the time of the transfer), minus the amount, as of such date of determination, of any portion of such Investment repaid to the investor in cash as a return of capital, but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the time of such transfer, and (e) any Investment (other than any Investment referred to in clause (a), (b), (c) or (d) above) in any Person resulting from the issuance by such Person of its Equity Interests to the investor shall be the fair value (as determined reasonably and in good faith by the chief financial officer of the Lead Borrower) of such Equity Interests at the time of the issuance thereof.

"IRS" means the United States Internal Revenue Service.

"Joinder Agreement" means a joinder agreement substantially in the form as Exhibit D.

"JV License Agreements" means the joint venture and related license agreements with respect to Brooks Brothers (Japan) Ltd. and Brooks Brothers Greater China Limited.

15

"<u>Laws</u>" means each international, foreign, federal, state, municipal and local statute, treaty, rule, guideline, regulation, ordinance, code and administrative or judicial precedent or authority, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and each applicable administrative order, directed duty, request, license, authorization and permit of, and agreement with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Lead Borrower</u>" has the meaning assigned to such term in the preamble of this Agreement.

"<u>Lender</u>" means each Person holding a Term Loan or Commitment from time to time.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Lead Borrower and the Agent.

"<u>Lien</u>" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"<u>Liquidity</u>" means, at any time of determination, the aggregate amount of cash of the Loan Parties that would not appear as "restricted" on a balance sheet of the Loan Parties prepared in accordance with GAAP.

"<u>Loan Account</u>" has the meaning assigned to such term in <u>Section 2.11(a)</u>.

"<u>Loan Documents</u>" means this Agreement, each Note, the Security Documents, each Facility Guaranty, the Perfection Certificate and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>Loan Parties</u>" means, collectively, the Borrowers and the Guarantors.

"<u>Loans</u>" means the Term Loans.

"<u>Margin Stock</u>" is as defined in Regulation U of the FRB as in effect from time to time.

"<u>Material Adverse Effect</u>" means any event, development or circumstance, other than (i) prior to October 1, 2020, events, developments and circumstances that arise from or are related to the impact of the COVID-19 pandemic and actions taken by any applicable Governmental Authority in response thereto, including, without limitation, shutdowns of Stores and other facilities, in each case, whether or not such shutdowns were mandated by any applicable Governmental Authority and (ii) as a result of the Chapter 11 Cases and/or the events and conditions related and/or leading up to or following the commencement of the Chapter 11 Cases or any defaults under agreements as a result of the Chapter 11 Cases that are stayed under the Bankruptcy Code, that has had or could reasonably be expected to have a material adverse effect on (a)

16

the business, assets, operations or condition (financial or otherwise) of the Lead Borrower and its Subsidiaries taken as a whole, (b) the ability of any Loan Party to perform any of its obligations under the Loan Documents to which it is a party, (c) the Collateral, the Agent's Liens (on behalf of itself, the Lenders or the other Credit Parties) on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Agent or the Lenders under the Loan Documents.

"Material Contracts" means with respect to any Loan Party or any of their Subsidiaries, (a) the BB Far East Inventory Agreement, (b) the JV License Agreements, (c) the Airport License Agreements, (d) any license agreement for which the Loan Parties have received royalty revenue, as calculated on a trailing twelve month basis as of the end of each calendar quarter, in excess of $2,000,000, and (e) each other contract, license, or instrument to which such Person is a party (or is otherwise bound) for which breach, nonperformance, cancellation or failure to timely renew could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means any Indebtedness owing by any Loan Party to the Pre-Petition ABL Agent or any lender or secured party under any Pre-Petition ABL Loan Document from time to time and all other Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $20,000,000. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maturity Date" means the earlier of (a) six (6) months after the Petition Date, (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (c) the consummation of a sale of all or substantially all of the assets of the Lead Borrower and its Subsidiaries, (d) the date that is thirty-five (35) days after the Petition Date if the Bankruptcy Court has not entered the Final Dip Order, (e) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, (f) the date of conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Agent, (g) the date of filing or express written support by any debtor in the Chapter 11 Cases of a plan of liquidation or reorganization and related disclosure statement, or order of dismissal, in each case, that is not an Acceptable Wind-Down, unless otherwise consented to in writing by the Agent and (h) the date of dismissal of any of the Chapter 11 Cases.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Measurement Period" means, at any date of determination, the most recently completed twelve Fiscal Months of the Lead Borrower.

"Milestones" means the Milestones set forth in Section 6.22.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions or has any ongoing obligation with respect to withdrawal liability (within the meaning of Title IV of ERISA).

"Net Proceeds" means , with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase

17

price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a Disposition of an asset (including pursuant to a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer of the Lead Borrower).

"Non-Consenting Lender" has the meaning provided therefor in Section 10.01.

"Note" means a Term Note, as may be amended, supplemented or modified from time to time.

"Obligations" means all advances to, and debts (including principal, interest, fees, premiums, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, costs, expenses and indemnities are allowed claims in such proceeding.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Operating Account" means the deposit account number ending -2944 at Bank of New York established by the Lead Borrower for the purpose of receipt of the Credit Extensions.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Ownership Group" means, collectively, the CDV 2015 Annuity Trust, the Del Vecchio Family Trust, Delfin SARL, and DV Family LLC or any one or more of (i) Claudio Del Vecchio, Debra Del Vecchio or Leonardo Del Vecchio; (ii) any child or descendant of Claudio Del Vecchio or Claudio Del

Vecchio and Debra Del Vecchio; (iii) any estate, trust, guardianship, custodianship or other similar entity or fiduciary arrangement for the primary benefit of any one or more of the individuals named or described in clauses (i) and (ii) above; and (iv) any Person (other than a natural person) Controlled by and substantially all of the interests in which are owned, directly or indirectly, by, any one or more of the individuals or entities named or described in clause (i), (ii) or (iii) above.

"Participant" has the meaning specified in Section 10.06(d).

"Patriot Act" has the meaning specified in Section 5.21.

"PCAOB" means the Public Company Accounting Oversight Board.

"Perfection Certificate" has the meaning specified in the Security Agreement.

"Permitted Encumbrances" means:

(a)      Liens imposed by law for Taxes that are not yet delinquent or (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Lead Borrower or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 6.04;

(c)      pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Lead Borrower or any Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above;

(d)      pledges and deposits made to secure the performance of bids, trade contracts (other than Indebtedness for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)      judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Section 8.01;

(f)      easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal easement agreements and similar encumbrances and exceptions to title on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Lead Borrower or any Subsidiary or the ordinary operation of such real property;

19

(g)      customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC in respect of payment items in the course of collection;

(h)      Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding operating leases or consignments;

(i)      Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license or sublicense or concession agreement permitted by this Agreement;

(j)      Liens arising in the ordinary course of business in favor of custom and forwarding agents and similar Persons in respect of imported goods and merchandise in the custody of such Persons solely to the extent the following conditions are satisfied: such Liens secure obligations that are not (i) not overdue by more than thirty (30) days or (ii)(A) being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(k)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods solely to the extent the following conditions are satisfied: such Liens secure obligations that are (i) not overdue by more than thirty (30) days or (ii) (A) being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation;

(l)      Liens or rights of setoff against credit balances of the Lead Borrower with Credit Card Issuers or Credit Card Processors to secure obligations of the Lead Borrower to any such Credit Card Issuer or Credit Card Processor incurred in the ordinary course of business as a result of fees and chargebacks;

(m)      other Liens that are contractual rights of set-off;

(n)      undetermined or inchoate Liens and charges arising or potentially arising under statutory provisions which have not at the time been filed or registered in accordance with applicable Law or which, although filed or registered, relate to obligations not due or delinquent; and

(o)      to the extent constituting Liens, non-exclusive licenses of Intellectual Property Rights permitted pursuant to Section 7.05(f).

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, other than Liens referred to in clause (c) above securing letters of credit, bank guarantees or similar instruments.

"Permitted Variance" has the meaning specified in Section 6.23.

20

"<u>Person</u>" means any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"<u>Petition Date</u>" means July 8, 2020.

"<u>Plan</u>" means any "employee pension benefit plan," as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Plan Wind-Down</u>" means a resolution of the Chapter 11 Cases pursuant to the confirmation and effectiveness of a chapter 11 plan.

"<u>Pledged Collateral</u>" means, collectively, (i) all Pledged JV Interests and (ii) all payments of dividends, distributions, cash instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the securities referred to in clause (i) above.

"<u>Pledged JV Interests</u>" means, collectively, (i) the Equity Interests of each of (A) to the extent required by <u>Section 6.26</u>, the Loan Party or Affiliate owning interests in Brooks Brothers (Japan) LTD, a Japanese corporation, (B) Brooks Brothers International, LLC, which is the owner of interests in Brooks Brothers Greater China Limited, a Chinese corporation and (C) BBDI, LLC, which is the owner of interests in Brooks Brothers India Private Limited, a company incorporated under the laws of India (such entities collectively, the "<u>JV Pledgors</u>"), together with any other Equity Interests of the JV Pledgors obtained in the future by any Loan Party, and (ii) the certificates, if any, representing such Equity Interests referred to in clause (i) above.

"<u>Pre-Petition ABL Agent</u>" means Wells Fargo Bank, National Association, in its capacity as administrative agent for the lenders under the Pre-Petition ABL Credit Agreement, together with any successor agent.

"<u>Pre-Petition ABL Collateral</u>" has the meaning given to the term "Collateral" in the Pre-Petition ABL Credit Agreement.

"<u>Pre-Petition ABL Credit Agreement</u>" means that certain Credit Agreement, dated as of June 28, 2019, among the Lead Borrower, the other borrowers party thereto, the guarantors party thereto, the lenders party thereto, the Pre-Petition ABL Agent, and the other agents party thereto, and any refinancings, refundings, renewals or extensions from time to time prior to the Petition Date.

"<u>Pre-Petition ABL Lenders</u>" means lenders under the Pre-Petition ABL Credit Agreement.

"<u>Pre-Petition ABL Loan Documents</u>" means the "Loan Documents" under and as defined in the Pre-Petition ABL Credit Agreement, together with all other Guarantees, security agreements and other material documents and instruments executed in connection with the Pre-Petition ABL Credit Agreement from time to time.

"<u>Pre-Petition ABL Obligations</u>" means the "Obligations" under and as defined in the Pre-Petition ABL Credit Agreement, together with any other Indebtedness owing by any Loan Party to the Pre-Petition ABL Agent or any lender or secured party under any Pre-Petition ABL Loan Document from time to time.

"Pre-Petition Loan Documents" means the Pre-Petition ABL Loan Documents and the Pre-Petition Term Loan Documents, collectively.

"Pre-Petition Term Loan Agent" means the administrative agent and collateral agent under the Pre-Petition Term Loan Agreement.

"Pre-Petition Term Loan Agreement" means that certain Term Loan Agreement, dated as of May 21, 2020, among, *inter alios*, the Lead Borrower, the other borrowers named therein, the lenders named therein and the Pre-Petition Term Loan Agent, as amended by that First Amendment to Term Loan Agreement, dated as of June 9, 2020, among the Lead Borrower, the other borrowers party thereto, the guarantors party thereto, the lenders party thereto, the Pre-Petition Term Loan Agent and the other parties thereto, and any refinancings, refundings, renewals or extensions from time to time prior to the Petition Date.

"Pre-Petition Term Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Term Loan Agreement.

"Professional Fees" has the meaning specified in the Bankruptcy Court DIP Order.

"Professional Fees Account" has the meaning specified in the Bankruptcy Court DIP Order.

"Projections" has the meaning set forth in Section 6.01(e).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Register" has the meaning specified in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reports" has the meaning provided in Section 9.12(b).

"Request for Credit Extension" means a notice of a Credit Extension, which, if in writing, shall be substantially in the form of Exhibit E.

"Required Lenders" means, as of any date of determination, collectively, Lenders holding more than fifty percent (50%) of the then outstanding amount of the Term Loan.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of

any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale Order" has the meaning set forth in Section 6.22(h).

"Sale/Leaseback Transaction" means an arrangement relating to property owned by the Lead Borrower or any Subsidiary whereby the Lead Borrower or such Subsidiary sells or transfers such property to any Person and the Lead Borrower or any Subsidiary leases such property, or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, from such Person or its Affiliates.

"Sanctioned Entity" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country or territory sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals ("SDN") and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargos anti-terrorism laws and other sanctions laws, regulations or embargos, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any Credit Party or any Loan Party or any of their respective Subsidiaries or Affiliates.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" has the meaning specified in the Security Agreement.

"Securities Account" has the meaning set forth in the UCC.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley, and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

23

"Security Agreement" means that certain Security Agreement (including any and all supplements thereto), dated as of the Closing Date, among the Loan Parties and the Agent, for the benefit of the Agent and the Credit Parties, and any other pledge or security agreement governed by the laws of a jurisdiction located within the United States entered into, after the Closing Date by any other Loan Party (as required by this Agreement or any other Loan Document) or any other Person for the benefit of the Agent and the Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Security Documents" means the Security Agreement, the Intellectual Property Security Agreements, the Bankruptcy Court DIP Order and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Shareholders' Equity" means, as of any date of determination, Consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company, unlimited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the

balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" means the term loans made by the Lenders to the Borrowers under Article II.

"Term Loan Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property of any Loan Party that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent (for the benefit of itself and the other Credit Parties), except in each case for the Pre-Petition ABL Collateral.

"Term Loan Collateral Proceeds Account" means a DDA or Securities Account of any Loan Party (a) that is used exclusively for the deposit of proceeds from the sale or disposition of the Term Loan Collateral, and (b) in which no products or proceeds of Pre-Petition ABL Collateral are deposited or otherwise commingled.

"Term Note" means a promissory note made by the Borrowers, substantially in the form of Exhibit A, in favor of a Lender, evidencing the portion of the Term Loan made by such Lender to the Borrowers.

"Termination Date" means the earlier to occur of (i) the Maturity Date or (ii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) in accordance with Article VIII.

"Trading with the Enemy Act" has the meaning set forth in Section 10.18.

"Transactions" means the (a) execution, delivery and performance by the Loan Parties of this Agreement, the borrowing of Loans hereunder and the use of the proceeds of such Loans, (b) the creation and perfection of the security interests provided for in the Security Documents, and (c) the payment of all fees, commissions, costs and expenses in connection with the foregoing.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the state of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided, further, that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the state of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UFCA" has the meaning specified in Section 10.22(d).

"UFTA" has the meaning specified in Section 10.22(d).

"UniCredit" means UniCredit S.p.A.-New York Branch, together with its successors, assigns and Affiliates.

"United States" and "U.S." mean the United States of America.

"Variance Report" has the meaning specified in Section 6.19(a).

"Windown Account" means a deposit account that, prior to the discharge in full in cash of all Obligations under the Facility, may only be used to pay windown costs of the Loan Parties in accordance with the terms of the Windown Budget and the Final DIP Order.

"Windown Account Funding Condition" the aggregate amount of cash deposited into the Windown Account, which amount shall not exceed $750,000.

"Windown Budget" has the meaning specified in Section 6.25.

"Windown Net Proceeds" means, with respect to any Disposition by any Loan Party of any Collateral, the excess, if any, of (i) the sum of cash received in such transaction over (ii) the sum of (A) the principal amount of any Indebtedness that is (x) secured by the applicable asset by a Lien which is senior to the Agent's Lien, if any, on such asset, but solely to the extent such Lien with such seniority is permitted hereunder, and (y) required, and permitted under this Agreement, to be repaid in connection with such transaction, (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party in connection with such transaction (including, without limitation, reasonable and customary attorneys' fees, accountants' fees, investment banking fees, appraisals, and brokerage, legal, title and recording or transfer Tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates), (C) transfer Taxes paid in cash by such Loan Party as a result thereof and (D) amounts required to be paid by any Loan Party pursuant to the Bankruptcy Court DIP Orders or other applicable order of the Bankruptcy Court in order to consummate such transaction.

"Windown Net Proceeds Account" means a fully blocked segregated account established for the benefit of the Agent and otherwise on terms and conditions satisfactory to the Agent in its sole discretion, for the purpose of holding the Windown Net Proceeds.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.02    Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and

26

Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (i) the repayment in Dollars in full in cash or immediately available funds (or, in the case of any contingent Obligation, including indemnification obligations, providing cash collateralization) or other collateral as may be requested by the Agent of all of the Obligations other than unasserted contingent indemnification Obligations.

**1.03    Accounting Terms.**

(a)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, <u>except</u> as otherwise specifically prescribed herein.

(b)    <u>Changes in GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding.**  Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

WEIL:\97549758\6\30950.0070

**1.05    Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06    [Reserved].**

**1.07    [Reserved].**

**1.08    [Reserved].**

**1.09    Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under the Laws of the state of Delaware (or any comparable event under a different jurisdiction's applicable Law): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## THE TERM LOAN

**2.01    Commitments and Loans.**  Subject to the terms and conditions set forth herein and in the Bankruptcy Court DIP Order, each Lender severally agrees to make its portion of the Term Loan to the Borrowers on the applicable borrowing date, which shall be a Business Day, in an aggregate amount not to exceed the amount of such Lender's Commitment. The Borrowers may make two (2) borrowings under the Commitments, (x) the first of which will occur on the Closing Date in aggregate amount of $60,000,000 (or such lesser amount as is specified in the Interim DIP Order) (the "Initial Borrowing") and (y) the second of which will occur at least five (5) Business Days prior to the Maturity Date in an aggregate principal amount not to exceed the difference between $80,000,000 and the amount of the Initial Borrowing (or such lesser amount as is specified in the Final DIP Order) (the "Final Borrowing") . Upon the funding of the Loans on the applicable borrowing date, all the Commitments of the Lenders corresponding to such Loans shall automatically terminate. Once repaid, no portion of the Term Loan may be reborrowed.

**2.02    [Reserved].**

**2.03    Credit Extensions.**

(a)    Each Credit Extension shall be made upon the applicable Borrower's irrevocable notice to the Agent.  In order to request a Credit Extension, the applicable Borrower shall notify the Agent of such request by telephone, not later than 5:00 p.m., New York City time, ten (10) calendar days before a proposed Credit Extension (except in the case of the Initial Borrowing for which the request for Credit Extension may be delivered on the Petition Date).  Each such telephonic Request for Credit Extension shall be confirmed promptly by hand, fax or electronic delivery to the Agent of a written Request for Credit Extension on the same day and shall specify the following information: (i) the date of such Credit Extension (which shall be a Business Day) and (ii) the amount of such Credit Extension.

(b)    Following receipt of a Request for Credit Extension by the Agent and subject to the satisfaction or waiver of the conditions set forth in Sections 4.01 and 4.02, the Agent shall promptly advise the applicable Lenders thereof, and of each Lender's portion of the requested Credit Extension, and each Lender shall make each Loan to be

28

made by it hereunder by wire transfer of immediately available funds to such account as the Agent may designate not later than 1:00 p.m., New York City time, on the Business Day specified in the applicable Request for Credit Extension.

(c)    Unless the Required Lenders determine that any applicable condition specified in Article IV has not been satisfied or waived, the amount so received by the Agent shall be deposited by the Agent in the Operating Account.

**2.04    [Reserved].**

**2.05    Optional and Mandatory Prepayments.**

(a)    The Borrowers may, upon irrevocable notice from the Lead Borrower to the Agent, at any time or from time to time voluntarily prepay the then outstanding amount of the Term Loan in full; provided that such notice must be received by the Agent not later than 11:00 a.m. three (3) Business Days prior to any date of prepayment of the Term Loan. Each such notice shall specify the date and amount of such prepayment. The Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Term Loan shall be accompanied by all accrued interest on the amount prepaid, and any additional amounts required pursuant to Section 3.05. Each such prepayment shall be applied to the outstanding amount of the Term Loan of the Lenders in accordance with their respective Applicable Percentages.

(b)    Promptly (and in any event, within one (1) Business Day) after receipt by any Loan Party of any Net Proceeds (including insurance proceeds), in each case, whether in a single or related series of transactions, of any (i) Disposition of all or any portion of Term Loan Collateral (for the avoidance of doubt, (x) including pursuant to a sale under Section 363 of the Bankruptcy Code and (y) excluding any Disposition of assets permitted under Section 7.05(a) through (k), (l)(i) and (l)(ii)), (ii) casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), all or any portion of any Term Loan Collateral, (iii) receipt of Extraordinary Receipt in respect of, or constituting, the Term Loan Collateral or (iv) incurrence by a Loan Party of any Indebtedness for borrowed money other than Indebtedness permitted under Section 7.01, the Borrowers shall prepay the Loans with 100% the aggregate amount of such Net Proceeds in the manner specified in Section 2.05(d); provided that the Agent may decline to receive prepayment of the Term Loan in accordance with all or any portion of Net Proceeds received by the Loan Parties pursuant to this clause (b).

(c)    Prepayments made pursuant to this Section 2.05, in whole or in part, shall be payable at a prepayment amount equal to (i) the principal amount of the Term Loan prepaid plus (ii) all accrued and unpaid interest on such principal amount prepaid on such prepayment date.

(d)    Prepayments made pursuant to this Section 2.05, shall be applied ratably to the outstanding principal amount of the Term Loan, until the Term Loan is paid in full, and thereafter, shall be applied to any remaining outstanding Obligations in such order as set forth in Section 8.03.

29

**2.06    [Reserved].**

**2.07    Repayment of all Obligations at Maturity.**

The Borrowers shall repay the Term Loans and all other outstanding Obligations on the Termination Date.

**2.08    Interest.**

(a)    Subject to the provisions of Section 2.08(b) below, the outstanding portion of the Term Loan shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Applicable Rate.

(b)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.

(c)    If any other Event of Default exists, then the Agent, upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations shall thereafter bear interest at the interest rate per annum at all times equal to the Default Rate and thereafter such Obligations shall bear interest at the Default Rate to the fullest extent permitted by applicable Law.

(d)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(e)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.09    [Reserved].**

**2.10    Computation of Interest and Fees**.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each outstanding Loan beginning, and including the day, such Loan is made and until (but not including) the day on which such Loan (or such portion thereof) is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day. Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.11    Evidence of Debt.**

(a)    The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such

30

Lender. The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto. Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

(b)    In the event of any conflict between the accounts and records maintained pursuant to Section 2.11(a) and the entries maintained in the Register, the Register shall control in the absence of manifest error.

**2.12    Payments Generally; Agent's Clawback.**

(a)    General.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. Subject to Section 2.14 hereof, the Agent will promptly distribute to each applicable Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Agent after 2:00 p.m., at the option of the Agent, shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day,

(b)    payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)    1.    [Reserved].

(i)    Payments by Borrowers; Presumptions by Agent.  Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the

31

greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice of the Agent to any Lender or the Lead Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(d)  <u>Failure to Satisfy Conditions Precedent</u>.  If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this <u>Article II</u>, and such funds are not made available to the Borrowers by the Agent because the conditions to the Loans set forth in <u>Article IV</u> are not satisfied or waived in accordance with the terms hereof, the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)  <u>Obligations of Lenders Several</u>.  The obligations of the Lenders hereunder to make Loans and to make payments hereunder are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment hereunder.

(f)  <u>Funding Source</u>.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.13  Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of such respective Obligations greater than its <u>pro rata</u> share thereof as provided herein (including as in contravention of the priorities of payment set forth in <u>Section 8.03</u>), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in <u>Section 8.03</u>, <u>provided</u> that:

(i)  if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)  the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrowers, any Subsidiary, or Affiliate thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

32

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY;
## APPOINTMENT OF LEAD BORROWER

**3.01    Taxes.**

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes, <u>provided</u> that if the Loan Parties shall be required by applicable Law to deduct any Indemnified Taxes  from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Agent, Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions and (iii) the Loan Parties shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b)    <u>Payment of Other Taxes by the Loan Parties</u>.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of the Agent or a Lender, shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes by the Loan Parties to a Governmental Authority, the Lead Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)    <u>Status of Lenders</u>.  The Agent and each Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which any Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Lead Borrower (with a copy to the Agent as applicable), at the time or times prescribed by applicable Law or reasonably requested by the Lead Borrower or the Agent as applicable, such properly completed and executed documentation prescribed by applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. Such delivery shall be provided on the Closing Date, upon reasonable request by the Lead Borrower or the Agent, as applicable, and on or before such documentation expires or becomes obsolete or after the occurrence of an event requiring a change in the documentation most recently delivered. In addition, the Agent and each Lender, if requested by the Lead Borrower or the Agent as applicable, shall

WEIL:\97549758\6\30950.0070

deliver such other documentation prescribed by applicable Law or reasonably requested by the Lead Borrower or the Agent, as applicable, as will enable the Lead Borrower or the Agent, as applicable, to determine whether or not the Agent or such Lender is subject to backup or other withholding or information reporting requirements.

Without limiting the generality of the foregoing, in the event that any Borrower is resident for tax purposes in the United States,

(i)    the Agent and each Lender that is not a Foreign Lender shall deliver to the Lead Borrower and the Agent, as applicable, on the Closing Date and on each subsequent date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Lead Borrower or the Agent, as applicable), executed copies of IRS Form W-9 certifying that the Agent and such Lender, as applicable is exempt from U.S. federal backup withholding tax, and

(ii)    any Foreign Lender shall deliver to the Lead Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Lead Borrower or the Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(A)    duly completed copies of IRS Form W-8BEN-E claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(B)    duly completed copies of IRS Form W-8ECI,

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of IRS Form W-8BEN-E, or

(D)    any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Law to permit the Lead Borrower to determine the withholding or deduction required to be made.

(f)    FATCA.    If a payment made to a Lender under any Loan Document would be subject to U.S. federal income withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Agent (or, in the case of a Participant, to the Lender granting the participation only) at the time or times prescribed by law and at such time or times reasonably requested by the Agent (or, in the case of a Participant, the Lender granting the participation) such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Agent (or, in the case of a Participant, the Lender granting the participation) as may be necessary for the Agent or the Borrowers to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to

34

deduct and withhold from such payment. Solely for purposes of this clause (f), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)    <u>Treatment of Certain Refunds</u>.  If the Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Loan Parties, upon the request of the Agent or such Lender, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Agent or such Lender in the event the Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the Agent or any Lender be required to pay any amount to any Loan Party pursuant to this paragraph (g) the payment of which would place the Agent, such Lender in a less favorable net after-Tax position than such Person would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require the Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

**3.02    [Reserved].**

**3.03    [Reserved].**

**3.04    Increased Costs.**

(a)    <u>Increased Costs Generally</u>.  If any (i) Change in Law, or (ii) compliance by any Lender with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority (including Regulation D of the FRB), shall:

(A)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(B)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(C)    impose on any Lender any other condition, cost or expense affecting this Agreement;

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such

35

Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, <u>provided</u> that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     [Reserved].

**3.05     Compensation for Losses.**  Upon demand of any Lender (with a copy to the Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of any failure by the Borrowers to prepay, borrow, continue or convert any portion of the Term Loan on the date or in the amount notified by the Lead Borrower including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained. The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

A certificate of the Agent or a Lender delivered to the Lead Borrower setting forth the amount that the Agent or such Lender is entitled to receive pursuant to this <u>Section 3.05</u> shall be conclusive absent manifest error. The Borrowers shall pay such amount to the Agent or such Lender, as the case may be, within 10 days after receipt thereof.

36

**3.06**     **Mitigation Obligations; Replacement of Lenders.**

(a)     <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.04</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, the Borrowers may replace such Lender in accordance with <u>Section 10.13</u>.

**3.07**     **Survival.**  All of the Borrowers' obligations under this <u>Article III</u> shall survive termination of this Agreement and repayment of all Obligations hereunder.

**3.08**     **Designation of Lead Borrower as Borrowers' Agent.**

(a)     Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain the Term Loan, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement. As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of the Term Loan so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which the Term Loan is recorded on the books and records of the Lead Borrower and of any other Borrower. In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)     Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers. Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)     The Lead Borrower shall act as a conduit for each Borrower (including itself, as a "Borrower") on whose behalf the Lead Borrower has requested the Term Loan. Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

37

## ARTICLE IV
## CONDITIONS PRECEDENT TO TERM LOAN

**4.01    Conditions to Effectiveness and Availability of the Initial Credit Extension.**  The effectiveness of this Agreement and the other Loan Documents and the commitment of each Lender, severally, to provide its Applicable Percentage of the initial Credit Extension, is subject to satisfaction of the following conditions precedent (subject to Section 6.26):

(a)    The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party or the Lenders, as applicable, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

(i)    executed counterparts of this Agreement sufficient in number for distribution to the Agent, each Lender and the Lead Borrower;

(ii)    a Note executed by the Borrowers in favor of each Lender requesting a Note at least three (3) Business Days prior to the Closing Date;

(iii)    the Security Documents, each duly executed by the applicable Loan Parties;

(iv)    [reserved];

(v)    all other Loan Documents, each duly executed by the applicable Loan Parties;

(vi)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(vii)    copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(viii)    results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Liens permitted by Section 7.02 and Liens for which termination statements and releases, satisfactions and discharges of any mortgages, and releases or subordination agreements satisfactory to the Agent are being tendered concurrently

38

with such extension of credit or other arrangements satisfactory to the Agent for the delivery of such termination statements and releases, satisfactions and discharges have been made;

(ix)    The Agent, for its benefit and the benefit of each Lender, shall have been granted a perfected, valid, enforceable and non-avoidable Lien on, and security interest in, the Collateral, in addition to the DIP Superpriority Claim, on the terms and conditions set forth herein, in the Interim DIP Order and in the other Loan Documents.; and

(x)    The Agent shall have received and approved in writing a cash flow forecast and initial budget for the 13 week period commencing on the Petition Date setting forth line items of sufficient detail to reflect the Loan Parties' projected receipts and disbursements for such 13-week period, a copy of which is attached hereto as <u>Schedule 4.01</u> (the "<u>Initial Approved Budget</u>").

(b)    The Agent shall have received such documents and instruments as it may reasonably require to evidence the repayment in full of the Pre-Petition Term Loan Obligations and the release of Liens securing the same.

(c)    [Reserved].

(d)    (i) Since the date of the Audited Financial Statements no event or series of events has occurred that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect and (ii) there shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(e)    [Reserved].

(f)    The consummation of the transactions contemplated hereby shall not violate any applicable Law or any Organization Document of the Loan Parties.

(g)    All fees and expenses required to be paid or reimbursed to the Agent on or before the Closing Date shall have been paid in full on or prior to the Closing Date, and all fees and expenses required to be paid to the Lenders on or before the Closing Date shall have been paid in full on or prior to the Closing Date.

(h)    The Borrowers shall have paid all fees, charges and disbursements of counsel to the Agent to the extent invoiced at least three (3) Business Days prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (<u>provided</u> that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent).

(i)    The Agent and the Lenders shall have received all documentation and other information required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act and, with respect to any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification with respect to such Loan Party, that shall have been reasonably requested by the Agent at least five (5) Business Days prior to the Closing Date.

39

(j)      [Reserved].

(k)      [Reserved].

(l)      [Reserved].

(m)      The Agent and the Lenders shall not own (either directly or indirectly and whether through assignment, participation, purchase agreement, voting agreement or otherwise) any interest in the Pre-Petition ABL Obligations.

(n)      The Chapter 11 Cases shall have been commenced and all of the pleadings related to the "first day orders" shall be in form and substance reasonably satisfactory to the Required Lenders.

(o)      The Interim DIP Order, substantially in the form of <u>Exhibit G</u> hereto, and the Cash Management Order shall have been entered by the Bankruptcy Court within three (3) days (or such later date as the Agent may agree in its sole discretion) after the Petition Date and the Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated in a manner inconsistent with the terms of this Agreement absent prior written consent of the Agent and the Required Lenders.

(p)      All orders entered by the Bankruptcy Court pertaining to the Loan Parties' cash management, including adequate protection for the Pre-Petition ABL Agent and the Pre-Petition ABL Lenders and all motions and other documents filed, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the Required Lenders (and with respect to any provisions that adversely affect the rights or duties of the Agent, the Agent).

(q)      No Person shall have been appointed as trustee, receiver or examiner with expanded powers in any of the Chapter 11 Cases.

Without limiting the generality of the provisions of <u>Section 9.04</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02      Conditions to Each Credit Extension.**  The obligations of each Lender to honor any Request for Credit Extension is subject to the following conditions precedent:

(a)      The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

40

(b)      No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)      At least ten (10) calendar days prior to each borrowing, the Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)      With respect to the Final Borrowing, the Final DIP Order shall have been signed and entered by the Bankruptcy Court, and (i) the Agent shall have received a true and complete copy of such order, (ii) such order shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that materially adversely affect the rights or duties of the Agent, the Agent) in their sole discretion and (iii) such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated in a manner inconsistent with the terms of this Agreement absent the prior written consent of the Required Lenders (and with respect to amendments, modifications or supplements that materially adversely affect the rights or duties of the Agent, the Agent).

(e)      The aggregate amount of all Loans made by the Lenders (including the Loans requested to be made on such date of borrowing) shall not exceed the aggregate amount of the Commitment.

(f)      With respect to the Final Borrowing, the Bid Procedures Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or subject to a stay without the prior written consent of the Agent.

(g)      [Reserved].

(h)      (i) There shall not have been (x) any order granted by the Bankruptcy Court sustaining any objection by any Person, nor (y) any motion, complaint, objection or other pleading filed by any party challenging, in either case, the validity, priority, perfection, opposability or enforceability of the Loan Documents or any Lien granted pursuant to the Loan Documents and (ii) no Lien granted pursuant to the Loan Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Chapter 11 Cases.

Each Request for Credit Extension submitted by a Borrower shall be deemed to be a representation and warranty that the applicable conditions specified in this <u>Section 4.02</u> have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make the Loans on and after the Closing Date, each Loan Party represents and warrants to the Agent and the other Credit Parties, on the date of each Credit Extension, that:

**5.01      Organization; Powers.**  The Lead Borrower and each Subsidiary is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction and, in the case of any Subsidiary other than the Loan Parties, except where the failure to be so, individually or in the aggregate, would not

41

reasonably be expected to result in a Material Adverse Effect) in good standing under the Laws of the jurisdiction of its organization, subject to the entry and terms of the Bankruptcy Court DIP Order and other orders of the Bankruptcy Court, as applicable, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

**5.02    Authorization; Enforceability.**  The Transactions, insofar as they are to be carried out by each Loan Party, are within such Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, shareholder or other equityholder action. This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will, subject to the entry and the terms of the Bankruptcy Court DIP Order constitute, a legal, valid and binding obligation of such Loan Party, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.03    Governmental Approvals; No Conflicts.**  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, in each case other than the entry of the Bankruptcy Court DIP Order and except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the Loan Documents and (b) unless stayed by the Chapter 11 Cases, (i) will not violate any Laws applicable to any Loan Party or any Subsidiary and (ii) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary or the assets of any Loan Party or any Subsidiary, or give rise to a right thereunder to require any payment to be made by any Loan Party or any of its Subsidiaries, and (c) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any Subsidiary, except Liens created pursuant to the Loan Documents.

**5.04    Financial Condition; No Material Adverse Effect.**

(a)    The Lead Borrower has heretofore furnished to the Lenders its Consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the Fiscal Year ended August 3, 2019 reported on by Deloitte & Touche LLP, independent public accountants, and (ii) as of and for the Fiscal Quarter and the portion of the Fiscal Year ended May 2, 2020, certified by its Financial Officer. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Lead Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to normal year-end audit adjustments (all of which, when taken as a whole, would not be materially adverse) and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since August 3, 2019.

**5.05    Properties; Intellectual Property Rights.**

(a)    As of the date of this Agreement, Schedule 5.05 sets forth the address of each parcel of real property that is owned or leased by a Loan Party. Each Loan Party has good title to, or valid leasehold interests in, all its property material to its

business, except for minor defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes and Permitted Encumbrances.

(b)    To the best knowledge of the Lead Borrower, each Loan Party owns, or is licensed to use, all Intellectual Property Rights, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person. To the best knowledge of the Lead Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon any rights held by any other Person. Other than the Disclosed Matters, no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Lead Borrower, threatened, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

**5.06    Litigation and Environmental Matters.**

(a)    Unless stayed by the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened against or affecting any Loan Party (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any of the Loan Documents or the Transactions.

(b)    Except for the Disclosed Matters or matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, no Loan Party (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(c)    Since the Closing Date, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

**5.07    Compliance with Laws; No Default.**  Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect and unless stayed by the Chapter 11 Cases, the Lead Borrower and each Subsidiary is in compliance with all Laws applicable to them or their property. No Default has occurred and is continuing.

**5.08    Investment Company Status.**  No Loan Party is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 2005.

**5.09    Taxes.**  Each Loan Party and each Subsidiary has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as withholding agent), except (a) any Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which the Lead Borrower has set aside on its books reserves with respect thereto to the extent required by GAAP or the payment of which

43

are stayed by the Chapter 11 Cases or (b) to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. There is no current or proposed tax assessment, deficiency or other claim against the Loan Parties that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**5.10    ERISA; Labor Matters.**

(a)    Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) except as otherwise disclosed on Schedule 5.10(a), no ERISA Event has occurred or is reasonably expected to occur, and (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or any other labor disputes against the Lead Borrower or any Subsidiary pending or, to the knowledge of the Lead Borrower, threatened, (ii) the hours worked by and payments made to employees of the Lead Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act of 1938, or any other applicable federal, state, local or foreign law dealing with such matters and (iii) all payments due from the Lead Borrower or any Subsidiary, or for which any claim may be made against the Lead Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Lead Borrower or such Subsidiary to the extent required by GAAP. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Lead Borrower or any Subsidiary is bound.

(c)    The Borrowers are not and will not be using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Term Loan.

**5.11    Disclosure.**  The Lead Borrower has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which the Lead Borrower or any Subsidiary is subject, and all other matters known to them, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect. No reports, financial statements, certificates or other information furnished by or on behalf of the Lead Borrower or any Subsidiary to the Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that with respect to forecasts and projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time made and at the time so furnished and, if furnished prior to the Closing Date, as of the Closing Date (it being understood that any forecasts and projections may vary from actual results and that such variances may be material).

**5.12    [Reserved].**

**5.13    Insurance.**  Schedule 5.13 sets forth a description of all insurance maintained by or on behalf of the Lead Borrower and its Subsidiaries as of the Closing Date. As of the Closing Date, all premiums in respect of such insurance which are due and payable have been paid. The Lead Borrower and

44

its Subsidiaries maintain, with financially sound and reputable insurance companies, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

5.14    **Subsidiaries and Joint Ventures.**  Schedule 5.14 sets forth as of the Closing Date (a) a correct and complete list of the name and relationship to the Lead Borrower of each and all of the Lead Borrower's Subsidiaries and all joint ventures in which the Lead Borrower or any Subsidiary owns any Equity Interest, (b) a true and complete listing of each class of the Lead Borrower and each Loan Party's authorized Equity Interests, all of which issued Equity Interests (to the extent such concepts are relevant with respect to such Equity Interests) are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 5.14, and (c) the type of entity of the Lead Borrower, each of its Subsidiaries and each joint venture in which the Lead Borrower or any Subsidiary owns any Equity Interest. All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable. There are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

5.15    **Collateral Matters.**  Subject to the of the Bankruptcy Court DIP Orders and the terms thereof, as applicable, this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral granted by the Loan Parties in favor of the Agent (for the benefit of the Credit Parties), securing the Obligations, constitute perfected and continuing Liens on the Collateral (subject to Liens permitted by Section 7.02), securing the applicable Obligations, enforceable against the applicable Loan Party and having priority over all other Liens on the Collateral (subject to the prior Lien of (i) Pre-Petition ABL Agent and Pre-Petition ABL Lenders on the Pre-Petition ABL Collateral, and (ii) any mortgages existing on the Petition Date encumbering real property of the Loan Parties on such date), in each case to the extent provided for in the Bankruptcy Court DIP Orders.

5.16    **Federal Reserve Regulations; EEA Financial Institution.**

(a)    Neither the Lead Borrower nor any Subsidiary is principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the FRB), or extending credit for the purpose of purchasing or carrying margin stock. No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner or for any purpose that would entail a violation of Regulations T, U or X of the FRB. If any Loan Party or any of its Subsidiaries owns any Margin Stock, Borrowers shall deliver to the Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrowers, together with such other documentation as the Agent shall reasonably request, in order to enable the Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the FRB.

(b)    No Loan Party is an EEA Financial Institution.

5.17    **Use of Proceeds.**  The Borrowers will use the proceeds of the Loans only for purposes set forth in Section 7.12.

5.18    **[Reserved].**

45

**5.19    No Burdensome Restrictions.**  No Loan Party is subject to any Burdensome Restrictions except Burdensome Restrictions permitted under <u>Section 7.10</u>.

**5.20    OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.**  No Loan Party nor any of its Subsidiaries is in violation of any Sanctions. No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure (x) compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Sanctions and (y) compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Anti-Corruption Laws and Anti-Money Laundering Laws in all material respects. Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any Loan made will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any applicable Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws by any Person (including any Credit Party or other individual or entity participating in any transaction). As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

**5.21    Patriot Act.**  To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the Foreign Assets Control Regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001, as amended) (the "<u>Patriot Act</u>").

**5.22    Affiliate Transactions.**  Except as set forth on <u>Schedule 5.22</u>, as of the date of this Agreement, there are no existing or proposed agreements, arrangements, understandings or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, holders of other Equity Interests, employees or Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party (except that any such Persons may own Equity Interests in (but not exceeding 2.0% of the outstanding Equity Interests of)) any publicly traded company that may compete with a Loan Party).

**5.23    Common Enterprise.**  The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party. Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies. Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and/or indirect benefit to such Loan Party, and is in its best interest.

46

**5.24    Budget and Financial Plan**. The Approved Budget was prepared in good faith based on assumptions believed by the Loan Parties to be reasonable at the time made and upon information believed by the management of the Borrowers to have been accurate based upon the information available to the management of the Borrowers at the time such Approved Budget was furnished. On and after the delivery of any Variance Report in accordance with this Agreement, such Variance Report shall be complete and correct and fairly represent in all respects the results of operations of the Lead Borrower and its Subsidiaries for the period covered thereby and in the detail to be covered thereby.

<div align="center">

**ARTICLE VI**
**AFFIRMATIVE COVENANTS**

</div>

Until the principal of and interest on the Term Loan and all fees, expenses and other Obligations payable under any Loan Document have been paid in full in cash, the Loan Parties covenant and agree, jointly and severally, with the Agent and the Lenders that:

**6.01    Financial Statements, Certificates and Other Information.**  The Borrowers will furnish to the Agent (in form and detail reasonably satisfactory to the Agent), for distribution to each Lender.

(a)    [reserved];

(b)    upon the earlier of (x) delivery to the Pre-Petition ABL Agent and (y) within (i) 45 days after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year of the Lead Borrower, and (ii) within 60 days after the end of the fourth Fiscal Quarter of each Fiscal Year of the Lead Borrower, the Consolidated and consolidating balance sheet of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Quarter and the related Consolidated and consolidating statements of operations, stockholders' equity and cash flows of the Lead Borrower and its Subsidiaries for such Fiscal Quarter and the then elapsed portion of the Fiscal Year (including, without limitation, a schedule detailing the outstanding principal amounts of all outstanding Indebtedness of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Quarter), setting forth in each case in comparative form (A) the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, and (B) the figures for the same period included in the Projections delivered pursuant to Section 6.01(e) below, accompanied by a same Store sales report in form reasonably satisfactory to the Agent, all certified by a Financial Officer of the Lead Borrower as presenting fairly in all material respects the financial position, results of operations and cash flows of the Lead Borrower and its Subsidiaries on a Consolidated and consolidating basis as of the end of and for such Fiscal Quarter and such portion of the Fiscal Year on a Consolidated and consolidating basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    upon the earlier of (x) delivery to the Pre-Petition ABL Agent and (y)(i) within 30 days after the end of each Fiscal Month of the Lead Borrower a copy of the Lead Borrower's management prepared monthly financial summary; and (ii) at any time required under the Pre-Petition ABL Credit Agreement, in addition to the financial summary prepared under subclause (c)(i), within 45 days after the end of each Fiscal Month of the Lead Borrower, the Consolidated and consolidating balance sheet of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Month and the related Consolidated and consolidating statements of operations, stockholders' equity and cash flows of the Lead Borrower and its Subsidiaries for such Fiscal Month and the then elapsed portion of the Fiscal Year (including, without limitation, a schedule detailing the

<div align="center">47</div>

outstanding principal amounts of all outstanding Indebtedness of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Month), setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous Fiscal Year, all certified by a Financial Officer of the Lead Borrower as presenting fairly in all material respects the financial position, results of operations and cash flows of the Lead Borrower and its Subsidiaries on a Consolidated and consolidating basis as of the end of and for such Fiscal Month and such portion of the Fiscal Year on a Consolidated and consolidating basis in accordance with GAAP, subject to normal year- end audit adjustments and the absence of footnotes;

(d)    concurrently with each delivery of financial statements under clause (a), (b) or (c)(ii) above, a completed Compliance Certificate signed by a Financial Officer of the Lead Borrower (i) certifying, in the case of the financial statements delivered under clause (b) that such financial statements present fairly in all material respects the financial position, results of operations and cash flows of the Lead Borrower and its consolidated Subsidiaries on a Consolidated (and as applicable, consolidating) basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) if any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 5.04, specifying the effect of such change on the financial statements accompanying such certificate, (iv) certifying that all notices required to be provided under Section 6.02 have been provided, and (v) providing a copy of management's discussion and analysis with respect to such financial statements, to the extent available;

(e)    concurrently with the delivery of each financial statement or summary, appraisal, field examination, borrowing base certificate, collateral eligibility report or summary, budget reconciliation, schedule of activity, and notice of material events to the Pre-Petition ABL Agent under and in respect of the Pre-Petition ABL Credit Agreement, a copy of each such report or other information;

(f)    the Approved Budget may be updated, modified or supplemented (with the consent of the Agent and/or at the reasonable request of the Agent) from time to time, and each such updated, modified or supplemented budget shall be approved by, and in form and substance reasonably satisfactory to, the Agent who must object in writing within five (5) days of receipt if not satisfactory to the Agent, and no such updated, modified or supplemented budget shall be effective until so approved; provided that, upon the approval of the Agent, or if no written objection is received within five (5) days of receipt, such updated, modified, or supplemented budget shall thereupon be deemed an Approved Budget; provided, further, that in any event the Approved Budget shall be updated by the Borrower not less than one time in each four (4) consecutive week period, which updated budget shall be in form and substance reasonably acceptable to the Agent and approved by the Agent, provided, further, that in the event that the Agent and the Lead Borrower cannot, while acting in good faith, agree as to an updated, modified or supplemented budget, then the current Approved Budget shall remain in effect unless and until a new Approved Budget is not objected to by the Agent. Each Approved Budget delivered to the Agent shall be accompanied by such supporting documentation as reasonably requested by the Agent. Each Approved Budget shall be prepared in good faith based upon assumptions which the Lead Borrower believes to be reasonable at the time prepared, and are reasonably satisfactory to the Agent;

48

(g)     on each Budget Testing Date (prior to 5:00 p.m. (Eastern Time)), the Lead Borrower shall deliver to the Agent an Approved Budget Variance Report, and certify therein that the Lead Borrower is in compliance with the covenants contained in Section 6.23;

(h)     as soon as available but in any event within 30 days after the end of each Fiscal Month of the Lead Borrower, a report of the joint venture revenue summary by partner and licensing detail with respect to any Intellectual Property Rights, all delivered electronically in a text formatted file in form reasonably acceptable to the Agent;

(i)     [reserved];

(j)     [reserved];

(k)     promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Loan Party or any Subsidiary with the SEC, or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities exchange, or distributed by any Borrower to its shareholders generally, as the case may be;

(l)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of this Agreement, as the Agent or any Lender may reasonably request;

(m)     as promptly as is practicable following any request therefor, information and documentation for each Loan Party reasonably requested by the Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation; and

(n)     additional reporting in accordance with Section 6.19.

Documents required to be delivered pursuant to Section 6.01(b), or (c) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Lead Borrower posts such documents, or provides a link thereto on the Lead Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Lead Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Agent have access (whether a commercial, third-party website or whether sponsored by the Agent); provided that: (i) to the extent so requested by the Agent, the Lead Borrower shall deliver paper copies of such documents to the Agent for itself and for delivery to any Lender (that requests such delivery in writing to the Agent) until a written request to cease delivering paper copies is given by the Agent and (ii) the Lead Borrower shall notify the Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. The Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Loan Parties with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it (or requesting delivery to it through Agent, as applicable) or maintaining its copies of such documents.

WEIL:\97549758\6\30950.0070

**6.02    Notices of Material Events.** The Lead Borrower will furnish to the Agent (for distribution to the Lenders) written notice promptly upon any Financial Officer, or other officer or employee responsible for compliance with the Loan Documents, of the Lead Borrower or any Subsidiary becoming aware of any of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    other than with respect to the Chapter 11 Cases, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Lead Borrower or any Subsidiary, or any adverse development in any such pending action, suit or proceeding not previously disclosed in writing by the Lead Borrower to the Agent and the Lenders, that in each case would reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c)    [reserved];

(d)    [reserved];

(e)    [reserved];

(f)    [reserved];

(g)    [reserved];

(h)    except as otherwise disclosed on Schedule 6.02(h), the occurrence of an ERISA Event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect;

(i)    the receipt by any Loan Party from a counterparty to any Material Contract described in any of clauses (b), (c) or (d) of the definition thereof of notice of termination or purported termination or non-renewal thereof; or

(j)    any other development that has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Lead Borrower has taken and proposes to take with respect thereto.

**6.03    Existence; Conduct of Business.** The Lead Borrower will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, Intellectual Property Rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted, provided that the foregoing shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under Section 7.03, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

**6.04    Payment of Obligations.** The Lead Borrower will, and will cause each Subsidiary to, pay or discharge all its material obligations, including Tax liabilities (whether or not shown on a Tax return),

WEIL:\97549758\6\30950.0070

before the same shall become delinquent or in default, except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Lead Borrower or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation or (b) the failure to make payment would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. Notwithstanding the foregoing, nothing in this Section 6.04 shall prevent any Loan Party from making any payment or rejecting any contract in connection with the pendency of the Chapter 11 Cases which is permitted pursuant to the Bankruptcy Court DIP Orders or any Acceptable Wind-Down.

**6.05    Maintenance of Properties.**  Each Loan Party will (a) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (b) make all necessary repairs thereto and renewals and replacements thereof, except where, in each case of property other than property constituting Term Loan Collateral, the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

**6.06    Books and Records; Inspection Rights.**  Each Loan Party will (a) keep proper books of record and account in which full, true and correct (in all material respects) entries in accordance with GAAP and applicable Law are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Agent or any Lender (including employees of the Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Agent), upon reasonable prior notice (but in no event more than once each Fiscal Year of the Lead Borrower unless an Event of Default has occurred and is continuing), to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and, accompanied by one or more such officers or their designees if requested by the Lead Borrower, independent accountants, all at such reasonable times during normal business hours. Unless an Event of Default has occurred and is continuing, the Lead Borrower shall have the right to have a representative present at any and all inspections. Notwithstanding anything herein to the contrary, the right of the Agent or any Lender to conduct appraisals shall be governed exclusively by Section 6.11, and shall not be limited by this Section.

The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the Agent or the Lenders in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation and warranty by the Borrowers on the date thereof as to the matters specified in this Section 6.06.

**6.07    Compliance with Laws and Material Contractual Obligations.**  Each Loan Party will comply in all material respects with all Laws applicable to it or its property (including without limitation Environmental Laws), other than to the extent that such compliance is stayed by the Chapter 11 Cases.

**6.08    [Reserved].**

**6.09    Accuracy of Information.**  The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the Agent or the Lenders in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, taken as a whole, contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation

51

and warranty by the Borrowers on the date thereof as to the matters specified in this <u>Section 6.09</u>; <u>provided</u> that with respect to projected financial information, the Loan Parties will only ensure that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**6.10    Maintenance of Insurance.**

(a)    The Lead Borrower will, and will cause each Subsidiary to, maintain, with financially sound and reputable insurance companies having a financial strength rating of at least A by A.M. Best Company (i) insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (ii) all insurance required to be maintained pursuant to the Security Documents. The Lead Borrower will furnish to the Lenders, upon request of the Agent, information in reasonable detail as to the insurance so maintained. Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (i) in the case of each liability insurance policy (other than workers' compensation, director and officer liability or other policies in which such endorsements are not customary), name the Agent, as an additional insured thereunder, (ii) in the case of each casualty insurance policy, contain a lender loss payable clause or endorsement that names the Agent, as a lender loss payee thereunder with respect to the Collateral.

(b)    [Reserved].

(c)    All insurance policies required hereunder shall name the Agent (for the benefit of the Agent and the Lenders) as an additional insured or as lender loss payee, as applicable, and shall contain lender loss payable clauses, through endorsements in form and substance satisfactory to the Agent, which provide that: (i) all proceeds thereunder with respect to any Collateral (subject to any prior rights of the Pre-Petition ABL Lenders and Pre-Petition ABL Agent with respect to the Pre-Petition ABL Collateral) shall be payable to the Agent and (ii) such policy and lender loss payable clauses may be canceled, amended, or terminated only upon at least thirty (30) days prior written notice given to the Agent.

(d)    All premiums on any such insurance shall be paid when due by the Loan Parties, and copies of the policies delivered to the Agent. If the Loan Parties fail to obtain any insurance as required by this Section, the Agent may obtain such insurance at the Lead Borrower's expense. By purchasing such insurance, the Agent shall not be deemed to have waived any Default arising from any Loan Party's failure to maintain such insurance or pay any premiums therefor.

**6.11    [Reserved].**

**6.12    [Reserved].**

**6.13    Bankruptcy Court Orders; Cash Management.**

(a)    The Loan Parties shall comply in all material respects with the requirements of the Bankruptcy Court DIP Order and the Cash Management Order.

52

(b)    The Loan Parties shall cause bank statements and/or other reports delivered to the Pre-Petition ABL Agent pursuant to Section 6.13(f) of the Pre-Petition ABL Credit Agreement to be delivered to the Agent.

(c)    It is agreed and acknowledged that the "Term Loan Collateral Proceeds Account" (as defined in the Pre-Petition Term Loan Agreement) shall constitute the Term Loan Collateral Proceeds Account for all purposes under this Agreement. After the opening of the Term Loan Collateral Proceeds Account in accordance with Section 6.26, the Loan Parties shall maintain the existence of the Term Loan Collateral Proceeds Account.

(d)    The Lead Borrower will, and will cause each Loan Party to maintain their cash management system as it existed prior to the Petition Date, with such changes in each case as necessary to comply with their obligations under Section 6.13(a) or as may be required by an order of the Bankruptcy Court.

6.14    **Additional Loan Parties.**  Subject to applicable Law, the Loan Parties will cause any of its Subsidiaries (other than an Excluded Subsidiary) formed or acquired after the date of this Agreement or that becomes a Subsidiary (other than an Excluded Subsidiary) after the Closing Date in accordance with the terms of this Agreement to within thirty (30) days (in each case, as such time may be extended in the Agent's sole discretion) become either a Borrower or a Guarantor by (a) executing a Joinder Agreement in substantially the form of Exhibit D attached hereto and (b) providing the Agent all documentation and other information required by any applicable Governmental Authority under applicable "know your customer", Beneficial Ownership Regulations, and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, as reasonably requested by the Agent or any Lender. Upon execution and delivery thereof, each such Person (i) shall automatically become a Borrower or a Guarantor, as applicable, and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Agent, for the benefit of the Agent and the Credit Parties, in any property of such Loan Party which constitutes the Collateral under the Security Agreement.

6.15    **[Reserved].**

6.16    **Information Regarding the Collateral.**  The Loan Parties shall furnish to the Agent at least fifteen (15) days prior written notice of: (a) any change in any Loan Party's name used to identify it in the conduct of its business or in the ownership of its properties; (b) any change in the location of any Loan Party's chief executive office or its principal place of business, (c) the establishment of any new office of a Loan Party in which it maintains books or records relating to the Collateral; (iv) any change in any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (v) any change in any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its jurisdiction of organization. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been or will be timely made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral (subject only to the prior Liens of the Pre-Petition ABL Agent and Pre-Petition ABL Lenders in the Pre-Petition ABL Collateral) for its own benefit and the benefit of the other Credit Parties.

6.17    **Environmental Laws.**  Each Loan Party shall, and shall cause each of their Subsidiaries to (a) conduct its operations and keep and maintain its real estate in compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are necessary to maintain the value and marketability of the real estate or to otherwise comply with Environmental Laws

53

pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its real estate (except, in the case of each of the forgoing clauses (a)-(c), where failure to do so would not reasonably be expected to result in a Material Adverse Effect or to the extent stayed by the Chapter 11 Cases), <u>provided</u>, <u>however</u>, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.18     Further Assurances; Additional Collateral.**

(a)     The Loan Parties shall execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any applicable Law, or which the Agent may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon reasonable request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)     If any material assets constituting Collateral are acquired by any Loan Party after the Closing Date, the Loan Parties shall notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by the Agent to grant and perfect such Liens, including actions described in paragraph (a) of this <u>Section 6.18</u>, all at the expense of the Loan Parties. In no event shall compliance with this <u>Section 6.18(b)</u> waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this <u>Section 6.18(b)</u> if such transaction was not otherwise expressly permitted by this Agreement.

(c)     The Lead Borrower shall, and shall cause each Loan Party to, (i) deliver to the Agent each of the documents, instruments, agreements and information reasonably requested by the Agent to register a Lien on the Collateral other than the Term Loan Collateral in the United States and on the Term Loan Collateral in each of the United States, the European Union, Japan, and Greater China (i.e., Taiwan, Hong Kong, Macau and Mainland China), and (ii) upon request of the Agent following the Closing Date in consultation with the Lead Borrower, deliver to the Agent each of the documents, instruments, agreements and information reasonably requested by the Agent to register a Lien on the Term Loan Collateral in any other foreign jurisdiction not described in clause (i) above.

(d)     The Lead Borrower shall, and shall cause each Loan Party to, deliver to the Agent, within thirty (30) days after the Closing Date (or such later date as Agent shall approve in writing in its sole discretion), insurance endorsements to the extent required pursuant to <u>Section 6.10</u> of this Agreement.

**6.19     Additional Reporting**.  The Lead Borrower will furnish to the Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice);

(a)     [Reserved].

(b)     <u>Sale Process Reports</u>.  On or before 12:00 PM (New York City time) on the fourth (4th) Business Day of each calendar week (commencing with the first such Business Day falling during the first full calendar week after the Petition Date), a weekly report with respect to the sale process, in form and scope reasonably agreed to by the Lead Borrower and the Agent.  In addition, the Lead Borrower will grant access to any data room established for potential bidders to the Agent and its financial advisor and counsel and furnish to the Agent and its financial advisor and counsel, as they become available (and, in any event, together with the next weekly report delivered pursuant to this <u>Section 6.19(b)</u>), full copies of any preliminary and final bids received and any draft purchase and sale agreements.  Notwithstanding the foregoing, the Lead Borrower's obligations under this <u>Section 6.19(b)</u> shall be modified to the extent they conflict with the Bid Procedures.

(c)     <u>Aging Reports</u>.  Promptly, and in any event no later than ten (10) Business Days after the end of each calendar month, a detailed accounts payable aging report of each Loan Party as of the end of such calendar month, including a breakdown of accounts payable arising following the Petition Date, in form and substance reasonably satisfactory to the Agent.

(d)     <u>Court Filings</u>.  Substantially concurrent with the filing thereof with the Bankruptcy Court, copies of the monthly operating reports required to be filed with the Bankruptcy Court.  Prior to the filing thereof, copies of all material pleadings, motions and applications to be filed by or on behalf of the Loan Parties with the Bankruptcy Court or provided to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee, or if it is not practicable to provide copies of the same in advance of filing, then advance notice of all such material pleadings, motions and applications and copies of all such documents promptly after each such document is filed with the Bankruptcy Court or provided to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee.

**6.20     [Reserved].**

**6.21     OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  Each Loan Party will, and will cause each of its Subsidiaries to (a) comply with all applicable Sanctions and (b) comply in all material respects with all applicable Anti-Corruption Laws, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties shall and shall cause their respective Subsidiaries to comply with all Sanctions and comply in all material respects with all Anti-Corruption Laws and Anti-Money Laundering Laws.

**6.22     Milestones.**  The Loan Parties shall ensure the satisfaction of the following milestones (collectively, the "<u>Milestones</u>" and each a "<u>Milestone</u>"), unless waived or extended with the consent of either the Required Lenders (in each case, in their sole discretion) (which may be by email)):

(a)     On the Petition Date, the Loan Parties shall have filed a motion with the Bankruptcy Court seeking approval of the Interim DIP Order and Final DIP Order;

(b)    On or before the date that is seven (7) calendar days after the Petition Date, the Loan Parties shall have filed the Bid Procedures Motion with the Bankruptcy Court;

(c)    On or before the date that is three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the Agent;

(d)    On or before the date that is thirty-five (35) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(e)    On or before the date that is thirty-five (35) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order;

(f)    On or before the date that is fifty-three (53) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Approved Sale (as defined below) (the "Sale Order"), which shall be in form and substance satisfactory to the Agent as confirmed by the Agent in writing; and

(g)    On or before the date that is eighty-eight (88) calendar days after the Petition Date, the Lead Borrower shall have consummated the sale of substantially all of the assets of the Loan Parties to the party determined to have made the highest or otherwise best bid for the Lead Borrower's assets in accordance with the Sale Order and that results in Net Proceeds allocated to the DIP Collateral sufficient to repay the Obligations in full in cash (the "Approved Sale").

**6.23    Approved Budget**.  At all times following the Closing Date, the Loan Parties shall strictly perform in accordance with the Approved Budget, subject to the following (the "Permitted Variance"): commencing with the Thursday closest to the date that is seven (7) full weeks following the Petition Date (on a 7-week cumulative basis) (the "Initial Budget Testing Period") and for each Budget Testing Period thereafter, the Borrowers shall not permit, in the case of disbursements: the actual amount of aggregate cumulative (i) operating disbursements (excluding (x) fees and restructuring charges of Case Professionals arising on account of the Chapter 11 Cases (including U.S. Trustee fees) and (y) disbursements made with respect to inventory (the "Inventory Disbursements")) during the Initial Budget Testing Period to exceed the lesser of (1) the sum of the projected cumulative operating disbursements (excluding (x) fees and restructuring charges of Case Professionals arising on account of the Chapter 11 Cases (including U.S. Trustee fees) and (y) Inventory Disbursements) in the Approved Budget for the Initial Budget Testing Period, plus $2,000,000 and (2) one hundred and ten percent (110%) of the projected cumulative operating disbursements (excluding (x) fees and restructuring charges of Case Professionals arising on account of the Chapter 11 Cases (including U.S. Trustee fees) and (y) Inventory Disbursements) in the Approved Budget for the Initial Budget Testing Period, (ii) operating disbursements (excluding (x) fees and restructuring charges of Case Professionals arising on account of the Chapter 11 Cases (including U.S. Trustee fees) and (y) the Inventory Disbursements) during any Budget Testing Period (other than the Initial Budget Testing Period) to exceed one hundred and ten percent (110%) of the projected cumulative operating disbursements (excluding (x) fees and restructuring charges of Case Professionals arising on account of the Chapter 11 Cases (including U.S. Trustee fees) and (y) Inventory Disbursements) in the Approved Budget for such Budget Testing Period; (iii) Inventory Disbursements during any Budget Testing Period (including the Initial Budget Testing Period) to exceed one hundred and ten percent (110%) of projected cumulative Inventory Disbursements in the Approved Budget for such Budget Testing Period; and (iv) the restructuring costs during any Budget Testing Period (including the Initial Budget Testing Period) to exceed one hundred

and ten percent (110%) of the projected cumulative restructuring costs in the Approved Budget for such Budget Testing Period.

The foregoing covenant shall be tested pursuant to the Approved Budget Variance Report delivered by the Lead Borrower to the Agent in accordance with Section 6.01(g). The Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document.

       **6.24**    **Disposition of Collateral**. Subject to the Winddown Budget and Final DIP Order, the Lead Borrower shall apply any Winddown Net Proceeds of the sale of Collateral (a) first, to fund the Winddown Account, until the Winddown Account Funding Condition has been satisfied (provided, that in no event shall the Loan Parties permit the Winddown Account to hold cash or any other property in excess of the amount required to satisfy the Winddown Account Funding Condition), (b) second, to fund the Term Loan Collateral Proceeds Account, and (c) third, to fund the Winddown Net Proceeds Account.

       **6.25**    **Winddown Budget**. The Borrowers shall provide to the Agent a winddown budget (the "Winddown Budget") in form and substance satisfactory to the Agent in its sole discretion not later than July 17, 2020 (or such later date as the Agent may agree in its sole discretion).

       **6.26**    **Post-Closing Matters**. The Lead Borrower shall, and shall cause its Subsidiaries, to satisfy the requirements set forth in Schedule 6.26 on or before the date specified for such requirements, in each case as such date may be extended at the sole discretion of the Agent so long as the Lead Borrower is working diligently to complete, or to cause its applicable Subsidiary to complete, the applicable requirement, as determined by the Agent in its sole discretion.

<div align="center">

**ARTICLE VII**
**NEGATIVE COVENANTS**

</div>

       Until the principal of and interest on the Term Loan and all fees, expenses and other Obligations payable under any Loan Document have been paid in full in cash, the Loan Parties covenant and agree, jointly and severally, with the Agent and the Lenders that:

       **7.01**    **Indebtedness; Certain Equity Securities.**

            (a)    The Loan Parties will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

            (i)    the Obligations;

            (ii)    Indebtedness existing on the Petition Date;

            (iii)    Indebtedness of (A) any Loan Party to any other Loan Party, (B) of any Loan Party to any Excluded Subsidiary but solely to the extent consented to by the Agent and permitted by the Bankruptcy Court, and (C) of any Excluded Subsidiary to any Loan Party or to any other Excluded Subsidiary, provided that (x) Indebtedness of any Excluded Subsidiary to any Loan Party shall be subject to the limitations and provisions of Section 7.04, and (y) Indebtedness of any Loan Party to any Excluded Subsidiary shall be subordinated to the Obligations on terms reasonably satisfactory to the Agent;

<div align="center">57</div>

(iv)    Guarantees incurred in compliance with <u>Section 7.04</u>;

(v)    Indebtedness expressly permitted by the Approved Budget (including Permitted Variances);

(vi)    Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit and checking accounts, in each case, in the ordinary course of business;

(vii)    Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of any Loan Party in the ordinary course of business supporting obligations under workers' compensation, unemployment insurance and other social security laws;

(viii)    [reserved];

(ix)    [reserved];

(x)    Indebtedness under (i) the Carve-Out and (ii) the Professional Fees Account;

(xi)    Indebtedness of Loan Parties in respect of surety bonds (whether bid performance or otherwise) and performance and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business;

(xii)    [reserved];;

(xiii)    [reserved];

(xiv)    [reserved];

(xv)    Indebtedness consisting of (A) the financing of insurance premiums and (B) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xvi)    obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services;

(xvii)    [reserved];

(xviii)    [reserved];

(xix)    [reserved];

(xx)    [reserved];

(xxi)    [reserved];

58

(xxii)  [reserved]; and

(xxiii) obligations of the Subsidiaries of the Lead Borrower owing to Lead Borrower in connection with Investments permitted pursuant to <u>Section 7.04(o)</u>.

Notwithstanding anything to the contrary contained herein, no Indebtedness permitted to be incurred pursuant to this <u>Section 7.01(a)</u> shall be secured by Liens on the Intellectual Property Collateral or the products or proceeds of any of the foregoing.

(b)  The Lead Borrower will not, and will not permit any Subsidiary to, issue any Disqualified Stock.

**7.02    Liens.**  The Loan Parties will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)  Liens pursuant to (i) the Loan Documents, (ii) the Carve-Out and (iii) the Professional Fees Account;

(b)  Permitted Encumbrances;

(c)  any Lien on any asset of the Lead Borrower or any Subsidiary existing on the Petition Date;

(d)  [reserved];

(e)  Liens granted pursuant to any order of the Bankruptcy Court in connection with any adequate protection, replacement lien or similar arrangement;

(f)  in the case of any Subsidiary that is not a wholly-owned Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Subsidiary or such other Person set forth in the organizational documents of such Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement; and

(g)  Liens solely on any cash earnest money deposits, escrow arrangements or similar arrangements made by the Lead Borrower or any Subsidiary in connection with any letter of intent or purchase agreement for a transaction permitted hereunder.

Notwithstanding anything to the contrary contained herein, the Loan Parties will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on all or any Intellectual Property and related licenses and goodwill, or any Proceeds or products of the foregoing, now owned or hereafter acquired, except (A) pursuant to clause (o) of the definition of Permitted Encumbrances or (B) in favor of (i) the Agent or (ii) on a junior basis, the Pre-Petition ABL Agent.

**7.03    Fundamental Changes; Business Activities.**

(a)  The Lead Borrower will not, and will not permit any Subsidiary to, merge into, amalgamate with or consolidate with any other Person, or permit any other Person to merge into, amalgamate with or consolidate with it, or sell, transfer, lease or

59

otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of the Lead Borrower and its Subsidiaries, taken as a whole, or liquidate or dissolve, except that, if (x) no approval of the Bankruptcy Court is required (or such approval is required and shall have been received) and (y) at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Subsidiary (other than the Lead Borrower) may merge into, amalgamate with or consolidate with the Lead Borrower in a transaction in which the Lead Borrower is the surviving corporation, (ii) any Person (other than the Lead Borrower) may merge into, amalgamate with or consolidate with any Subsidiary in a transaction in which the surviving or continuing entity is a Subsidiary and, if any party to such merger, amalgamation or consolidation is a Loan Party, a Loan Party, (iii) any Subsidiary may merge into, amalgamate with or consolidate with any Person (other than the Lead Borrower) in a transaction permitted under Section 7.05 in which, after giving effect to such transaction, the surviving or continuing entity is a Subsidiary, and (iv) any Subsidiary (other than a Loan Party) may liquidate or dissolve if the Lead Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Lead Borrower and is not materially disadvantageous to the Lenders; provided that any such merger, amalgamation or consolidation involving a Person that is not a wholly owned Subsidiary immediately prior to such merger, amalgamation or consolidation shall not be permitted unless it is also permitted by Section 7.04.

(b)     The Lead Borrower will not, and will not permit any of its Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Lead Borrower and its Subsidiaries on the Petition Date and businesses reasonably related or complementary thereto.

**7.04    Investments, Loans, Advances, Guarantees and Acquisitions.**  The Lead Borrower will not, and will not permit any Subsidiary to, purchase, hold, acquire (including pursuant to any merger, amalgamation or consolidation), make or otherwise permit to exist any Investment in any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) all or substantially all the assets of any other Person or of a business unit, division, product line or line of business of any other Person, except:

(a)     Investments in cash and Cash Equivalents;

(b)     Investments existing on the Petition Date (but not any additions thereto (including any capital contributions) made after the Petition Date);

(c)     Investments made after the date hereof by any Loan Party in another Loan Party;

(d)     Guarantees by any Loan Party of Indebtedness subject to the limitations of Section 7.01 or other obligations of any other Loan Party (including any such Guarantees (i) arising as a result of any such Person being a joint and several co-applicant with respect to any letter of credit or letter of guaranty or (ii) of any leases of Store locations and related obligations arising thereunder);

(e)     Investments made after the date hereof by any Excluded Subsidiary in (x) a Loan Party in an aggregate amount not to exceed $100,000 in the aggregate or (y) in another Excluded Subsidiary;

(f)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(g)    deposits, prepayments and other credits to suppliers, lessors and landlords made in the ordinary course of business;

(h)    advances by the Lead Borrower or any Subsidiary to employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes;

(i)    Investments made as a result of receipt of non-cash consideration from a sale, transfer or other disposition of assets permitted under Section 7.05;

(j)    Investments in the form of Swap Contracts existing on the Petition Date;

(k)    Investments constituting deposits described in clauses (c) and (d) of the definition of "Permitted Encumbrances" and endorsements of instruments for collection or deposit in the ordinary course of business; and

(l)    Investments in the form of unsecured Guarantees by the Lead Borrower of obligations of BB Far East under purchase orders entered into from time to time by BB Far East with vendors in the ordinary course of business; provided that notwithstanding anything to the contrary contained herein, payments made by the Lead Borrower (or any other Loan Party) under any such Guarantee made pursuant to this clause on account of amounts attributable to any portion of Inventory or other property under such purchase orders that are (or, will be) transferred to any Subsidiary that is not a Loan Party shall be repaid by such non-Loan Party Subsidiary to (or for the account of) the applicable Loan Party (making such payment) in a manner consistent with the repayment of advances made pursuant to clause (o) below.

Notwithstanding anything to the contrary contained herein, no Investments permitted pursuant to this Section 7.04 shall be made as an Investment of Intellectual Property Rights or the products or proceeds of any of the foregoing.

**7.05    Asset Sales.** The Loan Parties will not, and will not permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Lead Borrower permit any Subsidiary to issue any additional Equity Interests in such Subsidiary (other than to the Lead Borrower or any other Subsidiary in compliance with Section 7.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under any applicable Law), except:

(a)    (i) sales of inventory, (ii) sales, transfers and other dispositions of used, surplus, obsolete or outmoded machinery or equipment and (iii) dispositions of cash and Cash Equivalents, in each case (other than in the case of clause (iii)) in the ordinary course of business;

(b)    sales, transfers, leases and other dispositions from one Loan Party to another Loan Party;

61

(c)    the sale or discount of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not in connection with any financing transaction;

(d)    dispositions of assets subject to any casualty or condemnation proceeding (including in lieu thereof);

(e)    leases or subleases of real property granted by the Lead Borrower or any Subsidiary to third Persons not interfering in any material respect with the business of the Lead Borrower or any Subsidiary, including, without limitation, Store lease assignments and surrenders;

(f)    (i) the continuation of non-exclusive licenses of Intellectual Property Rights in existence on the Petition Date and (ii) non-exclusive licenses of Intellectual Property Rights entered into in the ordinary course of business consistent with past practices that replace those in existence on the Petition Date and which have substantially similar terms and conditions to those they are replacing and do not include additional licensed products or territories and are not, in each case of (i) and (ii), in the aggregate, reasonably likely to adversely affect the business of the Lead Borrower or any Subsidiary or the value of any Intellectual Property Rights;

(g)    [reserved];

(h)    [reserved];

(i)    [reserved];

(j)    [reserved];

(k)    Restricted Payments permitted by Section 7.08(a); and

(l)    (i) the sale of the Golden Fleece Haverhill Property, (ii) the sale of substantially all of Deconic's assets (including, for the avoidance of doubt, Intellectual Property Rights of Deconic) and (iii) any other Disposition, in each case of the foregoing clauses (i), (ii) and (iii), approved by an order of the Bankruptcy Court.

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (a)(ii), (a)(iii), (b) or (d) above) shall be made for fair value and, in the case of sales, transfers, leases and other dispositions permitted by clauses (c), (h) and (i) above, for at least 75% cash consideration.

Notwithstanding anything to the contrary contained herein, no Dispositions permitted pursuant to this Section 7.05 (other than as set forth in clause (f) above) shall extend to Intellectual Property Collateral or the products or proceeds of any of the foregoing.

**7.06    Sale/Leaseback Transactions.**  After the Closing Date, the Lead Borrower will not, and will not permit any Subsidiary to, enter into any Sale/Leaseback Transaction.

**7.07    Swap Contracts.**  After the Closing Date, the Lead Borrower will not, and will not permit any Subsidiary to, enter into any Swap Contract.

**7.08    Restricted Payments; Certain Payments of Indebtedness.**

(a)    After the Closing Date, the Lead Borrower will not, and will not permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(i)    [reserved];

(ii)    [reserved];

(iii)    [reserved];

(iv)    the Lead Borrower may make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Lead Borrower in connection with the exercise of warrants, options or other securities convertible into or exchangeable for shares of common stock in the Lead Borrower;

(v)    [reserved]; and

(vi)    The Lead Borrower may make Restricted Payments to the extent provided for in the Approved Budget.

(b)    After the Closing Date, the Lead Borrower will not, and will not permit any Subsidiary to, (i) make any payment of principal or interest or otherwise on account of any amounts payable under the Pre-Petition ABL Loan Documents, other than (x) payments made in compliance in all material respects with the Approved Budget (subject to Permitted Variances), (y) payments agreed to in writing by the Required Lenders, and (z) payments approved by the Bankruptcy Court DIP Order and, if necessary, authorized by the Bankruptcy Court; or (ii) amend or modify the terms of the Pre-Petition ABL Loan Documents (other than amendments or modifications not materially adverse to the Agent or the Lenders or their rights and remedies under the Loan Documents or which would have any material and adverse impact on the Collateral) unless consented to in writing by the Agent;

**7.09    Transactions with Affiliates.**    After the Closing Date, the Lead Borrower will not, and will not permit any Subsidiary to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions in the ordinary course of business at prices and on terms and conditions not less favorable to the Lead Borrower or such Subsidiary than those that would prevail in an arm's-length transaction with unrelated third parties, (b) transactions between or among the Lead Borrower and its Subsidiaries not involving any other Affiliate, (c) Investments permitted under Section 7.04, (d) any Restricted Payment permitted by Section 7.08, (e) transactions between Affiliates pursuant to existing contractual relationships described on Schedule 5.22 hereto, and (f) the payment of reasonable fees and compensation to, and the providing of reasonable indemnities on behalf of, directors and officers of the Lead Borrower or any Subsidiary, as determined by the board of directors of the Lead Borrower in good faith.

**7.10    Restrictive Agreements.**    After the Closing Date, the Lead Borrower will not, and will not permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that restricts or imposes any condition upon (a) the ability of the Loan Parties to create, incur or permit to exist any Lien upon any of its assets to secure any Obligations or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to its Equity Interests or to make or repay

loans or advances to the Lead Borrower or any Subsidiary or to Guarantees of any Loan Party; provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document, (B) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (C) in the case of any Subsidiary that is not a wholly-owned Subsidiary, restrictions and conditions imposed by its organizational documents or any related joint venture or similar agreement, provided that such restrictions and conditions apply only to such Subsidiary and to any Equity Interests in such Subsidiary, (D) restrictions and conditions imposed by agreements relating to Indebtedness of Excluded Subsidiaries permitted under Section 7.01(a) and (E) cash to secure letters of credit and other segregated deposits that are permitted pursuant to Section 7.02(h), provided that such restrictions and conditions apply only to such Subsidiaries that are not Loan Parties, (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.01(a) if such restrictions or conditions apply only to the assets securing such Indebtedness and (B) customary provisions in leases and other agreements restricting the assignment thereof and (iii) clause (b) of the foregoing shall not apply to restrictions and conditions imposed by agreements relating to Indebtedness of any Subsidiary in existence at the time such Subsidiary became a Subsidiary and otherwise permitted under Section 7.01(a) (but shall apply to any amendment or modification expanding the scope of, any such restriction or condition), provided that such restrictions and conditions apply only to such Subsidiary.

**7.11    Amendment of Organization Documents and Material Documents.**  The Loan Parties will not, and will not permit any Subsidiary to, amend, modify, waive or terminate any of a Loan Party's rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, (b) any Material Contract to the extent that such amendment, modification, waiver or termination would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties or otherwise would be reasonably likely to have a Material Adverse Effect or (c) any Indebtedness, in each case.

**7.12    Use of Proceeds.**  The proceeds of the Facility shall be used by the Borrowers solely (1) to pay in full all obligations under the Pre-Petition Term Loan Agreement on the date of the initial credit extension hereunder, (2) to fund the Chapter 11 Cases in accordance with the Approved Budget (subject to Permitted Variances), (3) to finance the Borrowers' ordinary working capital, letters of credit and other general corporate needs including certain fees and expenses of professionals retained by the Loan Parties, subject to the Carve Out, funding winddown costs of the Loan Parties in accordance with the terms of the Winddown Budget and the Final DIP Order, in an aggregate amount not to exceed $750,000 during the term of this Agreement, in each case, to the extent permitted under this Agreement and in accordance with the Approved Budget, and (4) for certain other pre-petition and pre-filing expenses and payments that are approved by the Bankruptcy Court and permitted by the Approved Budget.  No portion of the proceeds of the Facility, the Collateral, the Carve Out, or the Professional Fees Account may be used:

> (a)    for any purpose that is prohibited under the Bankruptcy Code or the Bankruptcy Court DIP Orders;

> (b)    to finance in any way: (i) any contested matter, adversary proceeding, suit, arbitration, application, motion or other litigation of any type adverse to the interests of any or all of the Agent, the Lenders or their respective rights and remedies under Loan Documents or the Bankruptcy Court DIP Order or (ii) any other action which with the giving of notice or passing of time would result in an Event of Default under the Loan Documents;

WEIL:\97549758\6\30950.0070

(c)      for the payment of fees, expenses, interest or principal under the Pre-Petition Loan Documents (other than permitted adequate protection payments); provided that all obligations under the Pre-Petition Term Loan Agreement shall be paid in full with the proceeds of the Initial Borrowing;

(d)      to make any distribution under a chapter 11 plan confirmed in the Chapter 11 Cases that does not provide for the indefeasible payment of the Loans in full and in cash on the effective date of such plan; or

(e)      to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Agent acting at the direction of the Required Lenders.

Nothing herein shall in any way prejudice or prevent the Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest.

**7.13    Changes in Fiscal Periods or Accounting Policies.**  The Lead Borrower will not change the Fiscal Year or its method of determining Fiscal Quarters of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP or with the written consent of the Agent.

**7.14    [Reserved].**

**7.15    Chapter 11 Modifications**. Except as permitted pursuant to the terms of this Agreement and the Bankruptcy Court DIP Order or otherwise consented to by the Required Lenders, neither the Lead Borrower nor any Subsidiary that is a Debtor under the Chapter 11 Cases will, directly or indirectly:

(a)      Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Bankruptcy Court DIP Order.

(b)      Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Agent and the Lenders hereunder, except for the Carve-Out and the Professional Fees Account.

**7.16    Additional Restrictions on Loan Parties.**  Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, without the prior written consent of the Agent, no Loan Party shall, nor shall it permit any of its Subsidiaries to reopen or close any Store unless, in the good faith judgment of the Lead Borrower, such reopening or closure is reasonably necessary to enhance liquidity of the Loan Parties.

# ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default.**  Any of the following ("Events of Default") shall constitute an Event of Default:

(a)    any Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    any Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Section 8.01) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c)    any representation, warranty or certification made or deemed made by or on behalf of any Loan Party in or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made;

(d)    any Loan Party shall (i) fail to observe or perform any covenant, condition or agreement contained in Section 6.01(f), 6.01(g), 6.02(a), 6.03 (with respect to any Loan Party's existence), 6.08, 6.13, 6.22, 6.23, 6.24 or 6.25, or in Article VII, or (ii) fail to observe or perform any material term of any Bankruptcy Court DIP Order;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clauses (a), (b) or (d) of this Section 8.01), and such failure shall continue unremedied for a period of (i) four (4) consecutive Business Days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Agent (which notice shall be given at the request of any Lender) if such breach relates to the terms or provisions of Sections 6.01, 6.02 (other than Section 6.02(a)), 6.03 (other than with respect to any Loan Party's existence), 6.04, 6.05, 6.06, 6.10, or 6.13, or (ii) 30 days after the earlier of (A) any Loan Party's knowledge of such breach or (B) notice thereof from the Agent (which notice will be given at the request of any Lender) if such breach relates to terms or provisions of any other Section of this Agreement;

(f)    any Loan Party or any Subsidiary thereof (A) fails to make any payment (whether of principal, interest, termination payment or other payment obligation and regardless of amount) in respect of any post-petition Material Indebtedness (other than the Obligations) when and as the same shall become due and payable (after giving effect to any applicable grace period); or (B) fails to observe or perform any other agreement or condition relating to any post-petition Material Indebtedness, the effect of which default or other event is to cause, or to permit the holder or holders of any Material Indebtedness, or the beneficiary or beneficiaries of any guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, in each case, that has not been cured or waived under such Material Indebtedness, prior to the acceleration of the obligations thereunder or the obligations hereunder, or such guarantee to become payable or cash collateral in respect thereof to be demanded; provided that this clause (B) shall not apply to secured Indebtedness of a Loan

66

Party or a Subsidiary permitted hereunder that becomes due upon the sale or transfer by such Loan Party or Subsidiary of the assets securing such Indebtedness;

(g)    one or more judgments entered after the Petition Date for the payment of money in an aggregate amount in excess of $15,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against any Loan Party, or any combination thereof, and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party to enforce any such judgment;

(h)    except as otherwise disclosed on Schedule 8.01(h), an ERISA Event shall have occurred that would reasonably be expected to result in a Material Adverse Effect;

(i)    a Change in Control shall occur;

(j)    the Interim DIP Order and the Final DIP Order, as applicable, together with the Loan Documents, shall cease to create a valid and perfected Lien with such priority required by this Agreement;

(k)    any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations other than contingent Obligations for which no claim has been made in writing, ceases to be in full force and effect; or any Loan Party or any Subsidiary thereof contests the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document;

(l)    [reserved];

(m)    [reserved];

(n)    The payment of any Indebtedness or any payables or liabilities, except as otherwise provided in the Approved Budget and as permitted by the Bankruptcy Court DIP Order;

(o)    The use of cash collateral by the Debtors authorized by the Bankruptcy Court DIP Order is terminated or limited in any respect by an entered order of the Bankruptcy Court;

(p)    If there occurs any uninsured loss of any portion of the Collateral with a market or book value in excess of $2,000,0000;

(q)    Without the express written consent of the Required Lenders, and other than a motion in support of the Bankruptcy Court DIP Orders, the bringing of a motion, taking of any action or the filing of any chapter 11 plan or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by

67

or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted pursuant to Section 7.02 upon or affecting any Collateral; (C) except as provided in the Interim DIP Order or Final DIP Order, as the case may be, to use cash collateral of the Agent and the other secured parties under Section 363(c) of the Bankruptcy Code; or (D) any other action or actions materially adverse to the Agent and Lenders, as a whole, or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral;

(r)     The filing of any chapter 11 plan or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement or by any other Person to which the Agent and the Required Lenders do not consent, or any of the Loan Parties or their Subsidiaries shall see, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order;

(s)     The entry of an order in any of the Chapter 11 Cases confirming a chapter 11 plan that (A) is not reasonably acceptable to the Agent, (B) does not provide for an Acceptable Wind-Down or (C) does not provide for termination of the Commitments and indefeasible repayment in full in cash of all the Obligations under this Agreement on or before the effective date of such plan or plans;

(t)     Any Loan Party or any of its Subsidiaries, or any person claiming by or through any Loan Party or any of its Subsidiaries, with any Loan Party's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the Lenders relating to this Agreement;

(u)     An order is entered in any of the Chapter 11 Cases appointing, or any Loan Party, or any Subsidiary of a Loan Party shall file an application for an order seeking the appointment of, (i) a trustee, receiver or any similar insolvency official or administrator under Section 1104, or (ii) an examiner with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(v)     An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, in each case, which does not contain a provision for termination of the Commitments, and payment in full in cash of all Obligations (other than contingent Obligations not due and owing) of the Loan Parties hereunder and under the other Loan Documents upon entry thereof or the filing of any motion to so dismiss or convert brought by any Loan Party, or any of the Debtors and their Subsidiaries shall seek, support or fail to contest in good faith the entry of such order;

(w)     Any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral not approved by the Agent, (B) approving any settlement or other stipulation not approved by the Agent with any secured creditor of any

WEIL:\97549758\6\30950.0070

Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral not approved by the Agent to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim that would have a Material Adverse Effect on the Borrower or their estates (taken as a whole) or more or (D) permit other actions that would have a Material Adverse Effect on the Borrowers or their estates (taken as a whole);

(x)    Any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting substantive consolidation of any of the Loan Parties' estates, other than in connection with an Acceptable Wind-Down;

(y)    The commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against either the Agent or any Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof with dismissal for thirty (30) days after the service thereof on either the Agent or such Lender, that asserts or seeks by or on behalf of a Loan Party, any state or federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Agent or any Lender under the Loan Documents to any claim, or (y) have a Material Adverse Effect on the rights and remedies of the Agent or any Lender under any Loan Document or the collectability of all or any portion of the Obligations;

(z)    The entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owning under this Agreement or the other Loan Documents;

(aa)    The failure of any Loan Party to perform any of its material obligations under, or the occurrence of an event of default under or as defined in, the Interim DIP Order, the Final DIP Order or any order of the Court approving any plan of reorganization, sale of all or substantially all assets under Section 363 of the Bankruptcy Code, or to perform in any material respect its material obligations under the Bid Procedure Order;

(bb)    An order materially adversely impacting the rights and interests of the Agent and the Lenders, as determined by the Agent in its reasonable discretion, without the prior written consent of the Agent, shall have been entered by the Court and such order shall not be reversed or vacated within 10 days;

(cc)    Any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral (i) to the extent having a value in excess of $2,500,000 outside the ordinary course of business and not otherwise permitted hereunder or (ii) that results in Net Proceeds allocated to the DIP Collateral that is not sufficient to repay the Obligations in full in cash, in either case, without the Agent's consent;

(dd)    Without the Agent's consent, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (A) to

69

grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral (as defined in the Bankruptcy Court DIP Orders), whether senior, equal or subordinate to the Agent's liens and security interests; or (B) to modify or affect any rights of the Agent or the Lenders under the Bankruptcy Court DIP Orders or the Loan Documents and related documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

        (ee)    An order is entered by the Bankruptcy Court in any of the Chapter 11 Cases without the express prior written consent of the Required Lenders (and with respect to any provisions that adversely affect the rights or duties of the Agent, the Agent), (i) to revoke, reverse, stay, modify, supplement or amend the Bankruptcy Court DIP Order or the Cash Management Order in a manner that is inconsistent with this Agreement that is not otherwise consented to by the Required Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the Agent, the Agent), (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the DIP Superpriority Claim shall be entered by the Bankruptcy Court without the express prior written consent of the Lenders in respect of the Obligations (and with respect to any provisions that adversely affect the Agent, the Agent) or (iii) to grant or permit the grant of a Lien on the Collateral (other than Liens permitted under <u>Section 7.01</u>);

        (ff)    An application for any of the orders described in clauses 8.01(p) and(q), shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or any Person obtains a final order under § 506(c) of the Bankruptcy Code against the Agent or obtains a final order adverse to the Agent or the Lenders or any of their respective rights and remedies under the Loan Documents or in the Collateral;

        (gg)    The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

        (hh)    Any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Agent and/or the Lenders, claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) the Lien or security interest created by collateral documents or the Bankruptcy Court DIP Order with respect to the Collateral shall, for any reason, cease to be valid, perfected and enforceable in any respect or (iii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Agent and/or the Lenders created by any of the Bankruptcy Court DIP Order, this Agreement, or any collateral document;

        (ii)    Any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or contest any material provision of any Loan Document or any material provision of any Loan Document shall cease to be effective (other than in accordance with its terms), or any Loan Party shall seek or support:

<div align="center">70</div>

(jj)    The entry of order by the Bankruptcy Court limiting in any way the right of the Agent or the Lenders to "credit bid" pursuant to Section 363(k) of the Bankruptcy Code the full amount of the Obligations or any other obligations owed to the Agent and/or the Lenders as of the date such credit bid is made or the date of the Auction (as applicable), or any of the Loan Parties shall seek, support or fail to contest in good faith the entry of any such order;

(kk)    An order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Agent or any of the Lenders of any amounts received in respect of the Obligations;

(ll)    Failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone (unless waived or extended with the consent of the Required Lenders); or

(mm)    An ABL Cash Collateral Termination Event (as defined in the Bankruptcy DIP Order) shall have occurred.

**8.02    Remedies Upon Event of Default; Financial Covenant Cure.**

(a)    Subject to the Bankruptcy Court DIP Order, if any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(i)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; and

(ii)    whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties;

provided, however, that upon the occurrence of any Event of Default with respect to any Loan Party or any Subsidiary thereof under Sections 8.01(h) or (i), the unpaid principal amount of all outstanding Loans and all interest and other Obligations shall automatically become due and payable, in each case without further act of the Agent or any Lender.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

Each of the Lenders agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Loan Party or to foreclose any Lien on, or otherwise enforce any security interest in, or other rights to, any of the Collateral.

71

(b)      [Reserved].

**8.03    Application of Funds.**  After the exercise of remedies provided for in <u>Section 8.02</u> any amounts received on account of the Obligations and such other proceeds remaining in the (i) Operating Account shall be applied in accordance with <u>Section 2.12</u>, subject to the obligation of the Agent to fund the Professional Fees Account on account of obligations benefitting from the Carve-Out in accordance with the Bankruptcy Court DIP Order, and (ii) the Operating Account shall be applied by the Agent in accordance with the Bankruptcy Court DIP Order.

<div align="center">

**ARTICLE IX**
**THE AGENT**

</div>

**9.01    Appointment and Authority.**  Each of the Lenders hereby irrevocably appoints ABG-BB, LLC, to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

**9.02    Rights as a Lender.**  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions.**  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agent:

(a)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

<div align="center">72</div>

The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.01</u> and <u>8.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties or a Lender. Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders. Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties. In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04     Reliance by Agent.**  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05     Delegation of Duties.**  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

**9.06     Resignation of Agent.**  The Agent may at any time give written notice of its resignation to the Lenders and the Lead Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Lead Borrower, to appoint a successor, which shall be an

WEIL:\97549758\6\30950.0070

Eligible Assignee. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; provided that if the Agent shall notify the Lead Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

**9.07    Non-Reliance on Agent and Other Lenders.**  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.12, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08    [Reserved].**

**9.09    Agent May File Proofs of Claim.**  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise.

> (a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Agent and the other Credit Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent, such Credit Parties and their respective agents and counsel and all other amounts due the Lenders, the Agent and such Credit Parties under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, interim receiver, receiver and manager, monitor, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

9.10    **Collateral and Guaranty Matters.**  The Credit Parties irrevocably authorize the Agent, at its option and in its discretion,

(a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01; and

(b)    to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.10. In each case as specified in this Section 9.10, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.10.

9.11    **Notice of Transfer.**  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

9.12    **Reports and Financial Statements.**  By signing this Agreement, each Lender:

(a)    is deemed to have requested that the Agent furnish such Lender, promptly after they become available, copies of all financial statements required to be delivered by the Lead Borrower hereunder and all appraisals and collateral reports received by the Agent (collectively, the "Reports");

75

(b)    expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(d)    agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Loan that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.13    Agency for Perfection.**  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Law of the United States can be perfected only by possession. Should any Lender (other than the Agent) obtain possession of any such collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such collateral to the Agent or otherwise deal with such collateral in accordance with the Agent's instructions.

**9.14    Indemnification of Agent.**  Without limiting the obligations of the Loan Parties hereunder, the Lenders hereby agree to indemnify the Agent and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and its Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and its Related Parties in connection therewith; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's and its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.15    Relation among Lenders.**  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

WEIL:\97549758\6\30950.0070

# ARTICLE X
## MISCELLANEOUS

**10.01    Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the consent of the Required Lenders, and the Lead Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

> (a)    increase (or, following the funding of the Term Loan on the Closing Date, reinstate) the Commitment of any Lender without the written consent of such Lender;

> (b)    as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written consent of such Lender entitled to such payment, or (ii) any scheduled or mandatory reduction or termination of any Commitment hereunder or under any other Loan Document without the written consent of such Lender;

> (c)    as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (iv) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written consent of each Lender entitled to such amount;

> (d)    as to any Lender, change Section 2.13 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of such Lender;

> (e)    (i) change any provision of this Section or the definition of "Required Lenders" without the written consent of each Lender, or (ii) change any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

> (f)    except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written consent of each Lender;

> (g)    release all or substantially all of the Term Loan Collateral from the Liens of the Security Documents without the written consent of each Lender; or

> (h)    except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written consent of each Lender;

77

and, _provided_, _further_, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document; and (ii) any fee arrangements (if any) may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

If any Lender does not consent (a "Non-Consenting Lender") to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender and that has been approved by the Required Lenders, the Lead Borrower may replace such Non-Consenting Lender in accordance with Section 10.13; _provided_ that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph).

### 10.02   Notices; Effectiveness; Electronic Communications.

(a)      Notices Generally.  Except as provided in subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)      if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address specified for such Person on Schedule 10.02; and

(ii)      if to any other Lender, to the address, telecopier number, electronic mail address specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)      Electronic Communications.  Notices and other communications to the Loan Parties and the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, _provided_ that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agent that it is incapable of receiving notices under such Article by electronic communication. The Agent may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, _provided_ that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), _provided_ that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

78

(c) [Reserved].

(d) Change of Address, Etc. Each of the Loan Parties and the Agent may change its address or telecopier for notices and other communications hereunder, or, solely with respect to communications, may change its telephone number, by notice to the other parties hereto. Each other Lender may change its address or telecopier number for notices and other communications hereunder by notice to the Lead Borrower and the Agent. In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e) Reliance by Agent and Lenders. The Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties. All telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03 No Waiver; Cumulative Remedies.** No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

**10.04 Expenses; Indemnity; Damage Waiver.**

(a) Costs and Expenses. The Borrowers shall pay all Credit Party Expenses.

(b) Indemnification by the Loan Parties. The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Agent (and any sub-agents thereof) and their Related Parties only, the

administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) [Reserved], or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (A) result from (w) Taxes, except to the extent that the Taxes represent losses, claims, damages, liabilities or related expenses arise from or relate to a non-Tax claim for which indemnity is available under this section, or (x) a dispute solely among Indemnitees not arising from any act or omission of any Loan Party (other than any such dispute against any Indemnitee acting in its capacity as "Agent" or an "Arranger" under the Loan Documents, as to which such indemnity shall apply) at a time when no Loan Party has breached its obligations hereunder in any material respect, or (B) have been determined by a final and nonappealable judgment in a court of competent jurisdiction obtained by the Borrowers or such Loan Party, to have resulted from (y) the gross negligence, bad faith or willful misconduct of such Indemnitee, or (z) a material breach of such Indemnitee's material obligations hereunder or under any other Loan Document pursuant to a claim brought by a Borrower or any other Loan Party against an Indemnitee.

(c)    Reimbursement by Lenders.  Without limiting their obligations under Section 9.14 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub- agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby or any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or

willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    <u>Payments</u>.  All amounts due under this Section shall be payable on demand therefor.

(f)    <u>Survival</u>.   The agreements in this Section shall survive the resignation of the Agent, the assignment of any Loan by any Lender, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside.**  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns.**

(a)    <u>Successors and Assigns Generally</u>.   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of <u>Section 10.06(b)</u>, (ii) by way of participation in accordance with the provisions of <u>Section 10.06(d)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.06(f)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    In the case of an assignment of the entire remaining amount of the assigning Lender's Loans at the time owing to it or in the case of an assignment to a Lender or an

81

Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

              (B)     In any case not described in subsection (b)(i)(A) of this Section, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000, unless each of the Agent and, so long as no Default or Event of Default has occurred and is continuing, the Lead Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed and shall be deemed given if the Lead Borrower has not responded to a request for such consent within seven (7) Business Days); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

            (ii)    <u>Proportionate Amounts</u>. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned;

            (iii)    <u>Required Consents</u>. In addition to any other requirements of this <u>Section 10.06(b)</u>:

              (A)    the consent of the Lead Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) a Default or Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; and

              (B)    the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Term Loan if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

            (iv)    Assignment and Assumption. The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u>, and <u>10.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Upon request, the Borrowers (at their expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection

shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register.  The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that, no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Agent (in its capacity as Agent) shall have no responsibility for maintaining a Participant Register.

WEIL:\97549758\6\30950.0070

(e)    <u>Limitations upon Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under <u>Section 3.01</u> or <u>3.04</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of <u>Section 3.01</u> unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with <u>Section 3.01(e)</u> as though it were a Lender.

(f)    <u>Certain Pledges</u>. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    <u>Electronic Execution of Assignments</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)    [Reserved].

(i)    <u>Lender Representation</u>. Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agent and the arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Term Loan,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loan and this Agreement, or

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified

84

Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Term Loan and this Agreement, (C) the entrance into, participation in, administration of and performance of the Term Loan and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loan and this Agreement.

**10.07    Treatment of Certain Information; Confidentiality.** Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Law or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party and its obligations, (g) with the consent of the Lead Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that in the case of information received from any Loan Party or any Subsidiary after the Closing Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

**10.08    Right of Setoff.** If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement

85

or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have at Law but subject to terms of the Bankruptcy Court DIP Order and the Carve-Out. Each Lender agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09    Interest Rate Limitation.**

(a)    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non- usurious interest permitted by applicable Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

(b)    [Reserved].

**10.10    Counterparts; Integration; Effectiveness.**    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11    Survival.**    All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Loan, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied. Further, the provisions of Sections 3.01, 3.04, 3.05 and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously

86

applied to the Obligations that may subsequently be reversed or revoked and (y) any Obligations that may thereafter arise under <u>Section 10.04</u>.

**10.12    Severability.**  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13    Replacement of Lenders.**  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender is a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 10.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)    the Borrowers shall have paid to the Agent the assignment fee specified in <u>Section 10.06(b)</u>;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**10.14    Governing Law; Jurisdiction; Etc.**

(a)    <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, BUT INCLUDING SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    <u>SUBMISSION TO JURISDICTION</u>.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND,

WEIL:\97549758\6\30950.0070

BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE LEAD BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH HEREIN, THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(c)     WAIVER OF VENUE. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     SERVICE OF PROCESS.     EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)     ACTIONS COMMENCED BY LOAN PARTIES. EACH LOAN PARTY AGREES THAT ANY ACTION COMMENCED BY ANY LOAN PARTY ASSERTING ANY CLAIM OR COUNTERCLAIM ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT

88

SHALL BE BROUGHT SOLELY IN A COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK OR ANY FEDERAL COURT SITTING THEREIN AS THE AGENT MAY ELECT IN ITS SOLE DISCRETION AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS WITH RESPECT TO ANY SUCH ACTION.

**10.15    Waiver of Jury Trial.**  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.16    No Advisory or Fiduciary Responsibility.**  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; (v) Affiliates of the Credit Parties may, in the ordinary course of business, engage in a wide range of activities and transactions, including without limitation, acquisitions, dispositions, appraisals, loans, and investments, and nothing herein shall preclude the Loan Parties and their Affiliates, or the Pre-Petition ABL Agent, from engaging any such Credit Party Affiliate in the above- referenced ordinary course business transactions or activities, now or in the future, to perform services related to or any transaction regarding the foregoing, and none of the Credit Parties shall be deemed to be an advisor, agent or fiduciary of the Loan Parties in connection with any such services provided by Affiliates of a Credit Party; and (vi) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law,

any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.17    Patriot Act Notice.**  Each Lender that is subject to the requirements of the Patriot Act hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act. In addition, Agent and each Lender shall have the right to periodically conduct due diligence (including, without limitation, in respect of information and documentation as may reasonably be requested by the Agent or any Lender from time to time for purposes of compliance by the Agent or such Lender with applicable Law (including, without limitation, the Patriot Act and other "know your customer" and Anti-Money Laundering Laws), and any policy or procedure implemented by the Agent or such Lender to comply therewith) on all Loan Parties, their senior management and key principals and legal and beneficial owners. Each Loan Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Agent shall constitute Credit Party Expenses hereunder and be for the account of Borrowers.

**10.18    Foreign Asset Control Regulations.**  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Patriot Act). Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violate any such order.

**10.19    Time of the Essence.**  Time is of the essence of the Loan Documents.

**10.20    [Reserved].**

**10.21    Press Releases.**

(a)      Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under applicable Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b)      Each Loan Party consents to the publication by the Agent, any Lender or their respective representatives of advertising material, including any "tombstone," press release or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent or such Lender shall provide a draft reasonably in advance of any advertising

WEIL:\97549758\6\30950.0070

material, "tomb stone" or press release to the Lead Borrower for review and comment prior to the publication thereof. The Agent reserves the right to provide to industry trade organizations and loan syndication and pricing reporting services information necessary and customary for inclusion in league table measurements.

**10.22   Additional Waivers.**

(a)     The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by applicable Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)     The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations).

(c)     To the fullest extent permitted by applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations. The Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash. Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any

WEIL:\97549758\6\30950.0070

Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**10.23    No Strict Construction.**  The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.24    Attachments.**  The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.25    Conflicts**.  If any provision in this Agreement or any other Loan Document expressly conflicts with any provision in the Interim DIP Order or Final DIP Order, the provisions in the Bankruptcy Court DIP Order shall govern and control.

**10.26    Acknowledgment and Consent to Bail-In of EEA Financial Institutions.**  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be

subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

> (a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

> (b)    the effects of any Bail-In Action on any such liability, including, if applicable:

>> (i)    a reduction in full or in part or cancellation of any such liability;

>> (ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge

>> (iii)    institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

>> (iv)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**10.27    Credit Bidding**. The Loan Parties and the Lenders hereby irrevocably authorize Agent, to (a) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under provisions of the Bankruptcy Code, including under Section 363 of the Bankruptcy Code or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) credit bid and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any other sale or foreclosure conducted by (or with the consent or at the direction of) Agent (whether by judicial action or otherwise) in accordance with applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not unduly delay the ability of Agent to credit bid and purchase at such sale or other disposition of the Collateral and, if such claims cannot be estimated without unduly delaying the ability of Agent to credit bid, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the asset or assets purchased by means of such credit bid) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to aggregate amount of Obligations so credit bid) in the asset or assets so purchased (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such purchase). Except as provided above and otherwise expressly provided for herein or in the other Loan Documents, Agent will neither execute nor deliver a release of any Lien on any Collateral. Upon request by Agent at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types of items of Collateral pursuant to, and in accordance with, this Section 10.27.  Each Secured Party whose Obligations are credit bid under this Section 10.27 shall be entitled to receive interests in the Collateral or any other assets acquired in connection with such credit bid (or in the Equity Interests of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (y) the amount of the Obligations of such Secured Party that were credit bid in such credit bid, by (z) the aggregate amount of all Obligations that were credit bid in such credit bid.

WEIL:\97549758\6\30950.0070

## ARTICLE XI
## SECURITY AND PRIORITY

**11.01    Collateral; Grant of Lien and Security Interest**.

(a)    Pursuant to, and otherwise subject to the terms of, the Bankruptcy Court DIP Order and in accordance with the terms thereof and subject to the Carve-Out and the Professional Fees Account, as security for the full and timely payment and performance of all of the Obligations, the Loan Parties hereby, pledge and grant to the Secured Parties, a security interest in and to and, subject to Section 11.04, a Lien on and security interest in and to all of the right, title and interest of such Loan Party in, the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time (collectively, the "Collateral"):

(i)    All Accounts;

(ii)    all Goods, including Equipment, Inventory and Fixtures;

(iii)    all Intellectual Property Collateral;

(iv)    all General Intangibles;

(v)    all Pledged Collateral;

(vi)    all deposit accounts;

(vii)    all monies, whether or not in the possession or under the control of Agent, a Lender, or a bailee or Affiliate of Agent or a Lender;

(viii)    all real property, whether owned or leased, and all improvements thereon (including fixtures) and appurtenances thereto;

(ix)    solely to the extent relating or arising from any of the forgoing;

(A)    all Letters of Credit and Letter-of-Credit Rights;

(B)    all Commercial Tort Claims;

(C)    all Documents, Instruments and Chattel Paper (including electronic chattel paper);

(D)    all Supporting Obligations;

(E)    all books and records relating to the property described in this Section 11.01; and

(F)    to the extent not covered by clauses (i) through (ix) of this sentence, all other real and personal property of such Loan Party, whether tangible or intangible and all Proceeds and products of each of the foregoing (including the proceeds of the Avoidance Actions) and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Loan Party from time to time with respect to any of the foregoing.

94

(b)    Unless otherwise defined herein, capitalized terms used in this Section 11.01 that are defined in the UCC shall have the meanings assigned to them in the UCC.

**11.02    Priority and Liens Applicable to Loan Parties.**

(a)    Upon entry of the Interim DIP Order or Final DIP Order and subject to the terms thereof, as the case may be, the Obligations, Liens and security interests in favor of the Agent shall, subject in all respects to the Carve Out and the Professional Fees Account, at all times:

(i)    pursuant to Bankruptcy Code sections 364(c)(1) , all of the Obligations shall constitute allowed superpriority administrative expense claims ("DIP Superpriority Claims"), which DIP Superpriority Claims in respect of the Loans shall rank pari passu with each other and superior to all other claims;

(ii)    pursuant to Bankruptcy Code section 364(c)(2), shall include a first priority Lien on the Operating Account, the funds maintained in such account and all proceeds thereof;

(iii)    pursuant to Bankruptcy Code section 364(c)(2), shall include a first priority Lien on all other Term Loan Collateral (other than real property that was encumbered by mortgages on the Petition Date) and all proceeds thereof;

(iv)    pursuant to Bankruptcy Code section 364(c)(3), shall include a second priority Lien on and security interest in (x) all assets of the Loan Parties included in the Pre-Petition ABL Collateral junior only to the first priority Lien on such assets under the Pre-Petition ABL Loan Documents (now or hereafter acquired and all proceeds thereof) that were subject to a lien as of the Petition Date and (y) all real property of the Loan Parties that were subject to a lien of mortgages on the Petition Date, junior only to the first priority Lien of such mortgages; and

(v)    pursuant to Bankruptcy Code section 364(d), shall include a first priority Lien on and security interest in all assets of the Loan Parties not otherwise described in clauses (i) through (iv) above.

(b)    The Liens to be granted by the Bankruptcy Court shall cover all Collateral of the Loan Parties (now or hereafter acquired and all proceeds thereof), including property or assets that do not secure the Pre-Petition ABL Obligations.

(c)    All of the liens described herein with respect to the assets of the Loan Parties shall be effective and perfected as of the Interim DIP Order Entry Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements.

**11.03    Grants, Rights and Remedies**. The Liens and security interests granted pursuant to Section 11.01(a) hereof and the administrative priority and lien priority granted pursuant to Section 11.02 hereof may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the Bankruptcy Court DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agent and the Lenders hereunder and thereunder are cumulative; provided that to the extent of conflict the Bankruptcy Court DIP Order controls.

95

**11.04    No Filings Required.**  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim DIP Order or the Final DIP Order, as the case may be, and entry of the Interim DIP Order shall have occurred on or before the date of the Credit Extension.  The Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the Interim DIP Order or the Final DIP Order, as the case may be, or any other Loan Document.

**11.05    Survival**.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent and the Lenders pursuant to this Agreement, the Bankruptcy Court DIP Order and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases, or by any other act or omission whatsoever.   Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

> (a)    except with respect to the Carve Out and the Professional Fees Account, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agent and the Lenders against the Borrowers in respect of any Obligation;

> (b)    the Liens in favor of the Agent and the Lenders set forth in Section 11.01(a) hereof shall constitute valid and perfected Liens and security interests, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever (subject to Section 11.02); and

> (c)    the Liens in favor of the Agent and the Lenders set forth herein, in the Interim DIP Order and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Agent file financing statements or mortgages, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

[remainder of page intentionally left blank]

96

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

<div align="right">

**BORROWERS:**

**BROOKS BROTHERS GROUP, INC.**


**By:** _____
**Name:**
**Title:**

**GOLDEN FLEECE MANUFACTURING GROUP, LLC**


**By:** _____
**Name:**
**Title:**

**GUARANTORS:**

**BROOKS BROTHERS INTERNATIONAL, LLC**


**By:** _____
**Name:**
**Title:**

**RETAIL BRAND ALLIANCE GIFT CARD SERVICES, LLC**


**By:** _____
**Name:**
**Title:**

**RETAIL BRAND ALLIANCE OF PUERTO RICO, INC.**


**By:** _____
**Name:**
**Title:**

</div>

[Signature Page to Debtor-In-Possession Term Loan Agreement]

**RBA WHOLESALE, LLC.**


By:           _____
Name:
Title:

**696 WHITE PLAINS ROAD, LLC**


By:           _____
Name:
Title:

[Signature Page to Debtor-In-Possession Term Loan Agreement

**ABG-BB, LLC**, as Agent


**By:** _____
**Name:**
**Title:**

[Signature Page to Debtor-In-Possession Term Loan Agreement

**ABG-BB, LLC,** as a Lender

**By:** _____
**Name:**
**Title:**

[Signature Page to Debtor-In-Possession Term Loan Agreement