> **THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN.   ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.   THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **BBGI US, INC.,** *et al.*, | : | **Case No. 20–11785 (CSS)** |
| | : | |
| Debtors.[1] | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------ x

## PROPOSED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11
## PLAN OF LIQUIDATION FOR BBGI US, INC. AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Garrett A. Fail (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors
and Debtors in Possession*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Zachary I. Shapiro (No. 5103)
Christopher M. De Lillo (No. 6355)
One Rodney Square
910 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

Dated: December 24, 2020
Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are BBGI US, Inc. (f/k/a Brooks Brothers Group, Inc.) (8883); Brooks Brothers Far East Limited (N/A); BBD Holding 1, LLC (N/A); BBD Holding 2, LLC (N/A); BBDI, LLC (N/A), BBGI International, LLC (f/k/a Brooks Brothers International, LLC) (N/A); BBGI Restaurant, LLC (f/k/a Brooks Brothers Restaurant, LLC) (3846); Deconic Group LLC (0969); Golden Fleece Manufacturing Group, LLC (5649); RBA Wholesale, LLC (0986); Retail Brand Alliance Gift Card Services, LLC (1916); Retail Brand Alliance of Puerto Rico, Inc. (2147); 696 White Plains Road, LLC (7265); and BBGI Canada Ltd. (f/k/a Brooks Brothers Canada Ltd.) (4709). The Debtors' corporate headquarters and service address is 100 Phoenix Ave., Enfield, CT 06082.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 1

    A.      BACKGROUND AND OVERVIEW OF THE PLAN .............................. 1

    B.      SUMMARY OF PLAN CLASSIFICATION AND TREATMENT OF CLAIMS ........... 2

    C.      SUMMARY OF RELEASE, EXCULPATION, AND RELATED PROVISIONS .......... 4

    D.      IMPORTANT DATES ............................................................................. 6

    E.      DISCLOSURE STATEMENT EXHIBITS .............................................. 6

    F.      CONFIRMATION HEARING ................................................................ 6

II. OVERVIEW OF THE DEBTORS' PREPETITION OPERATIONS ...................... 7

    A.      OVERVIEW OF DEBTORS' BUSINESSES PRIOR TO SALE TRANSACTION .................................................................................. 7

    B.      ORGANIZATIONAL AND CAPITAL STRUCTURE ......................... 7

         1.      Governance, Organizational Structure, and Equity Ownership ............ 7

         2.      Overview of Secured Indebtedness ......................................... 8

             i.      Prepetition ABL Facility ................................................ 8

             ii.      Prepetition Term Loan Facility .................................... 9

             iii.      Prepetition UniCredit Facility .................................... 10

             iv.      Mortgages .................................................................. 10

         3.      Overview of Unsecured Indebtedness/Claims ...................... 11

             i.      Unsecured Notes ........................................................ 11

             ii.      Other Unsecured Claims ............................................ 12

III. KEY EVENTS LEADING TO THESE CHAPTER 11 CASES ........................... 13

IV. THE CHAPTER 11 CASES ................................................................................... 14

    A.      DEBTOR-IN-POSSESSION FINANCING ........................................ 14

    B.      FIRST DAY PLEADINGS ................................................................. 15

    C.      ADDITIONAL PLEADINGS .............................................................. 15

    D.      THE DEBTORS' PROFESSIONALS .................................................. 16

    E.      FORMATION OF THE CREDITORS' COMMITTEE .......................... 16

    F.      SALE PROCESS AND SALE TRANSACTIONS ............................... 17

         1.      Postpetition Sale Process ........................................................ 17

         2.      Stalking Horse Agreement ...................................................... 17

         3.      Bidding and Auction Process ................................................... 17

4.     Asset Purchase Agreement Overview ................................................. 18

5.     BB Canada Amendment ................................................................... 20

6.     Recognition Proceedings ................................................................. 20

7.     Other Material Asset Sales .............................................................. 21

G.     SCHEDULES AND BAR DATES .......................................................... 22

H.     OTHER POST-CLOSING DEVELOPMENTS ........................................ 22

1.     Retired Employees Committee ......................................................... 22

2.     DV Claims Investigation, Standstill, and Resolution with Creditors' Committee ..................................................................................... 23

3.     Exclusivity .................................................................................... 24

V. PLAN ....................................................................................................... 25

1.     Administrative Expense and Priority Claims ..................................... 25

2.     Classification of Claims and Interests ............................................... 27

3.     Treatment of Claims and Interests ................................................... 28

4.     Means for Implementation ............................................................... 30

5.     Distributions ................................................................................. 49

6.     Procedures for Disputed Claims ...................................................... 52

7.     Executory Contracts and Unexpired Leases ....................................... 54

8.     Conditions Precedent to the Effective Date ........................................ 56

9.     Settlement, Releases, Injunctions, and Related Provisions .................. 57

10.    Retention of Jurisdiction ................................................................. 61

11.    Miscellaneous Provisions ............................................................... 63

VI. CERTAIN RISK FACTORS AFFECTING THE DEBTORS ............................ 66

A.     CERTAIN BANKRUPTCY LAW CONSIDERATIONS ............................. 66

1.     Risk of Non-Confirmation of the Plan ............................................... 66

2.     Risk of Failing to Satisfy Vote Requirement ....................................... 66

3.     Failure to Satisfy Administrative Claims or Otherwise Agree to Alternative Treatment and Other Factors that May Impact Administrative Solvency ....................................................................................... 66

4.     Non-Consensual Confirmation ........................................................ 66

5.     Conversion to Chapter 7 ................................................................. 67

B.     ADDITIONAL FACTORS TO BE CONSIDERED ................................... 67

1.     The Debtors Have No Duty to Update ............................................... 67

2.     No Representations Outside This Disclosure Statement Are Authorized ........... 67

3.     No Legal or Tax Advice Is Provided to You by This Disclosure Statement ..................................................................................... 67

4.     No Admission Made ........................................................................ 67

5.     Failure to Identify Litigation Claims or Projected Objections............................ 68

6.     No Waiver of Right to Object or Right to Recover Transfers and Assets ........... 68

7.     Information Was Provided by Debtors and Was Relied Upon by Debtors' Advisors ........................................................................................ 68

VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ..................................... 68

    A.     CONSEQUENCES TO THE DEBTORS ........................................................... 69

         1.     Limitations on NOL Carryforwards and Other Tax Attributes........................... 69

         2.     Transfer of Assets to the Plan Trusts; Dissolution of the Debtors...................... 70

         3.     Cancellation of Debt ................................................................ 70

    B.     CONSEQUENCES TO HOLDERS OF GENERAL UNSECURED CLAIMS.............. 71

         1.     General Consequences to Holders in Class 3 ..................................... 71

         2.     Distributions in Respect of Accrued But Unpaid Interest................................ 72

    C.     TAX TREATMENT OF THE PLAN TRUSTS AND HOLDERS OF BENEFICIAL INTERESTS THEREIN ........................................................... 73

         1.     General "Liquidating Trust" Tax Reporting by the Plan Trusts and their Beneficiaries ........................................................................ 73

         2.     Tax Reporting for Assets Allocable to Disputed Claims.................................. 74

    D.     WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING .......... 75

VIII. VOTING PROCEDURES AND REQUIREMENTS ......................................................... 75

    A.     VOTING INSTRUCTIONS AND VOTING DEADLINE ............................................. 76

    B.     PARTIES ENTITLED TO VOTE ................................................................... 76

    C.     AGREEMENTS UPON FURNISHING BALLOTS.................................................. 77

    D.     CHANGE OF VOTE ................................................................................... 78

    E.     WAIVERS OF DEFECTS, IRREGULARITIES, ETC..................................... 78

    F.     MISCELLANEOUS ................................................................................... 78

    G.     FURTHER INFORMATION, ADDITIONAL COPIES ............................................. 79

IX. CONFIRMATION OF THE PLAN .............................................................................. 79

    A.     CONFIRMATION HEARING....................................................................... 79

    B.     OBJECTIONS ........................................................................................... 79

    C.     REQUIREMENTS FOR CONFIRMATION OF THE PLAN ...................................... 81

         1.     Requirements of Section 1129(a) of the Bankruptcy Code ............................... 81

             i.     General Requirements................................................................ 81

             ii.     Best Interests Test..................................................................... 82

             iii.     Feasibility ............................................................................... 82

iv.     No Unfair Discrimination ........................................................................ 83

v.     Fair and Equitable Test ........................................................................... 83

2.     Application to the Plan ........................................................................... 84

i.     Alternatives to Confirmation and Consummation of the Plan ................ 84

X. CONCLUSION AND RECOMMENDATION ...................................................................... 85

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE *JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR BBGI US, INC. AND ITS AFFILIATED DEBTORS*, DATED DECEMBER 24, 2020 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**PLAN**"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[1]   A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT A**.   NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

**ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VI (CERTAIN OTHER FACTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.   IN THE EVENT OF ANY CONFLICTS BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN GOVERN**.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

AS TO CONTESTED MATTERS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT ALSO WILL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF

---

[1] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined have the same meanings ascribed to such terms in the Plan.

THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THE CHAPTER 11 CASES OR THE RECOGNITION PROCEEDINGS.  THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM OR INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

# I.

# INTRODUCTION

---

**RECOMMENDATION BY THE DEBTORS
AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

It is the Debtors' opinion that confirmation and implementation of the Plan is in the best interests of the Debtors' estates and creditors.  Therefore, the Debtors recommend that all creditors whose votes are being solicited submit a ballot to **<u>accept</u>** the Plan.

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") also supports confirmation of the Plan and recommends that all creditors entitled to vote submit a ballot to accept the Plan.

---

## A.    <u>BACKGROUND AND OVERVIEW OF THE PLAN</u>[1]

This is the Disclosure Statement of BBGI US, Inc. (f/k/a Brooks Brothers Group, Inc.) ("**BB Parent**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (each a "**Debtor**", collectively, the "**Debtors**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  The Disclosure Statement has been filed pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Plan, a copy of which is annexed to this Disclosure Statement as **<u>Exhibit A</u>**.[2]

The Debtors commenced these Chapter 11 Cases to, among other things, attempt to secure a transaction that would ensure the continuation of the Brooks Brothers business and maximize value for the Debtors' creditors.

On July 15, 2020, the Debtors filed a motion seeking approval of bidding procedures [Docket No. 154] (the "**Bidding Procedures Motion**").  Shortly thereafter, the Debtors and SPARC Group LLC ("**SPARC**") entered into that certain *Asset Purchase Agreement*, dated as of July 23, 2020 (as amended by, in each case as of the effective date of the applicable agreement, that certain *First Amendment to the Asset Purchase Agreement* dated as of August 11, 2020, and that certain *Second Amendment to the Asset Purchase Agreement*, dated as of August 31, 2020, the "**Asset Purchase Agreement**" or "**APA**"), setting forth the terms and conditions upon which SPARC would serve as stalking horse bidder for substantially all of the Debtors' assets associated with the Brooks Brothers' Business (as defined below), on the terms and subject to the conditions contained in the APA (the "**Sale Transaction**") and filed a supplement to the Bidding Procedures

---

[1] **This overview is qualified in its entirety by reference to the Plan**.  The treatment of Claims and Interests (as defined in the Plan) under the Plan is not intended to, and will not, waive, compromise, or limit any rights, claims or causes of action if the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

[2] Capitalized terms used in this Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

Motion to seek approval of, among other things, bid protections provided under the APA [Docket No. 204].

On August 3, 2020, the Bankruptcy Court entered an order approving the relief requested in the Bidding Procedures Motion [Docket No. 285] (the "**Bidding Procedures Order**"), including auction and sale procedures and bid protections for the stalking horse bidder (the "**Bidding Procedures**"). Following further negotiations, SPARC materially increased the consideration under the APA to $325 million, and the Debtors declared SPARC the successful bidder, cancelled the auction, and sought Bankruptcy Court approval of the APA, subject to various adjustments. On August 14, 2020, the Bankruptcy Court approved the APA, and on August 31, 2020, the Debtors consummated the Sale Transaction.

The final phase in these chapter 11 cases is the confirmation and consummation of the Plan, pursuant to which the Debtors will distribute the remaining cash proceeds from the sale of their assets (the "**Sale Proceeds**") to creditors in accordance with the absolute priority rule and section 1129 of the Bankruptcy Code, including by:

- providing that all Allowed Administrative Expense Claims, Priority Tax Claims or Other Priority Claims, and Secured Claims, are unimpaired by the Plan;

- distributing to holders of Allowed General Unsecured Claims (i) interests in a Liquidation Trust that will liquidate the Debtors' remaining assets and make cash distributions to holders of Allowed General Unsecured Claims, and (ii) interests in a Litigation Trust that will pursue certain potential estate causes of action for the benefit of holders of General Unsecured Claims.

Section V of this Disclosure Statement provides a more detailed description of the Plan.

The Plan is the product of good-faith arm's-length negotiations and is consistent with the objectives of chapter 11. Throughout these chapter 11 cases, the Debtors worked closely and in coordination with their key stakeholders, including the Creditors' Committee, who actively participated in the development and negotiation of the Plan and supports confirmation of the Plan.

## B.    SUMMARY OF PLAN CLASSIFICATION AND TREATMENT OF CLAIMS

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

THE PLAN PROVIDES THAT HOLDERS OF IMPAIRED CLAIMS WHO ABSTAIN FROM VOTING ON THE PLAN BUT DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.

Only holders of General Unsecured Claims are being solicited under and are entitled to vote on the Plan.

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests to the extent calculable.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, *see* Section V below.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Liquidation Analysis attached hereto at **Exhibit C**.

| Class | Claim or Interest | Status | Treatment | Entitled to Vote | Estimated Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the (i) forty-five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the first Business Day after thirty (30) days from the date on which such Other Priority Claim becomes and Allowed Priority Claim, or as soon as reasonably practical thereafter. | No (presumed to accept) | $[●] | 100% |
| 2 | Secured Claims | Unimpaired | Except to the extent that a holder of an Allowed Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, at the option of the Debtors (after consultation with the Creditors' Committee if prior to the Effective Date) or the Liquidation Trustee, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of (A) forty-five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter) and (B) the first Business Day after thirty (30) days from the date on which such Secured Claim becomes an Allowed Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. | No (presumed to accept) | $[●] | 100% |

| Class | Claim or Interest | Status | Treatment | Entitled to Vote | Estimated Allowed Claims | Approximate Recovery |
|---|---|---|---|---|---|---|
| 3 | General Unsecured Claims | Impaired | Except to the extent that a holder of an Allowed General Unsecured Claim against the Debtors has agreed to less favorable treatment of such Claim, and except as provided in Section 5.11 of the APA with respect to the Claims of Former Non-Debtor Subsidiaries, each such holder shall receive, in full and final satisfaction of such Claim, (i) a Pro Rata Share of the Liquidation Trust Beneficial Interests and (ii) a Pro Rata Share of the Litigation Trust Beneficial Interests. | Yes | $[●] | [●]% |
| 4 | Intercompany Claims | Impaired | On or after the Effective Date, all Allowed Intercompany Claims shall be adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or the Liquidation Trustee (as applicable). | No (presumed to accept) | $[●] | N/A |
| 5 | Debtor Interests | Impaired | The Debtor Interests shall be cancelled when merged or dissolved pursuant to the terms of the Plan. Each holder of a Debtor Interest shall neither receive nor retain any property of the Debtors' estates or direct interest in property of the Debtors' estates. | No (deemed to reject) | N/A | N/A |
| 6 | Subordinated Claims | Impaired | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. Each holder of Allowed Subordinated Claims shall neither receive nor retain any property of the Debtors' estates or any interest in property of the Debtors' estates. | No (deemed to reject) | N/A | N/A |

## C.    SUMMARY OF RELEASE, EXCULPATION, AND RELATED PROVISIONS

### 1.    *Releases by the Debtors*

The Plan provides for the release of the Released Parties (as defined below) and the exculpation of the Exculpated Parties (as defined below). The Debtors' releases of the Released Parties pursuant to Section 10.4 of the Plan (the "**Releases**"), the third-party releases of the Released Parties pursuant to Section 10.5 of the Plan (the "**Third-Party Releases**"), and the exculpation of the Exculpated Parties pursuant to Section 10.6 of the Plan are an integral part of the Plan.

The "**Releasing Parties**" means collectively, and in each case, in their respective capacities as such: (i) the Released Parties; (ii) all holders of Claims and Interests that are deemed to accept the Plan; (iii) all holders of Claims who vote to accept the Plan; (iv) all holders of Claims that are entitled to vote on the Plan who abstain from voting on the Plan or who vote to reject the Plan, but in either case, do not opt out of granting the releases set forth in Section 10.5 of the Plan;

(v) holders of Claims or Interests that are deemed to reject the Plan and do not timely file with the Bankruptcy Court an objection to the releases set forth in Section 10.5 of the Plan by the deadline established to file objections to the Plan; and (vi) with respect to any Person or entity in the foregoing clauses (i) through (v), such Person or Entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in their respective capacities as such.

The "**Released Parties**" means collectively: (i) the Debtors; (ii) the Creditors' Committee and the members of the Creditors' Committee solely in their capacities as such, and not individually; (iii) the DIP Lender; (iv) the DIP Agent; (v) the ABL Agent; (vi) the ABL Lenders; (vii) the Information Officer; (viii) with respect to any Person or Entity in the foregoing clauses (i) through (vii), such Person or Entity's predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees each solely in its capacity as such; *provided*, *however*, that the (i) DV Entities, and (ii) Former D&Os and Shareholders shall not be Released Parties; *provided, further* that any holder of a Claim that opts out of the releases set forth in Section 10.5 of the Plan or files with the Bankruptcy Court an objection to the releases set forth Section 10.5 of the Plan by the deadline established to file objections to the Plan shall not be a Released Party.

2.    *Exculpation*

The "**Exculpated Parties**" means collectively: (i) the Debtors; (ii) the Estates; (iii) the Liquidation Trustee; (iv) the Litigation Trustee; (v) the Creditors' Committee and the members of the Creditors' Committee, and (iv) with respect to each of the foregoing entities in clauses (i) through (v), such entities' predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, Estates, servants and nominees, in each case in their capacity as such; *provided, however,* that Exculpated Parties shall not include any Former D&Os.

The Debtors believe that the Releases satisfy the business judgment standard. In exchange for the material benefits they will receive through the Plan, the Debtors have determined to release the Released Parties. With respect to the limited Third-Party Releases, the Debtors believe that such releases are appropriate and may become binding in accordance with section 1141(a) of the Bankruptcy Code and applicable law. The Debtors believe that parties who abstain from voting and are given an opportunity to opt out of the Third-Party Releases but do not opt out may be deemed to consent to such releases under section 1141(a) of the Bankruptcy Code and applicable law.

The Debtors believe that the release and exculpation provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of

Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

> 3.    *Substantive Consolidation*

The Plan serves as a motion by the Debtors seeking entry of an order substantively consolidating all of the Estates of all of the Debtors into a single consolidated estate for certain limited purposes related to the Plan, including voting, confirmation, and distributions.  The Debtors submit that creditors will not be harmed by substantive consolidation.  Given the nominal amount of assets held by certain of the Debtors, and the expense of generating separate chapter 11 plans for each of the Debtors, the Debtors believe that the overall effect of substantive consolidation will be beneficial to creditors and will allow for greater efficiencies and simplification in administering the Plan.  Accordingly, the Debtors believe that substantive consolidation of the Debtors' Estates under the terms of the Plan will not adversely impact the treatment of the Debtors' creditors, but rather will reduce expenses by decreasing the administrative difficulties and costs including potential litigation among creditors related to the administration of the Debtors' Estates separately.

## D.    **IMPORTANT DATES**

Please take note of the following important dates and deadlines:

| | |
|---|---|
| Deadline to file and serve any objection or response to the Plan (the "**Plan Objection Deadline**") | [●], 2021 at [●] [a.m./p.m.] (Eastern Time) |
| Deadline for completed Ballots to be received by the Voting Agent (the "**Voting Deadline**") | [●], 2021 at [●] [a.m./p.m.] (Eastern Time) |
| Scheduled date and time for the commencement of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") | [●], 2021 at [●] [a.m./p.m.] (Eastern Time) |

## E.    **DISCLOSURE STATEMENT EXHIBITS**

The following exhibits are annexed to this Disclosure Statement:

- **EXHIBIT A** – Plan

- **EXHIBIT B** – Debtors' Organizational Structure

- **EXHIBIT C** – Liquidation Analysis

## F.    **CONFIRMATION HEARING**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **[●], 2021 at [●] [a.m./p.m.] (Eastern Time)**.

Objections and responses to confirmation of the Plan ("**Confirmation**"), if any, must be served and filed as to be received on or before the Plan Objection Deadline [●], **2021 at [●] [a.m./p.m.] (Eastern Time)**, in the manner described in the Disclosure Statement Order and Section IX.B of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further Notice except for the filing a Notice of the adjournment date with the Bankruptcy Court.

## II.

## OVERVIEW OF THE DEBTORS' PREPETITION OPERATIONS

### A.    OVERVIEW OF DEBTORS' BUSINESSES PRIOR TO SALE TRANSACTION

Prior to the consummation of the Sale Transaction, the Debtors owned the intellectual property and operations related to Brooks Brothers® ("**Brooks Brothers**"), the oldest apparel company in the United States and one of the world's leading clothing retailers.  While famous for its clothing offerings and related retail services, Brooks Brothers was known as a lifestyle brand for men, women, and children, which markets and sells footwear, eyewear, bags, jewelry, watches, sports articles, games, personal care items, tableware, fragrances, bedding, linens, food items, beverages, and more.  Brooks Brothers generated revenue through various channels, including (i) North America "omni-channel" operations (retail stores, factory outlet stores, and e-commerce), (ii) worldwide wholesale, (iii) wholly-owned international operations, (iv) non-wholly-owned international operations, and (v) other businesses and arrangements.

Prior to the Sale Transaction, the Debtors sold Brooks Brothers' merchandise through over 1,400 points of sale locations worldwide, which included approximately 424 retail and factory outlet stores (including stores operated by non-debtor affiliates, joint ventures, and third-party licensees).  Under its wholesale, travel retail, and licensing segment, Brooks Brothers maintained high-quality partnerships with third-party franchisees and licensees that operate over 1,000 points of sale locations around the world.

### B.    ORGANIZATIONAL AND CAPITAL STRUCTURE

1.    *Governance, Organizational Structure, and Equity Ownership*

As set forth on the organizational structure attached hereto as **Exhibit B**, BB Parent is the direct or indirect corporate parent of each of the other Debtors.  BB Parent owned, either directly or indirectly, each of the Debtors and each of the Debtors' non-Debtor affiliates.

BB Parent is a closely-held private company.  Four entities collectively own 100% of BB Parent's Class A common stock (representing approximately 91% economic ownership interest in BB Parent).  Castle Apparel Limited ("**Castle**"), an entity affiliated with the Debtors' prepetition supplier TAL Apparel Limited ("**TAL**"), owns 100% of the Class B common stock (representing approximately 9% economic ownership interest in in BB Parent).  BB Parent has no preferred stock outstanding.

Prior to the Petition Date, BB Parent appointed two new independent directors—Alan J. Carr and William L. Transier—to the board of directors of BB Parent (the "**Board**") and a special committee of the Board (the "**Special Committee**") to oversee the Company's restructuring

process.  Following the consummation of the Sale Transaction, Messrs. Claudio Del Vecchio and Matteo Del Vecchio resigned from the Board, leaving Messrs. Carr and Transier as the sole directors on the Board.

        2.    *Overview of Secured Indebtedness*

As of the Petition Date, the Debtors had outstanding funded secured debt obligations in the aggregate amount of approximately $266 million.  During the pendency of these Chapter 11 Cases, the Debtors satisfied a number of these obligations.  The following table summarizes the Debtors' outstanding secured funded debt obligations as of the Petition Date and as of the date hereof:

| Debt Instrument | Principal Outstanding as of the Petition Date | Principal Outstanding as of Date Hereof |
| --- | --- | --- |
| Prepetition ABL Facility Loan | $212,133,776 | $0 |
| Prepetition Term Loan | $32,500,000 | $0 |
| Prepetition UniCredit Facility | $13,611,420 | $13,611,420 |
| Haverhill Mortgage | $6,999,720 | $0 |
| Clinton Mortgage | $491,570 | $491,183 |
| **Total Secured Funded Debt** | **$265,736,486** | **$14,102,603** |

        i.    Prepetition ABL Facility

Certain of the Debtors were party to that certain Credit Agreement, dated as of June 28, 2019 (as amended by that certain First Amendment to Credit Agreement, dated as of April 22, 2020, and as further amended, modified, or otherwise supplemented from time to time, the "**ABL Credit Agreement**"), by and among, among others, BB Parent, RBA Wholesale, LLC, and Golden Fleece Manufacturing Group, LLC ("**Golden Fleece**"), Wells Fargo as administrative agent and collateral agent (in such capacities, the "**Prepetition ABL Agent**"), and the lenders from time to time party thereto (the "**Prepetition ABL Lenders**"), pursuant to which the Prepetition ABL Lenders agreed to provide (i) a revolving credit facility in a maximum aggregate principal amount equal to $300 million (of which up to $30 million is available for the issuance of letters of credit) (the "**Prepetition Revolving Facility**") and (ii) a "first-in-last-out" ("**FILO**") term loan facility in an aggregate principal amount equal to $15 million outstanding under the Prepetition FILO Loan (the "**Prepetition ABL Facility**").  As of the Petition Date, the aggregate amount outstanding under the Prepetition ABL Facility was approximately $212.1 million in unpaid principal, plus accrued and unpaid interest, fees, and other amounts (comprised of approximately $182.9 million outstanding under the Prepetition Revolving Facility (including approximately $7.9 million outstanding in respect of issued letter of credit), $15 million outstanding under the Prepetition FILO Loan, and approximately $6.3 million outstanding under a bank product with J.P. Morgan Chase).

The obligations under the ABL Credit Agreement were secured, in each case, in accordance with the terms of that certain Security Agreement, dated as of June 28, 2019 (as amended, modified, or otherwise supplemented from time to time), and that certain Canadian Security Agreement (as amended, modified, or otherwise supplemented from time to time), dated as of June

28, 2019.  The obligations under the Prepetition ABL Facility were secured by a first priority security interest and continuing lien on, subject to certain exceptions and carve outs, the Debtors' cash and accounts, U.S. and Canadian inventory, credit card receivables, and trade account receivables.

Pursuant to the Final DIP Order (as defined below) and the Sale Order, the Prepetition ABL Agent agreed that all outstanding obligations under the Prepetition ABL Facility would be satisfied and extinguished following the payment of $205,807,243 (the "**Payment Amount**"), by the Debtors to the Prepetition ABL Agent, which the Debtors paid in connection with the closing of the Sale Transaction on September 1, 2020.

Subsequent to entry of the Sale Order, but prior to the closing of the Sale Transaction, on August 31, 2020, the Debtors entered into a *Stipulation and Agreement with Wells Fargo Bank, National Association Regarding Sale Order and Release of Liens and Claims* [Docket No. 535] (the "**Stipulation**") to, among other things (a) confirm that notwithstanding that the conveyance of the Prepetition ABL Facility collateral (the "**Canadian Collateral**") owned by BBGI Canada Ltd. (f/k/a Brooks Brothers Canada Ltd.) ("**BB Canada**") would occur post-closing, the Debtors should still pay the full Payment Amount to the Agent upon the Closing, (b) stipulate that, as consideration for the Debtors providing the Prepetition ABL Agent the full Payment Amount  in respect of the anticipated post-Closing sale, transfer and assignment of the Canadian Collateral, the Prepetition ABL Agent would retain (rather than release) its liens and claims against BB Canada, on behalf of and solely for the benefit of the Debtors, and shall turnover any proceeds of the Canadian Collateral received by the Prepetition ABL Agent to BB Parent, and (c) affirm that SPARC would pay the purchase price related to the Canadian Collateral directly to BB Parent upon the conveyance of the Canadian Collateral in accordance with and subject to the terms and conditions of the APA.  On October 20, 2020, the sale of the Canadian Collateral to SPARC closed.

ii.    Prepetition Term Loan Facility

Pursuant to that certain Term Loan Agreement, dated as of May 21, 2020 (as amended by that certain First Amendment to Term Loan Agreement, dated as of June 29, 2020, and as further amended, modified, or otherwise supplemented from time to time, the "**Prepetition Term Loan Agreement**" and the underlying credit facility, the "**Prepetition Term Loan Facility**"), among BB Parent and Golden Fleece as borrowers, and Brand Funding, LLC, in its capacity as a lender (in such capacity, together with the other lenders from time to time party thereto, the "**Prepetition Term Loan Lenders**") and as administrative agent and collateral agent, provided term loans in the amount of $32.5 million.[3]  The obligations under the Prepetition Term Loan Agreement were secured by that certain Security Agreement, dated as of May 21, 2020 (the "**IP Security Agreement**") by a first priority security interest and lien on all Intellectual Property Collateral (as such term is defined in the IP Security Agreement).  On July 13, 2020, all obligations under the Prepetition Term Loan Agreement were paid in full in cash from proceeds of the DIP Facility (as defined below) in accordance with the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to*

---

[3] The Prepetition Term Loan Facility was in the original principal amount of $20,000,000, but on or about June 29, 2020, at the request of the Debtors, the Prepetition Term Loan Lenders provided additional emergency bridge financing in the principal amount of $12,500,000.

*the Prepetition Secured Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 118].

### iii.    Prepetition UniCredit Facility

As of the date hereof, there is approximately $13 million in outstanding obligations under that certain Uncommitted Facility Agreement, dated as of September 2, 2014 (as amended by that certain Amendment to Uncommitted Facility Agreement, dated as of March 13, 2017, and that certain Second Amendment Agreement, dated as of May 19, 2020, and as further amended, modified, or otherwise supplemented from time to time, the "**Prepetition UniCredit Credit Agreement**"), by and among BB Parent and UniCredit S.p.A. – New York Branch ("**UniCredit**"), pursuant to which UniCredit agreed to provide an uncommitted credit facility (the "**Prepetition UniCredit Facility**"), in the form of loans not to exceed $7,950,000 and in the form of letters of credit not to exceed, together with the aggregate amount of any loans outstanding thereunder, $13,700,000.  The Prepetition UniCredit Facility is secured by a first lien mortgage granted by BB Parent to UniCredit on the Debtors' formerly owned facilities located in Enfield, Connecticut (the "**Enfield Facilities**").

In connection with the Sale Transaction, the Debtors sold the Enfield Facilities to SPARC.  Pursuant to the Sale Order, to the extent UniCredit has valid, perfected, enforceable, senior and non-avoidable liens on the Enfield Facilities, as adequate protection the liens asserted by UniCredit in the Enfield Facilities attached to the proceeds of the sale of the Enfield Facilities to the same extent and with the same priority, validity, and enforceability as the liens UniCredit asserted against the Enfield Facilities.  The Debtors are conducting a review of the priority, validity, amount and extent of UniCredit's claims and liens.

### iv.    Mortgages

**Haverhill Mortgage.**  Pursuant to that certain Mortgage and Security Agreement, dated as of January 25, 2016 (the "**Southwick Mortgage**"), among Golden Fleece as grantor or mortgagor and JP Morgan Chase Bank, N.A. ("**JPM**") as grantee or mortgagee, JPM agreed to provide to Golden Fleece a term loan of $10 million, pursuant to that certain Term Loan and Security Agreement dated as of January 25, 2016, by and among Golden Fleece, as borrower, BB Parent, as guarantor, and JPM, to finance the purchase of Golden Fleece's manufacturing facility in Haverhill, Massachusetts (the "**Southwick Facility**").  On August 13, 2020, the Bankruptcy Court entered the *Order Granting Motion of Debtors for Entry of Order Authorizing Sale of Southwick Manufacturing Facility Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (II) Granting Related Relief* authorizing the sale of the Southwick Facility to Eastern Opportunity Fund LLC [Docket No. 424] (the "**Southwick Sale Order**").  In accordance with the Southwick Sale Order, the proceeds from the sale of the Southwick Facility were used, in part, to repay the Southwick Mortgage in full in the amount of approximately $7.04 million on August 18, 2020.

**Clinton Mortgage.**  Pursuant to that certain promissory note, dated as of October 31, 2012 (the "**Clinton Promissory Note**"), issued in connection with that certain Purchase and Sale Agreement, dated as of August 28, 2012, BB Parent entered into a mortgage (the "**Clinton Mortgage**") in the principal amount of $1.85 million with Dixie Development Company ("**Dixie**") to finance the purchase of the Debtors' former manufacturing and distribution centers in Clinton,

North Carolina (the "**Clinton Facility**"). The Clinton Mortgage obligations mature in October 2022 and bears an interest rate of 3.50% per annum. As of the Petition Date, the aggregate amount outstanding under the Clinton Promissory Note was approximately $491,000 in unpaid principal, plus accrued and unpaid interest, fees, and other amounts. In connection with the Sale Transaction, the Debtors sold the Clinton Facility to SPARC. Pursuant to the Sale Order, as adequate protection the Clinton Mortgage asserted by Dixie on the Clinton Facility attached to the proceeds of the sale of the Clinton Facility to the same extent and with the same priority, validity, and enforceability as the Clinton Mortgage.

      3.    *Overview of Unsecured Indebtedness/Claims*

         i.    <u>Unsecured Notes</u>

    <u>Japan JV Note</u>. Pursuant to that certain Promissory Note, dated as of August 1, 2011 (the "**Japan JV Note**"), between and BB Parent and Daidoh Limited ("**Daidoh**") (BB Parent's joint venture partner in Brooks Brothers (Japan) Ltd, BB Parent was obligated to pay ¥545,855,933 to Daidoh, together with interest thereon. The Japan JV Note was secured by a letter of credit issued under the Prepetition UniCredit Facility. On July 27, 2020, the UniCredit letter of credit was drawn, and as of the date hereof, no amount remains outstanding under the Japan JV Note.

    <u>Convertible Note</u>. Pursuant to that certain Securities Purchase Agreement, dated as of June 23, 2016 (the "**Securities Purchase Agreement**"), among BB Parent, Castle, and TAL, for consideration of $100 million, (i) BB Parent issued 148,025 shares of Class B Common Stock, convertible into 148,025 shares of Class A Common Stock, to Castle, (ii) BB Parent agreed to issue to Castle a promissory note in the amount of $50 million dollars, convertible into 122,599 shares of Class A Common Stock, and (iii) Castle pledged its Class B Common Stock to BB Parent pursuant to a Share Pledge Agreement, to secure Castle's obligation to purchase the $50 million promissory note. Subsequently, Castle loaned an additional $50 million to BB Parent, who issued that certain Convertible Promissory Note, dated as of July 3, 2017 (as amended by that certain Amended and Restated Convertible Promissory Note, dated as of June 28, 2019, the "**Convertible Note**"), pursuant to which BB Parent is obligated to pay $50 million of principal and accrued interest equal to 3.0% per annum. As of the date hereof, the aggregate principal amount outstanding under the Convertible Note is approximately $50 million.

    <u>Subordinated Notes</u>. The Debtors are party to unsecured notes totaling approximately $66.3 million in the aggregate (the "**Subordinated Notes**") outstanding related to dividends declared but not paid to certain shareholders. Each of the Subordinated Notes are subject to (i) that certain Subordination Agreement dated as of June 28, 2019, which subordinated such obligations to the obligations under the terms of the ABL Credit Agreement, and (ii) subordination agreements dated as of July 3, 2017, that subordinated the obligations under the Subordinated Notes to the obligations under the Securities Purchase Agreement.

    a)  *First Subordinated Note*. Pursuant to that certain Third Amended and Restated Subordinated Unsecured Promissory Note, dated as of June 28, 2019, BB Parent promised to pay approximately $37.7 million to the CDV 2015 Annuity Trust or its registered assigns. The note is unsecured, bears interest at a rate of 3.0% per annum, and was set to mature on December 31, 2024.

b) *Second Trust Subordinated Note*.  Pursuant to that certain Third Amended and Restated Subordinated Unsecured Promissory Note, dated as of June 28, 2019, BB Parent promised to pay approximately $26.9 million to the CDV 2015 Annuity Trust or its registered assigns.  The note is unsecured, bears interest at a rate of 3.0% per annum, and was set to mature on December 31, 2024.

c) *Third Subordinated Note*.  Pursuant to that certain Third Amended and Restated Subordinated Unsecured Promissory Note, dated as of June 28, 2019, BB Parent promised to pay approximately $1.7 million to Claudio Del Vecchio, or his registered assigns.  Such note is unsecured, bears interest at a rate of 3.0% per annum, and was set to mature on December 31, 2024.

Shareholder Unsecured Promissory Note.  Pursuant to that certain Unsecured Promissory Note, dated as of January 23, 2020, BB Parent borrowed $5 million from Claudio Del Vecchio at an interest rate of 9.0% per annum.  The promissory note matured on February 22, 2020 and remains unpaid.

ii.    Other Unsecured Claims

As of the date hereof, approximately $500 million of General Unsecured Claims have been scheduled and/or asserted against the Debtors.  The Debtors estimate that approximately $425 - $525 million in Class 3 (General Unsecured Claims) may ultimately be Allowed.  The filed General Unsecured Claims include, but are not limited to, the following:

a) Pension Benefit Guaranty Corporation Claims.  On September 21, 2020, the Pension Benefit Guaranty Corporation ("**PBGC**") filed various contingent claims in the aggregate amount of $51.3 million against the Debtors (the "**Unfunded Benefit Liability Claims**") on account of statutory liability under 29 U.S.C. § 1362 and 1368 for the unfunded benefit liabilities of the Brooks Brothers Pension Plan and Retail Brand Alliance, Inc. Pension Plan (the "**Pension Plans**").  Contemporaneously, the PBGC also filed a contingent claim in the aggregate amount of approximately $14.5 million against the Debtors (the "**Premiums Claims**") on account of statutory liability under 26 U.S.C. § 1307 for certain unpaid premiums due with respect to the Brooks Brothers Pension Plan and Retail Brand Alliance, Inc. Pension Plan (collectively, the "**Premiums**") that may become due and owed to the PBGC under certain circumstances upon termination of the Pension Plans.  Contemporaneously, the PBGC filed an unliquidated claim in the aggregate amount of approximately $4 million against the Debtors (the "**Unpaid Minimum Contribution Claims**") on account of statutory liability under 26 U.S.C. §§ 412 and 430, 29 U.S.C. §§ 1082, 1342, and 1362(c) for unpaid minimum funding contributions benefit liabilities.  The Debtors are evaluating the PBGC Claims (as defined in the Plan), including the Unfunded Liability Claims, the Unpaid Minimum Contribution Claims, and the Termination Premiums Claims, and are engaged in discussions with the PBGC regarding the PBGC Claims.

b) Prepetition Trade Claims.  As of the date hereof, there has been asserted approximately $105 million in prepetition trade Claims against the Debtors filed by merchandise vendors.

c) <u>Landlord Claims</u>.  As of the date hereof, there has been asserted approximately $98 million in Claims by landlords.  The Debtors expect that certain of these claims will be satisfied in connection with unexpired leases being assumed and assigned to the Buyer in accordance with the APA and the Sale Order.

d) <u>Litigation Claims</u>.  A list of litigation pending as of the Petition Date involving the Debtors is listed on the Debtors' schedules of assets and liabilities and statements of financial affairs, and as of the date hereof approximately $11 million in litigation claims have been asserted against the Debtors.  Any Claims relating to such litigation will be classified as General Unsecured Claims.  The Debtors expect that to the extent Allowed, certain of these Claims may be covered by the Debtors' insurance coverage, in whole or in part.

III.

**KEY EVENTS LEADING TO THESE CHAPTER 11 CASES**

In the years preceding the Petition Date, the Debtors' revenues declined, in large part due to increased competition from online retailers and general declines in the specialty retail clothing industry.  Beginning in late February 2020, the Debtors began to face unprecedented liquidity and operational challenges associated with the spread of COVID-19.  As the pandemic spread through Asia and Europe, Brooks Brothers' international operations suffered, and the Debtors' foreign vendors found themselves unable to operate or produce and ship inventory, which led to the borrowing base under the Debtors' Prepetition ABL Facility decreasing in size, reducing the Debtors' liquidity.  By March 2020, as the pandemic entered full force in North America, the Debtors were forced to close all North America stores and their headquarters consistent with governmental health guidelines and directives.  The Debtors were forced to rely primarily on e-commerce revenues, which were relatively small compared to lost brick-and-mortar sales.  The Debtors were disproportionately and adversely affected by the shutdown as compared to some other retailers—with office buildings closed, office workers have been working remotely and demand for professional attire became depressed.  In response to COVID-19, the Debtors undertook a number of critical cost-saving initiatives, including decreasing employee compensation and benefits, negotiating concessions with suppliers and landlords, and shutting down their manufacturing facilities.

The global pandemic struck as Brooks Brothers was conducting a capital raise and marketing process that was originally initiated in April 2019 and led by PJ Solomon.  In April 2019, PJ Solomon had contacted a significant number of potential domestic and international investors, including both strategic and financial investors, to solicit interest in the Debtors' businesses.  During this process, interested investors executed confidentiality agreements and were provided with diligence access.  A number of parties submitted indications of interest.  The Debtors engaged in extensive discussions and negotiations with bidders and provided significant diligence to assist bidders in their evaluation of the Brooks Brothers.

However, beginning in early April 2020, after several weeks of government mandated store closures and uncertainty as to the duration and resulting impact of the pandemic, the Debtors determined they would require additional financing to fund their operations and continue their marketing process, and consummate a value-maximizing transaction through a chapter 11 case.

The Debtors were able to obtain $32.5 million of financing in May and June 2020 under the Prepetition Term Loan Facility to meet the Debtors' ongoing liquidity needs while they examined their store footprint, strategically prepared a store re-opening plan, pursued a value-maximizing restructuring or possible sale transaction to be implemented in chapter 11, and pursued debtor-in-possession financing to finance the Debtors' chapter 11 cases.

After further discussions with parties, in May 2020, PJ Solomon reached out to a number of parties that had previously executed non-disclosure agreements and had data room access, requesting that each party submit an indication of interest ("**IOI**") to act as a stalking horse bidder in connection with potential chapter 11 cases. In late-May 2020, several parties submitted IOIs. Throughout June and early July 2020, the Debtors' advisors facilitated due diligence and negotiated proposals with interested bidders. However, the Debtors did not secure a stalking horse bidder prior to running out of liquidity and commencing these Chapter 11 Cases.

Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the is set forth in the *Declaration of Stephen Marotta in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 38].

## IV.

## THE CHAPTER 11 CASES

### A.    DEBTOR-IN-POSSESSION FINANCING

After extensive prepetition marketing and negotiations with parties to obtain postpetition debtor-in-possession financing, the Debtors and their advisors determined that a proposal received from WH HOLDCO, LLC, an affiliate of WHP Global ("**WHP**") to provide postpetition financing in an aggregate principal amount of $75 million represented the best financing proposal available to the Debtors. Accordingly, the Debtors and their advisors finalized the terms of a credit agreement with WHP on the Petition Date and sought approval of such financing.

However, shortly thereafter, the Debtors received a new, superior debtor-in-possession financing proposal from ABG-BB, LLC ("**ABG**", or the "**DIP Lender**"), an affiliate of SPARC. Thereafter, the Debtors and their advisors provided the ABG proposal to WHP, solicited a counter, and engaged in extensive discussions with both the DIP Lender and WHP in order to obtain the best financing proposal for the Debtors. After both ABG and WHP each provided subsequent financing offers, the Debtors determined that ABG, who offered to provide an $80 million debtor-in-possession financing facility (the "**DIP Facility**") on a no-interest, no-fee, basis, had provided the superior offer, and sought approval of the DIP Facility. The DIP Facility was approved by the Bankruptcy Court on an interim basis on July 10, 2020 [Docket No. 118]. Upon interim approval of the DIP Facility, the proceeds of the DIP Facility were used, in part to repay all obligations outstanding under the Prepetition Term Loan Facility. The DIP Facility was approved by the Bankruptcy Court on a final basis on August 14, 2020 [Docket No. 443] (the "**Final DIP Order**"). All of the claims under the DIP Facility were ultimately assigned by the DIP Lender to SPARC and were used by SPARC to credit bid for the Debtors assets in connection with the Sale Transaction, resulting in the complete discharge and release of the DIP Facility.

B.    **FIRST DAY PLEADINGS**

On the July 8, 2020 the Debtors (other than BB Canada) filed various "first-day" motions (collectively, the "**First Day Pleadings**") seeking certain immediate relief from the Bankruptcy Court designed to allow the Debtors to continue to operate in chapter 11 and avoid irreparable harm due to the commencement of the chapter 11 cases.[4]  The Bankruptcy Court granted all of the relief requested in the First Day Pleadings and entered various orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits [Docket Nos. 110, 275];

- Continue the use of the Debtors' cash management system [Docket Nos. 111, 370];

- Pay certain critical vendors and prepetition claims of shippers, warehousemen, and miscellaneous lien claimants [Docket Nos. 112, 365];

- Pay certain prepetition taxes and assessments [Docket Nos. 113, 330];

- Continue customer programs [Docket Nos. 114, 332];

- Continue insurance programs and modify the automatic stay as to workers' compensation claims [Docket Nos. 115, 335]; and

- Obtain debtor-in-possession financing pursuant to the DIP Facility, use cash collateral, and provide adequate protection to certain of the Debtors' prepetition lenders [Docket Nos. 116, 443].

C.    **ADDITIONAL PLEADINGS**

The Debtors filed various additional motions, and the Bankruptcy Court entered various orders relating to such motions authorizing the Debtors to, among other things:

- Jointly administer the Debtors' chapter 11 cases [Docket No. 105];

- Establish lease rejection procedures [Docket No. 337];

---

[4] On July 8, 2020 (the "**Petition Date**"), the following Debtors commenced their chapter 11 cases: BB Parent; Brooks Brothers Far East Limited; BBD Holding 1, LLC; BBD Holding 2, LLC; BBDI, LLC; BBGI International, LLC (f/k/a Brooks Brothers International, LLC); BBGI Restaurant, LLC (f/k/a Brooks Brothers Restaurant, LLC); Deconic Group LLC; Golden Fleece Manufacturing Group, LLC; RBA Wholesale, LLC; Retail Brand Alliance Gift Card Services, LLC; Retail Brand Alliance of Puerto Rico, Inc.; and 696 White Plains Road, LLC (the "**Original Debtors**").  BB Canada did not initially seek Chapter 11 protection, as the Original Debtors were attempting to pursue an out-of-court restructuring for BB Canada, including a potential sale of the equity in BB Canada.  However, on September 10, 2020, BB Canada commenced a voluntary chapter 11 case.

- Establish procedures for the sale, transfer, or abandonment of *de minimis* assets [Docket No. 262];

- Employ professionals utilized by the Debtors in the ordinary course of business [Docket No. 333];

- Establish procedures for interim compensation and reimbursement of expenses of professionals [Docket No. 367];

- Extend the time for the Debtors' to perform obligations arising under any unexpired non-residential real property leases for a period of sixty (60) days following the Petition Date [Docket No. 272];

- Reject approximately fifty (50) leases [Docket No. 439]; and

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 441].

## D.    THE DEBTORS' PROFESSIONALS

The Debtors have retained the following professionals pursuant to separate orders of the Bankruptcy Court: (i) Weil, Gotshal & Manges LLP ("**Weil**"), as their legal advisors; (ii) Richards, Layton & Finger, P.A. ("**RLF**"), as co-counsel; (iii) PJ Solomon, L.P. ("**PJ Solomon**") as investment banker; (iv) Ankura Consulting Group, LLC ("**Ankura**") as restructuring officers; (v) Prime Clerk LLC ("**Prime Clerk**"), as claims agent and administrative advisor (the "**Voting Agent**"); (vi) Malfitano Advisors, LLC as retail restructuring advisor; and (v) Osler, Hoskin & Harcourt LLP ("**Osler**") as Canadian counsel.

## E.    FORMATION OF THE CREDITORS' COMMITTEE

On July 21, 2020, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. The Creditors' Committee retained Akin Gump Strauss Hauer & Feld LLP as its counsel and Troutman Pepper Hamilton Sanders LLP as co-counsel (together, the "**UCC Counsel**"), and FTI Consulting, Inc. as its financial advisor. The members of the Creditors' Committee are (i) 39-15 Skillman Realty Co. LLC., (ii) FedEx Corporate Services, Inc., (iii) Workers United, (iv) Trajes Mexicanos S.A. de C.V., (v) Swiss Garments Company, (vi) PT. Ungaran Sari Garments, and (vii) the PBGC.

F.     **SALE PROCESS AND SALE TRANSACTIONS**

1.     *Postpetition Sale Process*

After the Petition Date, and after securing the DIP Facility, the Debtors continued to engage with potential acquirers for the Debtors' assets.  On July 15, 2020 the Debtors filed the Bidding Procedures Motion to, among other things, seek approval of bidding procedures and schedule an auction and sale hearing.

2.     *Stalking Horse Agreement*

Following the filing of the Bidding Procedures Motion, the Debtors continued negotiations with interested parties, and reached an agreement with SPARC to act as a stalking horse bidder. On July 23, 2020, the Debtors entered into the Asset Purchase Agreement for SPARC to acquire substantially all of the Debtors' assets for a purchase price of $305 million (subject to certain adjustments).  On the same day, the Debtors filed the *Supplement to Motion of Debtors for Entry of Orders (I) Approving (A) Bidding Procedures, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Scheduling Auction and Sale Hearing, (III) Approving (A) Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 204] seeking approval of revised bidding procedures and the bid protections provided under the Asset Purchase Agreement.

3.     *Bidding and Auction Process*

Following entry into the Asset Purchase Agreement, the Debtors continued to engage in discussions with multiple potential bidders who were seeking to be named the stalking horse bidder.  However, leading up to the August 3, 2020 hearing to approve the Bidding Procedures Motion, the Debtors' determined that the transaction contemplated by the SPARC Asset Purchase Agreement was superior to other potential bids.  At the hearing to consider the Bidding Procedures Motion, the Bankruptcy Court overruled all objections and entered the Bidding Procedures Order.

Following entry of the Bidding Procedures Order, the Debtors continued to engage with multiple bidders in advance of the bid deadline established under the Bidding Procedures Order, including extending the bid deadline to allow for additional negotiations.  However, ultimately, at the bid deadline, the Debtors only received one additional bid for a material portion of their assets, in the form of a credit bid by the Prepetition ABL Agent.  Rather than commence an auction, the Debtors (in consultation with the Creditors' Committee) began to engage in discussions and negotiations with the Prepetition ABL Agent and SPARC to, among other things, (i) have SPARC increase the consideration under the APA, (ii) address certain of the Creditors' Committee's concerns with the APA, and (iii) attempt to reach an agreement to impair and satisfy the obligations under the Prepetition ABL Facility with the proceeds of the Sale Transaction in order to substantially reduce administrative expenses by effectively eliminating numerous material disputes among the Debtors, the Creditors' Committee, and the Prepetition ABL Lenders.

These efforts were successful as SPARC increased its purchase price by $20 million (from $305 million to $325 million, subject to certain adjustments) and agreed to exclude certain claims and causes of action from the acquired assets under the APA. In addition, the Debtors, the Creditors' Committee, and Prepetition ABL Lenders achieved a global resolution that provided for, among other things, the impairment and settlement of the Prepetition ABL Lenders' claims for approximately $205.8 million and for the remainder of the sale proceeds to be delivered to the Debtors' estates. The Debtors entered into an amendment to the APA to document the improved terms (*see* Docket No. 375, Ex. A), cancelled the auction, and announced that SPARC was the successful bidder. On August 14, 2020, the Bankruptcy Court entered the Sale Order approving the APA and Sale Transaction. On August 31, 2020, the Debtors consummated the Sale Transaction (other than the sale of BB Canada's assets) pursuant to the terms and conditions of the Asset Purchase Agreement. While the Creditors' Committee expected that SPARC sale would provide a continuing customer relationship for the Debtors' trade vendors that hold Claims in these Chapter 11 Cases, the Creditors' Committee believes that in many instances that this hoped-for benefit of the SPARC sale has not materialized.

    4.    *Asset Purchase Agreement Overview*[5]

    <u>Summary of Acquired Assets</u>. Pursuant to the Asset Purchase Agreement, SPARC agreed to purchase substantially all of the Debtors' assets associated with their business and operations relating to (i) designing, sourcing, marketing, licensing, distributing and selling apparel and accessories on both wholesale and retail bases, (ii) retail clothing and the retail sale of clothing and accessories at certain store locations, (iii) acting as a franchisor of retail clothing stores under the brand "Brooks Brothers" relating to the retail sale of clothing and accessories at such stores, and (iv) e-commerce platforms by the Debtors relating to the retail sale of clothing and accessories on such e-commerce platforms (the "**Business**").[6] The Acquired Assets included inventory, owned real property, and intellectual property associated with such Business.

    <u>Designated Contracts</u>. In addition, SPARC purchased the option, during the period from August 31, 2020 until the later of Confirmation or December 31, 2020 (the "**Designation Rights Period**") to designate executory contracts for either (i) assumption and assignment to SPARC or its designee, or (ii) rejection. Since the closing of the Sale Transaction, SPARC has designated, in the aggregate, 135 executory contracts and unexpired leases for assumption and 183 for rejection. Under the APA, SPARC agreed to assume at least 125 store leases. *See* Section 2.8(b) of the Asset Purchase Agreement.

    <u>Designated Foreign Subsidiaries</u>. SPARC also purchased the option to, during the Designation Rights Period, act as Sellers' exclusive agent for the purposes of marketing and selling, assigning or otherwise transferring any or all of Sellers' and their Subsidiaries' rights, title and interest in and to the capital stock (or similar equity interests) in certain of the Debtors' subsidiaries.

---

[5] The following discussion is qualified in its entirety by the applicable Bankruptcy Court orders and sale documentation.

[6] Not included in the assets acquired by SPARC was (i) any business conducted by Deconic Group LLC; (ii) any assets related to the manufacturing business operated by the Debtors; and the DV Claims (as defined in the APA).

Purchased Actions.  Under the original APA, the assets acquired by SPARC in the Sale Transaction included all claims and causes of action available to the Debtors or their estates as of the time of the Closing against (A) SPARC or any of its affiliates (other than claims pursuant to the Asset Purchase Agreement or arising out of the Sale Transaction), (B) any person who as of the Closing served as a director, officer, manager, employee, or advisor of any Seller or any Subsidiary thereof or any shareholder or Related Party of any Seller who becomes a director or advisor of SPARC or its Affiliates or becomes a transferred employee on or after July 23, 2020, and (C) any customer, supplier, manufacturer, distributor, broker, or vendor of any Seller, any Subsidiary thereof or any other Person with whom the Debtors or any Subsidiary thereof has a commercial relationship in connection with the Business (each as defined in the Asset Purchase Agreement, and together, the "**Purchased Actions**").  Following negotiations with the Creditors' Committee, and as documented in the first and second amendments to the Asset Purchase Agreement, claims against the DV Entities (as defined in the Plan) were excluded from the definition of Purchased Actions.

As discussed in greater detail in Section IV.G below, following the closing of the Sale Transaction, the Debtors and the Creditors' Committee engaged in discussions regarding the investigation into potential estate claims and causes of action against the DV Entities (as more particularly defined in the Plan, the "**DV Claims**"), and agreed that, subject to the consummation of the Plan, the Litigation Trust (as defined in the Plan) shall be granted standing for investigating, pursuing, and/or settling the DV Claims, and that the Litigation Trust shall be funded in the manner provided for in the Plan.

Assumed Liabilities[7].  The liabilities assumed by SPARC in the Sale Transaction (the "**Assumed Liabilities**") included: (a) all Liabilities under the Assumed Leases and Transferred Contracts (solely to the extent such Liabilities arise from and after the Closing Date); (b) all Buyer Cure Costs; (c) all Assumed Taxes and all Transfer Taxes to be borne by Buyer pursuant to Section 6.4(a) of the Asset Purchase Agreement; (d) all accounts payable relating to any inventory ordered upon the written request of Buyer following the Petition Date and delivered following the Closing Date; (e) all Liabilities to the extent relating to or arising out of the ownership, possession, operation or use of any Acquired Assets, in each case from and after the Closing; (f) all Liabilities related to an Assumed Employee Benefit Plan (including all assets, trusts, insurance policies and administration service contracts related thereto) arising on or after the Closing and all Liabilities which are expressly assumed pursuant to Section 6.3 of the Asset Purchase Agreement; (g) all Liabilities related to the Owned Real Properties solely to the extent such Liabilities arise from and after the Closing, including any Permitted Post-Closing Liens to which they are subject; (h) certain Liabilities relating to or arising out of honoring Gift Cards issued before Closing and presented to Buyer or its Affiliates for redemption after Closing; and (i) any Liabilities arising from Buyer's employment of the Transferred Employees after the Closing.

---

[7] Capitalized terms used in this paragraph but not defined herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement.

5.    *BB Canada Amendment*

On the Petition Date, BB Canada did not seek Chapter 11 protection, as the Debtors were attempting to pursue an out-of-court restructuring for BB Canada and a potential sale of the equity in BB Canada.  After the Sale Transaction was approved but before it closed, SPARC informed the Debtors that it was not interested in obtaining the equity of BB Canada, and instead solely desired to acquire certain assets.  Accordingly, the Debtors and SPARC determined it would be beneficial to obtain an order in Canada recognizing the Sale Order and approving the sale of BB Canada's assets free and clear of all claims and encumbrances.  Accordingly, prior to the closing of the Sale Transaction, on August 31, 2020, the Debtors entered into an amendment with respect to BB Canada that addressed the process for SPARC to acquire substantially all of the assets of BB Canada after the closing of the Sale Transaction and after obtaining approval of the free and clear sale of BB Canada's assets by a Canadian Court.

6.    *Recognition Proceedings*

On September 10, 2020, BB Canada filed a voluntary petition for relief with the Bankruptcy Court.  The following day, on September 11, 2020, the Bankruptcy Court appointed BB Parent as the foreign representative of the estates of the Chapter 11 Debtors (the "**Foreign Representative**") [Docket No. 578].  On September 13, 2020, the Foreign Representative commenced a proceeding (the "**Recognition Proceeding**") under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") in the Ontario Superior Court of Justice (the "**Canadian Court**") seeking recognition of these chapter 11 cases as "foreign main proceedings" and certain other Bankruptcy Court orders.  The Canadian Court issued initial recognition and supplemental orders that approved the requested relief.

On September 18, 2020, the Bankruptcy Court entered the *Order Extending to Brooks Brothers Canada Ltd. Certain Relief Granted to the Original Debtors* [Docket No. 602] (the "**All Orders Order**").  Pursuant to the All Orders Order, substantially all the orders previously entered in the Original Debtors' chapter 11 cases (including the Sale Order) were ordered to apply to BB Canada.  On September 25, 2020, the Canadian Court entered a *Recognition, Approval and Vesting Order* that, among other things (i) recognized and gave effect to the All Orders Order in Canada, and (ii) subject to the sale closing, vested in and to SPARC the Debtors' right, title, and interest in the Debtors' assets located in Canada, including inventory owned by BB Canada).  On October 20, 2020, the sale of the Debtors' assets located in Canada closed and SPARC paid $6,104,200 to BB Parent.  As of the date of filing this Disclosure Statement, $427,000 of proceeds remain in BB Canada to support certain charges approved in the Recognition Proceeding by the Canadian Court.

With respect to the Debtors' leases in Canada, on October 8, 2020, the Bankruptcy Court entered the *Third Order (I) Authorizing Debtors to (A) Reject Certain Unexpired Leases of Nonresidential Real Property and (B) Abandon Property in Connection Therewith and (II) Granting Related Relief* [Docket No. 649] (the "**Canadian Lease Rejection Order**").  Pursuant to the Canadian Lease Rejection Order, the BB Canada leases were deemed rejected subject to the customary Canadian 30-day notice period.  On October 16, 2020, the Canadian Court entered the Recognition Order (Lease Rejection Order) that recognized and gave effect to the Canadian Lease Rejection Order in Canada.  The Debtors understand that SPARC has entered into arrangements with an operator to operate the majority of the Debtors' former stores in Canada.

The Debtors also understand that new lease arrangements have been entered into between that operator and the majority of the landlords at the Debtors' former Canadian stores.

Further information regarding the CCAA proceeding can be found at https://www.alvarezandmarsal.com/brooksbrotherscanada.

7.    *Other Material Asset Sales*

In addition to the sale of the Brooks Brothers business, the Debtors have maximized the value of their estates by consummating a number of other sales of non-core assets, including the following:

- Southwick Manufacturing Facility: On July 21, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Authorizing Sale of Southwick Manufacturing Facility Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (II) Granting Related Relief* [Docket No. 178] (the "**Southwick Motion**") to sell the Southwick Facility to Eastern Opportunity Fund LLC for $14,000,000, free and clear of all liens, claims, encumbrances, and other interests, subject to higher or better bids. Following the repayment the Southwick Mortgage in full in the amount of approximately $7.04 million on August 18, 2020, the sale of the Southwick Facility netted approximately $6.94 million.  The Debtors (i) provided notice of the Southwick Motion to all parties that had expressed an interest in purchasing the Southwick Facility, (ii) distributed the Southwick Motion to other parties that might have been interested in purchasing the Property, and (iii) published a notice of the proposed sale in *The Boston Globe*.  Ultimately, the sale transaction proposed in the Southwick Motion was the highest and best bid received.  The sale of the Southwick Facility closed on October 12, 2020.

- Deconic: Following an extensive and thorough marketing process, the Debtors entered into an agreement to sell certain assets associated with their jewelry business owned by Deconic Group LLC (the "**Deconic Assets**") to AB-IP Holdco LLC ("**Alexis Bittar**") for $1,200,000 subject to certain adjustments.  On August 14, 2020, the Debtors filed a notice seeking approval of the sale of the Deconic Assets to Alexis Bittar [Docket No. 445].  Following the receipt of competing bids, Alexis Bittar increased its bid to $2,750,000 to acquire the Deconic Assets.  *See* Docket No. 528.  The sale of the Deconic Assets to Alexis Bittar closed on September 15, 2020.

- Garland Manufacturing Facility: Following an extensive marketing process, on August 19, 2020 the Debtors filed a notice notifying the Court that they had entered into an agreement to sell their Garland manufacturing facility (the "**Garland Facility**") to Legacy Industries, Inc. ("**Legacy**") for $2 million [Docket No. 475].  Following objections in the Bankruptcy Court, and the receipt of competing bids, on September 23, 2020, Legacy notified the Debtors that it would not close on the sale and purported to terminate the agreement, alleging the Debtors were unable to

provide good and marketable title.[8]   The Debtors have obtained a quiet title judgment for the real property to cure any potential title defects. The Debtors are currently re-marketing the Garland Facility and have received expressions of interest from a number of parties.

## G.    SCHEDULES AND BAR DATES

On August 21, 2020, the Original Debtors filed their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs [Docket Nos. 484-510].   On September 6, 2020, BB Canada filed its schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs [Docket Nos. 645, 646].  On August 11, 2020, the Bankruptcy Court entered an order establishing (i) September 25, 2020 at 5:00 p.m. (Eastern Time) as the deadline for each person or entity, not including governmental units to file proofs of claim in respect of any prepetition claims against any of the Original Debtors, and (ii) January 4, 2021 at 5:00 p.m. (Eastern Time) as the deadline for governmental units to file proofs of claim in respect of any prepetition claims against any of the Original Debtors [Docket No. 366].

On November 16, 2020, the Bankruptcy Court entered an order establishing (i) (a) December 18, 2020 at 5:00 p.m. (Eastern Time) as the deadline for each person or entity, not including governmental units to file proofs of claim in respect of any prepetition claims against BB Canada and (b) March 9, 2021 at 5:00 p.m. (Eastern Time) at the deadline for Governmental Units to file a proof of claim in respect of a prepetition claim against BB Canada; (ii) December 23, 2020 as the deadline for each person or entity to file a proof of claim for pre-paid, reloadable gift cards or merchandise credits related to the Alexis Bittar® brand of goods; and (iii) December 31, 2020 at 5:00 p.m. (Eastern Time) as the deadline for each person or entity to file a proof of claim for administrative expense claims that arose between the Petition Date and August 31, 2020 [Docket No. 727] (the "**Supplemental Bar Date Order**").  On November 27, 2020, the Canadian Court recognized the Supplemental Bar Date Order.

## H.    OTHER POST-CLOSING DEVELOPMENTS

### 1.    *Retired Employees Committee*

On November 16, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order Authorizing the United States Trustee to Appoint of a Committee of Retired Employees* [Docket No. 736] (the "**Retiree Committee Motion**") pursuant to which the Debtors requested entry of an order directing the U.S. Trustee to appoint a committee of retired employees who are currently receiving retiree benefits.   On November 19, 2020, the Bankruptcy Court entered an order authorizing the relief requested in the Retiree Committee Motion [Docket No. 749].  To date, no committee of retired employees has been appointed by the U.S. Trustee.

---

[8] On October 21, 2020 Legacy filed a motion to compel the return of the $250,000 deposit held in escrow in connection with the agreement [Docket No. 673].   On November 4, 2020 the Debtors filed an objection to such motion  [Docket No. 698].   The hearing has been adjourned to January 26, 2020.

2.    *DV Claims Investigation, Standstill, and Resolution with Creditors' Committee*

After the Petition Date, both the Debtors' Special Committee of independent directors and the Creditors' Committee took steps to investigate potential estate claims and causes of action against the DV Entities.  After SPARC agreed to carve-out potential DV Claims from the Purchased Actions under the APA, given the potential scarcity of resources available to the Debtors' estates, the Debtors and Creditors' Committee agreed to a temporary standstill on further investigating or pursuing any DV Claims.  For the avoidance of doubt, all Claims of the DV Entities are Disputed Claims.

Following entry of the Sale Order, to avoid incurring investigative and litigation expenses prior to the Debtors having comfort that they had sufficient funds available to satisfy Administrative Expense Claims, Secured Claims, and Priority Tax Claims or Other Priority Claims, the Debtors and Creditors' Committee engaged in discussions regarding a longer-term standstill on investigating such claims until after the consummation of a chapter 11 plan.  Such discussions resulted in the Debtors and Creditors' Committee agreeing to such a standstill and to the vesting of all DV Claims in the Litigation Trust pursuant to the Plan.

Pursuant to such resolution, among other things:

(i)  Neither the Debtors nor the Creditors' Committee would investigate, settle, or pursue potential DV Claims until after consummation of the Plan.

(ii) Upon consummation of the Plan, standing to pursue, prosecute, abandon or otherwise resolve the DV Claims, the Former D&O and Shareholder Claims, and other Causes of Action that are Litigation Trust Assets for the benefit of holders of Allowed General Unsecured Claims.

(iii) All rights of the Debtors or their Estates to seek to recharacterize or contractually or equitably subordinate any Claims of the DV Entities shall be preserved and vested in the Litigation Trust; *provided*, that all legal and financial work, including discovery, investigation, and litigation related to such actions shall only occur after the Effective Date of the Plan.

(iv) The Debtors will fund $500,000 in Cash from the Professional Fees Account into the Litigation Trust on the Effective Date of the Plan (the "**Litigation Trust Minimum Funding**").  The funding of the Litigation Trust Minimum Funding as provided for in Section 5.4(c) of the Plan is a condition to the Effective Date of the Plan.

(v)  The Debtors will fund the amounts budgeted for the go-forward legal fees and expenses of the UCC Counsel into a segregated bank account (the "**Litigation Account**") for the benefit of the Litigation Trust in the amount of $1,930,000, *less* any fees and expenses actually incurred by the Creditors' Committee Counsel between September 4, 2020 and the Effective Date, which amounts shall be funded into the Professional Fees Account in accordance with paragraph 43 of the Final DIP Order [Docket No. 443] (the "**Litigation Fees Amount**").  The Litigation Fees Amount will be funded after the Debtors or the Liquidation Trustee, as applicable

has paid or reserved for any amounts necessary to fund the Wind-Down Reserve and to pay all Administrative Expense Claims, Fee Claims, Secured Claims, Priority Tax Claims and Other Priority Claims, after consulting with the Litigation Trustee as to any amounts to be reserved.  The total amount of the Litigation Trust Funding shall be subject to the adjustments set forth in Section 5.4(c) of the Plan. To the extent the Debtors determine in a good faith exercise of their business judgment consistent with their fiduciary duties that not funding all or a portion of the Litigation Fees Amount is necessary to allow the Debtors to fund or administer their chapter 11 cases (including to satisfy Administrative Expense Claims (including Fee Claims), Secured Claims, Priority Tax Claims and Other Priority Claims), the Debtors or the Liquidation Trustee, as applicable, are authorized to make such adjustment after consultation with the Litigation Trustee; *provided* that (i) in no event shall the Debtors or the Liquidation Trustee fund the Litigation Trust with an amount less than the Litigation Trust Minimum Funding, and (ii)(A) to the extent that the Debtors or the Liquidation Trustee, as applicable, make any such adjustment to the amount of the Litigation Fees Amount, and (B) the Debtors or the Liquidation Trustee, as applicable, is satisfied at a later date that the Debtors, or the Liquidation Trust, as applicable, have sufficient funds to satisfy all Allowed Administrative Expense Claims (including Fee Claims), Secured Claims, and Priority Tax Claims or Other Priority Claims and be able to transfer such withheld amounts to the Litigation Trust, the Debtors or the Liquidation Trustee, as applicable, shall do so in accordance with the terms of the Plan.

(vi) William T. Reid, IV, shall serve as the initial trustee of the Litigation Trust and administer the Litigation Trust in accordance with the provisions of Section 5.4(f) of the Plan and pursuant to the Litigation Trust Agreement.

3.    *Exclusivity*

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

On November 5, 2020, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Extending the Exclusive Periods to file and Solicit Acceptances of a Chapter 11 Plan and (II) Granting Related Relief* [Docket No. 707] and on November 18, 2020, the Bankruptcy Court entered an order extending the Exclusive Plan Period to February 3, 2021, and the Exclusive Solicitation Period to April 5, 2021.  The Exclusive Periods may be further extended by the Bankruptcy Court subject to section 1121(d) of the Bankruptcy Code.

## V. PLAN

This Section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.

1.      *Administrative Expense and Priority Claims*

i.      Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Debtors or the Liquidation Trustee agree to different treatment, the Debtors (or the Liquidation Trustee, as the case may be) shall pay to each holder of an Allowed Administrative Expense Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (i) forty five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim is Allowed.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, or the Liquidation Trust or the Liquidation Trust Assets, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date.  The Debtors or the Liquidation Trustee, as applicable, may file and serve objections to Administrative Expense Claims on or before the Claims Objection Bar Date.

ii.      Fee Claims

(a)      *Professional Fee Escrow.* No later than five (5) days after the Effective Date, the Liquidation Trustee shall establish and fund the Professional Fee Escrow, and the Debtors shall be authorized to transfer custody of the Professional Fees Account to the Liquidation Trust for this purpose. Fee Claims shall be paid in Cash from funds held in the Professional Fee Escrow when such Claims are Allowed by a Final Order of the Bankruptcy Court. Neither the Debtors' nor the Liquidation Trust's obligations to pay Professional Fee Claims shall be limited nor be deemed limited to funds held in the Professional Fee Escrow.

(b)      *Estimation of Fee Claims.*  No later than five (5) days before the anticipated Effective Date, Professionals shall provide a good faith estimate of their Fee Claims projected to be outstanding as of the Effective Date and shall deliver such estimate to the Debtors. Such estimate shall not be considered an admission or limitation with respect to the fees and

expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may, after consulting with the Committee, estimate the unbilled fees and expenses of such Professional. The total amount so estimated shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow. The Liquidation Trust shall use Cash on hand to increase the amount of the Professional Fee Escrow to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow based on such estimates.

(c)     *Payment of Fee Claims.* All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (ii) shall be paid in full from the Professional Fees Account or the Professional Fee Escrow, as applicable, in such amounts as are Allowed by the Bankruptcy Court (A) in accordance with the Interim Compensation Order, (B) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (C) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or the Liquidation Trustee, as applicable. The Liquidation Trustee is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval. When all Allowed Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Liquidation Trust without any further action or order of the Bankruptcy Court.

(d)     *Professional Fee Escrow Not Property of the Liquidation Trust.* Funds held in the Professional Fee Escrow shall not be considered Liquidation Trust Assets or Litigation Trust Assets or otherwise property of the Liquidation Trust or Litigation Trust, the Debtors, or their Estates. The Professional Fee Escrow shall be treated as a trust account for the benefit of holders of Fee Claims and for no other parties until all Allowed Fee Claims have been paid in full in Cash. No Liens, claims, or interests shall encumber the Professional Fee Escrow or Cash held in the Professional Fee Escrow in any way.

iii.     <u>Priority Tax Claims</u>

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Liquidation Trustee, as applicable, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (a) forty five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Business Day after the date that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or as soon thereafter as is reasonably practicable, or (b) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date. The holders of Allowed Priority Tax Claims shall retain their tax liens on their collateral to the same validity, extent and priority as existed on the Petition Date until all validly determined taxes and related interest, penalties, and fees (if any) have been paid in full. To the extent a holder of an Allowed Priority Tax Claim is not paid in the ordinary course of business,

payment of the Allowed Priority Tax Claim shall include interest through the date of payment at the applicable state statutory rate, as set forth in sections 506(b), 511, and 1129 of the Bankruptcy Code.

2.      *Classification of Claims and Interests*

i.      Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

ii.      Formation of Debtor Groups for Convenience Only

The Plan (including, but not limited to, Section 2 and Section 3 of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and Plan Distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Except as provided in Section 5 of the Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets.

iii.      Summary of Classification

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (iii) deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.5.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| 2 | Secured Claims | Unimpaired | No (Presumed to accept) |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4 | Intercompany Claims | Impaired | No (Presumed to accept) |
| 5 | Debtor Interests | Impaired | No (Deemed to reject) |
| 6 | Subordinated Claims | Impaired | No (Deemed to reject) |

iv.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Liquidation Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

v.    Elimination of Vacant Classes

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

vi.    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by the holders of such Claims or Interests in such Class.

vii.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Section 12.6 hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

3.    *Treatment of Claims and Interests*

i.    Other Priority Claims (Class 1)

a)    *Classification*:  Class 1 consists of Allowed Other Priority Claims against the Debtors.

b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the (i) forty five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the first Business Day after thirty (30) days from the date on which such Other Priority Claim becomes and Allowed Priority Claim, or as soon as reasonably practical thereafter.

c)      *Voting*:  Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

> ii.      Secured Claims (Class 2)

a)      *Classification*:  Class 2 consists of the Secured Claims.

b)      *Treatment*:  Except to the extent that a holder of an Allowed Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder shall receive, at the option of the Debtors (after consultation with the Creditors' Committee if prior to the Effective Date) or the Liquidation Trustee, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of (A) forty five (45) calendar days after the Effective Date (or as soon as reasonably practicable thereafter) and (B) the first Business Day after thirty (30) days from the date on which such Secured Claim becomes an Allowed Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

c)      *Voting*:  Class 2 is Unimpaired, and the holders of Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Secured Claims.

> iii.      General Unsecured Claims (Class 3)

a)      *Classification*:  Class 3 consists of General Unsecured Claims against the Debtors.

b)      *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim against the Debtors has agreed to less favorable treatment of such Claim, and except as provided in Section 5.11 of the APA with respect to the Claims of Former Non-Debtor Subsidiaries, each such holder shall receive, in full and final satisfaction of such Claim, (i) a Pro Rata Share of the Liquidation Trust Beneficial Interests and (ii) a Pro Rata Share of the Litigation Trust Beneficial Interests.

c)      *Voting*:  Class 3 is Impaired, and the holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

> iv.      Intercompany Claims (Class 4)

a)      *Classification*:  Class 4 consists of Intercompany Claims against the Debtors.

b)      *Treatment*:  On or after the Effective Date, all Allowed Intercompany Claims shall be adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or the Liquidation Trustee (as applicable).

c)      *Voting*:  Class 4 is Impaired. The holders of Intercompany Claims are plan proponents and are conclusively presumed to accept the Plan.  Therefore, holders of Intercompany

Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Intercompany Claims.

v.    Debtor Interests (Class 5)

a)    *Classification*:  Class 5 consists of all Interests in the Debtors.

b)    *Treatment*:  The Debtor Interests shall be cancelled when merged or dissolved pursuant to the terms of the Plan.  Each holder of a Debtor Interest shall neither receive nor retain any property of the Debtors' estates or direct interest in property of the Debtors' estates.

c)    *Voting*:  Class 5 is Impaired, and the holders of Debtor Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Debtor Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Interests.

vi.    Subordinated Claims (Class 6)

a)    *Classification*:  Class 6 consists of all Subordinated Claims.

b)    *Treatment*:  All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. Each holder of Allowed Subordinated Claims shall neither receive nor retain any property of the Debtors' estates or any interest in property of the Debtors' estates.

c)    *Voting*:  Class 6 is Impaired, and the holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the holders of Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Subordinated Claims.

4.    *Means for Implementation*

i.    Joint Chapter 11 Plan

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

ii.    Limited Substantive Consolidation

(a)    *Limited Substantive Consolidation*.  The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including voting, confirmation, and distribution and the Bankruptcy Court's findings that the substantive consolidation of the Estates to the extent set forth in the Plan is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.  As a result of the limited substantive consolidation of the Estates, each Class of Claims and Interests

shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan, and otherwise in satisfying the applicable requirements of section 1129 of the Bankruptcy Code. The limited substantive consolidation of the Debtors under the Plan shall not (other than for purposes related to funding Distributions under the Plan) affect (u) the legal and organizational structure of the Debtors, (v) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (w) any agreements entered into by the Liquidation Trust on or after the Effective Date, (x) the Debtors' or the Liquidation Trust's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (y) any causes of action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order and the Confirmation Recognition Order as if there had been no substantive consolidation of the Estates of the Debtors, and (z) distributions to the Debtors or the Liquidation Trust from any insurance policies or the proceeds thereof.

(b)      *Effect on Distributions*.  On and after the Effective Date, solely for Distribution purposes (i) all assets and liabilities of the Debtors shall be treated as though they were pooled; (ii) each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors; (iii) all Intercompany Claims shall be reinstated, settled, offset, cancelled, extinguished or eliminated in accordance with Section 4.4 of the Plan; (iv) no Distributions shall be made under the Plan on account of any Intercompany Interest; (v) any Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof by any other Debtor shall be treated as one consolidated Claim against the substantively-consolidated Debtors, and (vi) any joint or several liability of any of the Debtors shall be one obligation of the substantively-consolidated Debtors and any Claims based upon such joint or several liability shall be treated as one consolidated Claim against the substantively-consolidated Debtors.

(c)      *Alternative Plan Debtors*.  Notwithstanding the foregoing in Section 5.2 of the Plan, the Debtors, after consulting with the Creditors' Committee, reserve the right to examine the Claims asserted against the various Entities and to withdraw the Plan with respect to any particular Debtor Entity if the total dollar amount of the Administrative Expense Claims against such Entity would result in the Debtors not being able to satisfy all Allowed Administrative Expense Claims, Secured Claims, Priority Tax Claims and Other Priority Claims against such Debtor in full.  In the event that the Debtors elect to withdraw the Plan with respect to any Entity, such Entity shall be listed on the Schedule of Alternative Plan Debtors included in the Plan Supplement and the Debtors, after consulting with the Creditors' Committee, may proceed to seek confirmation of the Plan as to the remaining Debtors on a limited substantively consolidated basis in accordance with Section 5.2(a) of the Plan; *provided*, however, that to the extent the Creditors' Committee does not agree with the withdrawal of the Plan with respect to any Debtor, the Creditors' Committee reserves all rights to object to confirmation on the basis of such withdrawal.

iii.    Liquidation Trust

(a)      *Liquidation Trust Generally*.  On or prior to the Effective Date, the Liquidation Trust shall be established in accordance with the Liquidation Trust

Agreement for the purpose of being vested with and liquidating the Liquidation Trust Assets, reconciling Claims and making Distributions to Holders of Allowed Claims in accordance with the terms of the Plan and the Liquidation Trust Agreement.  Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidation Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Liquidation Trust and the Liquidation Trustee shall be empowered, without the need for Bankruptcy Court Approval or Canadian Court approval, to:

> (i)      perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Liquidation Trust;

> (ii)      establish, maintain and administer trust accounts, which shall be segregated to the extent appropriate in accordance with the Plan;

> (iii)      accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle and protect, as applicable, the Liquidation Trust Assets in accordance with the Plan;

> (iv)      except to the extent any other Claims have already been Allowed, control and effectuate the Claims reconciliation process with respect to all Claims that are not Claims of the DV Entities or of any of the Former D&Os or Shareholders, including to object to, seek to subordinate, recharacterize, compromise or settle any and all such Claims against the Debtors, including the Disputed Claims (except for the Claims of the DV Entities or of any of the Former D&Os or Shareholders), pursuant to the procedures prescribed in the Plan;

> (v)      pursue Causes of Action that are Liquidation Trust Assets, elect not to pursue any such Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as is in the best interests of the Liquidation Trust Beneficiaries;

> (vi)      calculate and make Distributions of the proceeds of the Liquidation Trust Assets to holders of Allowed Claims;

> (vii)      prepare and file appropriate tax returns and other reports on behalf of the Liquidation Trust and pay taxes or other obligations owed by the Debtors or the Liquidation Trust;

> (viii)      retain, compensate and employ professionals to represent the Liquidation Trust;

> (ix)      direct and control the wind down, liquidation, sale or abandonment of the remaining assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(x)     exercise such other powers as may be vested in the Liquidation Trust under the Liquidation Trust Agreement and the Plan, or as are deemed by the Debtors or the Liquidation Trustee to be necessary and proper to implement the provisions of the Liquidation Trust Agreement and effectuate the purpose of the Liquidation Trust; and

(xi)     dissolve the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement; and

(xii)     wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor.

Notwithstanding anything to the contrary in Section 5.3 of the Plan, the Liquidation Trust's primary purpose is liquidating the Liquidation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidation Trust's liquidating purpose and reasonably necessary to conserve and protect the Liquidation Trust Assets and provide for the orderly liquidation thereof.

(b)     *Funding of and Transfer of Assets into the Liquidation Trust.* Except as otherwise provided in the Plan, the Confirmation Order, or the Confirmation Recognition Order, on the Effective Date, the Debtors shall transfer the Liquidation Trust Assets to the Liquidation Trust, and all such assets shall vest in the Liquidation Trust on such date, to be administered by the Liquidation Trustee, in accordance with the Plan and the Liquidation Trust Agreement; *provided*, that until final dissolution of BB Canada (i) the shares of BB Canada shall be owned by the Liquidation Trust, (ii) any remaining Canadian Collateral Proceeds in the possession of BB Canada pursuant to the Canadian Sale Order to support the Administration Charge and the Directors' Charge shall be retained by BB Canada until repaid to BB Parent (or paid as directed by BB Parent) in accordance with the Debtors' Stipulation and Agreement with Wells Fargo, N.A. Regarding Sale Order and Release of Liens and Claims dated August 30, 2020, and (iii) any remaining Canadian Assets shall be continued to be owned by BB Canada until recovered by the Liquidation Trust and shall be distributed by BB Canada to the Liquidation Trust in respect of such shares as part of any dissolution of BB Canada, subject to any withholding requirements in accordance with Section 5.11 of the Plan. The Liquidation Trustee shall have the authority to create additional sub-accounts in trust accounts established pursuant to Section 5.3(g) of the Plan and sub-trusts within the Liquidation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Liquidation Trust. The act of transferring the Liquidation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidation Trust as if the asset or right was still held by the applicable Debtor.

(c)     *Liquidation Trustee.* The Liquidation Trustee shall serve as the initial trustee of the Liquidation Trust. Except as otherwise provided in the Plan, the Liquidation Trustee (i) shall be the successor to and representative of the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code and (ii) shall be the sole representative of, and shall act for, the Debtors, and shall assume any such outstanding

responsibility of the Debtors under the Plan.  The powers, rights and responsibilities of the Liquidation Trustee shall be as specified in the Liquidation Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in Section 5.3 of the Plan. Other rights and duties of the Liquidation Trustee and the Liquidation Trust Beneficiaries shall be as set forth in the Liquidation Trust Agreement.

(d)    *Functions of the Liquidation Trustee*.   On and after the Effective Date, the Liquidation Trustee and/or the Liquidation Trust, as applicable, shall carry out the functions set forth in Section 5.3 of the Plan and may take such actions without supervision or approval by the Bankruptcy Court or the Canadian Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, CCAA or BIA, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the Liquidation Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)    effectuate the Plan, including the prosecution and any other disposition of all litigation related to any appeals in respect to the approval and/or implementation of the Plan;

(ii)    wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt, or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor;

(iii)    serve as the initial director or manager, as applicable, and sole officer of each Debtor after the Effective Date until such time as such Debtor is merged into BB Parent or dissolved, as applicable, and take any actions necessary to effectuate the terms of the Plan and the Liquidation Trust Agreement in such capacities;

(iv)    serve on the board of directors of any subsidiary of the Liquidation Trust, provided the subsidiary's objective is consistent with that of the Liquidation Trust (*i.e.*, to sell its assets and distribute the proceeds in liquidation);

(v)    take any actions necessary to (A) resolve all matters related to the Liquidation Trust Assets and (B) vest such assets in the Liquidation Trust;

(vi)    fund the Wind-Down Reserve;

(vii)    pay all (A) Allowed Administrative Expense Claims (including payment of Professional Fee Claims as set forth in Section 2.2 of the Plan), (B) Allowed Priority Tax Claims, (C) Allowed Other Priority Claims, and (D) Allowed Secured Claims pursuant to the Plan;

(viii)    prepare and file appropriate Tax returns and other reports on behalf of the Debtors and pay Taxes or other obligations owed by the Debtors (including, without limitation, any Allowed Administrative Expense Claims and Allowed Priority Tax Claims asserted by taxing authorities);

(ix)    provide reporting to the Litigation Trust Oversight Board, as set forth in the Liquidation Trust Agreement and Litigation Trust Agreement;

(x)    file, prosecute, settle or dispose of any and all objections to asserted (A) Administrative Expense Claims, (B) Priority Tax Claims, (C) Other Priority Claims, (D) Secured Claims, and (E) General Unsecured Claims;

(xi)    enter into and consummate any transactions for the purpose of dissolving the Debtors;

(xii)    make Distributions of the Liquidation Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay Liquidation Trust Expenses, to holders of Allowed Unsecured Claims;

(xiii)    take such actions as are necessary or appropriate to close any of the Debtors' Chapter 11 Cases; or the Recognition Proceedings ;

(xiv)    retain, compensate and employ professionals to represent the Liquidation Trust or the Liquidation Trustee, as applicable;

(xv)    pay the reasonable fees and disbursements of the Information Officer and its counsel upon the submission of invoices on a monthly basis to the Liquidation Trustee, subject to the approval of the Canadian Court in the Recognition Proceedings;

(xvi)    maintain the books and records and accounts of the Debtors;

(xvii)    transfer any additional Litigation Trust Assets to the Litigation Trust after the Effective Date;

(xviii)    consult with the Information Officer in respect of any matters set forth in Section 5.3 of the Plan as such matters also relate to Canada, including by responding to any reasonable information requests of the Information Officer;  and

(xix)    take any other actions not inconsistent with the provisions hereof that the Liquidation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

After the Effective Date, the Liquidation Trustee shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Debtors or the Liquidation Trustee during the applicable period, attested to by the Liquidation Trustee.  Quarterly reports, including a separate schedule of disbursements, shall also be provided to the Information Officer and the Litigation Trust Oversight Board as soon as practicable following their preparation and upon filing.

(e)  *Liquidation Trust Agreement*.  Prior to the Effective Date, the Debtors shall execute and deliver the Liquidation Trust Agreement.  The Liquidation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Liquidation Trustee.  Any such indemnification shall be the sole responsibility of the Liquidation Trust and payable solely from the Liquidation Trust Assets.

(f)  *Fees and Expenses of the Liquidation Trust*.  From and after the Effective Date, Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets in the ordinary course of business, in accordance with the Plan and the Liquidation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Liquidation Trustee, on behalf of the Liquidation Trust, may employ and pay in the ordinary course of business, the reasonable fees of any professional (including professionals previously employed by the Debtors) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Liquidation Trustee, are necessary to assist the Liquidation Trustee in the performance of the Liquidation Trustee's duties under the Plan and the Liquidation Trust Agreement, subject to any limitations and procedures established by the Liquidation Trust Agreement.

(g)  *Creation and Maintenance of Trust Accounts*.  On or prior to the Effective Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidation Trust.  Cash deposited in the trust accounts will be invested, held and used solely as provided in the Liquidation Trust Agreement. The Liquidation Trustee is authorized to establish additional trust accounts after the Effective Date, consistent with the terms of the Liquidation Trust Agreement, as applicable.  After the funding of the trust accounts on the Effective Date, the trust accounts will be funded, as applicable, by Cash proceeds obtained through litigation or the disposition of Liquidation Trust Assets or the proceeds of the Litigation Trust.  Upon obtaining an order of the Bankruptcy Court authorizing final Distribution or closure of the Debtors' Chapter 11 Cases, any funds remaining in the trust accounts shall be distributed in accordance with the Plan and the Liquidation Trust Agreement, and the trust accounts may be closed.

(h)  *Limitation of Liability*.  Neither the Liquidation Trustee, nor its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Plan or Liquidation Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage or expense suffered by the Liquidation Trust.  The Liquidation Trustee shall enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee or any other analogous trustee, except with respect to the DV Claims, Claims of the DV Entities or any of the Former D&Os or Shareholders, Former D&O and Shareholder Causes of Action, and any other Causes of Action that are Litigation Trust Assets.  The Liquidation Trustee may, in connection with the performance of his, her or its functions, in the Liquidation Trustee's sole and absolute discretion, consult with his, her or its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing.

36

Notwithstanding such authority, the Liquidation Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Liquidation Trustee or its members unless such determination is based on willful misconduct, gross negligence or fraud. Persons dealing with the Liquidation Trustee shall look only to the Liquidation Trust Assets to satisfy any liability incurred by the Liquidation Trustee to such person in carrying out the terms of the Plan or the Liquidation Trust Agreement, and the Liquidation Trustee shall have no personal obligation to satisfy such liability.

(i)     *Indemnification*. The Liquidation Trust shall indemnify the Liquidation Trustee for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Liquidation Trustee (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Liquidation Trustee in connection with the acceptance, administration, exercise and performance of their duties under the Plan or the Liquidation Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court or the Canadian Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct. In addition, the Liquidation Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Liquidation Trustee, from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidation Trust or the implementation or administration of the Plan if the Liquidation Trustee acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Liquidation Trust. To the extent the Liquidation Trust indemnifies and holds the Liquidation Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Liquidation Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidation Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in Section 5.3(i) of the Plan shall be paid by the Liquidation Trust. Section 5.3(i) of the Plan shall survive the termination of the Liquidation Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Liquidation Trustee.

(j)     *Insurance*. The Liquidation Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidation Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Liquidation Trustee, which insurance coverage may, at the sole option of the Liquidation Trustee, be extended for a reasonable period after the termination of the Liquidation Trust Agreement.

(k)     *Dissolution of the Liquidation Trust*. In no event shall the Liquidation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private

letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Liquidation Trust Assets.

(l)      *Records*.  The Liquidation Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Liquidation Trust Assets and objections to Disputed Claims.

(m)      *Non-Transferability of Liquidation Trust Interests*.  The Liquidation Trust Beneficial Interests shall be non-transferable other than if transferred by will, intestate succession or otherwise by operation of law.

iv.    Litigation Trust

(a)      *Litigation Trust Generally*.  The Litigation Trust shall be established on the Effective Date, in accordance with the terms of the Plan and the Litigation Trust Agreement and shall be governed by the terms of the Litigation Trust Agreement and shall liquidate the Litigation Trust Assets, including by, among other things, prosecuting, settling, compromising, abandoning, or otherwise assessing and, if possible, realizing the value of the DV Claims, Former D&O and Shareholder Causes of Action, and any other Causes of Action assigned to the Litigation Trust in accordance with the terms of the Plan, from time to time in accordance with the terms of the Plan for the benefit of the Litigation Trust Beneficiaries.  At such time as the Litigation Trustee determines the Litigation Trust has, pursuant to Section 5.4 of the Plan and the Litigation Trust Agreement, (i) resolved, settled, compromised, or otherwise liquidated the DV Claims, Former D&O and Shareholder Causes of Action, and all other Causes of Action assigned to the Litigation Trust from time to time in accordance with the terms of the Plan and the Litigation Trust Agreement, and (ii) paid all Litigation Trust Expenses, the Litigation Trustee shall transfer any and all remaining Litigation Trust Assets to the Liquidation Trust; provided that, if the Liquidation Trust has been dissolved pursuant to the terms of the Plan and the Liquidation Trust Agreement before such time as the Litigation Trustee has acted in accordance with the foregoing clauses (i) and (ii), the Litigation Trustee shall make a Distribution of the remaining Litigation Trust Assets to the Litigation Trust Beneficiaries in accordance with the terms of the Plan.  From time to time, and after paying or appropriately reserving for Litigation Trust Expenses, the Litigation Trust may distribute proceeds of the Litigation Trust Assets to the Liquidation Trust for Distribution to Litigation Trust Beneficiaries.

(b)      Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidation Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Litigation Trust and the Litigation Trustee shall be empowered to:

(i)      conduct investigations of the DV Claims and other Causes of Action that are Litigation Trust Assets pursuant to Bankruptcy Rule 2004;

(ii)     perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(iii)    establish, maintain and administer trust accounts, which shall be segregated to the extent appropriate in accordance with the Plan;

(iv)    manage, liquidate, supervise, prosecute, and protect, as applicable, the Litigation Trust Assets;

(v)     settle Claims that are Litigation Trust Assets, including the DV Claims, and the Former D&O and Shareholder Claims, without further order of the Bankruptcy Court;

(vi)    control and effectuate the Claims reconciliation process for Claims of any of the DV Entities or any of the Former D&Os or Shareholders, including to object to, seek to subordinate, recharacterize, compromise or settle any and all such Claims, pursuant to the procedures prescribed in the Plan;

(vii)   pursue, prosecute, abandon or otherwise resolve the DV Claims, the Former D&O and Shareholder Claims, and other Causes of Action that are Litigation Trust Assets;

(viii)  retain, compensate and employ professionals to represent the Litigation Trust;

(ix)    prepare and file appropriate tax returns and other reports on behalf of the Litigation Trust and pay taxes or other obligations owed by the Litigation Trust;

(x)     exercise such other powers as may be vested in the Litigation Trust under the Litigation Trust Agreement and the Plan, or as are deemed by the Litigation Trustee to be necessary and proper to implement the provisions of the Litigation Trust Agreement and effectuate the purpose of the Litigation Trust; and

(xi)    dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

Notwithstanding anything to the contrary in Section 5 of the Plan, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

(c)     *Litigation Trust Funding.*  The Litigation Trust shall be funded with the Litigation Trust Minimum Funding on the Effective Date of the Plan and as a condition to the Effective Date of the Plan (subject to waiver in accordance with Section 9.2 of the

Plan). The Litigation Fees Amount will be funded after the Debtors or the Liquidation Trustee, as applicable, have paid or reserved for any amounts necessary to fund the Wind-Down Reserve and to pay all Administrative Expense Claims, Fee Claims, Secured Claims, Priority Tax Claims and Other Priority Claims; after consulting with the Litigation Trustee as to any amounts to be reserved. The total amount of the Litigation Trust Funding shall be subject to the adjustments set forth in Section 5.4(c) of the Plan, but in any event shall not be less than the Litigation Trust Minimum Funding (subject to waiver in accordance with Section 9.2 of the Plan). To the extent the Debtors or the Liquidation Trustee, as applicable, determine in a good faith exercise of their business judgment consistent with their fiduciary duties that not funding all or a portion of the Litigation Fees Amount is necessary to allow the Debtors to fund or administer their chapter 11 cases (including to fund the Wind-Down Reserve and satisfy Administrative Expense Claims (including Fee Claims), Secured Claims, Priority Tax Claims and Other Priority Claims), the Debtors or the Liquidation Trustee, as applicable, are authorized to make such adjustment after consultation with the Litigation Trustee; *provided* that (i) in no event shall the Debtors or the Liquidation Trustee fund the Litigation Trust with an amount less than the Litigation Trust Minimum Funding, and (ii)(A) to the extent that the Debtors or the Liquidation Trustee, as applicable, make any such adjustment to the amount of the Litigation Fees Amount, and (B) the Debtors or the Liquidation Trustee, as applicable, is satisfied at a later date that the Debtors, or the Liquidation Trust, as applicable, have sufficient funds to satisfy all Allowed Administrative Expense Claims (including Fee Claims), Secured Claims, and Priority Tax Claims and Other Priority Claims, and be able to transfer some or all of such withheld amounts to the Litigation Trust, the Debtors or the Liquidation Trustee, as applicable, shall do so in accordance with the terms of the Plan.

(d)     *Transfer of Assets Into the Litigation Trust*.     Upon the Effective Date, (i) the DV Claims; (ii) Former D&O and Shareholder Causes of Action and (iii) the Litigation Trust Minimum Funding, shall vest in and be transferred to the Litigation Trust. Upon the Debtors or the Liquidation Trustee, as applicable having paid or reserved for any amounts necessary to fund the Wind-Down Reserve and pay all Administrative Expense Claims, Fee Claims, Secured Claims, Priority Tax Claims and Other Priority Claims in accordance with Section 5.4(c) of the Plan, the Debtors or the Liquidation Trustee, as applicable, shall transfer the Litigation Fees Amount to the Litigation Trust, and such assets shall vest in the Litigation Trust on the date of such transfer and shall be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement. The act of transferring the Litigation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the applicable Debtor.

(e)     *Litigation Trustee*. The Litigation Trustee will serve as the initial trustee of the Litigation Trust. Except as otherwise provided in the Plan, the powers, rights and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

(f)     *Functions of the Litigation Trustee*. On and after the Effective Date, the Litigation Trustee and/or the Litigation Trust, as applicable, shall carry out the functions set forth in Section 5.4(f) of the Plan and may take such actions without supervision or approval by the Bankruptcy Court or the Canadian Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, CCAA or BIA, other than any restrictions expressly

imposed by the Plan, the Confirmation Order or the Litigation Trust Agreement.  Such functions shall include any and all powers and authority to:

> (i)    take any actions necessary to resolve all matters related to the Litigation Trust Assets;

> (ii)    retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable;

> (iii)    transfer all Cash proceeds of the DV Claims, the Former D&O and Shareholder Claims, and of other Causes of Action assigned to the Litigation Trust, after payment of the Litigation Trust Expenses to the Liquidation Trust, unless the Liquidation Trust has been dissolved;

> (iv)    consult with the Information Officer in respect of any matters set forth in Section 5.4 of the Plan as such matters also relate to Canada; and

> (v)    take any other actions not inconsistent with the provisions hereof that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

(g)    *Litigation Trust Agreement*.  On or prior to the Effective Date, the Debtors shall execute and deliver the Litigation Trust Agreement, which Litigation Trust Agreement shall be, in form and substance, reasonably acceptable to the Debtors and the Creditors' Committee.

(h)    *Litigation Trust Oversight Board*.  On the Effective Date, the Litigation Trust Oversight Board shall be established. The initial Litigation Trust Oversight Board members shall consist of [all the members of the Creditors' Committee]. Upon its formation, the duties of the Litigation Trust Oversight Board shall be set forth in the Litigation Trust Agreement, including but not limited to: (i) overseeing the Claims reconciliation and settlement process related to the Claims of the DV Entities conducted by or on behalf of the Litigation Trustee; (ii) overseeing the Litigation Trustee's investigation into, and, if applicable, prosecution of, the DV Claims and Former D&O and Shareholder Causes of Action; (iii) formulating with the Litigation Trustee appropriate procedures for the settlement of DV Claims, Former D&O and Shareholder Causes of Action, and Claims of the DV Entities; (iv) overseeing the distributions to the Litigation Trust Beneficiaries as provided for under the Plan; (v) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the above limited duties; and (vi) such other matters specified in the Plan or the Litigation Trust Agreement. For so long as the Claims reconciliation and investigation and/or prosecution of the DV Claims, Former D&O and Shareholder Causes of Action, and any other Causes of Action that are or become Litigation Trust Assets shall continue, the Litigation Trustee shall make regular reports to the Litigation Trust Oversight Board as and when the Litigation Trustee and the Litigation Trust Oversight Board may reasonably agree upon.

(i)    *Fees and Expenses of the Litigation Trust*.  From and after the Effective Date, Litigation Trust Expenses shall be paid from the Litigation Trust Assets in the

ordinary course of business, in accordance with the Plan and the Litigation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay in the ordinary course of business, any professional for services rendered or expenses incurred on and after the Effective Date, in accordance with the terms of any agreement entered into between the Litigation Trust and such professional, in the discretion of the Litigation Trustee, that are necessary to assist the Litigation Trustee in the performance of the Litigation Trustee's duties under the Plan and the Litigation Trust Agreement, subject to any limitations and procedures established by the Litigation Trust Agreement.

(j)     *Limitation of Liability*.  Neither the Litigation Trustee, nor its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Litigation Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order (not subject to further appeal or review) of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage or expense suffered by the Litigation Trust.  The Litigation Trustee shall enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee or any other analogous trustee with respect to the DV Claims, Claims of the DV Entities, any of the Former D&Os or Shareholders, the Former D&O and Shareholder Causes of Action, and other Causes of Action that are Litigation Trust Assets.  The Litigation Trustee may, in connection with the performance of his, her or its functions, in the Litigation Trustee's sole and absolute discretion, consult with his, her or its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing.  Notwithstanding such authority, the Litigation Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Litigation Trustee or its members unless such determination is based on willful misconduct, gross negligence or fraud.  Persons dealing with the Litigation Trustee shall look only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to such person in carrying out the terms of the Litigation Trust Agreement, and the Litigation Trustee shall have no personal obligation to satisfy such liability.

(k)     *Indemnification*.  The Litigation Trust shall indemnify the Litigation Trustee for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Litigation Trustee (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Litigation Trustee in connection with the acceptance, administration, exercise and performance of their duties under the Plan or the Litigation Trust Agreement, as applicable.  An act or omission taken with the approval of the Bankruptcy Court or the Canadian Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct.  In addition, the Litigation Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Litigation Trustee, from and against and with respect to any and all liabilities, losses, damages, claims, costs

42

and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Litigation Trust or the implementation or administration of the Plan if the Litigation Trustee acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Litigation Trust. To the extent the Litigation Trust indemnifies and holds the Litigation Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Litigation Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Litigation Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in Section 5.3(k) of the Plan shall be paid by the Litigation Trust. Section 5.3(k) of the Plan shall survive the termination of the Litigation Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Litigation Trustee.

(l)     *Insurance*. The Litigation Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Litigation Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Litigation Trustee, which insurance coverage may, at the sole option of the Litigation Trustee, be extended for a reasonable period after the termination of the Litigation Trust Agreement.

(m)     *Dissolution of the Litigation Trust*. In no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets. Upon the dissolution of the Litigation Trust, the Litigation Trustee shall transfer any remaining Litigation Trust Assets to the Liquidation Trust, *provided* that if the Liquidation Trust is dissolved before the dissolution of the Litigation Trust, the Litigation Trustee shall distribute the Litigation Trust Assets directly to Litigation Trust Beneficiaries pursuant to the terms of the Plan.

(n)     *Records*. The Litigation Trustee shall be provided with originals or copies of or access to all documents and business records accessible to or retained by the Debtors or the Liquidation Trustee necessary for the disposition and liquidation of Litigation Trust Assets; *provided* that the Litigation Trustee or the Litigation Trust shall reimburse the Liquidation Trust and/or the Liquidation Trustee, as applicable, for any reasonable out-of-pocket fees or expenses incurred in assisting the Litigation Trustee in the procurement of records that were not retained by the Debtors after the Sale Transaction.

(o)     *Non-Transferability of Litigation Trust Interests*. The Litigation Trust Beneficial Interests shall be non-transferable other than if transferred by will, intestate succession or otherwise by operation of law.

v.    <u>Plan Trusts Tax Matters</u>

(a)    *Tax Treatment; No Successor in Interest*.  The Plan Trusts are intended to be treated for U.S. federal income tax purposes as liquidating trusts described in Treasury Regulation section 301.7701-4(d) and, to the extent applicable, as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section l.468B-9.  For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Plan Trusts will be treated (i) as the transfer of assets by the Debtors to the holders of Allowed Claims entitled to distributions from the Liquidation Trust Assets or the Litigation Trust Assets, as applicable, subject to any liabilities of the Debtors or the Plan Trusts payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the applicable Plan Trust in exchange for the beneficial interests in the Plan Trusts, and (ii) to the extent applicable, as the transfer of assets by the Debtors to one more Disputed Claims Reserves.

(b)    *Liquidation Purpose of the Plan Trusts*.  The Plan Trusts shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trusts.  Accordingly, the Plan Trustees shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets and the Litigation Trust Assets, as applicable, make timely distributions to the Liquidation Trust Beneficiaries and the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration.  The Plan Trusts shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Plan, the Liquidation Trust Agreement or the Litigation Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Plan Trustees expressly for such purpose.

(c)    *Cash Investments*.  The right and power of the Plan Trustees to invest the Liquidation Trust Assets and the Litigation Trust Assets, as applicable, the proceeds thereof or any income earned by the applicable Plan Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code.  The Plan Trustees may expend the Cash of the Plan Trusts (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Plan Trusts during liquidation, (ii) to pay the respective reasonable administrative expenses (including, but not limited to, any taxes imposed on the Plan Trusts) and (iii) to satisfy other respective liabilities incurred by the Plan Trusts in accordance with the Plan and the Liquidation Trust Agreement or the Litigation Trust Agreement, as applicable (including, without limitation, the payment of any taxes).

(d)    *Liquidation Trust as Grantor Trust*.  The Liquidation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust.  For all U.S. federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such assets by the Debtors to the holders of Allowed Claims entitled to distributions from the

44

Liquidation Trust Assets, followed by a transfer by such holders to the Liquidation Trust. Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

(e)     *Litigation Trust as Grantor Trust*. The Litigation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Litigation Trust Beneficiaries treated as grantors and owners of the Litigation Trust. For all U.S. federal income tax purposes, all parties (including the Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets by the Debtors to the Litigation Trust, as set forth in the Litigation Trust Agreement, as a transfer of such assets by the Debtors to the holders of Allowed Claims entitled to distributions from the Litigation Trust Assets, followed by a transfer by such holders to the Litigation Trust. Thus, the Litigation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

As soon as practicable after the Effective Date, the Plan Trustees shall make a good faith determination of the fair market value of the Liquidation Trust Assets and the Litigation Trust Assets, as applicable, as of the Effective Date. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the assets of the Plan Trusts.

(f)     *Tax Reporting and Tax Payments*.

(i)     The Plan Trustees shall file tax returns for the Plan Trusts treating the Plan Trusts as a grantor trusts pursuant to Treas. Reg. § 1.671-4(a) and in accordance with Section 5.5(f) of the Plan. The Plan Trustees also shall annually send to each holder of a Liquidation Trust Beneficial Interest and Litigation Trust Beneficial Interest, as applicable, a separate statement regarding the receipts and expenditures of the applicable Plan Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable after the Effective Date, the Plan Trustees shall make a good faith determination of the fair market value of the Liquidation Trust Assets and the Litigation Trust Assets, as applicable, as of the Effective Date. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the assets of the Plan Trusts.

(iii)     The Plan Trustees may elect to treat any such Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Plan Trustees shall be the administrators of any such applicable Disputed Claims Reserves within the meaning of Treasury

45

Regulation section 1.468B-9(b)(2) and shall be responsible for all tax reporting and withholding required by any such Disputed Claims Reserve.

(iv)    The Plan Trusts shall be responsible for payment, out of Liquidation Trust Assets and the Litigation Trust Assets, of any taxes imposed on the Plan Trusts (including any Disputed Claims Reserve) or the Liquidation Trust Assets and the Litigation Trust Assets. More particularly, any taxes imposed on any Disputed Claims Reserve or its assets will be paid out of the assets of the Disputed Claims Reserve, and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed Claims Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Claims Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claims Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)    Each Plan Trustee may request an expedited determination of taxes of its Plan Trust, including any Disputed Claims Reserve, and, in the case of the Liquidation Trustee, of the Debtors, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, such Plan Trust or the Debtors for all taxable periods through the dissolution of such Plan Trust.

vi.    <u>Merger of Debtors</u>

On or after the Effective Date, at the Liquidation Trustee's direction: (i) any of the Debtor Affiliates may be merged into BB Parent and the Liquidation Trustee may complete the winding up of such Debtor Affiliates without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholders or any payments to be made in connection therewith, other than the filing of a certificate of dissolution and/or merger with the appropriate governmental authorities, and any such certificate of dissolution and/or merger may be filed by the Liquidation Trustee without need for any authorization, signature or other act of any Person or Entity, including without limitation any holder of any Claim or Interest; and (ii) all Claims filed or scheduled in the Affiliated Debtors' cases shall be deemed to have been filed in the Chapter 11 Case of BB Parent.  In the discretion of the Debtors or the Liquidation Trustee, as applicable, after the Effective Date, BB Parent and the Liquidation Trustee may engage in any other transaction in furtherance of the Plan.  Any such transactions may be effective as of the Effective Date without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors.  On or after the Effective Date, as determined by the Liquidation Trustee, BB Canada shall be dissolved in accordance with the Confirmation Recognition Order and applicable Canadian Law.

vii.    <u>Elimination of Duplicate Claims</u>

Any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single Claim, and all duplicate Proofs of Claim for the same Claim filed against more than one Debtor shall be deemed disallowed and expunged.

viii.   <u>Dissolution of BB Parent</u>

After the Effective Date, the Liquidation Trustee or its designee shall, subject to applicable non-bankruptcy law and consistent with the implementation of the Plan, dissolve, liquidate, or take such other similar action with respect BB Parent  and complete the winding up of BB Parent as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of BB parent or its shareholders or members, as applicable, or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities.

ix.    <u>Corporate Action</u>

Upon the Effective Date all actions contemplated by the Plan (including any action to be undertaken by the Liquidation Trustee or the Debtors) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

x.    <u>Directors, Officers, Managers, Members and Authorized Persons of the Debtor</u>

On the Effective Date, the authority, power and incumbency of the persons then acting as directors, officers, managers, members and other authorized persons of the Debtors shall be terminated and such persons shall be deemed to have resigned.  The Liquidation Trustee (or its designee) shall serve as the initial director or manager, as applicable, and sole officer of each Debtor after the Effective Date until such time as such Debtor is merged into BB Parent or dissolved, as applicable.

xi.    <u>Withholding and Reporting Requirements</u>

(a)    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, provincial or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

47

(b)      *Forms*.  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to, as applicable, the Liquidation Trustee, the Litigation Trustee, or such other Person designated by the Liquidation Trustee or the Litigation Trustee (which entity shall subsequently deliver to the applicable Trustee any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the Tax Code and so notifies the Liquidation Trustee or the Litigation Trustee, as applicable.  If such request is made by the Liquidation Trustee, the Litigation Trustee or such other Person designated by the applicable Trustee and the holder fails to comply before the date that is 150 days after the request is made, the amount of such distribution shall irrevocably revert to the Liquidation Trust or Litigation Trust, as applicable, and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

xii.    <u>Exemption From Certain Transfer Taxes</u>

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code or similar filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate federal, state, provincial or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

xiii.   <u>Effectuating Documents; Further Transactions</u>

On and after the Effective Date, the Liquidation Trustee and the Debtors are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

xiv.    <u>Preservation of Rights of Action</u>

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Litigation Trustee, under the supervision of the Litigation Trust Oversight Board, shall have sole and exclusive discretion to pursue and dispose of the DV Claims, Former D&O and Shareholder Causes of Action, and any other Causes of Action that are or become Litigation Trust Assets, and the Liquidation Trustee shall have sole and exclusive discretion to pursue or dispose of any and all other Causes of Action.

All Causes of Action that are or become Litigation Trust Assets shall vest in the Litigation Trust as provided for in the Plan and the Litigation Trustee may pursue any Causes of Action that are or become Litigation Trust Assets in its sole discretion.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Liquidation Trustee or the Litigation Trustee will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  Prior to the Effective Date, the Debtors (and on and after the Effective Date, the Liquidation Trustee or the Litigation Trustee under the supervision of the Litigation Trust Oversight Board, as applicable) shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party (except for, on and after the Effective Date, the Liquidation Trustee or the Litigation Trustee under the supervision of the Litigation Trust Oversight Board, as applicable) or further notice to or action, order, or approval of the Bankruptcy Court.

xv.   <u>Stock Restrictions</u>

The restrictions imposed by the *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors, Claims Against the Debtor, and Claiming a Worthless Stock Deduction*, entered on August 7, 2020 ) [Docket No. 331], as the same may be amended from time to time, shall remain effective and binding through the closing of all of the Chapter 11 Cases.

xvi.   <u>Closing of the Chapter 11 Cases</u>

The Liquidation Trustee shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5.   *Distributions*

i.   <u>Distribution Record Date</u>

The Debtors and the Liquidation Trustee shall have no obligation to recognize any transfer of the Claims or Interests (i) occurring on or after the Effective Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules.

ii.   <u>Date of Distributions</u>

Except as otherwise provided in the Plan, the Debtors or the Liquidation Trustee, as applicable, shall direct the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date.  After the Initial Distribution Date, the Liquidation Trustee shall, from time to time, determine the subsequent Distribution Dates, which shall be no less frequent than annual.

### iii.    Delivery of Distributions

In the event that any Distribution to any holder is returned as undeliverable, no Distribution to such holder shall be made unless and until the Debtors or the Liquidation Trustee, as applicable, has determined the then current address of such holder, at which time such Distribution shall be made to such holder without interest; *provided*, *however*, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the date such Distribution was made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidation Trust automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

### iv.    Disputed Administrative Claims Holdback

From and after the Effective Date, and until such time as all Disputed Administrative Claims have been compromised and settled or determined by Final Order, the Debtors or the Liquidation Trustee, as applicable, shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain Cash in an aggregate amount equal to the Pro Rata share of the Distributions that would have been made to each holder of a Disputed Administrative Expense Claim if such Disputed Administrative Expense Claim were an Allowed Claim against such Debtor in an amount equal to the lesser of (i) the filed amount of such Disputed Administrative Expense Claim, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Administrative Expense Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Administrative Expense Claim and the Debtors or the Liquidation Trustee, as applicable. On the date of the first Distribution that is at least forty-five (45) days (or such fewer days as may be agreed between the Debtor or the Liquidation Trustee, as applicable, and the holder of the applicable Disputed Administrative Expense Claim) after the date on which a Disputed Administrative Expense Claim becomes an Allowed Claim against a Debtor, the Liquidation Trustee shall remit to the holder of such Administrative Expense Claim Cash equal to the amount that would have been distributed from the Effective Date through and including the date of such Distribution on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. To the extent that a Disputed Administrative Expense Claim against a Debtor is disallowed by Final Order or becomes an Allowed Claim in an amount less than the amount retained with respect to such Claim pursuant to this provision, the amount that would have been distributed on account of such Disputed Administrative Expense Claim, or the excess of the amount of Cash that would have been distributed on account of such Disputed Administrative Expense Claim over the amount of Cash actually distributed on account of such Disputed Administrative Expense Claim, shall become available Cash for Distributions to the holders of Allowed Claims by the Liquidation Trust.

v.      Manner of Payment Under Plan

At the option of the Debtors or the Liquidation Trustee, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer. Any wire transfer fees incurred by the Debtors or the Liquidation Trust (as applicable) in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's Allowed Claim. The wire transfer fee will be deducted from the amount of the Distribution a holder of an Allowed Claim would otherwise receive. The Debtors or the Liquidation Trustee, as applicable, will, to the extent practicable, make aggregate Distributions on account of all the Allowed Claims held by a particular holder.

vi.     Minimum Cash Distributions

The Debtors and the Liquidation Trust shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100; *provided*, *however*, that if any Distribution is not made pursuant to Section 6.6 of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim. The Debtors and the Liquidation Trust shall not be required to make any final Distributions of Cash less than $50 to any holder of an Allowed Claim.

vii.    Setoffs

The Debtors, the Liquidation Trustee, and the Litigation Trustee may, but shall not be required to, set off against any Claim, any Claims of any nature whatsoever that the Debtors, the Liquidation Trustee, or the Litigation Trustee may have against the holder of such Claim; *provided* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Liquidation Trustee, or the Litigation Trustee of any such Claim the Debtors, the Liquidation Trustee, or the Litigation Trustee may have against the holder of such Claim.

viii.   Distributions After Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

ix.     Allocation of Distributions Between Principal and Interest

Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

x.      No Postpetition Interest on Claims

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, or required by the Bankruptcy Code, postpetition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date.

51

xi.   No Distribution in Excess of Amount of Allowed Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

xii.   Securities Registration Exemption

The Debtors intend that the Litigation Trust Beneficial Interests and the Liquidation Trust Beneficial Interests shall not be "securities" under applicable laws and believe the Litigation Trust Beneficial Interests and Liquidation Trust Beneficial Interests should not be deemed to be "securities," but to the extent such units are deemed to be "securities," the Debtors believe the issuance of such units under the Plan is exempt, pursuant to section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code).

6.   *Procedures for Disputed Claims*

i.   Objections to Claims

As of the Effective Date, objections to, and requests for estimation of Claims against the Debtors may only be interposed and prosecuted by the Liquidation Trustee; *provided* that the Litigation Trustee shall have the exclusive authority to object to, recharacterize, seek to subordinate or request estimation of Claims of any of the DV Entities or any of the Former D&Os or Shareholders and to prosecute the DV Claims and Former D&O and Shareholder Causes of Action.  Such objections and requests for estimation shall be served and filed on or before the Claims Objection Bar Date.

ii.   Allowance of Claims

After the Effective Date, the Liquidation Trust and the Litigation Trust, as applicable, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim against a Debtor, except with respect to any Claim deemed Allowed under the Plan.  As of the Effective Date of the Plan, all Claims of the DV Entities are Disputed.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

iii.   Estimation of Claims

The (i) Debtors (after consulting with the Creditors' Committee if prior to the Effective Date) or the Liquidation Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, other than the Claims of any of the DV Entities or any of the Former D&Os or Shareholders, and (ii) the Litigation Trustee may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim of any of the DV Entities or any of the Former D&Os or Shareholders, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously

objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trustee or the Litigation Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

iv.    No Distributions Pending Allowance

No payment or Distribution provided under the Plan shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

v.    Resolution of Claims

Except as otherwise provided in the Plan (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Liquidation Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Liquidation Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection therewith; *provided*, *however*, that on and after the Effective Date the Litigation Trustee shall have the sole authority to enforce, sue on, settle, or compromise (or decline to do any of the foregoing) the DV Claims, the Claims of any DV Entities, Former D&O and Shareholder Causes of Action, the Claims of any of the Former D&Os or Shareholders and any other Causes of Action that are or become Litigation Trust Assets.

vi.    Late Filed Claims

Except as otherwise provided in the Plan or as agreed to by the Debtors (with the consent of the Creditors' Committee if prior to the Effective Date) or Liquidation Trustee, any Proof of Claim filed after the Bar Date with respect to such Claim shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any Distributions on account of such Claims, unless such late Proof of Claim has been deemed timely filed by a Final Order.

vii.    Amendments to Claims

A Claim may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the Liquidation Trustee, and any such new, amended, or supplemented Claim filed without such written authorization shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

viii.    <u>Insured Claims</u>

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

7.    *Executory Contracts and Unexpired Leases*

i.    <u>Assumption and Assignment of Executory Contracts and Unexpired Leases</u>

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) as of the Effective Date is subject to a pending motion to assume such Unexpired Lease or Executory Contract; (ii) is a contract, release, or other agreement or document entered into in connection with the Plan; (iii) is a D&O Policy or an insurance policy; or (iv) is identified for assumption on the Assumption Schedule included in the Plan Supplement.

ii.    <u>Claims Based on Rejection of Executory Contracts and Unexpired Leases</u>

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Liquidation Trustee no later than thirty (30) days after the earlier of the Effective Date or the effective date of rejection of such Executory Contract or Unexpired Lease.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Liquidation Trust, the Litigation Trust, the Debtors' Estates, or the property for any of the foregoing without the need for any objection by the Liquidation Trustee or the Litigation Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

iii.   <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date (or as soon as reasonably practicable thereafter), subject to the limitation described below, by the Debtors or the Liquidation Trust, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

In the event of a dispute regarding (i) the amount of the Cure Obligation, (ii) the ability of the Liquidation Trust or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment (as applicable); *provided*, that the Debtors or the Liquidation Trust (as applicable) may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment.  Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

iv.   <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>

Unless otherwise provided in the Plan, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

v. <u>Reservation of Rights</u>

Neither the exclusion nor inclusion of any contract or lease in the Assumption Schedule or the Sale Order, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors' Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidation Trustee, as applicable, shall have sixty 60 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

8. *Conditions Precedent to the Effective Date*

i. <u>Conditions Precedent to the Effective Date</u>

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay, modification, vacation on appeal, and shall have become a Final Order;

(b)    all funding, actions, documents and agreements necessary to implement and consummate the Plan and the transactions and other matters contemplated thereby, shall have been effected or executed, including the funding of (i) the Wind-Down Reserve, and (ii) the Litigation Trust Minimum Funding as provided for in Section 5.4(c) of the Plan; and

(c)    all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

ii. <u>Waiver of Conditions Precedent</u>

Each of the conditions precedent in Section 9.1 of the Plan other than the condition set forth in Section 9.1(a) of the Plan may be waived in writing by the Debtors with the consent of the Creditors' Committee, which shall not be unreasonably withheld. Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

iii. <u>Substantial Consummation</u>

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

iv. <u>Effect of Vacatur of Confirmation Order</u>

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as

of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

9.   *Settlement, Releases, Injunctions, and Related Provisions*

i.   Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors.

ii.   Binding Effect

(a)   Confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because the Plan is a liquidating chapter 11 plan.  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, the Debtors, and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

(b)   By participating in the Plan by voting (as contemplated in Section 4 of the Plan) or by accepting Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to and accepted the terms of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever in the Courts of the Special Administrative Region of Hong Kong or any other tribunal, whether in Hong Kong or elsewhere, and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

iii.   Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

iv.    Releases by the Debtors

As of the Effective Date, except (i) for the rights that remain in effect from and after the Effective Date to enforce the Plan; and (ii) as otherwise provided in the Plan or in the Confirmation Order, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Debtors and the Estates, in each case, on behalf of themselves and their respective successors (including the Liquidation Trust and the Litigation Trust), assigns, and representatives, and any and all other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons and Entities, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, in whole or in part, the Debtors, the Chapter 11 Cases, the Recognition Proceedings, the pre- and post-petition marketing and sale process, the Sale Transaction, the APA, the DIP Credit Agreement or any related agreements, instruments, and other documents relating thereto, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Recognition Proceedings, the Disclosure Statement, the Plan (including the Plan Supplement), or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing in the Plan shall be construed to release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan or the Sale Transaction; *provided*, *further*, that nothing in Section 10.4 of the Plan shall constitute a release of any of the DV Claims or the Former D&O and Shareholder Claims.

v.    Releases By Holders of Claims and Interests.

As of the Effective Date, except (i) for the right to enforce the Plan; and (ii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by the Releasing Parties in each case, from any and all Claims and Causes of Action, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, in law or equity, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising

**prior to the Effective Date, from, in whole or in part, the Debtors, the Chapter 11 Cases, the Recognition Proceedings, the pre-and post-petition marketing and sale process, the Sale Transaction, the APA, the DIP Credit Agreement or any related agreements, instruments, and other documents relating thereto, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Recognition Proceedings, the Disclosure Statement, the Plan (including any Plan Supplement), or the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, that nothing in the Plan shall be construed to release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan or Sale Transaction. The Releasing Parties shall be permanently enjoined from prosecuting any of the foregoing Claims or Causes of Action released under Section 10.5 of the Plan against each of the Released Parties.**

vi.    <u>Exculpation</u>

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each of the Exculpated Parties are hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim arising on or after the Petition Date in connection with or arising out of the filing or administration of the Chapter 11 Cases, the administration of the Recognition Proceedings, the postpetition marketing and sale process, the postpetition purchase, sale, or rescission of the purchase or sale of any security or asset of the Debtors; the negotiation and pursuit of the Disclosure Statement, the APA, the Sale Transaction, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the DIP Credit Agreement; the post-Effective Date administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; except for fraud, gross negligence, or willful misconduct, as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in the Plan does not release any post-Effective Date obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

vii.    <u>Injunction</u>

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the**

Debtors and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Liquidation Trust, and the Litigation Trust, or the property of any of the Debtors, the Liquidation Trust, the Litigation Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, and the Liquidation Trust; or the property of any of the Debtors, the Liquidation Trust, and the Litigation Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Liquidation Trust, and the Litigation Trust or the property of any of the Debtors, the Liquidation Trust, and the Litigation Trust; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Liquidation Trust, and the Litigation Trust, or against property or interests in property of any of the Debtors, the Liquidation Trust, and the Litigation Trust except as contemplated or allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)     **By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in <u>Section 10.7</u> of the Plan.**

(d)     **The injunctions in <u>Section 10.7</u> of the Plan shall extend to any successors of the Debtors, the Liquidation Trust, and the Litigation Trust and their respective property and interests in property.**

viii.     <u>Waiver of Statutory Limitation on Releases</u>

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER <u>SECTION 10</u> OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND

TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN <u>SECTION 10</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

ix.　　Solicitation of the Plan

Pursuant to the terms of the Plan, the only holders of Claims or Interests who are entitled to vote are Class 3 General Unsecured Claims.  As of and subject to the occurrence of the Confirmation Date:  (i) the Debtors shall be deemed to have previously solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (ii) the Debtors and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.　　*Retention of Jurisdiction*

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)　　to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)　　to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the Litigation Trustee;

(c)　　to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(d)　　to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)　　to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)        to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)        to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)        to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)        to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the APA, the Sale Order, the Liquidation Trust Agreement, the Litigation Trust Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)        to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(k)        to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar Claims pursuant to section 105(a) of the Bankruptcy Code;

(l)        to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)        to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)        to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(o)        to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)        to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)        to enter one or more final decrees closing the Chapter 11 Cases;

(r)        to enforce all orders previously entered by the Bankruptcy Court;

(s)     to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(t)     to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

11.    *Miscellaneous Provisions*

### i.    No Revesting of Assets

To the extent not otherwise distributed in accordance with the Plan, the property of the Debtors' Estates shall not revest in the Debtors on or after the Effective Date but shall instead vest in the Liquidation Trust or the Litigation Trust, as applicable, to be administered by the Liquidation Trustee or the Litigation Trustee in accordance with the Plan, the Liquidation Trust Agreement and the Litigation Trust Agreement.  For the avoidance of doubt, the Litigation Trust Funding shall be subject to the adjustments set forth in Section 5.4(c) of the Plan.

### ii.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Liquidation Trustee (or the Litigation Trustee solely with respect to any Claims of any of the DV Entities or the Former D&Os or Shareholders) to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### iii.    Payment of Statutory Fees

All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date or as soon as is reasonably practicable thereafter.  On and after the Effective Date, the Debtors (or the Liquidation Trustee) shall pay any and all such fees in full in Cash when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor (or the Liquidation Trustee) shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### iv.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however,* that after the Effective Date, the Creditors' Committee shall continue to exist solely to prosecute applications filed pursuant to sections 330 and 331 of the Bankruptcy Code or to prosecute any appeals ongoing as of the Effective Date or for which the appeal period has not yet run as of the Effective Date.

v.    Amendments

(a)    *Plan Modifications*.  The Plan may be amended, modified or supplemented by the Debtors, with the consent of the Creditors Committee (not to be unreasonably withheld) prior to the Effective Date, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided* that such amendments, modifications or supplements shall be reasonably satisfactory in all respects to the Debtors and the Creditors' Committee.  In addition, after the Confirmation Date, the Debtors may, after consulting with the Creditors' Committee, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments*.  Before the Effective Date, the Debtors may, with the consent of the Creditors' Committee (not to be unreasonably withheld), make appropriate technical adjustments and modifications to the Plan and any of the documents prepared in connection herewith without further order or approval of the Bankruptcy Court.

vi.    Revocation or Withdrawal of the Plan

The Debtors reserve the right, after consulting with the Creditors' Committee, to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors, after consulting with the Creditors' Committee, revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (ii) nothing contained in the Plan shall: (A) constitute a waiver or release of any Claims or Interests; (B) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (C) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

vii.    Severability of Plan Provisions upon Confirmation

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, after consulting with the Creditors' Committee, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the

consent of the Debtors or the Liquidation Trustee (as the case may be); and (iii) nonseverable and mutually dependent.

viii.   <u>Governing Law</u>

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

ix.   <u>Time</u>

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

x.   <u>Additional Documents</u>

On or before the Effective Date, the Debtors may, after consulting with the Creditors' Committee, file with the Bankruptcy Court or the Canadian Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

xi.   <u>Immediate Binding Effect</u>

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Liquidation Trustee.

xii.   <u>Successor and Assigns</u>

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

xiii.   <u>Entire Agreement</u>

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

65

## VI. CERTAIN RISK FACTORS AFFECTING THE DEBTORS

Prior to voting to accept or reject the Plan, Holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

1.    *Risk of Non-Confirmation of the Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2.    *Risk of Failing to Satisfy Vote Requirement*

In the event that the Debtors are unable to get sufficient votes from the Voting Class, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Claims as those proposed in the Plan.

3.    *Failure to Satisfy Administrative Claims or Otherwise Agree to Alternative Treatment and Other Factors that May Impact Administrative Solvency*

To confirm a chapter 11 plan, section 1129(a)(9) of the Bankruptcy Code requires, among other things, that "except to the extent that the holder of a particular claim has agreed to a different treatment of such claim," claims entitled to administrative priority under 507(a)(2) or 507(a)(3) must be paid in full in order for a debtor to confirm a chapter 11 plan. To the extent that a Debtor is unable to pay such claims in full or otherwise agree to treatment with the applicable holder, such Debtor may be unable to confirm a chapter 11 plan. Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of Administrative Expense Claims, which may impact the Debtors' ability to confirm a chapter 11 plan for all or certain of the Debtors. If no plan can be confirmed, one or more of these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.

4.    *Non-Consensual Confirmation*

In the event any impaired class of claims or interests entitled to vote on a plan does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements.

5.    *Conversion to Chapter 7*

If a chapter 11 plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, one or more of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the applicable Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  See Section IX.C.2 hereof, as well as the liquidation analysis, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests (the "**Liquidation Analysis**").

## B.    ADDITIONAL FACTORS TO BE CONSIDERED

1.    *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.    *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, the Recognition Proceedings, or the Plan are authorized by the Bankruptcy Court, the Bankruptcy Code, the Canadian Court or the CCCA, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.    *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice.  Each holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4.    *No Admission Made*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests, or on the rights of any other Person or Entity.

5.      *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or in the Plan or Plan Supplement.  The Debtors, the Liquidation Trustee, or the Litigation Trustee, as applicable, may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the confirmation date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

6.      *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or for the Debtors or the Litigation Trust to recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Disclosure Statement, the Plan, or the Plan Supplement.

7.      *Information Was Provided by Debtors and Was Relied Upon by Debtors' Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

**VII.**

**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to (i) creditors whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan or (ii) holders who are deemed to reject the Plan, such as holders of Class 5 Debtor Interests and Class 6 Subordinated Claims.

The discussion of U.S. federal income tax consequences below is based on the U.S. Internal Revenue Code of 1986, as amended from time to time (the "**Tax Code**"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan.  No assurance can be given that the IRS will not take a position contrary to the description of U.S. federal income tax consequences of the Plan described below.

This discussion does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes

of taxpayers, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes and that all distributions by the Debtors will be taxed accordingly. Additionally, this discussion assumes that (i) the various arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except if otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

The following discussion of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. Each holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, provincial, local and other tax consequences applicable under the Plan.

## A.    <u>CONSEQUENCES TO THE DEBTORS</u>

Each of the Debtors is a member of an affiliated group of corporations that files a consolidated federal income tax return with BB Parent as the common parent (collectively, the "**BB Group**") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the BB Group. The Debtors estimate that, as of the Petition Date, the BB Group had consolidated net operating losses ("**NOLs**") for U.S. federal income tax purposes of approximately $250 million, among other tax attributes (including consolidated disallowed business interest expense carryforwards, tax credits and aggregate tax basis in excess liabilities). However, the amount of any NOLs and other tax attributes, as well as the application of any limitations on their use, remain subject to review and adjustment by the IRS.

### 1.    *Limitations on NOL Carryforwards and Other Tax Attributes*

The BB Group's ability to utilize its NOLs and certain other tax attributes could be subject to limitation if the BB Group underwent or were to undergo an ownership change within the meaning of section 382 of the Tax Code after the Petition Date. Accordingly, the Debtors obtained a Bankruptcy Court order (the "**Stock Restrictions Order**"), effective as of the Petition Date, imposing certain restrictions with respect to trading in BB Parent's stock (and the claiming of a worthless stock deduction by any 50-percent shareholder of BB Parent, within the meaning of section 382 of the Tax Code) so as to avoid such an ownership change. The Debtors believe that no ownership change of the BB Group for purposes of section 382 of the Tax Code has occurred

to date and intend that no such ownership change will, absent the prior approval of the Debtors or the Bankruptcy Court, occur prior to the liquidation of the Debtors pursuant to the Plan. Moreover, pursuant to the Plan, the restrictions imposed by the Stock Restrictions Order – including the restriction on claiming of a worthless stock deduction by any 50-percent shareholder of BB Parent – shall remain in full force and effect following the Effective Date.

2.    *Transfer of Assets to the Plan Trusts; Dissolution of the Debtors*

Pursuant to the Plan, two Plan Trusts will be established: the Litigation Trust and the Liquidation Trust.  Upon the Effective Date of the Plan, (i) the DV Claims; (ii) Former D&O and Shareholder Causes of Action and (iii) the Litigation Trust Minimum Funding, shall vest in and be transferred to the Litigation Trust. The Litigation Fees Amount will be funded after the Debtors or the Liquidation Trustee, as applicable have paid or reserved for any amounts necessary to fund the Wind-Down Reserve and pay all Administrative Expense Claims, Fee Claims, Secured Claims, Priority Tax Claims and Other Priority Claims after consulting with the Litigation Trustee as to any amounts to be reserved.  The Liquidation Trust will receive an assignment of all the remaining assets of the Debtors, and the Debtors will thereafter be dissolved; *provided* that until the final dissolution of BB Canada, (i) shares of BB Canada will be owned by the Liquidation Trust, (ii) any remaining Canadian Collateral Proceeds in the possession of BB Canada pursuant to the Canadian Sale Order will be retained by BB Canada until repaid to BB Parent, and (iii) any remaining Canadian Assets will continue to be owned by BB Canada until recovered by the Liquidation Trust and will be distributed by BB Canada to the Liquidation Trust in respect of such shares as part of any dissolution of BB Canada, subject to any withholding requirements. BB Canada will be dissolved in accordance with an order recognizing the Confirmation in Canada and applicable Canada law.  Accordingly, as of the end of the date of such transfers and distributions, all of the Debtors should be treated as having completely liquidated for U.S. federal income tax purposes. For U.S. federal income tax purposes, the transfer of the Debtors' assets to the Plan Trusts generally is treated as equivalent to a sale of such assets at their then fair market value. *See* Section VII.C of this Disclosure Statement.

Although the Debtors may recognize taxable income in connection with the transfer of assets to the Plan Trusts and their liquidation in the taxable year of such transfer, the Debtors expect to have sufficient current deductions for such year, available NOL carryforwards and/or other tax attributes for such year to avoid any meaningful U.S. federal income tax liability for such year.  Depending on the availability of and limitations on the Debtors' NOLs and tax credits for state and local income tax purposes, the Debtors may be subject to certain state or local income tax liabilities relating to such transfers.

3.    *Cancellation of Debt*

The Tax Code provides that a debtor must recognize cancellation of debt ("**COD**") income upon the elimination or reduction of debt for insufficient consideration.  The Tax Code provides an exception to such income recognition treatment for any COD arising by reason of the discharge of the debtor's indebtedness in the bankruptcy case or to the extent of the debtor's insolvency immediately before the cancellation of the debt.  In such case, the Tax Code generally requires the debtor to reduce certain of its tax attributes – such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets – by the amount of any such excluded COD income. COD income generally is the amount by which the adjusted issue price of cancelled debt exceeds

the sum of the amount of cash and the fair market value of any other property given in exchange therefor.  In general, any reduction in tax attributes under the COD rules does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD occurs.  Also, where the Debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

Consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, the Debtors believe that no COD should be incurred by a Debtor as a result of the implementation of the Plan prior to the distribution by such Debtor of all of its assets.  In such case, the reduction of tax attributes resulting from such COD (which, as indicated above, only occurs as of the end of the tax year in which the COD occurs) generally should not have a material impact on the Debtors.

## B.  CONSEQUENCES TO HOLDERS OF GENERAL UNSECURED CLAIMS

Pursuant to the Plan, each holder of an Allowed Claim in Class 3 will receive, in full and final satisfaction of its applicable claim, an interest in each of the Plan Trusts representing such holder's right to receive its pro rata share of the proceeds of the Liquidation Trust Assets and the Litigation Trust Assets in excess of any amounts necessary to pay the Liquidation Trusts Expenses and the Litigation Trust Expenses.  As discussed below (*see* Section VII.C of this Disclosure Statement), each holder of an Allowed Claim in Class 3 that receives a beneficial interest in the Plan Trusts will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, an undivided interest in the assets transferred to such trusts consistent with its Pro Rata interest in the trusts, and subject to any portion(s) of the Plan Trusts being treated as a "disputed ownership fund" for U.S. federal income tax purposes.

### 1.  *General Consequences to Holders in Class 3*

In general, a holder of an Allowed Claim in Class 3 will recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the fair market value of its undivided interest in the assets transferred to the Plan Trusts and treated as received in respect of its Claim (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest previously included in the holder's taxable income).

Pursuant to the Plan, the Plan Trustees will in good faith value the Liquidation Trust Assets and the Litigation Trust Assets as of the Effective Date, and all parties to the Plan Trusts (including holders of Allowed Claims receiving interests therein) must consistently use such valuation for all U.S. federal income tax purposes.  As discussed below, the amount of cash or other property received in respect of an Allowed Claim for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under its method of accounting.  *See* Section VII.B.2 of this Disclosure Statement.

After the date of transfer of assets to the Plan Trusts, a holder's share of any collections received on the assets of the Plan Trusts (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable distributions) should not be included, for U.S.

federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Plan Trusts.

In the event of the subsequent disallowance of any Disputed Claim, it is possible that a holder of a previously Allowed Claim may receive additional Cash or, in the case of the release of non-Cash assets from a Disputed Claims Reserve, non-Cash distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed Claim may be deferred until all Claims are Allowed or Disallowed. Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received. *See also* Section VII.C of this Disclosure Statement.

If gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed Claim disposed of is a capital asset in the hands of the holder and has been held for more than one year. Each holder of an Allowed Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder. The character of any gain or loss depends on, among other things, the origin of the holder's Allowed Claim, when the holder receives payment (or is deemed to receive payment) in respect of such Allowed Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Allowed Claim at a discount, whether the holder has taken a bad debt deduction with respect to such Allowed Claim, and/or whether (as intended and herein assumed) the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes.

A holder's aggregate tax basis in its undivided interest in the assets of the Plan Trusts (subject to any portion(s) of the Plan Trusts being treated as a "disputed ownership fund" for U.S. federal income tax purposes) will equal the fair market value of such interest increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Plan Trusts, and a holder's holding period generally will begin on the day following the date of transfer of such assets to the Plan Trusts.

2.    *Distributions in Respect of Accrued But Unpaid Interest*

In general, to the extent any amount received (whether cash or other property) by a holder of a debt instrument is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

Pursuant to Section 6.8 of the Plan, distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

C.      **TAX TREATMENT OF THE PLAN TRUSTS AND HOLDERS OF BENEFICIAL INTERESTS THEREIN**

Each Plan Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the assets transferred to the Plan Trusts that are part of a Disputed Claims Reserve (*i.e.*, assets allocable to Disputed Claims, including assets retained on account of Disputed Claims), as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Plan Trusts will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Plan Trustees and beneficiaries of the Plan Trusts) shall treat the transfer of assets to the Plan Trusts as (1) a transfer of such assets (subject to any obligations relating to those assets) directly to recipients of beneficial interests in the Plan Trusts (other than any Disputed Claims Reserve), followed by (2) the transfer by such beneficiaries to the Plan Trusts of such assets in exchange for beneficial interests in the Plan Trusts. Accordingly, except in the event of contrary definitive guidance, holders of beneficial interests in the Plan Trusts shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the assets transferred by the Debtors to the Plan Trusts (other than any Disputed Claims Reserve).

No ruling is currently being requested from the IRS concerning the tax status of the Plan Trusts as grantor trusts. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Plan Trusts as grantor trusts. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Plan Trusts and the holders of Claims could vary from those discussed herein. Certain U.S. federal income tax consequences of the Plan Trusts or portions thereof being treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 are also discussed below.

1.      *General "Liquidating Trust" Tax Reporting by the Plan Trusts and their Beneficiaries*

For all U.S. federal income tax purposes, all parties must treat the Plan Trusts as grantor trusts of which the holders of beneficial interests in the Plan Trusts are the owners and grantors, and treat such beneficiaries as the direct owners of an undivided interest in the assets transferred to the Plan Trusts (other than any Disputed Claims Reserve), consistent with their Pro Rata interests therein. The Plan Trustees will file tax returns for the Plan Trusts treating the Plan Trusts as grantor trusts pursuant to section 1.671-4(a) of the Treasury Regulations. The Plan Trustees also shall annually send to each holder of a beneficial interest in the Plan Trusts a separate statement regarding the receipts and expenditures of the Plan Trusts as relevant for U.S. federal income tax purposes.

All taxable income and loss of the Plan Trusts will be allocated among, and treated as directly earned and incurred by, the holders of beneficial interests in the Plan Trusts with respect to such holder's interest in the assets of the Plan Trusts (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any

Disputed Claims Reserve. The character of any income and the character and ability to use any loss would depend on the particular situation of the holder. The U.S. federal income tax consequences to U.S. beneficiaries of U.S. grantor trusts with foreign corporate subsidiaries is not entirely clear. Holders of Liquidation Trust Beneficial Interests may be taxed on certain income of foreign corporate subsidiaries of the Liquidation Trust, but the amount of such income, if any, is not expected to be material.

As soon as reasonably practicable after the transfer of the Debtors' assets to the Plan Trusts, the Plan Trustees shall make a good faith valuation of the fair market value of such assets. All parties to the Plan Trusts (including, without limitation, the Debtors, holders of Allowed Claims, and the beneficiaries of the Plan Trusts) must consistently use such valuation for all U.S. federal income tax purposes.

The U.S. federal income tax obligations of a holder with respect to its beneficial interest in the Plan Trusts are not dependent on the Plan Trusts distributing any cash or other proceeds, subject to any Disputed Claims Reserve. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Plan Trusts' income even if the Plan Trusts do not make a concurrent distribution to the holder. In general, other than in respect of cash retained as part of a Disputed Claims Reserve (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by the Plan Trusts will not be separately taxable to a beneficiary of the Plan Trusts since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidation Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidation Trust as part of a Disputed Claims Reserve.

The Plan Trusts will comply with all applicable governmental withholding requirements (*see* Section 5.10 of the Plan and Section VII.D herein).

2.    *Tax Reporting for Assets Allocable to Disputed Claims*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Plan Trustee of an IRS private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), the Plan Trustees may elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by section 1.468B-9(b)(2) of the Treasury Regulations, if applicable.

Accordingly, if a "disputed ownership fund" election is made with respect to any Disputed Claims Reserves, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets allocable thereto (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Plan Trustees and the beneficiaries of the Plan Trusts) will be required to report for tax purposes consistently with the foregoing.

A reserve will be responsible for payment, out of the assets of the reserve, of any taxes imposed on the reserve or its assets.  In the event, and to the extent, any cash in the reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the reserve may be sold to pay such taxes.

### D.        WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

The foregoing summary has been provided for informational purposes only.  All holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.

### VIII.

### VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of General Unsecured Claims should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

This Section is qualified in its entirety by the *Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation, Voting, and Related Procedures, (III) Scheduling Confirmation hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of Plan, and (V) Granting Related Relief*, entered on [●], 2021 [Docket No. [●]], (the "**Solicitation Order**").

A. **VOTING INSTRUCTIONS AND VOTING DEADLINE**

Holders in Class 3 (General Unsecured Claims) are entitled to vote to accept or reject the Plan.  All holders of General Unsecured Claims have been sent a Ballot together with this Disclosure Statement.   Such holders should read the Ballot carefully and follow the instructions contained therein.   Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

Each ballot contains detailed voting instructions.  Each ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating ballots.  The record date for determining which holders are entitled to vote on the Plan is [●], 2021 at [●] [a.m./p.m.] (Eastern Time).

Please complete the information requested on the ballot, sign, date and indicate your vote on the ballot, and return the completed ballot either (i) via electronic, online transmission through the E-Ballot platform on the Voting Agent's website; or (ii) by overnight courier or hand delivery in the enclosed pre-addressed postage-paid envelope to:

> **BBGI US, Inc.,**
> Claims Processing Center
> c/o Prime Clerk LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN [●], 2021, AT [●] P.M. EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS.  ANY FAILURE TO FOLLOW THE VOTING INSTRUCTIONS INCLUDED WITH YOUR BALLOT MAY DISQUALIFY YOUR BALLOT AND YOUR VOTE.

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT (A) WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, (B) PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN, OR (C) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU ARE AN ELIGIBLE HOLDER AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT, OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT OMNI AGENT SOLUTIONS BY CALLING (877) 930-4317 (DOMESTIC TOLL-FREE)   OR   347-899-4592   (INTERNATIONAL)   OR   BY   EMAILING BROOKSBROTHERSINFO@PRIMECLERK.COM.

B. **PARTIES ENTITLED TO VOTE**

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and

contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not actually vote on the Plan and will not receive a Ballot.  If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (2) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the plan.

The Claims in Class 3 (General Unsecured Claims) are impaired under the Plan and entitled to vote to accept or reject the Plan: Claims in all other Classes are either unimpaired and presumed to accept or will not receive a Distribution under the Plan and deemed to reject the Plan, and therefore are not entitled to vote.  For a detailed description of the treatment of Claims and Interests under the Plan, *see* Section V.3 of this Disclosure Statement.  As Class 3 is the only impaired Class entitled to vote on the Plan, the Debtors will be unable to confirm the Plan if Class 3 votes to reject the Plan.  **The Creditors Committee supports the Plan and urges holders of Claims in Class 3 to vote to accept the Plan.**

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all holders of Claims or Interests in Class 5 (Debtor Interests) and Class 6 (Subordinated Claims).  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, *see* Section IX.C of this Disclosure Statement.

## C.    AGREEMENTS UPON FURNISHING BALLOTS

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.4, 10.5, 10.6, and 10.7 therein.  All parties in interest retain their right to object to confirmation of the Plan.

D. **CHANGE OF VOTE**

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed ballot for acceptance or rejection of the Plan.

E. **WAIVERS OF DEFECTS, IRREGULARITIES, ETC.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of their creditors. The interpretation (including the ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

F. **MISCELLANEOUS**

Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the ballots. If you return more than one ballot voting different Claims or Interests, the ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those ballots will not be counted. An otherwise properly executed ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of the Claims or Interests, as applicable, who actually vote will be counted. The failure of a holder to deliver a duly executed ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such ballot, the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

## G.    FURTHER INFORMATION, ADDITIONAL COPIES

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## IX.

## CONFIRMATION OF THE PLAN

## A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan.  The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **[●], 2021 at** [●] **[a.m./p.m.] (Eastern Time)**.  The Confirmation Hearing may be adjourned from time-to-time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

## B.    OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the parties listed below no later than the Plan Objection Deadline of **[●], 2021 at** [●] **[a.m./p.m.] (Eastern Time)**:

| *Debtors* | *Counsel to the Debtors* |
|---|---|
| BBGI US, Inc.<br>100 Phoenix Ave.<br>Enfield, CT 06082<br>Attn:  Steven Goldaper | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn:   Garrett A. Fail<br>            David J. Cohen<br>Telephone:  (212) 310-8000<br>Facsimile:  (212) 310-8007<br><br>  – and –<br><br>Richards, Layton & Finger, P.A.<br>One Rodney Square |

|  | 920 N. King Street<br>Wilmington, DE 19801<br>Attn:   Mark D. Collins<br>         Zachary I. Shapiro<br>         Christopher M. De Lillo<br>Telephone:  (302) 651-7700<br>Facsimile:  (302) 651-7701 |
|---|---|
| **Office of the United States Trustee**<br><br>844 N. King Street, Room 2207, Lockbox 35<br>Wilmington, Delaware 19801<br>Attn:   Richard L. Schepacarter, Esq.<br>Telephone:  (302) 573-6491<br>Facsimile:   (302) 573-6497 | **Counsel to the Creditors' Committee**<br><br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, NY 10036<br>Attn:  Meredith A. Lahaie<br>         Abid Qureshi<br>Telephone:  (212) 872-1000<br>Facsimile:  (212) 872-1002<br><br>– and –<br><br>2001 K Street NW<br>Washington, DC 20006<br>Attn: Kate Doorley<br>         Julie Thompson<br>Telephone:  (202) 887-4000<br>Facsimile:  (202) 887-4288<br><br>– and –<br><br>Troutman Pepper Hamilton Sanders LLP<br>Hercules Plaza, Suite 5100<br>1313 N. Market Street, P.O. Box 1709<br>Wilmington, DE 19899<br>Attn:  David B. Stratton<br>         David M. Fournier<br>         Evelyn J. Meltzer<br>         Marcy J. McLaughlin Smith<br>Telephone:  (302) 777-6500<br>Facsimile:  (302) 421-8390 |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN

1.    *Requirements of Section 1129(a) of the Bankruptcy Code*

i.    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with these chapter 11 cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy;

(vi)    with respect to each Class of Claims or Interests, each holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and priority claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation is proposed in the Plan; and

(xi)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

ii.    <u>Best Interests Test</u>

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **<u>Exhibit C</u>**.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtors that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation. The Liquidation Analysis is based upon a number of significant assumptions which are described therein. The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

iii.    <u>Feasibility</u>

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. Since the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan

is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds to liquidate the Debtors' remaining assets. Accordingly, the Debtors believe the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code. Moreover, Section VI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

iv.    No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe that, under the Plan, all impaired classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Interests having the same priority. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

v.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

(i)    *Secured Creditors*. With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim. There are no impaired classes of creditors holding Secured Claims under the Plan.

(ii)    *Unsecured Creditors*. With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

83

(iii)     *Holders of Equity Interests*.   With respect to a class of equity interests, a proposed plan must provide the following: (i) that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (ii) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

Pursuant to the Plan, no class junior to Class 3 (General Unsecured Claims) will receive or retain property on account of their Claims or Interests.   Accordingly, the Plan meets the "fair and equitable" test with respect to all Claims and Interests.

2.     *Application to the Plan*

As to any Class that may reject, or be deemed to reject, the Plan, the Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment, and such Class will either be paid in full, or no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

i.     Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated several alternatives to the Plan.   After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative chapter 11 plan, or (ii) a liquidation under chapter 7 of the Bankruptcy Code.

**a.**     **Alternative Chapter 11 Plan**.  If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.

**b.**     **Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law**.  If no plan can be confirmed, one or more of these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that liquidating the Debtors' Estates under the Plan will provide Holders of Allowed General Unsecured Claims with a larger, more timely recovery because of the fees and expenses that would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors and their estates.  The Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved

in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets and that the assets available for distribution to creditors would be reduced by such additional expenses.  Further, a liquidation would result in the Debtors receiving less proceeds for certain assets the Debtors expect to recover following the Effective Date of the Plan.

Accordingly, the Debtors believe that a chapter 7 liquidation or other bankruptcy would result in smaller distributions being made to creditors than those provided for under the Plan because of additional expenses and claims that would be generated during the liquidation, as well as lower recoveries on certain assets of the Debtors.  Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

**X.**

**CONCLUSION AND RECOMMENDATION**

The Debtors and Creditors' Committee believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of impaired General Unsecured Claims (Class 3) to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than the Voting Deadline, **[●], 2021 at [●] [a.m./p.m.] (Eastern Time)**.

Dated: December 24, 2020
        Wilmington, Delaware

Respectfully submitted,

By: _____
        Name: Stephen Marotta
        Title: Chief Restructuring Officer

**<u>Exhibit A</u>**

**Plan of Liquidation**

**(Filed separately)**

## **Exhibit B**

**Corporate Organization Chart**



Ownership interests are 100% unless otherwise stated.

As of December 24, 2020

## Exhibit C

**Liquidation Analysis**

**(To come)**